No. 23-2133

_____

In the

# United States Court of Appeals

## For the Fourth Circuit

_____

ANGELITA BAILEY,
on her own behalf and on behalf of all others similarly situated,

*Plaintiff-Appellee,*

v.

MERCURY FINANCIAL, LLC,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the District of Maryland
Honorable Deborah K. Chasanow, Senior District Judge
Case No. 8:23-cv-00827-DKC

_____

**JOINT APPENDIX – VOLUME I OF I (pages JA1-JA304)**

_____

Benjamin H. Carney
Richard S. Gordon
GORDON, WOLF & CARNEY, CHTD
Executive Plaza I
11350 McCormick Road, Suite 1000
Hunt Valley, MD 21031
T: (410) 825-2300

Matthew A. Fitzgerald
Bryan A. Fratkin
Katherine E. Lehnen
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
T: (804) 775-4716

*Counsel for Appellee*

*Counsel for Appellant*

March 8, 2024

# TABLE OF CONTENTS

**Page**

**Volume I of I**

District Court Docket Sheet (Case No. 8:23-cv-00827-DKC) ................................1

Notice of Removal (Mar. 24, 2023) (Dkt. 1) .............................................................4

    Exhibit C: Declaration of Mercury Financial, LLC (Dkt. 1-12) .................11

State Court Complaint (Mar. 24, 2023) (Dkt. 3) ....................................................14

    Civil Case Information Report (Dkt. 3-1) ......................................................35

Mercury Financial, LLC's Answer to Complaint and Affirmative Defenses
(Mar. 31, 2023) (Dkt. 6) .........................................................................................38

Mercury Financial, LLC's Motion to Compel Arbitration and Stay
Proceedings and to Strike Class Allegations (Mar. 31, 2023) (Dkt. 7)........74

    Memorandum in Support (Dkt. 7-1)...............................................................77

    Exhibit 1: Declaration of Mercury Financial, LLC (Dkt. 7-2).....................99

    Exhibit 2: Juniper Cardmember Agreement (Dkt. 7-3)..............................105

    Exhibit 3: Conversion Letter (Dkt. 7-4) ......................................................114

    Exhibit 4: Current Cardmember Agreement (Dkt. 7-5) .............................121

    Exhibit 5: 2018 Cardmember Agreement (Dkt. 7-6) ..................................130

Plaintiff's Response in Opposition to Motion to Compel Arbitration and
Stay Proceedings and to Strike Class Allegations (May 15, 2023)
(Dkt. 11).................................................................................................................135

    Exhibit 1: CFPB Fact Sheet (Dkt. 11-1)......................................................176

    Exhibit 2: Charles County District Court Complaint (Dkt. 11-2)..............180

Mercury Financial, LLC's Reply in Support of Motion to Compel
Arbitration and Stay Proceedings and to Strike Class Allegations
(June 30, 2023) (Dkt. 15)......................................................................................230

    Exhibit 1: Supplemental Declaration of Mercury Financial, LLC
(Dkt. 15-1) ..............................................................................................................257

    Exhibit 1 to Supplemental Declaration: Mercury Terms of Use
Webpage (Dkt. 15-2) ............................................................................................259

Plaintiff's Surreply in Opposition to Motion to Compel Arbitration and Stay Proceedings and to Strike Class Allegations (July 24, 2023) (Dkt. 16-1) ................................................................267

Memorandum Opinion (Sept. 26, 2023) (Dkt. 20) ...............................................282

Order (Sept. 26, 2023) (Dkt. 21) ...........................................................302

Notice of Appeal (Oct. 24, 2023) (Dkt. 23) ........................................303

APPEAL,STAYED

## U.S. District Court
## District of Maryland (Greenbelt)
## CIVIL DOCKET FOR CASE #: 8:23−cv−00827−DKC

Bailey v. Mercury Financial, LLC
Assigned to: Judge Deborah K. Chasanow
Demand: $75,000
Case in other court: Fourth Circuit Court of Appeals, 23−02133
                       Circuit Court for Montgomery County,
                       C−15−CV−23−000224
Cause: 28:1446 Notice of Removal

Date Filed: 03/24/2023
Jury Demand: Plaintiff
Nature of Suit: 480 Consumer Credit
Jurisdiction: Diversity

**Plaintiff**

**Angelita Bailey**
*On Her Own Behalf and on Behalf of All*
*Others Similarly Situated*

represented by **Benjamin Howard Carney**
Gordon, Wolf & Carney, Chtd.
11350 McCormick Road
Executive Plaza 1, Suite 1000
Hunt Valley, MD 21031
410−825−2300
Email: bcarney@GWCfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard S Gordon**
Gordon, Wolf & Carney, Chtd.
11350 McCormick Road
Executive Plaza 1, Suite 1000
Hunt Valley, MD 21031
410−825−2300
Fax: 410−825−0066
Email: rgordon@GWCfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Mercury Financial, LLC**

represented by **Melissa O Martinez**
McGuireWoods LLP
500 East Pratt Street Ste 1000
Baltimore, MD 21202
4106594432
Fax: 14106594482
Email: MMartinez@mcguirewoods.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/24/2023 | 1 | NOTICE OF REMOVAL from Circuit Court for Montgomery County, case number C−15−CV−23−000224. ( Filing fee $ 402 receipt number AMDDC−10508905), filed by Mercury Financial, LLC. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit A (Part 1), # 3 Exhibit A (Part 2), # 4 Exhibit A (Part 3), # 5 Exhibit A (Part 4), # 6 Exhibit A (Part 5), # 7 Exhibit A (Part 6), # 8 Exhibit A (Part 7), # 9 Exhibit A (Part 8), # 10 Exhibit A (Part 9), # 11 Exhibit B, # 12 Exhibit C)(Martinez, Melissa) (Entered: 03/24/2023) |
| 03/24/2023 | 2 | Local Rule 103.3 Disclosure Statement by Mercury Financial, LLC identifying Other Affiliate Mercury Financial Intermediate LLC, Other Affiliate Mercury Financial Holdings LLC for Mercury Financial, LLC.(Martinez, Melissa) (Entered: 03/24/2023) |

## JA1

| | | |
|---|---|---|
| 03/24/2023 | 3 | STATE COURT COMPLAINT against Mercury Financial, LLC, filed by Angelita Bailey. (Attachments: # 1 Civil Case Information Report)(kk5s, Deputy Clerk) (Entered: 03/28/2023) |
| 03/24/2023 | | THE ABOVE DOCUMENTS (3) ARE COPIES OF ORIGINAL PAPERS FILED IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY. (kk5s, Deputy Clerk) (Entered: 03/28/2023) |
| 03/28/2023 | 4 | Clerk's Notice of Standing Order concerning removal actions filed in this Court, which can be downloaded here. (kk5s, Deputy Clerk) (Entered: 03/28/2023) |
| 03/31/2023 | 5 | Local Rule 103.3 Disclosure Statement by Angelita Bailey (Gordon, Richard) (Entered: 03/31/2023) |
| 03/31/2023 | 6 | ANSWER to 3 Complaint *and Affirmative Defenses* by Mercury Financial, LLC.(Martinez, Melissa) (Entered: 03/31/2023) |
| 03/31/2023 | 7 | MOTION to Compel *Arbitration and Stay Proceedings and to Strike Class Allegations* by Mercury Financial, LLC (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1 – Declaration, # 3 Exhibit 2 – Juniper Cardmember Agreement, # 4 Exhibit 3 – Conversion Letter, # 5 Exhibit 4 – Current Cardmember Agreement, # 6 Exhibit 5 – 2018 Cardmember Agreement, # 7 Text of Proposed Order)(Martinez, Melissa) (Entered: 03/31/2023) |
| 04/05/2023 | 8 | Joint MOTION for Extension of Time to File Response/Reply as to 7 MOTION to Compel *Arbitration and Stay Proceedings and to Strike Class Allegations* by Angelita Bailey. (Attachments: # 1 Text of Proposed Order)(Carney, Benjamin) (Entered: 04/05/2023) |
| 04/05/2023 | 9 | PAPERLESS ORDER GRANTING 8 joint motion for extension of time. Plaintiff's opposition to 7 motion to compel arbitration, stay proceedings, and strike class allegations is due by May 15 and Defendant's reply is due by June 14, 2023. Signed by Judge Deborah K. Chasanow on 4/5/2023. (sat, Chambers) (Entered: 04/05/2023) |
| 04/07/2023 | 10 | NOTICE by Mercury Financial, LLC re 4 Notice of Standing Order 2021–13 Concerning Removal Actions (Martinez, Melissa) (Entered: 04/07/2023) |
| 05/15/2023 | 11 | RESPONSE in Opposition re 7 MOTION to Compel *Arbitration and Stay Proceedings and to Strike Class Allegations* filed by Angelita Bailey. (Attachments: # 1 CFPB Fact Sheet, # 2 Exhibit 2 – Charles County District Court Complaint, # 3 Text of Proposed Order)(Gordon, Richard) (Entered: 05/15/2023) |
| 05/24/2023 | 12 | Consent MOTION to Stay by Mercury Financial, LLC (Attachments: # 1 Text of Proposed Order)(Martinez, Melissa) (Entered: 05/24/2023) |
| 05/30/2023 | 13 | PAPERLESS NOTICE SCHEDULING a telephone conference with counsel on Tuesday, June 13, 2023, at 9:30 a.m. Call–in information will be emailed to counsel. (sat, Chambers) (Entered: 05/30/2023) |
| 06/13/2023 | | Telephone Conference held on 6/13/2023 before Judge Deborah K. Chasanow. (sat, Chambers) (Entered: 06/13/2023) |
| 06/13/2023 | 14 | LETTER/ORDER CONFIRMING the matters discussed and the schedule set during the telephone conference, DENYING 12 motion to stay, and PROVIDING until June 30, 2023, for Defendant to file a reply to 7 motion to compel arbitration, stay proceedings, and to strike class allegations. Signed by Judge Deborah K. Chasanow on 6/13/2023. (sat, Chambers) (Entered: 06/13/2023) |
| 06/30/2023 | 15 | REPLY to Response to Motion re 7 MOTION to Compel *Arbitration and Stay Proceedings and to Strike Class Allegations* filed by Mercury Financial, LLC. (Attachments: # 1 Supplemental Declaration of Mercury Financial, LLC, # 2 Exhibit 1 – Ex. 1 (Terms of Use) to Supplemental Declaration of Mercury Financial, LLC)(Martinez, Melissa) (Entered: 06/30/2023) |
| 07/24/2023 | 16 | MOTION for Leave to File *MOTION FOR LEAVE TO FILE A SURREPLY IN OPPOSITION TO DEFENDANTS MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS AND TO STRIKE CLASS ALLEGATIONS* by Angelita Bailey (Attachments: # 1 Exhibit A – Proposed Surreply, # 2 Memorandum in Support, # 3 Text of Proposed Order)(Carney, Benjamin) (Entered: 07/24/2023) |

| 08/07/2023 | 17 | RESPONSE in Opposition re 16 MOTION for Leave to File *MOTION FOR LEAVE TO FILE A SURREPLY IN OPPOSITION TO DEFENDANTS MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS AND TO STRIKE CLASS ALLEGATIONS* filed by Mercury Financial, LLC. (Attachments: # 1 Text of Proposed Order)(Martinez, Melissa) (Entered: 08/07/2023) |
| 08/21/2023 | 18 | REPLY to Response to Motion re 16 MOTION for Leave to File *MOTION FOR LEAVE TO FILE A SURREPLY IN OPPOSITION TO DEFENDANTS MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS AND TO STRIKE CLASS ALLEGATIONS* filed by Angelita Bailey.(Carney, Benjamin) (Entered: 08/21/2023) |
| 09/11/2023 | 19 | NOTICE by Angelita Bailey re 11 Response in Opposition to Motion, *Plaintiff's Notice of Supplemental Authority* (Attachments: # 1 Exhibit A – Decision in Johnson v. Continental Finance Company, LLC)(Carney, Benjamin) (Entered: 09/11/2023) |
| 09/26/2023 | 20 | MEMORANDUM OPINION. Signed by Judge Deborah K. Chasanow on 9/26/2023. (sat, Chambers) (Entered: 09/26/2023) |
| 09/26/2023 | 21 | ORDER GRANTING IN PART and DENYING IN PART 16 motion for leave to file a surreply, DENYING 7 motion to compel arbitration and stay proceedings and to strike class allegations. Signed by Judge Deborah K. Chasanow on 9/26/2023. (sat, Chambers) (Entered: 09/26/2023) |
| 10/02/2023 | 22 | PAPERLESS NOTICE SCHEDULING a telephone conference with counsel on Monday, October 23, 2023, at 9:00 a.m. Call–in information will be emailed to counsel. (sat, Chambers) (Entered: 10/02/2023) |
| 10/23/2023 |  | Telephone Conference held on 10/23/2023 before Judge Deborah K. Chasanow. (sat, Chambers) (Entered: 10/23/2023) |
| 10/24/2023 | 23 | NOTICE OF APPEAL as to 20 Memorandum Opinion, 21 Order on Motion to Compel, Order on Motion for Leave to File by Mercury Financial, LLC. Filing fee $ 505, receipt number AMDDC–10886792.(Martinez, Melissa) (Entered: 10/24/2023) |
| 10/24/2023 | 24 | ORDER STAYING case while the appeal of Mercury Financial, LLC proceeds. Signed by Judge Deborah K. Chasanow on 10/24/2023. (sat, Chambers) (Entered: 10/24/2023) |
| 10/25/2023 | 25 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 23 Notice of Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(slss, Deputy Clerk) (Entered: 10/25/2023) |
| 10/30/2023 | 26 | USCA Case Number 23–2133 for 23 Notice of Appeal filed by Mercury Financial, LLC – Case Manager – Anisha Walker. (slss, Deputy Clerk) (Entered: 10/30/2023) |

**JA3**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ANGELITA BAILEY, | * |
| *On Her Own Behalf and on Behalf of All Others Similarly Situated*, | * |
| | Civil Action No. _____ |
| | * |
| | [Removed from the Circuit Court for |
| Plaintiff, | * |
| | Montgomery County, Maryland |
| v. | * |
| | Case No. C-15-CV-23-000224] |
| | * |
| MERCURY FINANCAL, LLC, | |
| | * |
| Defendant. | |
| | * |

*      *      *      *      *      *      *      *      *      *      *      *

### NOTICE OF REMOVAL

Defendant Mercury Financial, LLC ("Mercury," or "Removing Defendant"), by undersigned counsel and pursuant to 28 U.S.C. §§ 1332, 1367, 1441, and 1446, and the provisions of the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1332(d), 1453, and 1711-1715, hereby files this Notice of Removal from the Circuit Court for Montgomery County, Maryland, Case No. C-15-CV-23-000224, to the United States District Court for the District of Maryland, Southern Division. In support of this Notice of Removal, Removing Defendant states as follows:

### I.      Background

1.      On or about January 25, 2023, Named Plaintiff Angelita Bailey ("Bailey" or "Named Plaintiff"), individually and on behalf of other persons similarly situated, by her attorneys Gordon, Wolf, & Carney CHTD., filed a Complaint against Mercury in the Circuit Court for Montgomery County, Maryland, *Angelita Bailey v. Mercury Financial, LLC*., Case No. C-15-CV-23-000224 (the "State Court Action").

**JA4**

2.     The events alleged in the Complaint are based on allegations of illegally providing loans without a license as required under Maryland Law.  *See generally* Compl.  Named Plaintiff alleges seven causes of action:  Count I – Declaratory Relief Under Md. Cts. & Jud. Pro. § 3-406; Count II – Violation of the MCLL Licensing Provisions; Count III – Violation of the Maryland Consumer Debt Collection Act; Count IV – Violation of the Maryland Consumer Protection Act; Count V – Money Had and Received; Count VI – Negligence; and Count VII – Unjust Enrichment.

3.     Mercury was served with the Complaint on February 22, 2023.

4.     In compliance with 28 U.S.C. § 1446(a), a copy of all "process, pleadings, and orders" received by Removing Defendant are attached as **Exhibit A**.

## II.     Removal Procedures

5.     28 U.S.C. § 1441(a) provides, in pertinent part, as follows:

> (a) Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending . . . .

6.     Venue is appropriate in this Court, and Removing Defendant seeks to remove this case to the United States District Court for the District of Maryland, Southern Division, pursuant to 28 U.S.C. § 1441(a).  The Circuit Court for Montgomery County, Maryland is located within this District, and cases arising in the Circuit Court for Montgomery County, Maryland are properly assigned to the Southern Division of this Court.  *See* 28 U.S.C. § 100(1).

7.     Written notice of the filing of this Notice of Removal will be served upon counsel for Named Plaintiff, Benjamin H. Carney and Richard S. Gordon.

8.     In accordance with 28 U.S.C. § 1446(d), a true and correct copy of this Notice of Removal (without exhibits) is being filed contemporaneously with the Clerk of the Circuit Court

**JA5**

for Montgomery County, Maryland, and served upon all parties and/or counsel of record.  *See* Notice of Filing of Removal, attached as **Exhibit B**.

9.    This Notice of Removal is timely filed within thirty (30) days of service upon Removing Defendant pursuant to 28 U.S.C. § 1446(b).  Removing Defendant was served with the Complaint and the corresponding Summons on February 22, 2023.  Therefore, the thirty-day period for Removing Defendant ends on March 24, 2023.

10.    In filing this Notice of Removal, Removing Defendant does not waive, and specifically reserves, any and all objections as to service and personal jurisdiction, and the right to raise all defenses, exceptions, rights, and motions.  No statement herein or omission shall be deemed to constitute an admission by Removing Defendant of any of the allegations set forth in the Complaint or damages sought therein.

### III.   Removal Is Proper Under CAFA, 28 U.S.C. §§ 1332(d), 1453.

**A.    This Action Is Removable to Federal Court Pursuant to CAFA, 28 U.S.C. § 1332(d)(2).**

11.    This action meets the requirements for removal under CAFA because (1) this is a civil class action consisting of more than 100 putative class members, 28 U.S.C. § 1332(d)(2); (2) the citizenship of at least one plaintiff is different from that of at least one defendant, 28 U.S.C. § 1332(d)(2)(A); and (3) the matter in controversy, after aggregating the claims of the putative class members, exceeds $5 million, exclusive of interest and costs, 28 U.S.C. § 1332(d)(6).

12.    It is well-settled where the "complaint does not state the amount in controversy, the defendant's notice of removal may do so."  *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 84 (2014) (citing 28 U.S.C. § 1446(c)(2)(A)).  And, as "no antiremoval presumption attends cases invoking CAFA . . . a defendant's notice of removal need include only a plausible

**JA6**

allegation that the amount in controversy exceeds the jurisdictional threshold." *Goff v. Caliber Home Loans, Inc.*, No. 1:20-cv-2038-ELH, 2020 WL 6204299, at *7 (D. Md. Oct. 21, 2020).

**B.      This Is a Class Action Consisting of More Than 100 Putative Class Members.**

13.      CAFA applies to the State Court Action because the State Court Action is a "civil action filed under" Maryland Rule 2-231, and Maryland's analog to Fed. R. Civ. P. 23 "authorize[s] an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. § 1332(d)(1)(B).

14.      Accordingly, the requirement that a class action be a "civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action" is satisfied. *See* 28 U.S.C. §§ 1332(d)(1)(B), 1453(a).

15.      Further, the requirement that the number of members of all proposed plaintiff classes in the aggregate be greater than 100 is also satisfied. *See* 28 U.S.C. § 1332(d)(5)(B). The number of putative members in the Mercury Class total more than 100 borrowers.[1] Attached hereto as **Exhibit C** is a declaration from Janet Gigeous, employee and authorized representative of Mercury, establishing that there are approximately 32,000 loans for Maryland residents which, through agreements with a third-party institution, are exclusively serviced by Mercury.

**C.      The Minimal Diversity of Citizenship Is Satisfied.**

16.      CAFA eliminates the requirement of complete diversity and requires only "minimal diversity," *i.e.*, the citizenship of any plaintiff differs from that of at least one defendant. *See* 28 U.S.C. § 1332(d)(2)(A).

---

[1] In making these calculations based on the alleged putative classes, Mercury Financial, LLC does not in any way admit to the allegations against them, the appropriateness of the proposed class definition, or the propriety of this action proceeding as a class action.

**JA7**

17.    Named Plaintiff admits that she is a citizen of the State of Maryland. Compl. ¶ 16. Therefore, Named Plaintiff is a citizen of the State of Maryland for purposes of minimal diversity under CAFA.

18.    Mercury is a Limited Liability Company organized under the laws of the State of Delaware and with its principal place of business in Delaware. *See* **Ex. C** ¶ 3.

19.    Accordingly, Mercury is a citizen of Delaware for purposes of minimal diversity under CAFA. 28 U.S.C. § 1332(d)(10) ("For purposes of this subsection and section 1453, an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized.").

20.    A limited liability company is an unincorporated association for purposes of determining subject matter jurisdiction under CAFA. *See, e.g.*, *Ferrell v. Express Check Advance of SC LLC*, 591 F.3d 698, 699–705 (4th Cir. 2010) ("[A] limited liability company is an 'unincorporated association' as that term is used in 28 U.S.C. § 1332(d)(10) and therefore is a citizen of the State under whose laws it is organized and the State where it has its principal place of business."); *Ramirez v. Carefusion Res., LLC*, No. 18-CV-2852-BEN-MSB, 2019 WL 2897902, at *2 (S.D. Cal. July 5, 2019) (collecting cases).

21.    As such, there is minimal diversity between the parties because at least one plaintiff class member is diverse in citizenship from Removing Defendant.

**D.    The Amount-in-Controversy Requirement Is Satisfied.**

22.    The amount in controversy requirement under CAFA is also satisfied. Under 28 U.S.C. § 1332(d), a class action is removable if the aggregate amount in controversy is greater than $5 million, exclusive of interest and costs. *See* U.S.C. § 1332(d)(2).

**JA8**

23.     "Because no antiremoval presumption attends cases invoking CAFA, a defendant's notice of removal need include only a *plausible allegation* that the amount in controversy exceeds the jurisdictional threshold" of exceeding $5 million at the time of removal. *Scott v. Cricket Commc'ns, LLC*, 865 F.3d 189, 194 (4th Cir. 2017) (emphasis added).

24.     Named Plaintiff alleges violations of MCLL § 12-314 and requests relief in the amount of any principal, interest, fees, or other compensation Removing Defendant has received or retained. Compl. ¶ 85; "WHEREFORE" paragraph. *See also Price v. Murdy*, 462 Md. 145, 156 (2018) (holding that the remedy for MCLL violations is the defendant's inability to receive or retain principal, interest, or other compensation). As of February 22, 2023, Mercury has active accounts for members of the putative Mercury Class with aggregate balances of approximately $59 million. *See* **Ex. C** ¶ 6.

### IV.     Conclusion

WHEREFORE, for the foregoing reasons, Mercury respectfully requests the above-captioned action now pending in the Circuit Court for Montgomery County, Maryland, be removed to the United States District Court for the District of Maryland, Southern Division, and that said District assume jurisdiction of this action, granting such other relief as the court deems necessary and just.

Dated:   March 24, 2023                              Respectfully submitted,

                                                     */s/ Melissa O. Martinez*
                                                     Melissa O. Martinez (Fed. Bar No. 28975)
                                                     **MCGUIREWOODS LLP**
                                                     500 East Pratt Street, Suite 1000
                                                     Baltimore, MD 21202
                                                     410-659-4432
                                                     410-659-4482 (Fax)
                                                     mmartinez@mcguirewoods.com

                                                     *Counsel for Defendant Mercury Financial LLC*

**JA9**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 24, 2023 a copy of the foregoing Notice of Removal was

served via CM/ECF and first-class mail, postage prepaid on the following:

> Benjamin H. Carney
> Richard S. Gordon
> Gordon, Wolf, & Carney, CHTD.
> 100 West Pennsylvania Ave., Suite 100
> Townson, Maryland 21204
> rgordon@GWCfirm.com
>
> ***Counsel for Plaintiff***

*/s/ Melissa O. Martinez*
Melissa O. Martinez

7

**JA10**

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| ANGELITA BAILEY, | * |
| *On Her Own Behalf and on Behalf of All Others Similarly Situated*, | *   Civil Action No. _____ |
| Plaintiff, | *   [Removed from the Circuit Court for Montgomery County, Maryland |
| v. | *   Case No. C-15-CV-23-000224] |
| | * |
| MERCURY FINANCAL, LLC, | * |
| Defendant. | * |
| | * |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## DECLARATION OF MERCURY FINANCIAL, LLC

1.      I, Janet Gigeous, am over the age of eighteen, have personal knowledge of the facts set forth herein, and am otherwise competent to testify.

2.      I am employed by Mercury Financial, LLC ("Mercury"), and I am an authorized representative of Mercury for the purposes of providing this Declaration.

3.      Mercury is a Limited Liability Company organized and existing under the laws of the State of Delaware, with its principal place of business in the State of Delaware.

4.      Mercury services and markets credit cards as its principal business.  Mercury maintains records of, among other things, all financial activity related to each borrower's account it services, subject to its document retention policies and procedures.  These records are maintained and updated on a regular basis, and the financial activity for each account is captured and entered by a person with knowledge or from information transmitted by a person with knowledge.  It is the regular practice of Mercury to make and keep this information.

**JA12**

5.      I have access to this information as required, and I am fully familiar with the manner in which it is created and maintained for each account.

6.      As of the time of removal of this matter, Mercury has determined the following to be true based upon a review of its aforementioned business records:

      a.  As of February 22, 2023, Maryland borrowers with accounts being serviced by Mercury totaled approximately 32,000 accounts.

      b.  As of February 22, 2023, Maryland borrowers with accounts being serviced by Mercury had account balances totaling approximately $59,000,000 in the aggregate.

7.      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 24, 2023

Name: Janet Gigeous
Title: Head of Customer Operations

**JA13**

| | | |
|---|---|---|
| ANGELITA BAILEY<br>1140 Heritage Place, Apt. B<br>Waldorf, MD 20602 | * | IN THE |
| | * | |
| On Her Own Behalf and on Behalf of<br>All Others Similarly Situated | * | CIRCUIT COURT |
| | * | |
| Plaintiff, | * | FOR |
| v. | * | |
| MERCURY FINANCIAL, LLC<br>123 Justison St<br>Wilmington DE 19801 | * | MONTGOMERY COUNTY, MD. |
|     Resident Agent:<br>    Lawyers Incorporating<br>    Service Company<br>    7 St. Paul Street, Suite 820<br>    Baltimore MD 21202 | * | Case No. _____ |
| | * | |
| Defendant. | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**Class Action Complaint and Demand for Jury Trial**

Plaintiff, Angelita Bailey ("Ms. Bailey"), on her own behalf and on behalf of a class of similarly situated persons, by and through her attorneys Richard S. Gordon and Benjamin H. Carney of GORDON, WOLF & CARNEY, CHTD., sues Defendant Mercury Financial, LLC ("Mercury") and alleges as follows:

**Introduction**

1.      This Class Action Complaint and Demand for Jury Trial (the "Complaint") challenges the unlicensed and unlawful consumer lending scheme of Defendant Mercury.

2.      Mercury – formerly known as "CreditShop, LLC" – is a small-loan lender, which has, for many years, extended consumer credit of less than $25,000.00 to numerous Marylanders including Plaintiff, Ms. Bailey.

3.    Mercury advertises that it is "the largest non-bank credit card company in the U.S." and that "[t]o date, the Company has extended $2.5 billion in credit lines." Many of those credit lines, including Plaintiff's, were extended to Maryland residents.

4.    Maryland requires consumer lenders making loans of less than $25,000 to be licensed under the Maryland Consumer Loan Law, Md. Code Ann., Com. Law. §§ 12-301 et seq. (the "MCLL"). *See* MCLL § 12-302. Before 2019, consumer lenders making loans of $6,000 or less were required to be licensed. *See* 2018 Maryland Laws Ch. 790 (H.B. 1297). Mercury's loan to Plaintiff was for less than $6,000.

5.    The MCLL applies "regardless of:… [w]hether the transaction is or purports to be made under this subtitle." *Id.* § 12-303. The MCLL also "applies to all loans made by a lender domiciled in another state to a borrower who is a resident of this State if the application for the loan originated in this State." *Id.* § 12-314. Many of Mercury's loans, including Plaintiff's, were made to Maryland residents whose loan applications originated in Maryland.

6.    Each of Mercury's loans to Plaintiff and the members of the Class defined below was subject to the MCLL, and anyone in the business of making or acquiring those loans was required to be licensed.

7.    Despite its Maryland lending activities, Mercury has never had any MCLL license or any other license to make consumer loans to Marylanders, under any name.

8.    Because Mercury is in the business of making loans subject to the MCLL but it does not have an MCLL license, its loans to Plaintiff and other Maryland consumers are "void and unenforceable." MCLL § 12-314(b)(1)(i).

9.    No person may "receive or retain" any amounts from Plaintiff or Class Members in connection with Mercury's void and unenforceable loans to them. *See* MCLL § 12-314(b)(2)

2

**JA15**

("A person may not receive or retain any principal, interest, fees, or other compensation with respect to any loan that is void and unenforceable under this subsection.")

10.     By collecting on its void and unenforceable loans, Mercury violated the MCLL. *See* MCLL § 12-314(d)(1) ("With respect to a loan that is void and unenforceable under this section, a person may not:…[c]ollect or attempt to collect, directly or indirectly, any amount from the borrower.")

11.     Mercury's actions violated not only the MCLL, but also the Maryland Consumer Debt Collection Act, Md. Code Ann., Com. Law §§ 14-201 *et seq*. ("MCDCA") and the Maryland Consumer Protection Act, Md. Code Ann., Com. Law §§ 12-101 *et seq*. ("MCPA"), and give rise to claims for negligence, unjust enrichment, and money had and received.

12.     Because Mercury's activities were form-driven and violate the law in materially uniform ways in the transactions of the Plaintiff and the numerous other Maryland consumers to whom Mercury made loans, this lawsuit is well-suited for class action treatment.

13.     Accordingly, Plaintiff requests certification of the following Class:

> All Maryland residents to whom Mercury made loans which are subject to the MCLL, where the loan application originated in Maryland and the borrower made one or more payments to Mercury on the loan.
>
> Excluded from the Class are all employees or representatives of Mercury, all Court personnel, and all persons who have not made payments on the subject loan accounts within the last 12 years.

14.     As a result of Mercury's unlawful actions, Plaintiff and each Class Member are entitled to a declaration that Maryland law requires Mercury to be licensed, that the contracts for Mercury's loans are void and unenforceable, that all loans made by Mercury to Plaintiff and Class Members' are void and unenforceable, and that Mercury was never entitled to collect any amounts from Plaintiff and Class Members, under Maryland's Declaratory Judgment Act, Md. Code Ann., Cts. & Jud. Pro. §§ 3-401 *et seq*.

**JA16**

15.     In addition, Mercury must return all amounts collected on Plaintiff and Class Members' Mercury loans within the past twelve years, under the MCLL. Plaintiff and Class Members are also entitled to recover damages including the amounts collected on the Mercury loans under the MCDCA, the MCPA, in negligence, unjust enrichment, and money had and received.

### Parties

16.     Plaintiff Angelita Bailey is a natural person who is a resident and citizen of the State of Maryland.  She was a resident of the State of Maryland and within the State of Maryland at the time she entered into any agreement for the loan account at issue in this lawsuit. The application for that loan originated within the State of Maryland.

17.     Mercury Financial, LLC, formerly known as CreditShop, LLC, is a privately-held subprime credit card loan originator, lender, marketer, and servicer. It is a limited liability company organized in Delaware, with its principal place of business in Delaware. Mercury markets and makes consumer credit card loans in Maryland and elsewhere in the United States.

### Jurisdiction and Venue

18.     This Court has subject-matter jurisdiction over this case pursuant to Md. Code Ann., Cts. & Jud. Proc. §§ 1-501 and 4-402(c)(2).  This Court has personal jurisdiction pursuant to Md. Code Ann., Cts. & Jud. Proc. §§ 6-102 and 6-103(b), as the Defendant transacts business and performs work and service in the State of Maryland, contracts to supply services in the State of Maryland, and regularly does and solicits business and engages in other persistent courses of conduct in the State of Maryland, including the business described in this Complaint, and as the Defendant maintains a resident agent in the State of Maryland.

19.     This Court has personal jurisdiction over the Defendant under the long-arm statute of the State of Maryland, Md. Code, Cts. & Jud. Proc. § 6-103, and the United States

4

**JA17**

Constitution, because Mercury conducts substantial business within the State of Maryland. Therefore, a substantial part of the events and/or omissions giving rise to the claims and Plaintiffs tortious injuries occurred within the state of Maryland.

20.    Venue is proper in this Court under Md. Code Ann., Cts. & Jud. Proc. §§ 4-402(e)(2) and 6-201, as the amount in controversy in this case exceeds $25,000<u>00</u>, as the controversy includes a claim for declaratory relief, and because the Defendant carries on a regular business and habitually engages in vocation in Montgomery County, Maryland. Among other things, the Defendant directed its activity described in this Complaint to persons including Plaintiff and other residents of Montgomery County, Maryland.

## Factual Allegations for Individual and Class Relief

### Mercury's Business

21.    Mercury is a small-loan lender that makes loans to consumers and made consumer loans to Plaintiff and Class members.

22.    Mercury advertises that it "target[s] consumers through direct mail, digital affiliates, email origination channels and co-branded partnerships. To date, the Company has extended $2.5 billion in credit lines and helped nearly a million customers with a credit card that earns rewards, carries no monthly fee for issuance or availability, and has an affordable APR."

23.    Credit limits on Mercury's accounts with Plaintiff and Class members are and were all less than $25,000<u>00</u>.

24.    Although Mercury made consumer loans to Plaintiff and each Class member of less than $25,000, when the borrower was a resident of Maryland and the application for the loan originated in Maryland, it does not have the MCLL license required to do so.

25.    Mercury's business operations described in this Complaint violate Maryland law.

26.    Mercury does not have, and has chosen not to obtain, a license under the MCLL.

5

**JA18**

27.    Mercury has a sophisticated and experienced compliance and legal department. Mercury knows that its credit business is in violation of Maryland law and the MCLL.

### Plaintiff's Experience with Mercury

28.    Plaintiff had a "Mercury" branded credit card account which was owned by Mercury. Plaintiff accepted the credit card agreement for the credit card account in Maryland.

29.    Plaintiff's application for the account originated in Maryland, where she resides and resided at the time she obtained the account, and the credit extended under the account was extended for personal, family, and household purposes.

30.    The credit limit for Plaintiff's Mercury credit card account – which Mercury identified in correspondence to Plaintiff as her "credit line" – was $5,250.00.

31.    At no time was Mercury's loan to Plaintiff for more than $6,000.00.

32.    Plaintiff's credit card agreement does not contain a written election providing that the agreement would be governed by Subtitle 1, Subtitle 4, Subtitle 9, or Subtitle 10 of the Maryland Commercial Law Article.

33.    Mercury repeatedly extended consumer credit to Plaintiff of less than $6,000.

34.    For example, one month Plaintiff's "Mercury" credit card account had a balance of $4,583.09, which was credit Mercury extended to Plaintiff. The previous month, her account balance had been $4,374.24. In the intervening period, Mercury had extended additional credit to her in the amount of $307.50. During that same period, Plaintiff had made a payment to Mercury on the account of $94.73 and had a credit to her account of $3.92. Mercury sent Plaintiff correspondence which demanded that Plaintiff make an additional "minimum payment" of $99.30 to Mercury on Mercury's void and unenforceable loan to Plaintiff and asked her to make the payment to Mercury at "www.mercurycards.com."

35.     The next month, Plaintiff's "Mercury" credit card account had a balance of $4,527.54, which was credit Mercury extended to Plaintiff. The previous month, her account balance had been $4,583.09, as detailed above. In the intervening period, Mercury had extended additional credit to her in the amount of $52.54. During that same period, Plaintiff had made a payment to Mercury on the account of $108.09. Mercury sent Plaintiff correspondence which demanded that Plaintiff make an additional "minimum payment" of $97.29 to Mercury on Mercury's void and unenforceable loan to Plaintiff and asked her to make the payment to Mercury at "www.mercurycards.com."

36.     The next month, Plaintiff's "Mercury" credit card account had a balance of $4,568.96, which was credit Mercury extended to Plaintiff. The previous month, her account balance had been $4,527.54, as detailed above. In the intervening period, Mercury had extended additional credit to her in the amount of $138.71. During that same period, Plaintiff had made a payment to Mercury on the account of $97.29. Mercury sent Plaintiff correspondence which demanded that Plaintiff make an additional "minimum payment" of $99.07 to Mercury on Mercury's void and unenforceable loan to Plaintiff and asked her to make the payment to Mercury at "www.mercurycards.com."

37.     The next month, Plaintiff's "Mercury" credit card account had a balance of $4,611.47, which was credit Mercury extended to Plaintiff. The previous month, her account balance had been $4,568.96, as detailed above. In the intervening period, Mercury had extended additional credit to her in the amount of $143.58.  During that same period, Plaintiff had made a payment to Mercury on the account of $99.07. Mercury sent Plaintiff correspondence which demanded that Plaintiff make an additional "minimum payment" of $98.10 to Mercury on Mercury's void and unenforceable loan to Plaintiff and asked her to make the payment to Mercury at "www.mercurycards.com."

38.     The next month, Plaintiff's "Mercury" credit card account had a balance of $4,726.43, which was credit Mercury extended to Plaintiff. The previous month, her account balance had been $4,611.47, as detailed above. In the intervening period, Mercury had extended additional credit to her in the amount of $226.43.  During that same period, Plaintiff had made a payment to Mercury on the account of $111.47. Mercury sent Plaintiff correspondence which demanded that Plaintiff make an additional "minimum payment" of $101.53 to Mercury on Mercury's void and unenforceable loan to Plaintiff and asked her to make the payment to Mercury at "www.mercurycards.com."

39.     The next month, Plaintiff's "Mercury" credit card account had a balance of $4,680.11, which was credit Mercury extended to Plaintiff. The previous month, her account balance had been $4,726.43, as detailed above. In the intervening period, Mercury had extended additional credit to her in the amount of $55.21.  During that same period, Plaintiff had made a payment to Mercury on the account of $101.53. Mercury sent Plaintiff correspondence which demanded that Plaintiff make an additional "minimum payment" of $101.46 to Mercury on Mercury's void and unenforceable loan to Plaintiff and asked her to make the payment to Mercury at "www.mercurycards.com."

40.     The next month, Plaintiff's "Mercury" credit card account had a balance of $4,844.08, which was credit Mercury extended to Plaintiff. The previous month, her account balance had been $4,680.11, as detailed above. In the intervening period, Mercury had extended additional credit to her in the amount of $163.97.  Mercury sent Plaintiff correspondence which demanded that Plaintiff make a "minimum payment" of $228.37 to Mercury on Mercury's void and unenforceable loan to Plaintiff and asked her to make the payment to Mercury at "www.mercurycards.com."

41.     The next month, Plaintiff's "Mercury" credit card account had a balance of $4,931.69, which was credit Mercury extended to Plaintiff. The previous month, her account balance had been $4,844.08, as detailed above. In the intervening period, Mercury had extended additional credit to her in the amount of $87.61.  Mercury sent Plaintiff correspondence which demanded that Plaintiff make an additional "minimum payment" of $364.42 to Mercury on Mercury's void and unenforceable loan to Plaintiff and asked her to make the payment to Mercury at "www.mercurycards.com."

42.     Although Mercury extended credit and made consumer loans to Plaintiff of less than $25,000.00, and collected payments from Plaintiff on that credit extension, Mercury does not have any license to conduct its lending business in Maryland and has never had any license to conduct its lending business in Maryland.

43.     Maryland law, including the MCLL, requires Mercury to be licensed by the Commissioner of Financial Regulation to conduct its lending business in Maryland or with respect to consumers including Plaintiff and Class members.

**Class Action Allegations**

44.     Named Plaintiff brings this action on behalf of a Plaintiff Class which consists of:

All Maryland residents to whom Mercury made loans which are subject to the MCLL, where the loan application originated in Maryland and the borrower made one or more payments to Mercury on the loan.

Excluded from the Class are all employees or representatives of Mercury, all Court personnel, and all persons who have not made payments on the subject loan accounts within the last 12 years.

45.     The Class, as defined above, is identifiable.  The Named Plaintiff, Ms. Bailey, is a member of the Plaintiff Class.

46.     Each Class member's experience was materially the same as Plaintiff's experience.

9

**JA22**

47.     Mercury extended credit and made consumer loans to each Class member in an amount of less than $25,000.00, when the Class member was a resident of Maryland and the application for the Class member's loan originated in Maryland.

48.     Mercury did not have a license to act as a lender under the MCLL at the time it engaged in any transactions with Plaintiff or any Class member.

49.     Nevertheless, Mercury demanded that Plaintiff and each Class member make payments on Mercury's void and unenforceable loans to them, and Plaintiff and each Class member made payments to Mercury on those void and unenforceable loans.

50.     Plaintiff and Class Members made numerous payments to Mercury, including payments of principal, interest, costs, fees and other charges. Mercury received and retained Plaintiff and Class Members' payments.

51.     None of the loans of Plaintiff or Class Members contain a written election to be governed by Subtitle 1, Subtitle 4, Subtitle 9, or Subtitle 10 of the Maryland Commercial Law Article.

52.     Mercury was not permitted to make its loans to Plaintiff or Class Members because it is not, and never has been, licensed under or exempt from the licensing requirements under the MCLL.

53.     Mercury's loans to Plaintiff and each Class Member are void and unenforceable because Mercury made the loans without a license under the MCLL, when Mercury is not exempt from the licensing requirements of the MCLL.

54.     Mercury has unlawfully received and retained, and continues to receive and retain, principal, interest, fees, and other compensation with respect to its loans to Plaintiff and Class Members, which are void and unenforceable under the MCLL.

JA23

55.    Mercury is not, and has never been, licensed as required by Maryland law, the statutes requiring Mercury to be licensed are regulatory in nature for the protection of the public, rather than merely to raise revenue, and Mercury's actions described in this Complaint violate the fundamental public policy of Maryland.

56.    Mercury never had any right to collect money from Plaintiff or Class Members, as a result of Mercury's illegal, unlicensed activity.

57.    There are questions of law and fact which are not only common to the members of the Class but which predominate over any questions affecting only individual Class members. The common and predominating questions include, but are not limited to:

i.    Whether Mercury had a license or was exempt from licensing under the MCLL;

ii.    Whether Mercury's transactions with Plaintiff and each Class Member are contrary to the public policy of Maryland;

iii.    Whether the statutes requiring Mercury to be licensed are regulatory in nature for the protection of the public, rather than merely to raise revenue, and enforcing Class Members' Mercury loan accounts is against public policy;

iv.    Whether Mercury ever had any right to receive or retain any payments on Class Members' loans;

v.    Whether each Class Member is entitled to a declaration under the Maryland Declaratory Judgment Act, Md. Code Ann., Cts. & Jud. Pro. §§ 3-401 *et seq.* that their loan account is void and unenforceable;

vi.    Whether the MCLL or the other causes of action alleged in this Complaint entitle Plaintiff and each Class Member to recover all payments made to Mercury;

vii.    Whether Mercury is liable to Plaintiff and Class members under the MCDCA;

viii.    Whether Mercury is liable to Plaintiff and Class members under the MCPA;

11

**JA24**

    ix.      Whether Mercury is liable to Plaintiff and Class members in negligence;

    x.      Whether Mercury is liable to Plaintiff and Class members in unjust enrichment;

    xi.      Whether Mercury is liable to Plaintiff and Class members for money had and received.

58.     Plaintiff's claims are typical of the claims of the respective members of the Class within the meaning of Md. Rule 2-231(b)(3) and are based on and arise out of similar facts constituting the wrongful conduct of Defendant.

59.     Plaintiff will fairly and adequately protect the interests of the Class within the meaning of Md. Rule 2-231(b)(4). Plaintiff is committed to vigorously litigating this matter. Further, Plaintiff has secured counsel experienced in handling consumer class actions and complex consumer litigation.

60.     Neither Plaintiff nor Plaintiff's counsel has any interests which might cause them not to vigorously pursue this claim.

61.     The prosecution of separate actions by individual members of the Class would create a risk of establishing incompatible standards of conduct for Defendant within the meaning of Md. Rule 2-231(c)(1)(A).

62.     Defendant's actions are generally applicable to the respective Class as a whole, and Plaintiff seeks equitable remedies with respect to the Class within the meaning of Md. Rule 2-231(c)(2).

63.     Common questions of law and fact enumerated above predominate over questions affecting only individual members of the Class and a class action is the superior method for fair and efficient adjudication of the controversy within the meaning of Md. Rule 2-231(c)(3).

64.     The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

JA25

65.    Plaintiff's counsel are experienced in class actions, and foresee little difficulty in the management of this case as a class action.

**Causes of Action**

**Count I**
**Declaratory Relief under Md. Cts. & Jud. Pro. § 3-406**

66.    Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

67.    This claim for declaratory relief is brought under the Maryland Declaratory Judgment Act, Md. Code Ann., Cts. & Jud. Pro. § 3-406, to settle and obtain relief from uncertainty and insecurity with respect to the rights, status and legal relations of the Plaintiff and Class Members with Defendant, under the consumer protections embodied in Maryland law.

68.    Defendant maintains that it was not required to have a license from the Maryland Commissioner of Financial Regulation to engage in its transactions with Plaintiff and Class Members.

69.    Plaintiff maintains that Defendant was required to have a license from the Maryland Commissioner of Financial Regulation to engage in the transactions with Plaintiff and Class Members.

70.    Defendant maintains that it did not violate the MCLL in the transactions of Plaintiff and Class Members.

71.    Plaintiff maintains that Defendant did violate the MCLL in its transactions with Plaintiff and Class Members.

72.    Defendant maintains that it and its assignees may assess and collect charges from Plaintiff and Class Members.

73.     Plaintiff maintains that Defendant does not have, and never had, the right to assess or collect charges from her, or from Class Members, and that the Defendant never had the right to assign any such rights to anyone else, due to the facts alleged in this Complaint.

74.     Plaintiff and Class Members have received or will receive collection notices from Defendant and its assignees demanding payment of the alleged amounts due and have been sued or will be sued for collection of the sums which Defendant or its assignees claim are due. Moreover, Defendant notifies credit reporting agencies of the alleged balances due, thereby damaging the credit scores and history of Plaintiff and Class Members.

75.     These practices continue and will continue unless and until this Court declares and affirms that Defendant does not have, and never had, the right to receive or retain money from Plaintiff and Class Members on their loan accounts.

76.     This presents an actual, justiciable controversy between the parties relating to the construction of the purported contracts of Plaintiff and Class Members and the application of the law to those purported contracts. Defendant and its assignees have sought and will continue to seek to collect amounts from Plaintiff and Class Members when they are not legally entitled to do so, harming Plaintiff and Class Members.

77.     Plaintiff and Class Members have a right to be free from the attempts of Defendant and its assignees to collect amounts from them which they do not owe.

### Count II
### Violation of the MCLL Licensing Provisions

78.     Plaintiff re-alleges and incorporates by reference the allegations set forth above.

79.     Each of the loans to Plaintiff and Class Members which are the subject of this Complaint were for less than $25,000, are extensions of credit or loans subject to the MCLL and are "loans" under the MCLL.

14

**JA27**

80.     Mercury made the loans to Plaintiff and Class Members which are the subject of this Complaint, and thus is a "lender" under the MCLL.

81.     Mercury is in the business of making credit card loans of less than $25,000$^{00}$.

82.     None of the loans to Plaintiff or Class Members elect to be governed by Subtitle 1, Subtitle 4, Subtitle 9, or Subtitle 10 of Title 12 of the Maryland Commercial Law Article.

83.     Mercury made loans to Plaintiff and Class Members of less than $25,000$^{00}$ when Mercury was required to be licensed under MCLL § 12-302, but Mercury was not and never has been licensed under or exempt from the licensing requirements of the MCLL.

84.     The loans to Plaintiff and Class Members are void and unenforceable under the MCLL.

85.     Although Plaintiff and Class members made payments to Mercury, or Mercury otherwise collected amounts due under the Class' loans, Mercury was never entitled to receive or retain any principal, interest, fees, or other compensation with respect to any loan to Plaintiff or Class Members, under MCLL § 12-314.

86.     In violation of the MCLL, Mercury, with respect to the Plaintiff's and Class Members' void and unenforceable loans, collected and attempted to collect, directly or indirectly, amounts from Plaintiffs and Class Members, and sold, assigned, or otherwise transferred loans of Plaintiff and Class Members to other persons.

**Count III**
**Violation of the Maryland Consumer Debt Collection Act**

87.     Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

88.     Defendant, at all times relevant to the actions alleged herein, is a "collector" within the meaning of section 14-201(b) of the MCDCA, because the alleged debts of Plaintiff

15

**JA28**

and members of the Class which Defendant collected or sought to collect from them through the actions described herein arose from consumer transactions – i.e. Defendant's extension of credit through consumer credit card loans.

89.    In collecting and attempting to collect on the alleged debts of Plaintiff and members of the Class, Defendant violated section 14-202 of the MCDCA.

90.    Among other things, Defendant violated section 14-202(8) and (11) of the MCDCA when it claimed, attempted, or threatened to enforce a right with knowledge that the right does not exist. Defendant claimed, attempted and threatened to enforce a right to collect on its loans to Plaintiff and Class members when the loans were void and unenforceable because Defendant was not licensed to make the loans under the MCLL. Defendant knew that it was not licensed under the MCLL, or any other Maryland law. Defendant knew that it had no right to act as an unlicensed lender in its dealings with Plaintiff and members of the Class. Defendant knew that it was acting as an unlicensed lender in its dealings with Plaintiff and the Class. At a minimum, Defendant acted with reckless disregard of the license required under the MCLL.

91.    Furthermore, Mercury violated the MCDCA § 14-202(11) when it undertook to charge and collect from Plaintiff and each Class member payments on void and unenforceable loans which it was not allowed to collect, thereby threatening to take actions that cannot legally be taken.

92.    Defendant's actions in violation of the MCDCA proximately caused damages to Plaintiff and members of the Class. As a direct and proximate result of Defendant's methods of collecting consumer debts in violation of Maryland law, Plaintiff and other members of the Class were assessed and paid charges which they did not legally owe, which damaged Plaintiff and Class Members.

93.     Plaintiff and Class Members also were damaged because they suffered emotional distress and mental anguish resulting from Defendant's illegal actions in violation of the MCDCA.

## Count IV
### Violation of the Maryland Consumer Protection Act

94.     Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

95.     The MCPA generally prohibits unfair or deceptive trade practices in, among other things, the collection of consumer debts. *See* MCPA § 13-303(5).

96.     The actions of Defendant alleged herein constituted unfair or deceptive trade practices in the collection of consumer debts as defined by the MCPA, and in taking those actions Defendant violated the MCPA.

97.     For example, Defendant's practice of engaging in the collection activity described in this Complaint and seeking to collect consumer debt from Plaintiff and Class Members, when Defendant was not licensed or permitted to do so, constituted the failure to state a material fact where the failure deceives or tends to deceive. Defendant's practice of assessing charges against the accounts of Plaintiff and Class Members, and in bills sent to Plaintiff and Class Members demanding payment, without advising that Defendant was not licensed and that its loans were void and unenforceable, constituted the failure to state a material fact where the failure deceives or tends to deceive. Defendant's practice of assessing charges against Plaintiff and Class Members and collecting payments from them without advising that Defendant was not licensed and the loans were void and unenforceable constituted the failure to state material facts where the failure deceives or tends to deceive.

17

**JA30**

98.    Moreover, the unfair or deceptive trade practices barred by the MCPA specifically include the violation of the MCDCA. *See* MCPA § 13-301(14)(iii). Defendant violated the MCDCA as alleged herein, thus also violating the MCPA.

99.    Plaintiff and Class Members sustained actual damages as a result of the actions in violation of the MCPA and MCDCA alleged herein. Plaintiff and Class Members were damaged by, among other things, the payments they made on account of Mercury's void and unenforceable loans to them and the outstanding balances Mercury has wrongfully assessed against them.

**Count V**
**Money Had and Received**

100.    Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

101.    Mercury acted as a lender in its dealings with Plaintiff and members of the Class without the license required under Maryland law, and demanded that Plaintiff and the members of the Class make payments on its loans to them, which were void and unenforceable under the fundamental public policy of Maryland. Plaintiff and Class members made payments to Mercury on its void and unenforceable loans.

102.    Defendant's actions as an unlicensed lender and its collection of payments from Plaintiff and Class members on loans which are void and unenforceable were and are illegal.

103.    Any otherwise existing basis under which Defendant would be entitled to any form of payment or compensation of any kind for its void and unenforceable loans is nugatory and ineffective as Defendants' activities in Maryland were in violation of Maryland law.

**JA31**

104.    As a result of Defendant's actions, Defendant collected money, resulting from the charges which it unlawfully assessed to Plaintiff and Class Members, to which it had no legal or equitable right.

105.    Defendant should return its ill-gotten gains to Plaintiff and other Class Members.

**Count VI**
**Negligence**

106.    Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

107.    Defendant had a duty to Plaintiff and members of the Class to not send them bills and act as a lender, when it did not have the license to act as a lender required under Maryland law.

108.    Defendant breached its duties of care to Plaintiff and members of the Class when it acted as lender in its dealings with Class members when it did not have the license to do so. Defendant further breached its duties of care to Plaintiff and members of the Class when it charged and collected payments from Plaintiff and Class members on void and unenforceable loans.

109.    Plaintiff and members of the Class have suffered actual losses and damages as the proximate result of the breaches of duty of Defendant. Among other things, Plaintiff and members of the Class have been assessed and forced to pay amounts to Mercury for its unlawful actions as a lender, and to pay amounts on void and unenforceable loans. These damages, losses and injuries were proximately caused by the breaches of duty of Defendant, as Plaintiff and Class Members would not have paid amounts for Defendant's unlicensed and unauthorized actions absent Defendant's breaches of duty and would not have made payments on void and unenforceable loans absent Defendant's breaches of duty.

19

**JA32**

**Count VII**
**Unjust Enrichment**

110.   Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

111.   Plaintiff and Class members conferred a benefit upon Defendant by paying amounts to Defendant which were billed to them by Defendant on void and unenforceable loans.

112.   Defendant knew of the benefit conferred upon it by Plaintiff and the members of the Class. Mercury affirmatively demanded in its bills to Plaintiff and Class members payment of amounts on its void and unenforceable loans.

113.   It would be inequitable for Defendant to retain the amounts that it has received in connection with its unlawful actions directed to Plaintiff and Class Members, as those amounts were paid to Defendant as a result of its unlawful activity described in this Complaint and were not legally owed to Defendant and could not legally be collected by Defendant.

WHEREFORE, Plaintiff demands declaratory judgment and judgment in an aggregated amount for the Class as a whole in excess of $75,000.00, as follows:

A.   A declaratory judgment establishing that Mercury was required to be licensed under the MCLL to undertake the actions alleged in this Complaint;

B.   A declaratory judgment establishing that Mercury never had any right to collect any money from Plaintiff or Class Members, and that Plaintiff and Class Members' loans and agreements with Defendant are void and unenforceable;

C.   A declaratory judgment establishing that Mercury never had any right to collect any money from Plaintiff or Class Members;

D.   Recovery of compensatory damages in an amount determined by a jury, including recovery of all principal, interest, and other compensation received by Mercury

**JA33**

on Plaintiff and Class member accounts; damages for emotional distress and mental anguish, disgorgement and restitution of all benefits received by Defendant in connection with its unlicensed and unlawful activity alleged in this Complaint, reasonable attorney's fees pursuant to Md. Code Ann., Com. Law § 13-408(b), and the costs of this action, all in an aggregated sum in excess of $75,000.00 for the proposed Class as a whole;

E.     Pre-judgment and post-judgment interest at the legal rate on all sums awarded to Plaintiff and Class Members; and,

F.     Such other and further relief as the nature of this case may require.

Respectfully submitted,

Dated: January 24, 2023

Benjamin H. Carney (CPF No. 0412140132)
bcarney@GWCfirm.com
Richard S. Gordon (CPF No. 8912180227)
rgordon@GWCfirm.com
GORDON, WOLF & CARNEY, CHTD.
100 West Pennsylvania Ave., St. 100
Baltimore, Maryland 21204
(410) 825-2300
(410) 825-0066 (facsimile)

*Attorneys for Plaintiffs and
the Plaintiff Class*

By: _____
Richard S. Gordon

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

_____
Richard S. Gordon

21

**JA34**

IN THE CIRCUIT COURT FOR _____  [ ▾ ]
(City or County)

## CIVIL – NON-DOMESTIC CASE INFORMATION SHEET

### DIRECTIONS

*Plaintiff:* This Information Report must be completed and attached to the complaint filed with the Clerk of Court unless your case is exempted from the requirement by the Chief Judge of the Court of Appeals pursuant to Rule 2-111(a).

*Defendant:* You must file an Information Report as required by Rule 2-323(h).

***THIS INFORMATION REPORT CANNOT BE ACCEPTED AS A PLEADING***

**FORM FILED BY:** ☐ PLAINTIFF  ☐ DEFENDANT        CASE NUMBER _____
                                                                                          (Clerk to insert)

**CASE NAME:** _____  vs.  _____

**PARTY'S NAME:** _____     PHONE: _____

**PARTY'S ADDRESS:** _____

**PARTY'S E-MAIL:** _____

**If represented by an attorney:**

**PARTY'S ATTORNEY'S NAME:** _____     PHONE: _____

**PARTY'S ATTORNEY'S ADDRESS:** _____

**PARTY'S ATTORNEY'S E-MAIL:** _____

**JURY DEMAND?** ☐ Yes  ☐ No

**RELATED CASE PENDING?** ☐ Yes  ☐ No  If yes, Case #(s), if known: _____

**ANTICIPATED LENGTH OF TRIAL?:** _____ hours _____ days

### PLEADING TYPE

**New Case:** ☐ Original      ☐ Administrative Appeal      ☐ Appeal
**Existing Case:** ☐ Post-Judgment      ☐ Amendment

*If filing in an existing case, skip Case Category/ Subcategory section – go to Relief section.*

### IF NEW CASE: CASE CATEGORY/SUBCATEGORY (*Check one box.*)

**TORTS**
- ☐ Asbestos
- ☐ Assault and Battery
- ☐ Business and Commercial
- ☐ Conspiracy
- ☐ Conversion
- ☐ Defamation
- ☐ False Arrest/Imprisonment
- ☐ Fraud
- ☐ Lead Paint – DOB of Youngest Plt:_____
- ☐ Loss of Consortium
- ☐ Malicious Prosecution
- ☐ Malpractice-Medical
- ☐ Malpractice-Professional
- ☐ Misrepresentation
- ☐ Motor Tort
- ☐ Negligence
- ☐ Nuisance
- ☐ Premises Liability
- ☐ Product Liability
- ☐ Specific Performance
- ☐ Toxic Tort
- ☐ Trespass
- ☐ Wrongful Death

**CONTRACT**
- ☐ Asbestos
- ☐ Breach
- ☐ Business and Commercial
- ☐ Confessed Judgment (Cont'd)
- ☐ Construction
- ☐ Debt
- ☐ Fraud

- ☐ Government
- ☐ Insurance
- ☐ Product Liability

**PROPERTY**
- ☐ Adverse Possession
- ☐ Breach of Lease
- ☐ Detinue
- ☐ Distress/Distrain
- ☐ Ejectment
- ☐ Forcible Entry/Detainer
- ☐ Foreclosure
  - ☐ Commercial
  - ☐ Residential
  - ☐ Currency or Vehicle
  - ☐ Deed of Trust
  - ☐ Land Installments
  - ☐ Lien
  - ☐ Mortgage
  - ☐ Right of Redemption
  - ☐ Statement Condo
- ☐ Forfeiture of Property / Personal Item
- ☐ Fraudulent Conveyance
- ☐ Landlord-Tenant
- ☐ Lis Pendens
- ☐ Mechanic's Lien
- ☐ Ownership
- ☐ Partition/Sale in Lieu
- ☐ Quiet Title
- ☐ Rent Escrow
- ☐ Return of Seized Property
- ☐ Right of Redemption
- ☐ Tenant Holding Over

**PUBLIC LAW**
- ☐ Attorney Grievance
- ☐ Bond Forfeiture Remission
- ☐ Civil Rights
- ☐ County/Mncpl Code/Ord
- ☐ Election Law
- ☐ Eminent Domain/Condemn.
- ☐ Environment
- ☐ Error Coram Nobis
- ☐ Habeas Corpus
- ☐ Mandamus
- ☐ Prisoner Rights
- ☐ Public Info. Act Records
- ☐ Quarantine/Isolation
- ☐ Writ of Certiorari

**EMPLOYMENT**
- ☐ ADA
- ☐ Conspiracy
- ☐ EEO/HR
- ☐ FLSA
- ☐ FMLA
- ☐ Worker's Compensation
- ☐ Wrongful Termination

**INDEPENDENT PROCEEDINGS**
- ☐ Assumption of Jurisdiction
- ☐ Authorized Sale
- ☐ Attorney Appointment
- ☐ Body Attachment Issuance
- ☐ Commission Issuance

- ☐ Constructive Trust
- ☐ Contempt
- ☐ Deposition Notice
- ☐ Dist Ct Mtn Appeal
- ☐ Financial
- ☐ Grand Jury/Petit Jury
- ☐ Miscellaneous
- ☐ Perpetuate Testimony/Evidence
- ☐ Prod. of Documents Req.
- ☐ Receivership
- ☐ Sentence Transfer
- ☐ Set Aside Deed
- ☐ Special Adm. – Atty
- ☐ Subpoena Issue/Quash
- ☐ Trust Established
- ☐ Trustee Substitution/Removal
- ☐ Witness Appearance-Compel

**PEACE ORDER**
- ☐ Peace Order

**EQUITY**
- ☐ Declaratory Judgment
- ☐ Equitable Relief
- ☐ Injunctive Relief
- ☐ Mandamus

**OTHER**
- ☐ Accounting
- ☐ Friendly Suit
- ☐ Grantor in Possession
- ☐ Maryland Insurance Administration
- ☐ Miscellaneous
- ☐ Specific Transaction
- ☐ Structured Settlements

**JA35**

## IF NEW OR EXISTING CASE: RELIEF (Check All that Apply)

| | | | |
|---|---|---|---|
| ☐ Abatement | ☐ Earnings Withholding | ☐ Judgment-Default | ☐ Reinstatement of Employment |
| ☐ Administrative Action | ☐ Enrollment | ☐ Judgment-Interest | ☐ Return of Property |
| ☐ Appointment of Receiver | ☐ Expungement | ☐ Judgment-Summary | ☐ Sale of Property |
| ☐ Arbitration | ☐ Financial Exploitation | ☐ Liability | ☐ Specific Performance |
| ☐ Asset Determination | ☐ Findings of Fact | ☐ Oral Examination | ☐ Writ-Error Coram Nobis |
| ☐ Attachment b/f Judgment | ☐ Foreclosure | ☐ Order | ☐ Writ-Execution |
| ☐ Cease & Desist Order | ☐ Injunction | ☐ Ownership of Property | ☐ Writ-Garnish Property |
| ☐ Condemn Bldg | ☐ Judgment-Affidavit | ☐ Partition of Property | ☐ Writ-Garnish Wages |
| ☐ Contempt | ☐ Judgment-Attorney Fees | ☐ Peace Order | ☐ Writ-Habeas Corpus |
| ☐ Court Costs/Fees | ☐ Judgment-Confessed | ☐ Possession | ☐ Writ-Mandamus |
| ☐ Damages-Compensatory | ☐ Judgment-Consent | ☐ Production of Records | ☐ Writ-Possession |
| ☐ Damages-Punitive | ☐ Judgment-Declaratory | ☐ Quarantine/Isolation Order | |

*If you indicated Liability above,* mark one of the following. This information is <u>not</u> an admission and may not be used for any purpose other than Track Assignment.

☐ Liability is conceded.    ☐ Liability is not conceded, but is not seriously in dispute.    ☐ Liability is seriously in dispute.

## MONETARY DAMAGES (Do not include Attorney's Fees, Interest, or Court Costs)

☐ Under $10,000    ☐ $10,000 - $30,000    ☐ $30,000 - $100,000    ☐ Over $100,000

☐ Medical Bills $ _____    ☐ Wage Loss $ _____    ☐ Property Damages $ _____

## ALTERNATIVE DISPUTE RESOLUTION INFORMATION

Is this case appropriate for referral to an ADR process under Md. Rule 17-101? (Check all that apply)

A. Mediation    ☐ Yes ☐ No          C. Settlement Conference    ☐ Yes ☐ No

B. Arbitration    ☐ Yes ☐ No          D. Neutral Evaluation    ☐ Yes ☐ No

## SPECIAL REQUIREMENTS

☐  If a Spoken Language Interpreter is needed, **check here and attach form CC-DC-041**

☐  If you require an accommodation for a disability under the Americans with Disabilities Act, **check here and attach form CC-DC-049**

## ESTIMATED LENGTH OF TRIAL

*With the exception of Baltimore County and Baltimore City, please fill in the estimated LENGTH OF TRIAL.*

### *(Case will be tracked accordingly)*

☐ 1/2 day of trial or less          ☐ 3 days of trial time

☐ 1 day of trial time          ☐ More than 3 days of trial time

☐ 2 days of trial time

## BUSINESS AND TECHNOLOGY CASE MANAGEMENT PROGRAM

*For all jurisdictions, if Business and Technology track designation under Md. Rule 16-308 is requested, attach a duplicate copy of complaint and check one of the tracks below.*

☐ **Expedited** - Trial within 7 months of          ☐ **Standard** - Trial within 18 months of

Defendant's response          Defendant's response

EMERGENCY RELIEF REQUESTED

## JA36

## COMPLEX SCIENCE AND/OR TECHNOLOGICAL CASE MANAGEMENT PROGRAM (ASTAR)

*FOR PURPOSES OF POSSIBLE SPECIAL ASSIGNMENT TO ASTAR RESOURCES JUDGES under Md. Rule 16-302, attach a duplicate copy of complaint and check whether assignment to an ASTAR is requested.*

☐ **Expedited** – Trial within 7 months of Defendant's response          ☐ **Standard** – Trial within 18 months of Defendant's response

---

*IF YOU ARE FILING YOUR COMPLAINT IN BALTIMORE CITY OR BALTIMORE COUNTY, PLEASE FILL OUT THE APPROPRIATE BOX BELOW.*

### CIRCUIT COURT FOR BALTIMORE CITY (CHECK ONLY ONE)

| | |
|---|---|
| ☐ Expedited | Trial 60 to 120 days from notice. Non-jury matters. |
| ☐ Civil-Short | Trial 210 days from first answer. |
| ☐ Civil-Standard | Trial 360 days from first answer. |
| ☐ Custom | Scheduling order entered by individual judge. |
| ☐ Asbestos | Special scheduling order. |
| ☐ Lead Paint | Fill in: Birth Date of youngest plaintiff_____. |
| ☐ Tax Sale Foreclosures | Special scheduling order. |
| ☐ Mortgage Foreclosures | No scheduling order. |

### CIRCUIT COURT FOR BALTIMORE COUNTY

| | | |
|---|---|---|
| ☐ | Expedited (Trial Date-90 days) | Attachment Before Judgment, Declaratory Judgment (Simple), Administrative Appeals, District Court Appeals and Jury Trial Prayers, Guardianship, Injunction, Mandamus. |
| ☐ | Standard (Trial Date-240 days) | Condemnation, Confessed Judgments (Vacated), Contract, Employment Related Cases, Fraud and Misrepresentation, International Tort, Motor Tort, Other Personal Injury, Workers' Compensation Cases. |
| ☐ | Extended Standard (Trial Date-345 days) | Asbestos, Lender Liability, Professional Malpractice, Serious Motor Tort or Personal Injury Cases (medical expenses and wage loss of $100,000, expert and out-of-state witnesses (parties), and trial of five or more days), State Insolvency. |
| ☐ | Complex (Trial Date-450 days) | Class Actions, Designated Toxic Tort, Major Construction Contracts, Major Product Liabilities, Other Complex Cases. |

---

_____          _____     _____
Date                              Signature of Attorney / Party       Attorney Number

_____          _____
Address                          Printed Name

_____
City        State    Zip Code

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ANGELITA BAILEY,

    *On Her Own Behalf and on Behalf of*
    *All Others Similarly Situated*,

        Plaintiff,

v.

MERCURY FINANCIAL, LLC,

        Defendant.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Civil Action No. 8:23-cv-00827-DKC

## ANSWER AND AFFIRMATIVE DEFENSES TO
## PLAINTIFF'S CLASS ACTION COMPLAINT

Defendant Mercury Financial, LLC ("Defendant"), by its undersigned counsel and pursuant to Rules 8 and 12 of the Federal Rules of Civil Procedure, hereby submits its Answer and Affirmative Defenses to the Class Action Complaint filed by Angelita Bailey ("Plaintiff") as follows:

## INTRODUCTION[1]

1.     This Class Action Complaint and Demand for Jury Trial (the "Complaint") challenges the unlicensed and unlawful consumer lending scheme of Defendant Mercury.

**ANSWER**:  **Defendant admits only that the Complaint speaks for itself. Defendant denies the remaining allegations in Paragraph 1.**

---

[1] Defendant uses certain subject headings from Plaintiff's Complaint strictly for ease of reference by the Court and the parties and, by using those headings, does not intend to admit the truth of any allegation contained within them. To the extent that any of the subject headings in Plaintiff's Complaint may be construed to contain factual allegations directed to Defendant, Defendant expressly denies all such allegations

**JA38**

2.        Mercury — formerly known as "CreditShop, LLC" — is a small-loan lender, which has, for many years, extended consumer credit of less than $25,000.00 to numerous Marylanders including Plaintiff, Ms. Bailey.

**ANSWER**:  **Defendant denies the allegations in Paragraph 2.**

3.        Mercury advertises that it is "the largest non-bank credit card company in the U.S." and that "[t]o date, the Company has extended $2.5 billion in credit lines." Many of those credit lines, including Plaintiff's, were extended to Maryland residents.

**ANSWER**:  **Defendant denies the allegations in Paragraph 3.**

4.        Maryland requires consumer lenders making loans of less than $25,000 to be licensed under the Maryland Consumer Loan Law, Md. Code Ann., Com. Law. §§ 12-301 et seq. (the "MCLL"). *See* MCLL § 12-302. Before 2019, consumer lenders making loans of $6,000 or less were required to be licensed. *See* 2018 Maryland Laws Ch. 790 (H.B. 1297). Mercury's loan to Plaintiff was for less than $6,000.

**ANSWER**:  **Defendant admits only that the referenced statutes speak for themselves. Defendant denies any allegations that are inconsistent with or mischaracterize the statutes.**

5.        The MCLL applies "regardless of:... [w]hether the transaction is or purports to be made under this subtitle." *Id.* § 12-303. The MCLL also "applies to all loans made by a lender domiciled in another state to a borrower who is a resident of this State if the application for the loan originated in this State." *Id.* § 12-3 l 4. Many of Mercury's loans, including Plaintiff's, were made to Maryland residents whose loan applications originated in Maryland.

**ANSWER**:  **Defendant admits only that the referenced statutes speak for themselves. Defendant denies any allegations that are inconsistent with or mischaracterize the statutes. Defendant denies the remaining allegations in Paragraph 5.**

**JA39**

6.    Each of Mercury's loans to Plaintiff and the members of the Class defined below was subject to the MCLL, and anyone in the business of making or acquiring those loans was required to be licensed.

**ANSWER**: **Defendant denies the allegations in Paragraph 6.**

7.    Despite its Maryland lending activities, Mercury has never had any MCLL license or any other license to make consumer loans to Marylanders, under any name.

**ANSWER**:    **Defendant denies the allegations in Paragraph 7.**

8.    Because Mercury is in the business of making loans subject to the MCLL but it does not have an MCLL license, its loans to Plaintiff and other Maryland consumers are "void and  unenforceable." MCLL § 12-314(b)(l)(i).

**ANSWER**:    **Defendant admits only that the referenced statutes speak for themselves. Defendant denies any allegations that are inconsistent with or mischaracterize the statutes. Defendant denies the remaining allegations in Paragraph 8.**

9.    No person may "receive or retain" any amounts from Plaintiff or Class Members in connection with Mercury void and unenforceable loans to them. *See* MCLL § 12-314(b)(2) ("A person may not receive or retain any principal, interest, fees, or other compensation with respect to any loan that is void and unenforceable under this subsection.").

**ANSWER**: **Defendant admits only that the referenced statutes speak for themselves. Defendant denies any allegations that are inconsistent with or mischaracterize the statutes. Defendant denies the remaining allegations in Paragraph 9.**

10.    By collecting on its void and unenforceable loans, Mercury violated the MCLL. *See* MCLL § 12-314(d)(I) ("With respect to a loan that is void and unenforceable  under this

**JA40**

section, a person may not:... [c]ollect or attempt to collect, directly or indirectly, any amount from the borrower.")

**ANSWER**:    **Defendant admits only that the referenced statutes speak for themselves. Defendant denies any allegations that are inconsistent with or mischaracterize the statutes. Defendant denies the remaining allegations in Paragraph 10.**

11.    Mercury's actions violated not only the MCLL, but also the Maryland Consumer Debt Collection Act, Md. Code Ann., Com. Law §§ 14-201 *et seq.* ("MCDCA") and the Maryland Consumer Protection Act, Md. Code Ann., Com. Law §§ 12-101 *et seq.* ("MCPA"), and give rise to claims for negligence, unjust enrichment, and money had and received.

**ANSWER**: **Defendant denies the allegations in Paragraph 11.**

12.    Because Mercury's activities were form-driven and violate the law in materially uniform ways in the transactions of the Plaintiff and the numerous other Maryland consumers to whom Mercury made loans, this lawsuit is well-suited for class action treatment.

**ANSWER**: **Defendant denies the allegations in Paragraph 12.**

13.    Accordingly, Plaintiff requests certification of the following Class:

All Maryland residents to whom Mercury made loans which are subject to the MCLL, where the loan application originated in Maryland and the borrower made one or more payments to Mercury on the loan.

Excluded from the Class arc all employees or representatives of Mercury, all Court personnel, and all persons who have not made payments on the subject loan accounts within the last 12 years.

**ANSWER**:    **Defendant denies that the Class referenced in Paragraph 13 may be certified.  Defendant denies the allegations in Paragraph 13.**

14.    As a result of Mercury's unlawful actions, Plaintiff and each Class Member are entitled to a declaration that Maryland law requires Mercury to be licensed, that the contracts

**JA41**

for Mercury's loans are void and unenforceable, that all loans made by Mercury to Plaintiff and Class Members are void and unenforceable, and that Mercury was never entitled to collect any amounts from Plaintiff and Class Members, under Maryland's Declaratory Judgment Act, Md. Code Ann., Cts. & Jud. Pro. §§ 3-401 *et seq*.

**ANSWER**: **Defendant denies the allegations in Paragraph 14.**

15.     In addition, Mercury must return all amounts collected on Plaintiff and Class Members' Mercury loans within the past twelve years, under the MCLL. Plaintiff and Class Members arc also entitled to recover damages including the amounts collected on the Mercury loans under the MCDCA, the MCPA, in negligence, unjust enrichment, and money had and received.

**ANSWER**: **Defendant denies the allegations in Paragraph 15.**

**Parties**

16.     Plaintiff Angelita Bailey is a natural person who is a resident and citizen of the State of Maryland. She was a resident of the State of Maryland and within the State of Maryland at the time she entered into any agreement for the loan account at issue in this lawsuit. The application for that loan originated within the State of Maryland.

**ANSWER**: **Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 16 and therefore denies those allegations.**

17.     Mercury Financial, LLC, formerly known as CreditShop, LLC, is a privately-held subprime credit card loan originator, lender, marketer, and servicer. It is a limited liability company organized in Delaware, with its principal place of business in Delaware. Mercury markets and makes consumer credit card loans in Maryland and elsewhere in the United States.

5

**JA42**

**ANSWER**:  **Defendant admits only that Mercury Financial, LLC, is organized in Delaware, with its principal place of business in Delaware.  Defendant denies the remaining allegations in Paragraph 17.**

## Jurisdiction and Venue

18.     This Court has subject-matter jurisdiction over this case pursuant to Md. Code Ann., Cts. & Jud. Proc. §§ 1-501 and 4-402(e)(2).  This Court has personal jurisdiction pursuant to Md. Code Ann., Cts. & Jud. Proc. §§ 6-102 and 6-103(6), as the Defendant transacts business and performs work and service in the State of Maryland, contracts to supply services in the State of Maryland, and regularly does and solicits business and engages in other persistent courses of conduct in the State of Maryland, including the business described in this Complaint, and as the Defendant maintains a resident agent in the State of Maryland.

**ANSWER**:  **Defendant admits only that the U.S. District Court for the District of Maryland has subject matter jurisdiction and personal jurisdiction over this matter for the reasons addressed in Defendant's Notice of Removal, ECF. No. 1.  Defendant denies the remaining allegations in Paragraph 18.**

19.     This Court has personal jurisdiction over the Defendant under the long-arm statute of the State of Maryland, Md. Code, Cts. & Jud. Proc.§ 6-103, and the United States Constitution, because Mercury conducts substantial business within the State of Maryland. Therefore, a substantial part of the events and/or omissions giving rise to the claims and Plaintiffs tortious injuries occurred within the state of Maryland.

**ANSWER**:  **Defendant admits only that the U.S. District Court for the District of Maryland has subject matter jurisdiction and personal jurisdiction over this matter for the reasons addressed in Defendant's Notice of Removal, ECF. No. 1.  Defendant denies the remaining allegations in Paragraph 19.**

**JA43**

20.    Venue is proper in this Court under Md. Code Ann., Cts. & Jud. Proc. §§ 4-402(e)(2) and 6-201, as the amount in controversy in this case exceeds $25,000.00, as the controversy includes a claim for declaratory relief, and because the Defendant carries on a regular business and habitually engages in vocation in Montgomery County, Maryland. Among other things, the Defendant directed its activity described in this Complaint to persons including Plaintiff and other residents of Montgomery County, Maryland.

**ANSWER**:  **Defendant denies that venue is proper in the Circuit Court for Montgomery County.  Defendant admits only that it conducts business in Montgomery County, Maryland.  Defendant denies the remaining allegations in Paragraph 20.**

**Factual Allegations for Individual and Class Relief**

***Mercury's Business***

21.    Mercury is a small-loan lender that makes loans to consumers and made consumer loans to Plaintiff and Class members).

**ANSWER**:  **Defendant denies the allegations in Paragraph 21.**

22.    Mercury advertises that it "target[s] consumers through direct mail, digital affiliates, email origination channels and co-branded partnerships. To date, the Company has extended $2.5 billion in credit lines and helped nearly a million customers with a credit card that earns rewards, carries no monthly fee for issuance or availability, and has an affordable APR.".

**ANSWER**:  **Defendant denies the allegations in Paragraph 22.**

23.    Credit limits on Mercury's accounts with Plaintiff and Class members are and were all less than $25,000.00.

**ANSWER**:  **Defendant denies the allegations in Paragraph 23.**

**JA44**

24.     Although Mercury made consumer loans to Plaintiff and each Class member of less than $25,000, when the borrower was a resident of Maryland and the application for the loan originated in Maryland, it does not have the MCLL license required to do so.

**ANSWER**:  **Defendant denies the allegations in Paragraph 24.**

25.     Mercury's business operations described in this Complaint violate Maryland law.

**ANSWER**:  **Defendant denies the allegations in Paragraph 25.**

26.     Mercury does not have, and has chosen not to obtain, a license under the MCLL.

**ANSWER**:  **Defendant denies the allegations in Paragraph 26.**

27.     Mercury has a sophisticated and experienced compliance and legal department. Mercury knows that its credit business is in violation of Maryland law and the MCLL.

**ANSWER**:  **Defendant admits only that it has a compliance and legal department. Defendant denies the remaining allegations in Paragraph 27.**

**Plaintiff's Experience with MERCURY**

28.     Plaintiff had a "Mercury" branded credit card account which was owned by Mercury. Plaintiff accepted the credit card agreement for the credit card account in Maryland.

**ANSWER**:  **Defendant denies the allegations in Paragraph 28.**

29.     Plaintiff's application for the account originated in Maryland, where she resides and resided at the time she obtained the account, and the credit extended under the account was extended for personal, family, and household purposes.

**ANSWER**:  **Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 29 and therefore denies those allegations.**

30.     The credit limit for Plaintiffs Mercury credit card account - which Mercury identified in correspondence to Plaintiff as her "credit line" - was $5,250.00.

8

**JA45**

**ANSWER**:  **Defendant admits only that the referenced correspondence speaks for itself.  Defendant denies any allegations that are inconsistent with or mischaracterize that correspondence.**

31.     At no time was Mercury's loan to Plaintiff for more than $6,000.00.

**ANSWER**:  **Defendant denies the allegations in Paragraph 31.**

32.     Plaintiffs credit card agreement does not contain a written election providing that the agreement would be governed by Subtitle 1, Subtitle 4, Subtitle 9, or Subtitle 10 of the Maryland Commercial Law Article.

**ANSWER**:  **Defendant admits only that the referenced credit card agreement speaks for itself.  Defendant denies any allegations that are inconsistent with or mischaracterize that agreement.**

33.     Mercury repeatedly extended consumer credit to Plaintiff of less than $6,000.

**ANSWER**:  **Defendant denies the allegations in Paragraph 33.**

34.     For example, one month Plaintiff's "Mercury" credit card account had a balance of $4,583.09, which was credit Mercury extended to Plaintiff. The previous month, her account balance had been $4,374.24. In the intervening period, Mercury had extended additional credit to her in the amount of $307.50. During that same period, Plaintiff had made a payment to Mercury on the account of $94.73 and had a credit to her account of $3.92. Mercury sent Plaintiff correspondence which demanded that Plaintiff make an additional "minimum payment" of $99.30 to Mercury on Mercury's void and unenforceable loan to Plaintiff and asked her to make the payment to Mercury at "www.mercurycards.com."

**ANSWER**:  **Defendant denies the allegations in Paragraph 34.**

9

**JA46**

35. The next month, Plaintiff's "Mercury" credit card account had a balance of $4,527.54, which was credit Mercury extended to Plaintiff. The previous month, her account balance had been $4,583.09, as detailed above. In the intervening period, Mercury had extended additional credit to her in the amount of $52.54. During that same period, Plaintiff had made a payment to Mercury on the account of $108.09. Mercury sent Plaintiff correspondence which demanded that Plaintiff make an additional "minimum payment" of $97.29 to Mercury on Mercury's void and unenforceable loan to Plaintiff and asked her to make the payment to Mercury at "www.mercurycards.com."

**ANSWER**: **Defendant denies the allegations in Paragraph 35.**

36. The next month, Plaintiffs "Mercury" credit card account had a balance of $4,568.96, which was credit Mercury extended to Plaintiff. The previous month, her account balance had been $4,527.54, as detailed above. In the intervening period, Mercury had extended additional credit to her in the amount of $138.71. During that same period, Plaintiff had made a payment to Mercury on the account of $97.29. Mercury sent Plaintiff correspondence which demanded that Plaintiff make an additional "minimum payment" of $99.07 to Mercury on Mercury's void and unenforceable loan to Plaintiff and asked her to make the payment to Mercury at "www.mercurycards.com."

**ANSWER**: **Defendant denies the allegations in Paragraph 36.**

37. The next month, Plaintiff's "Mercury" credit card account had a balance of $4,611.47, which was credit Mercury extended to Plaintiff. The previous month, her account balance had been $4,568.96, as detailed above. In the intervening period, Mercury had extended additional credit to her in the amount of $143.58. During that same period, Plaintiff had made a payment to Mercury on the account of $99.07. Mercury sent Plaintiff correspondence which

demanded that Plaintiff make an additional "minimum payment" of $98.10 to Mercury on Mercury's void and unenforceable loan to Plaintiff and asked her to make the payment to Mercury at "www.mercurycards.com."

**ANSWER**: **Defendant denies the allegations in Paragraph 37.**

38.    The next month, Plaintiff's "Mercury" credit card account had a balance of $4,726.43, which was credit Mercury extended to Plaintiff. The previous month, her account balance had been $4,611.47, as detailed above. In the intervening period, Mercury had extended additional credit to her in the amount of $226.43. During that same period, Plaintiff had made a payment to Mercury on the account of $111.47. Mercury sent Plaintiff correspondence which demanded that Plaintiff make.an additional "minimum payment" of $101.53 to Mercury on Mercury's void and unenforceable loan to Plaintiff and asked her to make the payment to Mercury at "www.mercurycards.com."

**ANSWER**: **Defendant denies the allegations in Paragraph 38.**

39.    The next month, Plaintiff's "Mercury" credit card account had a balance of $4,680.11, which was credit Mercury extended to Plaintiff. The previous month, her account balance had been $4,726.43, as detailed above. In the intervening period, Mercury had extended additional credit to her in the amount of $55.21. During that same period, Plaintiff had made a payment to Mercury on the account of $101.53. Mercury sent Plaintiff correspondence which demanded that Plaintiff make an additional "minimum payment" of $101.46 to MERCURY on Mercury's void and unenforceable loan to Plaintiff and asked her to make the payment to Mercury at "www.mercurycards.com."

**ANSWER**: **Defendant denies the allegations in Paragraph 39.**

**JA48**

40.    The next month, Plaintiff's "Mercury" credit card account had a balance of $4,844.08, which was credit Mercury extended to Plaintiff. The previous month, her account balance had been $4,680.11, as detailed above. In the intervening period, Mercury had extended additional credit to her in the amount of $163.97. MERCURY sent Plaintiff correspondence which demanded that Plaintiff make a "minimum payment" of $228.37 to Mercury on Mercury's void and unenforceable loan to Plaintiff and asked her to make the payment to Mercury at "www.mercurycards.com."

**ANSWER**:  **Defendant denies the allegations in Paragraph 40.**

41.    The next month, Plaintiff's "Mercury" credit card account had a balance of $4,931.69, which was credit Mercury extended to Plaintiff. The previous month, her account balance had been $4,844.08, as detailed above. In the intervening period, Mercury had extended additional credit to her in the amount of $87.61. Mercury sent Plaintiff correspondence which demanded that Plaintiff make an additional "minimum payment" of $364.42 to Mercury on Mercury's void and unenforceable loan to Plaintiff and asked her to make the payment to Mercury at "www.mercurycards.com."

**ANSWER**:  **Defendant denies the allegations in Paragraph 41.**

42.    Although Mercury extended credit and made consumer loans to Plaintiff of less than $25,000.00, and collected payments from Plaintiff on that credit extension, Mercury does not have any license to conduct its lending business in Maryland and has never had any license to conduct its lending business in Maryland

**ANSWER**:  **Defendant denies the allegations in Paragraph 42.**

**JA49**

43.     Maryland law, including the MCLL, requires Mercury to be licensed by the Commissioner of Financial Regulation to conduct its lending business in Maryland or with respect to consumers including Plaintiff and Class members.

**ANSWER:  Defendant denies the allegations in Paragraph 43.**

### Class Action Allegations

44.     Named Plaintiff brings this action on behalf of a Plaintiff Class which consists of:

All Maryland residents to whom Mercury made loans which are subject to the MCLL, where the loan application originated in Maryland and the borrower made one or more payments to MERCURY on the loan.

Excluded from the Class arc all employees or representatives of Mercury, all Court personnel, and all persons who have not made payments on the subject loan accounts within the last 12 years.

**ANSWER:  Defendant denies that the Class referenced in Paragraph 44 may be certified.**

45.     The Class, as defined above, is identifiable. The Named Plaintiff, Ms. Bailey, is a member of the Plaintiff Class.

**ANSWER Defendant denies that the Class referenced in Paragraph 45 may be certified.  Defendant denies the remaining allegations in Paragraph 45.**

46.     Each Class member's experience was materially the same as Plaintiff's experience.

**ANSWER:  Defendant denies that the Class referenced in Paragraph 46 may be certified.  Defendant denies the remaining allegations in Paragraph 46.**

47.     Mercury extended credit and made consumer loans to each Class member in an amount of less than $25,000.00, when the Class member was a resident of Maryland and the application for the Class member's loan originated in Maryland

**ANSWER:  Defendant denies that the Class referenced in Paragraph 47 may be certified.  Defendant denies the remaining allegations in Paragraph 47.**

13

**JA50**

48.      Mercury did not have a license to act as a lender under the MCLL at the time it engaged in any transactions with Plaintiff or any Class member.

**ANSWER**:   **Defendant denies that the Class referenced in Paragraph 48 may be certified.  Defendant denies the remaining allegations in Paragraph 48.**

49.      Nevertheless, Mercury demanded that Plaintiff and each Class member make payments on Mercury's void and unenforceable loans to them, and Plaintiff and each Class member made payments to Mercury on those void and unenforceable loans.

**ANSWER**:   **Defendant denies that the Class referenced in Paragraph 49 may be certified.  Defendant denies the remaining allegations in Paragraph 49.**

50.      Plaintiff and Class Members made numerous payments to Mercury, including payments of principal, interest, costs, fees and other charges. Mercury received and retained Plaintiff and Class Members' payments.

**ANSWER**:   **Defendant denies that the Class referenced in Paragraph 50 may be certified.  Defendant denies the remaining allegations in Paragraph 50.**

51.      None of the loans of Plaintiff or Class Members contain a written election to be governed by Subtitle 1, Subtitle 4, Subtitle 9, or Subtitle 10 of the Maryland Commercial Law Article.

**ANSWER**:  **Defendant admits only that the referenced credit card agreement speaks for itself.  Defendant denies all allegations that are inconsistent with or mischaracterize that agreement.**

52.      Mercury was not permitted to make its loans to Plaintiff or Class Members because it is not, and never has been, licensed under or exempt from the licensing requirements under the MCLL.

**JA51**

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 52 may be certified.  Defendant denies the remaining allegations in Paragraph 52.**

53.    Mercury's loans to Plaintiff and each Class Member are void and unenforceable because Mercury made the loans without a license under the MCLL, when Mercury is not exempt from the licensing requirements of the MCLL.

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 53 may be certified.  Defendant denies the remaining allegations in Paragraph 53.**

54.    Mercury has unlawfully received and retained, and continues to receive and retain, principal, interest, fees, and other compensation with respect to its loans to Plaintiff and Class Members, which are void and unenforceable under the MCLL.

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 54 may be certified.  Defendant denies the remaining allegations in Paragraph 54.**

55.    Mercury is not, and has never been, licensed as required by Maryland law, the statutes requiring Mercury to be licensed are regularly in nature for the protection of the public, rather than merely to raise revenue, and Mercury's actions described in this Complaint violate the fundamental public policy of Maryland.

**ANSWER**:  **Defendant denies the allegations in Paragraph 55.**

56.    Mercury never had any right to collect money from Plaintiff or Class Members, as a result of Mercury's illegal, unlicensed activity.

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 56 may be certified.  Defendant denies the remaining allegations in Paragraph 56.**

57.    There are questions of law and fact which are not only common to the members of the Class but which predominate over any questions affecting only individual Class members. The common and predominating questions include, but are not limited to:

i.    Whether Mercury had a license or was exempt from licensing under the MCLL;

ii.    Whether Mercury's transactions with Plaintiff and each Class Member are contrary to the public policy of Maryland;

iii.    Whether the statutes requiring Mercury to be licensed arc regulatory in nature for the protection of the public, rather than merely to raise revenue, and enforcing Class Members' Mercury loan accounts is against public policy;

iv.    Whether Mercury ever had any right to receive or retain any payments on Class Members' loans;

v.    Whether each Class Member is entitled to a declaration under the Maryland Declaratory Judgment Act, Md. Code Ann., Cts. &Jud. Pro.§§ 3-401 *et seq.* that their loan account is void and unenforceable;

vi.    Whether the MCLL or the other causes of action alleged in this Complaint entitle Plaintiff and each Class Member to recover all payments made to Mercury;

vii.    Whether Mercury is "liable to Plaintiff and Class members under the MCDCA;

viii.    Whether Mercury is liable to Plaintiff and Class members under the MCPA;

ix.    Whether Mercury is liable to Plaintiff and Class members in negligence.

x.    Whether Mercury is liable to Plaintiff and Class members in unjust enrichment;

xi.    Whether Mercury is liable to Plaintiff and Class members for money had and received.

16

**JA53**

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 57 may be certified.  Defendant denies the remaining allegations in Paragraph 57.**

58.     Plaintiff's claims are typical of the claims of the respective members of the Class within the meaning of Md. Rule 2-231(6)(3) and are based on and arise out of similar facts constituting the wrongful conduct of Defendant.

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 58 may be certified.  Defendant denies the remaining allegations in Paragraph 58.**

59.     Plaintiff will fairly and adequately protect the interests of the Class within the meaning of Md. Rule 2-231(6)(4).  Plaintiff is committed  to vigorously litigating this matter. Further, Plaintiff has secured counsel experienced in handling consumer class actions and complex consumer litigation.

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 59 may be certified.  Defendant denies the remaining allegations in Paragraph 59.**

60.     Neither Plaintiff nor Plaintiff's counsel has any interests which might cause them not to vigorously pursue this claim.

**ANSWER**:  **Defendant lacks sufficient knowledge or information to form a belief as to the truth of the allegations set forth in Paragraph 60 and therefore denies those allegations.**

61.     The prosecution of separate actions by individual members of the Class would create a risk of establishing incompatible standards of conduct for Defendant within the meaning of Md. Rule 2-23l(c)(l)(A).

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 61 may be certified.  Defendant denies the remaining allegations in Paragraph 61**.

62.     Defendant's actions are generally applicable to the respective Class as a whole, and Plaintiff seeks equitable remedies with respect to the Class within the meaning of Md. Rule 2-23l(c)(2).

**ANSWER**:   **Defendant denies that the Class referenced in Paragraph 62 may be certified.  Defendant denies the remaining allegations in Paragraph 62.**

63.     Common questions of law and fact enumerated above predominate over questions affecting only individual members of the Class and a class action is the superior method for fair and efficient adjudication of the controversy within the meaning of Md. Rule 2-23 l(c)(3).

**ANSWER**:   **Defendant denies that the Class referenced in Paragraph 63 may be certified.  Defendant denies the remaining allegations in Paragraph 63.**

64.     The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

**ANSWER**:   **Defendant denies that the Class referenced in Paragraph 64 may be certified.  Defendant denies the remaining allegations in Paragraph 64.**

65.     Plaintiff's counsel are experienced in class actions, and foresee little difficulty in the management of this case as a class action.

**ANSWER**:   **Defendant denies that the Class referenced in Paragraph 65 may be certified.  Defendant denies the remaining allegations in Paragraph 65.**

### Causes of Action

### Count I
### Declaratory Relief under Md. Cts. & Jud. Pro. § 3-406

66.     Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

**ANSWER**:  **Defendant incorporates its answers to the foregoing paragraphs as if set forth herein in their entirety.**

67.    This claim for declaratory relief is brought under the Maryland Declaratory Judgment Act, Md. Code Ann., Cts. & Jud. Pro.§ 3-406, to settle and obtain relief from uncertainty and insecurity with respect to the rights, status and legal relations of the Plaintiff and Class Members with Defendant, under the consumer protections embodied in Maryland law.

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 67 may be certified.  Defendant denies the remaining allegations in Paragraph 67.**

68.    Defendant maintains that it was not required to have a license from the Maryland Commissioner of Financial Regulation to engage in its transactions with Plaintiff and Class Members.

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 68 may be certified.  Defendant denies the remaining allegations in Paragraph 68.**

69.    Plaintiff maintains that Defendant was required to have a license from the Maryland Commissioner of Financial Regulation to engage in the transactions with Plaintiff and Class Members.

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 69 may be certified.  Defendant lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations set forth in Paragraph 69 and therefore denies those allegations.**

70.    Defendant maintains that it did not violate the MCLL in the transactions of Plaintiff and Class Members.

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 70 may be certified.  Defendant admits the remaining allegations set forth in Paragraph 70.**

**JA56**

71.     Plaintiff maintains that Defendant did violate the MCLL in its transactions with Plaintiff and Class Members.

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 71 may be certified.  Defendant lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations set forth in Paragraph 71 and therefore denies those allegations.**

72.     Defendant maintains that it and its assignees may assess and collect charges from Plaintiff and Class Members.

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 72 may be certified.  Defendant denies the remaining allegations in Paragraph 72.**

73.     Plaintiff maintains that Defendant does not have, and never had, the right *to* assess or collect charges from her, or from Class Members, and that the Defendant never had the right to assign any such rights to anyone else, due *to* the facts alleged in this Complaint.

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 73 may be certified.  Defendant lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations set forth in Paragraph 73 and therefore denies those allegations.**

74.     Plaintiff and Class Members have received or will receive collection notices from Defendant and its assignees demanding payment of the alleged amounts due and have been sued or will be sued for collection of the sums which Defendant or its assignees claim are due. Moreover, Defendant notifies credit reporting agencies of the alleged balances due, thereby damaging the credit scores and history of Plaintiff and Class Members.

**ANSWER**:  **Defendant admits only that, in the course of servicing credit card accounts on behalf of the issuing bank, Mercury engages in activity relating to collection from delinquent customers and notification of balances due to credit reporting agencies.**

**Defendant denies that the Class referenced in Paragraph 74 may be certified.  Defendant denies the remaining allegations in Paragraph 74.**

75.      These practices continue and will continue unless and until this Court declares and affirms that Defendant does not have, and never had, the right to receive or retain money from Plaintiff and Class Members on their loan accounts.

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 75 may be certified.  Defendant denies the remaining allegations in Paragraph 75.**

76.      This presents an actual, justiciable controversy between the parties relating to the construction of the purported contracts of Plaintiff and Class Members and the application of the law to those purported contracts. Defendant and its assignees have sought and  will continue to seek to collect amounts from Plaintiff and Class Members when they are not legally entitled to do so, harming Plaintiff and  Class Members.

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 76 may be certified.  Defendant denies the remaining allegations in Paragraph 76.**

77.      Plaintiff and Class Members have a right to be free from the attempts of Defendant and its assignees to collect amounts from them which they do not owe.

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 77 may be certified.  Defendant denies the remaining allegations in Paragraph 77.**

**Count II**
**Violation of the MCLL Licensing Provisions**

78.      Plaintiff re-alleges and incorporates by reference the allegations set forth above.

**ANSWER**:  **Defendant incorporates its answers to the foregoing paragraphs as if set forth herein in their entirety.**

21

**JA58**

79.    Each of the loans to Plaintiff and Class Members which arc the subject of this Complaint were for less than $25,000, are extensions of credit or loans subject to the MCLL and are "loans" under the MCLL.

**ANSWER**:    **Defendant denies that the Class referenced in Paragraph 79 may be certified.  Defendant denies the remaining allegations in Paragraph 79.**

80.    Mercury made the loans to Plaintiff and Class Members which are the subject of this Complaint, and thus is a "lender" under the MCLL.

**ANSWER**:    **Defendant denies that the Class referenced in Paragraph 80 may be certified.  Defendant denies the remaining allegations in Paragraph 80.**

81.    Mercury is in the business of making credit card loans of less than $25,000.00.

**ANSWER**:    **Defendant denies the allegations in Paragraph 81.**

82.    None of the loans to Plaintiff or Class Members elect to be governed by Subtitle I, Subtitle 4, Subtitle 9, or Subtitle 10 of Title 12 of the Maryland Commercial Law Article.

**ANSWER**:    **Defendant admits only that the referenced credit card agreement speaks for itself.  Defendant denies all allegations that are inconsistent with or mischaracterize that agreement.  Defendant denies that the Class referenced in Paragraph 82 may be certified.**

83.    Mercury made loans to Plaintiff and Class Members of less than $25,000.00 when Mercury was required to be licensed under MCLL § 12-302, but Mercury was not and never has been licensed under or exempt from the licensing requirements of the MCLL.

**ANSWER**:    **Defendant admits only that the referenced statute speaks for itself.  Defendant denies any allegations that are inconsistent with or mischaracterize the statute.  Defendant denies that the Class referenced in Paragraph 83 may be certified.  Defendant denies the remaining allegations in Paragraph 83.**

**JA59**

84.     The loans to Plaintiff and Class Members are void and unenforceable under the MCLL.

**ANSWER**:  **Defendant admits only that the referenced statute speaks for itself. Defendant denies any allegations that are inconsistent with or mischaracterize the statute. Defendant denies that the Class referenced in Paragraph 84 may be certified.  Defendant denies the remaining allegations in Paragraph 84.**

85.     Although Plaintiff and Class members made payments to Mercury, or Mercury otherwise collected amounts due under the Class' loans, Mercury was never entitled to receive or retain any principal, interest, fees, or other compensation with respect to any loan to Plaintiff or Class Members, under MCLL § 12-314.

**ANSWER**:  **Defendant admits only that the referenced statute speaks for itself. Defendant denies any allegations that are inconsistent with or mischaracterize the statute. Defendant denies that the Class referenced in Paragraph 85 may be certified.  Defendant denies the remaining allegations in Paragraph 85.**

86.     In violation of the MCLL, Mercury, with respect to the Plaintiffs and Class members' void and unenforceable loans, collected and attempted to collect, directly or indirectly, amounts from Plaintiffs and Class Members, and sold, assigned, or otherwise transferred loans of Plaintiff and Class Members to other persons.

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 86 may be certified.  Defendant denies the remaining allegations in Paragraph 86.**

**Count III**
**Violation of the Maryland Consumer Debt**
**Collection Act**

**JA60**

87.     Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

**ANSWER**:  **Defendant incorporates its answers to the foregoing paragraphs as if set forth herein in their entirety.**

88.     Defendant, at all times relevant to the actions alleged herein, is a "collector" within the meaning of section 14-201(6) of the MCDCA, because the alleged debts of Plaintiff and members of the Class which Defendant collected or sought to collect from them through the actions described herein arose from consumer transactions - i.e. Defendant's extension of credit through consumer credit card loans.

**ANSWER**:  **Defendant admits only that the referenced statute speaks for itself. Defendant denies any allegations that are inconsistent with or mischaracterize the statute. Defendant denies that the Class referenced in Paragraph 88 may be certified.  Defendant denies the remaining allegations in Paragraph 88.**

89.     In collecting and attempting to collect on the alleged debts of Plaintiff and members of the Class, Defendant violated section 14-202 of the MCDCA.

**ANSWER**:  **Defendant admits only that the referenced statute speaks for itself. Defendant denies any allegations that are inconsistent with or mischaracterize the statute. Defendant denies that the Class referenced in Paragraph 89 may be certified.  Defendant denies the remaining allegations in Paragraph 89.**

90.     Among other things, Defendant violated section 14-202(8) and (11) of the MCDCA when it claimed, attempted, or threatened to enforce a right with knowledge that the right does not exist. Defendant claimed, attempted and threatened to enforce a right to collect on its loans to Plaintiff and Class members when the loans were void and unenforceable because Defendant was

not licensed to make the loans under the MCLL. Defendant knew that it was not licensed under the MCLL, or any other Maryland law. Defendant knew that it had no right to act as an unlicensed lender in its dealings with Plaintiff and members of the Class. Defendant knew that it was acting as an unlicensed lender in its dealings with Plaintiff and the Class. At a minimum, Defendant acted with reckless disregard of the license required under the MCLL.

**ANSWER**:  **Defendant admits only that the referenced statute speaks for itself. Defendant denies any allegations that are inconsistent with or mischaracterize the statute. Defendant denies that the Class referenced in Paragraph 90 may be certified.  Defendant denies the remaining allegations in Paragraph 90.**

91.    Furthermore, Mercury violated the MCDCA § 14-202(11) when it undertook to charge and collect from Plaintiff and each Class member payments on void and unenforceable loans which it was not allowed to collect, thereby threatening to take actions that cannot legally be taken.

**ANSWER**:  **Defendant admits only that the referenced statute speaks for itself. Defendant denies any allegations that are inconsistent with or mischaracterize the statute. Defendant denies that the Class referenced in Paragraph 91 may be certified.  Defendant denies the remaining allegations in Paragraph 91.**

92.    Defendant's actions in violation of the MCDCA proximately caused damages to Plaintiff and members of the Class. As a direct and proximate result of Defendant's methods of collecting consumer debts in violation of Maryland law, Plaintiff and other members of the· Class were assessed and paid charges which they did not legally owe, which damaged Plaintiff and Class Members.

**ANSWER**:  Defendant admits only that the referenced statute speaks for itself. Defendant denies any allegations that are inconsistent with or mischaracterize the statute. Defendant denies that the Class referenced in Paragraph 92 may be certified.  Defendant denies the remaining allegations in Paragraph 92.

93.    Plaintiff and Class Members also were damaged because they suffered emotional distress and mental anguish resulting from Defendant's illegal actions in violation of the MCDCA.

**ANSWER**:  Defendant admits only that the referenced statute speaks for itself. Defendant denies any allegations that are inconsistent with or mischaracterize the statute. Defendant denies that the Class referenced in Paragraph 93 may be certified.  Defendant denies the remaining allegations in Paragraph 93.

**Count IV**
**Violation of the Maryland Consumer Protection Act**

94.    Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

**ANSWER**:  Defendant incorporates its answers to the foregoing paragraphs as if set forth herein in their entirety.

95.    The MCPA generally prohibits unfair or deceptive trade practices in, among other things, the collection of consumer debts. *See* MCPA § 13-303(5).

**ANSWER**:  Defendant admits only that the referenced statute speaks for itself. Defendant denies any allegations that are inconsistent with or mischaracterize the statute.

96.    The actions of Defendant alleged herein constituted unfair or deceptive trade practices in the collection of consumer debts as defined by the MCPA, and in taking those actions Defendant violated the MCPA.

26

**JA63**

**ANSWER**: Defendant admits only that the referenced statute speaks for itself. Defendant denies any allegations that are inconsistent with or mischaracterize the statute. Defendant denies the remaining allegations in Paragraph 96.

97. For example, Defendant's practice of engaging in the collection activity described in this Complaint and seeking to collect consumer debt from Plaintiff and Class Members, when Defendant was not licensed or permitted to do so, constituted the failure to state a material fact where the failure deceives or tends to deceive. Defendant's practice of assessing charges against the accounts of Plaintiff and Class Members, and in bills sent to Plaintiff and Class Members demanding payment, without advising that Defendant was not licensed and that its loans were void and unenforceable, constituted the failure to state a material fact where the failure deceives or tends to deceive. Defendant's practice of assessing charges against Plaintiff and Class Members and collecting payments from them without advising that Defendant was not licensed and the loans were void and unenforceable constituted the failure to state material facts where the failure deceives or tends to deceive.

**ANSWER**: Defendant denies that the Class referenced in Paragraph 97 may be certified. Defendant denies the remaining allegations in Paragraph 97.

98. Moreover, the unfair or deceptive trade practices barred by the MCPA specifically include the violation of the MCDCA. *See* MCPA § 13-301(14)(iii). Defendant violated the MCDCA as alleged herein, thus also violating the MCPA.

**ANSWER**: Defendant admits only that the referenced statutes speak for themselves. Defendant denies any allegations that are inconsistent with or mischaracterize the statutes. Defendant denies the remaining allegations in Paragraph 98.

**JA64**

99.     Plaintiff and Class Members sustained actual damages as a result of the actions in violation of the MCPA and MCDCA alleged herein. Plaintiff and Class Members were damaged by, among other things, the payments they made on account of Mercury's void and unenforceable loans to them and the outstanding balances Mercury has wrongfully assessed against them.

**ANSWER**:  **Defendant admits only that the referenced statutes speak for themselves. Defendant denies any allegations that are inconsistent with or mischaracterize the statutes. Defendant denies that the Class referenced in Paragraph 99 may be certified.  Defendant denies the remaining allegations in Paragraph 99.**

### Count V
### Money Had and Received

100.     Plaintiff re-alleges and inco1porates by reference the allegations set forth above as if fully set forth herein.

**ANSWER**:  **Defendant incorporates its answers to the foregoing paragraphs as if set forth herein in their entirety.**

101.     Mercury acted as a lender in its dealings with Plaintiff and members of the Class without the license required under Maryland law, and demanded that Plaintiff and the members of the Class make payments on its loans to them, which were void and unenforceable under the fundamental public policy of Maryland. Plaintiff and Class members made payments to Mercury on its void and unenforceable loans.

**ANSWER**:  **Defendant admits only that the referenced Maryland laws speak for themselves.  Defendant denies any allegations that are inconsistent with or mischaracterize those laws.  Defendant denies that the Class referenced in Paragraph 101 may be certified. Defendant denies the remaining allegations in Paragraph 101.**

**JA65**

102.     Defendant's actions as an unlicensed lender and its collection of payments from Plaintiff and Class members on loans which are void and unenforceable were and are illegal.

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 102 may be certified.  Defendant denies the remaining allegations in Paragraph 102.**

103.     Any otherwise existing basis under which Defendant would be entitled to any form of payment or compensation of any kind for its void and unenforceable loans is nugatory and ineffective as Defendants' activities in Maryland were in violation of Maryland law.

**ANSWER**:  **Defendant admits only that the referenced Maryland laws speak for themselves.  Defendant denies any allegations that are inconsistent with or mischaracterize those laws.  Defendant denies that the Class referenced in Paragraph 103 may be certified. Defendant denies the remaining allegations in Paragraph 103.**

104.     As a result of Defendant's actions, Defendant collected money, resulting from the charges which it unlawfully assessed to Plaintiff and Class Members, to which it had no legal or equitable right.

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 104 may be certified.  Defendant denies the remaining allegations in Paragraph 104.**

105.     Defendant should return its ill-gotten gains to Plaintiff and other Class Members.

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 105 may be certified.  Defendant denies the remaining allegations in Paragraph 105.**

### Count VI
### Negligence

106.     Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

**ANSWER**:  **Defendant incorporates its answers to the foregoing paragraphs as if set forth herein in their entirety.**

107.    Defendant had a duty to Plaintiff and members of the Class to not send them bills and act as a lender, when it did not have the license to act as a lender required under Maryland law.

**ANSWER**:  **Defendant admits only that the referenced Maryland laws speak for themselves.  Defendant denies any allegations that are inconsistent with or mischaracterize those laws.  Defendant denies that the Class referenced in Paragraph 107 may be certified. Defendant denies the remaining allegations in Paragraph 107.**

108.    Defendant breached its duties of care to Plaintiff and members of the Class when it acted as lender in its dealings with Class members when it did not have the license to do so. Defendant further breached its duties of care to Plaintiff and members of the Class when it charged and collected payments from Plaintiff and Class members on void and unenforceable loans.

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 108 may be certified.  Defendant denies the remaining allegations in Paragraph 108.**

109.    Plaintiff and members of the Class have suffered actual losses and damages as the proximate result of the breaches of duty of Defendant. Among other things, Plaintiff and members of the Class have been assessed and forced to pay amounts to Mercury for its unlawful actions as a lender, and to pay amounts on void and unenforceable loans. These damages, losses and injuries were proximately caused by the breaches of duty of Defendant, as Plaintiff and Class Members would not have paid amounts for Defendant's unlicensed and unauthorized actions absent Defendant's breaches of duty and would not have made payments on void and unenforceable loans absent Defendant's breaches of duty.

**JA67**

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 109 may be certified.  Defendant denies the remaining allegations in Paragraph 109.**

**Count VII**
**Unjust Enrichment**

110.    Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

**ANSWER**:  **Defendant incorporates its answers to the foregoing paragraphs as if set forth herein in their entirety.**

111.    Plaintiff and Class members conferred a benefit upon Defendant by paying amounts to Defendant which were billed to them by Defendant on void and unenforceable loans.

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 111 may be certified.  Defendant denies the remaining allegations in Paragraph 111.**

112.    Defendant knew of the benefit conferred upon it by Plaintiff and the members of the Class. Mercury affirmatively demanded in its bills to Plaintiff and Class members payment of amounts on its void and unenforceable loans.

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 112 may be certified.  Defendant denies the remaining allegations in Paragraph 112.**

113.    It would be inequitable for Defendant to retain the amounts that it has received in connection with its unlawful actions directed to Plaintiff and Class Members, as those amounts were paid to Defendant as a result of its unlawful activity described in this Complaint and were not legally owed to Defendant and could not legally be collected by Defendant.

**ANSWER**:  **Defendant denies that the Class referenced in Paragraph 113 may be certified.  Defendant denies the remaining allegations in Paragraph 113.**

**JA68**

WHEREFORE, Plaintiff demands declaratory judgment and judgment in an aggregated amount for the Class as a whole in excess of $75,000, as follows:

A. A declaratory judgment establishing that Mercury was required to be licensed under the MCLL to undertake the actions alleged in this Complaint;

B. A declaratory judgment establishing that Mercury never had any right to collect any money from Plaintiff or Class Members, and that Plaintiff and Class Members' loans and agreements with Defendant are void and enforceable;

C. A declaratory judgment establishing that Mercury never had any right to collect any money from Plaintiff or Class Members;

D. Recovery of compensatory damages in an amount determined by a jury, including recovery of all principal, interest, and other compensation received by Mercury on Plaintiff and Class member accounts; damages for emotional distress and mental anguish, disgorgement and restitution of all benefits received by Defendant in connection with its unlicensed and unlawful activity alleged in this Complaint, reasonable attorney's fees pursuant to Md. Code Ann., Com. Law. § 13-408(b), and the costs of this action, all in an aggregated sum in excess of $75,000.00 for the proposed Class as a whole;

E. Pre-judgment and post-judgment interest at the legal rate on all sums awarded to Plaintiff and Class Members; and

F. Such other and further relief as the nature of the case may require.

**ANSWER**:  **Defendant denies that the referenced Class may be certified.  Defendant denies that Plaintiff or the putative Class is entitled to relief.**

**JA69**

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

The Complaint as a whole, and each and every purported cause of action contained therein, fails to state facts sufficient to constitute a cause of action against Defendant.

### SECOND AFFIRMATIVE DEFENSE

The Complaint as a whole, and each and every purported cause of action alleged therein, is barred by the doctrine of accord and satisfaction.

### THIRD AFFIRMATIVE DEFENSE

The Complaint as a whole, and each and every purported cause of action alleged therein, is barred by release.

### FOURTH AFFIRMATIVE DEFENSE

The Complaint as a whole, and each and every purported cause of action alleged therein, is barred by the doctrine of estoppel.

### FIFTH AFFIRMATIVE DEFENSE

The Complaint as a whole, and each and every purported cause of action alleged therein, is barred by waiver.

### SIXTH AFFIRMATIVE DEFENSE

The Complaint as a whole, and each and every purported cause of action alleged therein, is barred because Plaintiff has selected an improper forum and must submit her claims to arbitration as provided in Plaintiff's cardholder agreement.

### SEVENTH AFFIRMATIVE DEFENSE

The Complaint as a whole, and each and every purported cause of action alleged therein, is barred because Plaintiff attempts to bring a class action suit, which is barred by the Plaintiff's cardholder agreement.

33

**JA70**

### EIGHTH AFFIRMATIVE DEFENSE

The Complaint as a whole, and each and every purported cause of action alleged therein, is barred because at all times relevant hereto, Defendant conducted itself in conformity with all applicable laws and regulations.

### NINTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint fails, in whole or in part, because Plaintiff has suffered no actual damages as a result of Defendant's alleged violations.

### TENTH AFFIRMATIVE DEFENSE

Plaintiff lacks Article III standing.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016).

### ELEVENTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint fails, in whole or in part, because Defendant owes no duty of law to Plaintiff.

### TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint fails, in whole or in part, because Defendant has breached no duty of law owed to Plaintiff.

### THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint fails, in whole or in part, because Defendant has at all times followed reasonable procedures to assure maximum possible accuracy of its servicing of Plaintiff's account.

### FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint fails, in whole or in part, because Defendant never arranged loans or extended credit to consumer and accordingly, is not subject to the licensing requirement on which Plaintiff bases the entirety of the Complaint.

**JA71**

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff's Complaint fails, in whole or in part, because Plaintiff is not entitled to injunctive relief or a declaratory judgment against Defendant.

## RIGHT TO ASSERT ADDITIONAL AFFIRMATIVE AND OTHER DEFENSES

Defendant reserves the right to assert any additional affirmative and other defenses, or to amend its present defenses, as further information becomes available.


Dated:  March 31, 2023                    Respectfully submitted,


                                          */s/ Melissa O. Martinez*
                                          Melissa O. Martinez (Fed. Bar No. 28975)
                                          **MCGUIREWOODS LLP**
                                          500 East Pratt Street
                                          Suite 1000
                                          Baltimore, MD 21202
                                          410-659-4400
                                          410-659-4482 (Fax)
                                          mmartinez@mcguirewoods.com

                                          ***Counsel for Mercury Financial, LLC***

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 31, 2023, the foregoing copy of Mercury Financial, LLC's Answer and Affirmative Defenses to Plaintiff's Class Action Complaint was electronically filed via the Court's CM/ECF system and served on all counsel of record.

*/s/ Melissa O. Martinez*

Melissa O. Martinez

**JA73**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ANGELITA BAILEY,    *

    *On Her Own Behalf and on Behalf of*    *
    *All Others Similarly Situated*,

                 *    Civil Action No. 8:23-cv-00827-DKC

        Plaintiff,

v.    *

MERCURY FINANANCIAL, LLC,    *

        Defendant.    *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
## AND TO STRIKE CLASS ALLEGATIONS

Defendant Mercury Financial, LLC ("Mercury"), by and through its attorneys, and pursuant to Federal Rules of Civil Procedure 12 and 23, hereby respectfully moves to compel arbitration and stay this action, and to strike the class allegations. The grounds for this motion are more fully stated in the accompanying Memorandum of Law in Support of Motion to Compel Arbitration and Stay Proceedings and to Strike Class Allegations, which is incorporated by reference as though restated fully herein.

**WHEREFORE**, for the foregoing reasons, Defendant Mercury Financial, LLC, respectfully requests that the Court grant this Motion to Compel Arbitration and Stay Proceedings, and to Strike the Class Allegations.

*[Signatures follow on the next page]*

**JA74**

Dated:  March 31, 2023                    Respectfully submitted,

                                          */s/ Melissa O. Martinez*
                                          Melissa O. Martinez (Fed. Bar No. 28975)
                                          **MCGUIREWOODS LLP**
                                          500 East Pratt Street
                                          Suite 1000
                                          Baltimore, MD 21202
                                          410-659-4400
                                          410-659-4482 (Fax)
                                          mmartinez@mcguirewoods.com

                                          ***Counsel for Mercury Financial, LLC***

**JA75**

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March 31, 2023, a copy of the foregoing Motion to Compel Arbitration and Stay Proceedings, and to Strike the Class Allegations, Memorandum of Law in Support, Exhibits, and Proposed Order were served via the CM/ECF System on all counsel of record.

*/s/ Melissa O. Martinez*
Melissa O. Martinez

**JA76**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ANGELITA BAILEY, | * |
| *On Her Own Behalf and on Behalf of All Others Similarly Situated*, | * Civil Action No. 8:23-cv-827-DKC |
| | * [Removed from the Circuit Court for Montgomery County, Maryland Case No. C-15-CV-23-000224] |
| Plaintiff, | |
| v. | * |
| MERCURY FINANCIAL, LLC, | * |
| Defendant. | * |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
## AND TO STRIKE CLASS ALLEGATIONS

Dated:  March 31, 2023                    Respectfully submitted,

*/s/ Melissa O. Martinez*
Melissa O. Martinez (Fed. Bar No. 28975)
**MCGUIREWOODS LLP**
500 East Pratt Street
Suite 1000
Baltimore, MD 21202
410-659-4400
410-659-4482 (Fax)
mmartinez@mcguirewoods.com

***Counsel for Mercury Financial, LLC***

**TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................... 1

RELEVANT FACTUAL BACKGROUND ............................................................... 2

   I.   Claims Relating To Plaintiff's Credit Card Are Governed By The Arbitration
      Provision In Her Cardmember Agreement. ..................................................... 2

   II.  Plaintiff Filed Suit In Court Seeking A Jury Trial And Purporting To Represent A
      Class In Violation Of The Terms Of The Cardmember Agreement................. 5

STANDARD OF REVIEW ........................................................................................ 6

ARGUMENT ............................................................................................................. 7

   I.   The Court Should Compel Arbitration Pursuant to the Cardmember Agreement............. 8

   II.  The Court Should Compel Arbitration Because The Plaintiff's Challenge To The
      Validity of the Cardholder Agreement Is For The Arbitrator To Decide. ........................ 13

   III. The Court Should Strike the Class Allegations. ............................................. 15

CONCLUSION ........................................................................................................ 17

**JA78**

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Express Co. v. Italian Colors Rest.*,
   133 S. Ct. 2304 (2013) ...............................................................................16

*Arthur Andersen LLP v. Carlisle*,
   556 U.S. 624 (2009) ......................................................................................7

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011) ................................................................................16, 17

*Bess v. Check Express*,
   294 F.3d 1298 (11th Cir. 2002) ...............................................................14, 15

*Buckeye Check Cashing, Inc. v. Cardegna*,
   546 U.S. 440 (2006) .........................................................................12, 13, 14, 15

*Del Webb Cmtys., Inc. v. Carlson*,
   817 F.3d 867 (4th Cir. 2016) .......................................................................7

*Dillon v. BMO Harris Bank, N.A.*,
   856 F.3d 330 (4th Cir. 2017) .......................................................................11

*Doe v. New Ritz, Inc.*,
   No. RDB-14-2367, 2016 WL 1642933 (D. Md. Apr. 26, 2016) ..........................6, 12

*Dwyer v. Discover Fin. Servs.*,
   No. WMN-15-2322, 2015 WL 7754369 (D. Md. Dec. 2, 2015) .........................2

*Epic Sys. Corp. v. Lewis*,
   138 S. Ct. 1612 (2018) ...........................................................................7, 8, 10

*Erie R.R. Co. v. Tompkins*,
   304 U.S. 64 (1938) ........................................................................................7

*Flandreau Pub. Sch. Dist. No. 50-3 v. G.A. Johnson Constr., Inc.*,
   701 N.W.2d 430 (S.D. 2005) ........................................................................8

*GKD-USA, Inc. v. Coast Mach. Movers*,
   126 F. Supp. 3d 553 (D. Md. 2015) ..............................................................12

*Hammerquist v. Warburton*,
   458 N.W.2d 773 (S.D. 1990) ........................................................................10

**JA79**

*Jackson v. Pasadena Receivables, Inc.*,
   398 Md. 611 (2007) ......................................................................................7

*Jones v. Prosper Marketplace, Inc.*,
   2022 WL 834210 (D. Md. Mar. 21, 2022)....................................................9

*King v. Capital One Bank (USA), N.A.*,
   Case No. 3:11-cv-00068, 2012 WL 5570624 (W.D. Va. Nov. 15, 2012) .............17

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
   313 U.S. 487 (1941)......................................................................................7

*Kop-Flex Emerson Power Transmission Corp. v. Int'l Ass'n of Machinists &*
   *Aerospace Workers Local Lodge No. 1784, Dist. Lodge No. 4*,
   840 F. Supp. 2d 885 (D. Md. 2012) ...........................................................11

*Levin v. Alms & Assocs., Inc.*,
   634 F.3d 260 (4th Cir. 2011) ......................................................................12

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983)..........................................................................................6

*U.S. ex rel. MPA Const., Inc. v. XL Specialty Ins. Co.*,
   349 F. Supp. 2d 934 (D. Md. 2004) ...........................................................12

*Muriithi v. Shuttle Express, Inc.*,
   712 F.3d 173 (4th Cir. 2013) ...............................................................12, 16

*Noohi v. Toll Bros.*,
   708 F.3d 599 (4th Cir. 2013) ......................................................................17

*Peabody Holding Co., LLC v. United Mine Workers of Am., Int'l Union*,
   665 F.3d 96 (4th Cir. 2012) ........................................................................11

*Rossi Fine Jewelers, Inc. v. Gunderson*,
   648 N.W.2d 812 (S.D. 2002) ........................................................................9

*Rota-McLarty v. Santander Consumer USA, Inc.*,
   700 F.3d 690 (4th Cir. 2012) ........................................................................8

*Russell v. Cont'l Rest., Inc.*,
   430 F. Supp. 2d 521 (D. Md. 2006) ...........................................................11

*Smith v. Hegg*,
   214 N.W.2d 789 (S.D. 1974) ........................................................................9

*Snowden v. CheckPoint Check Cashing*,
   290 F.3d 631 (4th Cir. 2002) .................................................................10, 15

**JA80**

*Stoebner v. Konrad*,
     914 N.W.2d 590 (S.D. 2018) ...................................................................14

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
     559 U.S. 662 (2010) .................................................................7, 15, 16

*Wandler v. Lewis*,
     567 N.W.2d 377 (S.D. 1997) ...............................................................9, 10

*Zirpoli v. Midland Funding, LLC*,
     48 F.4th 136 (3rd Cir. 2022) ..............................................................14, 15

**Statutes**

9 U.S.C. § 2 .............................................................................................6, 7

9 U.S.C. § 3 .........................................................................................6, 7, 13

Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* .....................................................1

Maryland Consumer Debt Collection Act, Md. Code Comm. Law § 14-201 *et seq.* ............5, 8, 13

Maryland Consumer Protection Act, Md. Code Comm. Law § 13-101 *et seq.* ....................5, 8, 13

Maryland Consumer Loan Law, Md. Code Fin. Inst. § 11-301 *et seq.* ................................5, 8, 13

Uniform Arbitration Act ...........................................................................14

**Other Authorities**

Fed. R. Civ. P. 12(b)(3) ...........................................................................1

iv

**JA81**

Defendant Mercury Financial, LLC ("Mercury" or "Defendant"), by and through its undersigned attorneys, and pursuant to Federal Rules of Civil Procedure 12 and 23, hereby respectfully moves to compel arbitration and stay this action, and to strike the class allegations, and in support states:

## INTRODUCTION

All of Plaintiff Angelita Bailey's ("Plaintiff") claims in this action are governed by a binding and enforceable arbitration provision and class action waiver ("Arbitration Provision") that she accepted when she opened and used her Juniper Mastercard® credit card issued by Barclays Bank Delaware and serviced by Mercury. Accordingly, this action should be stayed and Plaintiff should be compelled to arbitrate only her individual claims as she is contractually obligated to do, pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§1 *et seq*.

The applicable contract (the "Cardmember Agreement") governing the terms of Plaintiff's approval for and use of the credit card that is the subject of this claim (the "Account") contains a valid and enforceable Arbitration Provision. **Exhibit 1**, Declaration in Support of Defendant's Motion to Compel, at ¶ 15 (hereinafter, "Declaration"). This Arbitration Provision governs all claims arising from or relating to Plaintiff's Account, her application for and use of the Account, and the relationship between the parties that resulted from her being extended an Account. The Cardmember Agreement also includes a class action waiver barring Plaintiff's participation in the putative class action that she nevertheless attempts to bring in the instant case. The parties unambiguously agreed to submit their disputes to the American Arbitration Association ("AAA"), JAMS, or another mutually agreed arbitration company for adjudication. All of Plaintiff's claims are subject to individual, non-class arbitration pursuant to the parties' Arbitration Provision and the FAA. Because Defendant is demanding arbitration upon Plaintiff's initiation of this lawsuit,

an order compelling arbitration and submission of Plaintiff's claims to an arbitrator, and striking the class allegations, per the Cardmember Agreement is warranted.

## RELEVANT FACTUAL BACKGROUND

**I.      Claims Relating To Plaintiff's Credit Card Are Governed By The Arbitration Provision In Her Cardmember Agreement.**

On or about October 9, 2006, Plaintiff opened a Juniper Mastercard® credit card account issued by Barclays Bank Delaware ("Barclays"). *See* Declaration at ¶ 7. A Juniper cardmember agreement governed the relationship between Plaintiff and Juniper. *See* **Exhibit 2**, Juniper Cardmember Agreement.[1] The Juniper cardmember agreement contained an arbitration clause providing in pertinent part:

> **Arbitration**
> Any claim, dispute or controversy ("Claim") by either you or us against the other, or against the employees, agents or assigns of the other, arising from or relating in any way to this Agreement or your Account, or any transaction on your Account including (without limitation) statutory tort and contract claims and Claims regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved, upon the election by you or us, by binding arbitration under the rules and procedures of the arbitration Administrator selected at the time the Claim is filed.

*Id.* at 1. The Juniper cardmember agreement further contained an "**Assignment**" clause providing, "We may at any time assign your Account, any sums due on your Account, this Agreement or our rights or obligations under this Agreement. The person(s) to whom we make any such assignment shall be entitled to all of our rights under this Agreement, to the extent assigned." *Id.* at 2.

---

[1] The Court may consider documents outside of the pleadings, including the Cardmember Agreement, because they are specifically referenced in the Complaint. *See, e.g., Dwyer v. Discover Fin. Servs.*, No. WMN-15-2322, 2015 WL 7754369, at *2 (D. Md. Dec. 2, 2015); *see* ECF 3, Compl. ¶¶ 32, 51, 82 (specifically referring to credit card agreements applicable to loans of Plaintiff's and the putative class).

Moreover, the Juniper cardmember agreement contained a "**Changes in This Agreement**" clause providing:

> We can at any time change this Agreement, including the annual percentage rate and any fees, and can add or delete provisions relating to your Account or to the nature, extent and enforcement of the rights and obligations you or we may have under this Agreement. We will notify you of any change, addition, or deletion. . . . You will be deemed to accept all the changes, additions and deletions accompanying the notice and to ratify and confirm all the provisions of your Agreement and your acceptance of all the changes, additions and deletions described in other notices previously sent to you if 1) you do not notify us that you do not agree to the change, addition or deletion in a timely manner, or 2) you use the Card or Account after the conclusion of the specified time period.

*Id.*

On or about March 24, 2017, Barclays sold a portfolio of credit card accounts to First Bank & Trust, Brookings SD ("FB&T"), with servicing to be converted to Mercury, including the servicing of Plaintiff's account. *See* Declaration at ¶¶ 5-7. On or about July 23, 2018, Mercury notified Plaintiff by letter that her Juniper Mastercard® credit card account had been sold and would be converted on September 24, 2018, to a Mercury Mastercard® credit card account issued by FB&T. *See* **Exhibit 3**, Conversion Letter at 1; *see also* Declaration at ¶ 11. The letter included certain terms that would apply to the Mercury account on the conversion date, and highlighted that the new Cardmember Agreement would contain an Arbitration Provision.[2] *See* **Exhibit 3** at 1; *see also* Declaration at ¶ 12. The letter expressly highlighted, under the heading "**Jury Trial Waiver and Arbitration Clause Changes**," that the new Cardmember Agreement contains the Arbitration Provision as follows:

---

[2] The current Cardmember Agreement, attached hereto as **Exhibit 4,** has been revised since Plaintiff's account was converted in 2018. The relevant language in the current Cardmember Agreement that contains the Arbitration Provision requiring arbitration upon a party's demand has not changed since 2018. A true and correct copy of the 2018 version of the Cardmember Agreement is also attached hereto as **Exhibit 5**.

3

**JA84**

Your Cardmember Agreement contains a Jury Trial Waiver and Arbitration Clause.
Please read that section carefully. You may reject the Jury Trial Waiver and
Arbitration Clause ("opt-out") by following the steps noted in that section within
60 days after you have accepted the Agreement. The Account Conversion Date
will be considered the date you accepted the Agreement, for purposes of this opt-
out, because you have an existing Account.

**Exhibit 3** at 1-2**.**

Plaintiff did not opt out of the Arbitration Provision. *See* Declaration at ¶ 17. By not opting

out of the Arbitration Provision, Plaintiff agreed to resolve any claim that might arise out of or

relate to the Cardmember Agreement through binding bilateral arbitration. *See* **Exhibit 4**,

Cardmember Agreement at 5-6. Under the Cardmember Agreement's Arbitration Provision,

Plaintiff waived any right to file claims in court, other than small claims court, or to participate in

any class action lawsuit. *Id.* The Cardmember Agreement provides in pertinent part:

**JURY TRIAL WAIVER AND ARBITRATION CLAUSE**

By accepting this Agreement, you agree to this Jury Trial Waiver and Arbitration
Clause ("Clause"). This Clause is in question and answer form to make it easier to
understand. Even so, this Clause is part of this Agreement and is legally binding.
**Under this Clause, you waive the right to have any Dispute heard by a judge
and jury and you waive the right to participate in a class, representative or
private attorney general action regarding any Dispute. You may "opt out" of
this Clause in the manner set out in the section of the Clause entitled "Is this
Clause Required."**

*Id.* at 5.

The section of the Clause entitled "What Disputes does the Clause cover?" provides that

the Clause governs "all 'Disputes'" between Plaintiff and Defendant, and defines "Disputes" as

follows:

In this Clause, the word "Disputes" means any claim, counterclaim, cross-claim,
complaint, cross-complaint, controversy, or dispute between you or us arising
under, out of, or directly or indirectly related to your application, this Agreement
or your relationship with us. It includes claims related to any prior applications or
agreements. It includes extensions, renewals, refinancings, or payment plans. It
includes claims related to collections, privacy, and customer information. It

4

**JA85**

includes claims related to the validity in general of this Agreement. Without limiting the generality of the foregoing, the term Dispute shall include any claim, controversy or dispute without regard to when it arose; whether it is based in contract, tort, statute, regulation, common law, or equity; or whether the remedy sought is legal or equitable, including claims for compensatory, monetary and/or punitive damages, restitution and/or disgorgement, or injunctive relief, including public injunctive relief. Dispute also includes any claim, defense or dispute concerning the formation, existence, validity, enforceability, revocation or scope of this Clause.

*Id.* at 6.

Plaintiff used her Account for consumer related purchases. *See* Declaration at ¶ 16. By using her Account, Plaintiff agreed to be bound by the Cardmember Agreement. *See* **Exhibit 4** at 2.

## II.    Plaintiff Filed Suit In Court Seeking A Jury Trial And Purporting To Represent A Class In Violation Of The Terms Of The Cardmember Agreement.

Plaintiff, on behalf of herself and a class, filed suit against Defendant on January 25, 2023, alleging that Defendant violated the Maryland Consumer Debt Collection Act, the Maryland Consumer Protection Act, and the Maryland Consumer Loan Law by entering into credit transactions without a license. *See* ECF No. 3, Compl. at Counts I-V. Plaintiff further alleges that Defendant was negligent and unjustly enriched as a result of these violations. *See id.* at Counts VI-VII. Plaintiff contends that Defendant was never entitled to receive or retain any principal, interest, fees, or compensation related to the loans they serviced. *Id.* at "WHEREFORE" paragraph. The foregoing claims arose out of the Cardmember Agreement, given Plaintiff's claims that Defendant was not entitled to any fees or compensation under the Cardmember Agreement. Plaintiff and Defendant agreed to arbitrate these claims upon the demand of any party, and to a class action waiver. *See* **Exhibit 4** at 5-6. There are no claims asserted by Plaintiff against Defendant that fall outside the scope of the Arbitration Provision of the Cardmember Agreement.

**JA86**

## STANDARD OF REVIEW

In reviewing a motion to compel arbitration, the court applies a standard that is "akin to the burden on summary judgment." *Doe v. New Ritz, Inc.*, No. RDB-14-2367, 2016 WL 1642933, at *2 (D. Md. Apr. 26, 2016). "The party seeking a jury trial must make an unequivocal denial that an arbitration agreement exists—and must also provide sufficient evidence in support of its claims such that a reasonable jury could return a favorable verdict under applicable law." *Id.* In other words, to defeat the motion to compel, the plaintiff "must show genuine issues of material fact regarding the ***existence*** of an agreement to arbitrate." *Id.* (emphasis added).

The Federal Arbitration Act ("FAA") provides:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole of any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract . . . .

9 U.S.C. § 2. Section 2 evidences a "liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Moreover:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, ***shall*** on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3 (emphasis added). While the agreement is governed by the FAA, the court still looks to state law to determine whether the agreement is binding under Section 2 of the FAA

## JA87

and enforceable under Section 3 of the FAA. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630-31 (2009).

Because "[t]he central or primary purpose of the FAA is to ensure that private agreements to arbitrate are enforced according to their terms," "a party may not be forced to submit to class arbitration absent express agreement." *Del Webb Cmtys., Inc. v. Carlson*, 817 F.3d 867, 872 (4th Cir. 2016) (internal citation omitted). In other words, "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010) (emphasis in original).

A federal court sitting in diversity is required to apply the substantive law of the forum state, including its choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938). Maryland courts have "long recognized the ability of contracting parties to specify in their contract that the laws of a particular State will apply in any dispute over the validity, construction, or enforceability of the contract." *Jackson v. Pasadena Receivables, Inc.*, 398 Md. 611, 617 (2007). Such choice-of-law provisions "trump the conflict of law rules that otherwise would be applied by the court." *Id.*

## ARGUMENT

The Court should compel arbitration and stay this proceeding, and strike the class allegations, because the parties' dispute is subject to binding arbitration and a class action waiver. As set forth above, agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The [FAA], this Court has said, establishes "a liberal federal policy favoring arbitration agreements."" *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018). "[T]he Arbitration Act [also] requires

courts 'rigorously' to 'enforce arbitration agreements according to their terms, including terms that specify *with whom* the parties choose to arbitrate their disputes and *the rules* under which that arbitration will be conducted." *Id*. (emphasis in original).

As also set forth above, Maryland law dictates that the choice-of-law provision in the Cardmember Agreement will be applied. The Cardmember Agreement provides, under the "**Governing Law**" clause, that "[t]his Agreement is governed by applicable federal law and by South Dakota law, without regard to South Dakota's conflict of laws principles." **Exhibit 4** at 5. Thus, South Dakota law will determine whether the agreement is binding under the FAA. Consistent with federal law, South Dakota applies a "general presumption of arbitrability if there is an arbitration agreement." *Flandreau Pub. Sch. Dist. No. 50-3 v. G.A. Johnson Constr., Inc.*, 701 N.W.2d 430, 435 (S.D. 2005).

## I.    The Court Should Compel Arbitration Pursuant to the Cardmember Agreement.

To compel arbitration, Defendant must prove four elements: "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect, or refusal of the [party] to arbitrate the dispute." *Rota-McLarty v. Santander Consumer USA, Inc.*, 700 F.3d 690, 697 n.6 (4th Cir. 2012). Defendant easily satisfies each element.

***First***, there is a dispute between the parties. The complaint alleges that Defendant violated the Maryland Consumer Debt Collection Act, the Maryland Consumer Protection Act, and the Maryland Consumer Loan Law by entering into credit transactions without a license. The complaint also alleges claims against Defendant for money had and received, negligence, and

unjust enrichment.  Moreover, the dispute between the parties arises from Plaintiff's use of the Mercury credit card.

**Second**, the Arbitration Provision is clear and unambiguous.  Plaintiff and Defendant agreed in writing that "any party may elect to arbitrate or require arbitration of any 'Dispute' as defined [by the Jury Trial Waiver and Arbitration Clause]."  **Exhibit 4** at 6; *see also Jones v. Prosper Marketplace, Inc.*, 2022 WL 834210, at *5 (D. Md. Mar. 21, 2022) ("A court may compel arbitration under the [FAA] if the parties agreed in writing to arbitrate the dispute.").  This action arises out of Mercury's alleged wrongful retention of principal, interest, fees, and compensation collected under the Cardmember Agreement.  Plaintiff's claims are not excluded by any provision within the Cardmember Agreement.  *See Rossi Fine Jewelers, Inc. v. Gunderson*, 648 N.W.2d 812, 816 (S.D. 2002) ("[A] court should not deny a motion to compel arbitration unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation which would cover the dispute at issue." (internal citation omitted)).  By contract, Plaintiff and Defendant vested an arbitrator with the authority to decide these claims.

Similarly, that Plaintiff's Juniper Mastercard® credit card account was sold and converted to a Mercury Mastercard® credit card account issued by FB&T does not affect the enforceability of the Arbitration Provision.  In South Dakota, terms expressly authorizing the sale or assignment of a contract are enforceable.  *Wandler v. Lewis*, 567 N.W.2d 377, 384-86 (S.D. 1997) (affirming trial court's holding that assignment made pursuant to assignment provision in contract was valid).  Indeed, South Dakota courts have gone so far as to uphold assignments even if a party failed to provide required acquiescence prior to assignment under the doctrine of waiver.  *See Smith v. Hegg*, 214 N.W.2d 789, 791-92 (S.D. 1974) (a nonassignment provision in a lease was waived by the lessor's actual knowledge of the assignment and acceptance of monthly lease payments from

the assignee for approximately five years); *Wandler v. Lewis*, 567 N.W.2d 377, 384-85 (S.D. 1997) (vendor's acquiescence in previous nonconsensual assignments of property and acceptance of payments made pursuant to contract after prior assignments waived nonassignment clause of contract). Here, the sale and conversion of Plaintiff's credit card happened five years ago, in 2018. So even if her acquiescence was required to effectuate the sale and conversion, she waived it long ago.

Additionally, Defendant did not waive its right to arbitration. "The doctrine of waiver is applicable where one in possession of any right, whether conferred by law or by contract, and with a full knowledge of the material facts, does or forebears the doing of something inconsistent with the exercise of the right. To support the defense of waiver, there must be a showing of a clear, unequivocal and decisive act or acts showing an intention to relinquish the existing right." *Hammerquist v. Warburton*, 458 N.W.2d 773, 778 (S.D. 1990). There is no indication that Defendant waived its right to arbitration, and Plaintiff's own Complaint establishes that the Arbitration Provision remains intact. To be sure, the Cardmember Agreement allows cardholders to opt out of the Arbitration Provision by sending written notice of their decision to opt out within sixty days of accepting the Cardmember Agreement. **Exhibit 4** at 6. Here, Defendant did not receive any such written notice from Plaintiff expressing her desire to opt out of the Arbitration Provision after she received the Cardmember Agreement. *See* Declaration at ¶ 17.

Furthermore, the inclusion of a class action waiver does not bar the enforceability of the Cardmember Agreement. *See Snowden v. CheckPoint Check Cashing*, 290 F.3d 631, 638 (4th Cir. 2002) (rejecting that an arbitration agreement including a class action waiver provision is unenforceable); *see also Epic Sys. Corp.*, 138 S. Ct. at 1619 (holding that federal courts should enforce arbitration agreements according to their terms). Thus, Defendant has established the

second element requiring a written agreement that includes an arbitration provision which purports to cover the dispute.

**Third**, the use of credit cards is directly related to interstate commerce. Cardholders can enter into transactions with a business located in any state when using their credit cards. *See Russell v. Cont'l Rest., Inc.*, 430 F. Supp. 2d 521, 526 (D. Md. 2006) (conceding that individuals who engage in credit card transactions are engaged in interstate commerce).

**Fourth**, Plaintiff has failed to arbitrate the dispute. Rather than pursue arbitration pursuant the Cardmember Agreement, she chose to file a complaint in court. This Court is not the proper forum, however, because Defendant has exercised its right to demand arbitration[3] and the Cardmember Agreement's Arbitration Provision covers the parties' dispute.[4] Consequently, Defendant has satisfied the four elements for a motion to compel arbitration.

Courts have also repeatedly recognized a presumption in favor of arbitrability. *See Dillon v. BMO Harris Bank, N.A.,* 856 F.3d 330, 333 (4th Cir. 2017) (applying a "strong federal policy in favor of enforcing arbitration agreements" to uphold the enforceability of an arbitration agreement (quoting *Hayes v. Delbert Servs. Corp.,* 811 F.3d 666, 671 (4th Cir. 2016))); *Peabody Holding Co., LLC v. United Mine Workers of Am., Int'l Union*, 665 F.3d 96, 103 (4th Cir. 2012) ("Federal courts have developed a robust presumption in favor of arbitrability . . . ."); *Kop-Flex Emerson Power Transmission Corp. v. Int'l Ass'n of Machinists & Aerospace Workers Local Lodge No. 1784, Dist. Lodge No. 4*, 840 F. Supp. 2d 885, 892 (D. Md. 2012) (applying a

---

[3] Pursuant to the Cardmember Agreement, Defendant may demand arbitration through a motion to compel arbitration upon Plaintiff's initiation of a lawsuit. *See* **Exhibit 4** at 7 ("If one party starts or threatens a lawsuit, the other party can demand arbitration. This demand can be made in court papers.").

[4] Indeed, the same Cardmember Agreement bars Plaintiff's putative class action lawsuit. According to the Cardmember Agreement cardholders "waive the right to bring or participate in a class, representative or private attorney general action regarding any Dispute." **Exhibit 4** at 5.

11

**JA92**

presumption in favor of arbitrability to enforce an arbitration agreement); *GKD-USA, Inc. v. Coast Mach. Movers*, 126 F. Supp. 3d 553, 559 (D. Md. 2015) (asserting that there is a "presumption in favor of arbitration" (quoting *Applied Energetics v. NewOak Capital Mkts., LLC,* 645 F.3d 522, 526 (2nd Cir. 2011))).  When evaluating an arbitration provision, "any uncertainty regarding the scope of arbitrable issues agreed to by the parties must be resolved in favor of arbitration." *Muriithi v. Shuttle Express, Inc.*, 712 F.3d 173, 179 (4th Cir. 2013); *Levin v. Alms & Assocs., Inc.*, 634 F.3d 260, 266 (4th Cir. 2011) (The "heavy presumption of arbitrability requires that when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration.").

An arbitration provision creates a presumption that the parties agreed to arbitrate all disputes, including those regarding the validity of the contract in general.  *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 449 (2006) ("[A] challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator.").  This Court consistently enforces the plain language of arbitration agreements and requires parties to arbitrate disputes when they chose to do so in their agreement.  *See, e.g.*, *Doe v. New Ritz, Inc.*, No.RDB-14-2367, 2016 WL 1642933, at *6 (D. Md. Apr. 26, 2016); *U.S. ex rel. MPA Const., Inc. v. XL Specialty Ins. Co.*, 349 F. Supp. 2d 934, 943 (D. Md. 2004).

Moreover, in addition to the strong presumption in favor of arbitrability, Plaintiff's claims are clearly covered under the broad language of the Arbitration Provision. The Arbitration Provision defines the claims subject to arbitration as including, *inter alia*, "any claim, counterclaim, cross-claim, complaint, cross-complaint, controversy, or dispute between you or us arising under, out of, or directly or indirectly related to your application, this Agreement or your relationship with us."  *See* **Exhibit 4** at 6.

12

**JA93**

Plaintiff's claims plainly fall within the broad scope of the Arbitration Provision. In addition to compelling arbitration, stay of the proceedings is warranted to permit the arbitrator to render a decision on whether Defendant, as the party in privity with Plaintiff, violated the Maryland Consumer Debt Collection Act, the Maryland Consumer Protection Act, and the Maryland Consumer Loan Law. When claims in an action are subject to arbitration, the FAA makes clear that a court **shall**, upon application of one of the parties, stay the action pending arbitration, provided that the party making the demand is not in default in proceeding with the arbitration. 9 U.S.C. § 3. These claims arise out of the Cardmember Agreement and fall within the authority of an arbitrator to decide in accordance with the Arbitration Provision included in the Cardmember Agreement.

Stay of this action in its entirety is warranted because Mercury's alleged wrongful retention of principal, interest, fees, and compensation collected under the Cardmember Agreement gives rise to Plaintiff's claims against Defendant. Here, Defendant is not in default, and the claims made in the Complaint are subject to arbitration under the Cardmember Agreement. The risk of inconsistent decisions arising out of the same underlying facts and circumstances weighs against concurrent arbitration and litigation, thus favoring a global stay of the action.

## II. The Court Should Compel Arbitration Because The Plaintiff's Challenge To The Validity of the Cardholder Agreement Is For The Arbitrator To Decide.

Plaintiff will likely argue, incorrectly, that the Court must decide the validity of the arbitration clause because the Cardholder Agreement is void *ab initio* for failing to comply with Maryland licensing laws. In *Buckeye Check Cashing*, the Supreme Court held that a claim challenging the validity of a "contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." 546 U.S. at 449. The court emphasized that, "unless the challenge is to the arbitration clause itself the issue of the contract's validity is considered by the arbitrator."

## JA94

*Id.* at 446.   South Dakota's "approach under [its] version of the Uniform Arbitration Act is consistent with the United States Supreme Court's reading of the FAA in *Buckeye*."   *Stoebner v. Konrad*, 914 N.W.2d 590, 595 n.5 (S.D. 2018) (agreeing with the U.S. Supreme Court that, "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitration in the first instance" (quoting *Buckeye*, 546 U.S. at 445-46)).

Following the Supreme Court's *Buckeye* guidance, in *Bess v. Check Express*, 294 F.3d 1298, 1304 (11th Cir. 2002), the Eleventh Circuit analyzed an arbitration provision in a putative class action based on deferred payment transactions.  294 F.3d at 1301.  As in this case, the named plaintiffs claimed that the transactions are governed by state statute and that the defendants violated the statute "by making loans to the plaintiffs without the requisite license and at usurious rates of interest."  *Id*.  Also similar to this case, the plaintiffs argued that the contract between the parties was void *ab initio* because the deferred payments were illegal under state law.  *Id*. at 1305.  In reversing the trial court's denial of the defendants' motion to compel arbitration, the appellate court emphasized that if a plaintiff challenges an arbitration provision based on alleged defects in the underlying contract generally, as opposed to challenging the arbitration clause specifically, then an arbitrator should decide the formation issue.  *Id*. at 1305.  The Eleventh Circuit explained, "[b]ecause Colburn's allegations of illegality go to the deferred payment transactions generally, and not to the arbitration agreement specifically, . . . an arbitrator should decide those questions."  *Id.*

Similarly, in *Zirpoli v. Midland Funding, LLC*, 48 F.4th 136, 145 (3rd Cir. 2022), the Third Circuit scrutinized an arbitration provision in a putative class action suit claiming that the defendants engaged in improper collection practices and illegally purchased loans without having a license that was required under Pennsylvania's usury laws.  48 F.4th at 138.  Like Plaintiff in

this case, the plaintiff in *Zirpoli* argued that the agreement between the parties was void because the defendant's purchase of the loans was illegal under state law. *Id.* The Third Circuit vacated the district court's order denying the motion to compel arbitration. *Id.* at 145. In doing so, the court highlighted that an argument that the agreement was invalid after being assigned illegally was a question regarding enforceability or validity and thus must be decided by an arbitrator. *Id.* The court explained that "the ultimate illegality of a contract does not automatically negate the parties' agreement that an arbitrator should resolve disputes arising from the contract." *Id.*

*Bess* and *Zirpoli* are instructive. Plaintiff's allegations are the same as the plaintiffs in *Bess* and *Zirpoli*: that a contract containing an arbitration provision is void because the defendants made allegedly usurious loans without being licensed under state law. This is a challenge to the entirety of the Cardmember Agreement, not specifically to the Arbitration Provision in that Agreement. Accordingly, such a challenge must be submitted to an arbitrator. *See Buckeye Check Cashing*, 546 U.S. at 443 (holding that a claim that a purportedly usurious contract containing an arbitration provision that was void *ab initio* for illegality must be determined by an arbitrator); *Snowden*, 290 F.3d at 637 (remanding case to district court with instruction to grant motion to compel arbitration because the question of whether defendant's agreement was void *ab initio* is to be decided by an arbitrator).

## III.    The Court Should Strike the Class Allegations.

The Court should strike Plaintiff's class allegations in conjunction with compelling arbitration because class actions are barred by the Cardmember Agreement. In *Stolt-Nielsen S.A.*, 559 U.S. at 664, the Supreme Court held that it is improper to force a party into a class proceeding to which is did not agree, because arbitration "is a matter of consent." Parties "may specify *with whom* they choose to arbitrate their disputes." *Id.* at 683 (emphasis in original). Accordingly, "a

**JA96**

party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Id*. at 684 (emphasis in original).

In *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 341 (2011), the Supreme Court upheld the enforceability of class waivers in FAA-governed arbitration agreements, reaffirming the bedrock principle that arbitration agreements must be enforced as written. Similarly, in *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304 (2013), the Supreme Court reiterated that courts "must rigorously enforce" arbitration agreements according to their terms, including terms that "specify *with whom* [the parties] choose to arbitrate their disputes." *Id.* at 2309 (emphasis in original). The Court reversed the Second Circuit and enforced a class action waiver in an arbitration agreement, ruling that such a waiver in a FAA-governed arbitration agreement is enforceable, even if the plaintiff's costs of individually arbitrating a claim exceed the potential individual recovery. *Id.* at 2311-12.

Here, the parties expressly prohibited class claims. The Cardmember Agreement specifically states:

**JURY TRIAL WAIVER AND ARBITRATION CLAUSE**

By accepting this Agreement, you agree to this Jury Trial Waiver and Arbitration Clause ("Clause"). This Clause is in question and answer form to make it easier to understand. Even so, this Clause is part of this Agreement and is legally binding. Under this Clause, ***you waive the right to have any Dispute heard by a judge and jury and you waive the right to participate in a class***, representative or private attorney general action regarding any Dispute. You may "opt out" of this Clause in the manner set out in the section of the Clause entitled "Is this Clause Required."

**Exhibit 4** at 5 (emphasis added). This language is unambiguous and clear – Plaintiff has waived participation in any class action. Accordingly, Plaintiff cannot proceed with her class claims before this Court or in arbitration. *See Muriithi v. Shuttle Express, Inc.*, 712 F.3d 173, 184 (4th Cir. 2013) ("[W]e hold that the district court erred in concluding that the class action waiver was

16

**JA97**

unconscionable and rendered the Arbitration Clause unenforceable on that ground."); *Noohi v. Toll Bros.*, 708 F.3d 599, 606 (4th Cir. 2013) (explaining that the *Conception* Court "prohibited courts from altering otherwise valid arbitration agreements by applying the doctrine of unconscionability to eliminate a term barring classwide procedures."); *King v. Capital One Bank (USA), N.A.*, Case No. 3:11-cv-00068, 2012 WL 5570624, at *8 (W.D. Va. Nov. 15, 2012) ("Applying *Concepcion* . . . to this case, I find there is no basis upon which to find the arbitration clause and class action waiver unconscionable … [and] [a]s a result, the arbitration clause containing the class action waiver is valid and enforceable.").

## <u>CONCLUSION</u>

WHEREFORE, Defendant Mercury Financial, LLC respectfully requests that this Honorable Court grant the Motion to Compel Arbitration and Stay Proceedings, and to Strike the Class Allegations, and grant such other and further relief as the interests of justice require.

Dated:  March 31, 2023                    Respectfully submitted,

/s/ Melissa O. Martinez
_____
Melissa O. Martinez (Fed. Bar No. 28975)
**MCGUIREWOODS LLP**
500 East Pratt Street
Suite 1000
Baltimore, MD 21202
410-659-4400
410-659-4482 (Fax)
mmartinez@mcguirewoods.com

***Counsel for Mercury Financial, LLC***

17

**JA98**

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| ANGELITA BAILEY, | * |
| *On Her Own Behalf and on Behalf of All Others Similarly Situated*, | * Civil Action No. 8:23-cv-00827-DKC |
| Plaintiff, | * [Removed from the Circuit Court for Montgomery County, Maryland Case No. C-15-CV-23-000224] |
| v. | * |
| MERCURY FINANCIAL, LLC, | * |
| Defendant. | * |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

<u>**DECLARATION OF MERCURY FINANCIAL, LLC**</u>

1.    I, Janet Gigeous, am over the age of eighteen, have personal knowledge of the facts set forth herein, and am otherwise competent to testify.

2.    I am employed by Mercury Financial, LLC ("Mercury") as Head of Customer Operations, and I am an authorized representative of Mercury for the purposes of providing this Declaration.

3.    I am familiar with the business and record-keeping practices of Mercury. I make this Declaration on my own personal knowledge or upon my investigation of the books and records of Mercury.

4.    Mercury's principal business is servicing and marketing consumer credit cards that are issued by First Bank & Trust, Brookings, SD ("FB&T").

5.    On or about March 24, 2017, Barclays Bank Delaware sold a portfolio of credit card accounts to FB&T, with servicing to be converted to Mercury.

1

**JA100**

6.    A sale file providing information about each of the assigned credit card accounts, including information identifying the obligors on each account and the agreements governing the accounts, was also transmitted to Mercury.  The data transmitted in that sale file is also kept by Mercury in the ordinary course of its business.

7.    Upon information and belief, and based on my review of Mercury business records, on or about October 9, 2006, Plaintiff opened a Juniper Mastercard® credit card account issued by Barclays Bank Delaware ("Barclays"), which was later included in the portfolio of credit card accounts sold to FB&T for servicing by Mercury.

8.    Upon information and belief, and based on my review of Mercury business records, a cardmember agreement governed the relationship between Juniper Bank and Plaintiff.  A true and correct copy of the Juniper Cardmember Agreement is attached hereto as **Exhibit 2**.

9.    The Juniper Cardmember Agreement contains an arbitration provision, providing in part:

> **Arbitration**
> Any claim, dispute or controversy ("Claim") by either you or us against the other, or against the employees, agents or assigns of the other, arising from or relating in any way to this Agreement or your Account, or any transaction on your Account including (without limitation) statutory tort and contract claims and Claims regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved, upon the election by you or us, by binding arbitration under the rules and procedures of the arbitration Administration selected at the time the Claim is filed.

**Exhibit 2** at 1.

10.    The Juniper Cardmember Agreement also contains an Assignment provision providing: "We may at any time assign your Account, any sums due on your Account, this Agreement or our rights or obligations under this Agreement.  The person(s) to whom we make

2

**JA101**

any such assignment shall be entitled to all of our rights under this Agreement, to the extent assigned." *Id.* at 2.

11.     On or about July 23, 2018, Mercury notified Plaintiff by letter that her Juniper Mastercard® credit card account had been sold and would be converted on September 24, 2018, to a Mercury Mastercard® credit card account issued by First Bank & Trust, Brookings SD.  On or about August 10, 2018, Mercury sent another letter to Plaintiff correcting the previous letter's inaccurate identification of the last four digits of her account issued by Barclays.  True and correct copies of both letters are attached hereto as **Exhibit 3**.  Mercury keeps these letters in its ordinary course of business.

12.     Mercury's July 23, 2018 letter to Plaintiff included certain terms that would apply to Plaintiff's account as of the September 24, 2018 conversion date.  The letter highlighted that the new Cardmember Agreement would contain an Arbitration Provision as follows:

> Your Cardmember Agreement contains a Jury Trial Waiver and Arbitration Clause.  Please read that section carefully.  You may reject the Jury Trial Waiver and Arbitration Clause ("opt-out") by following the steps noted in that section within 60 days after you have accepted the Agreement.  The Account Conversion Date will be considered the date you accepted the Agreement, for purposes of this opt-out, because you have an existing Account.

**Exhibit 3** at 1-2**.**

13.     A true and correct copy of the current Cardmember Agreement governing the relationship between Mercury and Plaintiff is attached hereto as **Exhibit 4**.  Mercury keeps the Cardholder Agreement in its ordinary course of business.

14.     The current Cardmember Agreement has been revised since Plaintiff's account was converted in 2018.  The relevant language in the Cardmember Agreement that contains the Arbitration Provision requiring arbitration upon a party's demand has not changed since 2018.  A true and correct copy of the 2018 version of the Cardmember Agreement is attached hereto as

3

**JA102**

**Exhibit 5**.  Mercury also keeps prior versions of Cardmember Agreements in its ordinary course of business.

15.     The Cardmember Agreement contains an Arbitration Provision requiring arbitration upon a party's demand.  The Arbitration provision, presented in Question-and-Answer format, provides in part:

> **JURY TRIAL WAIVER AND ARBITRATION CLAUSE**
>
> By accepting this Agreement, you agree to this Jury Trial Waiver and Arbitration Clause ("Clause").  This Clause is in question and answer form to make it easier to understand.  Even so, this Clause is part of this Agreement and is legally binding. **Under this Clause, you waive the right to have any Dispute heard by a judge and jury and you waive the right to participate in a class, representative or private attorney general action regarding any Dispute.  You may "opt out" of this Clause in the manner set out in the section of the Clause entitled "Is this Clause Required."**

**Exhibit 4** at 5.

16.     Upon information and belief, and based on my review of Mercury business records, Plaintiff activated the Mercury Credit Card at issue on or about September 23, 2018, and began making consumer related purchases with the Credit Card on or about November 6, 2018.

17.     Upon information and belief, and based on my review of Mercury business records, Plaintiff did not opt out of the Arbitration Provision.

18.     I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

[*Signature Page to Follow*]

4

**JA103**

Executed on March 31, 2023

Janet Gigeous
Head of Customer Operations

# EXHIBIT 2

F01-8056-5-0703  7/30/03 10:36 AM  Page 1

## JUNIPER BILL OF RIGHTS

We promise to give you:

1. **Unparalleled Customer Focus** – Respect. Courtesy. Empathy. These values form the bedrock of Juniper Bank. You'll see these values in action each and every time we interact.

2. **Help How You Want It** – We make it easy for you to do business with us 7 days a week. Simply choose how you want to contact us, e-mail, toll-free telephone or written correspondence, and on the other end there will be a Relationship Manager specially trained and empowered to service your needs.

3. **Personalized Products and Services** – Your financial products and services will be designed with the objective of enhancing your financial status, while making your life easier.

4. **Fair Pricing** – Our prices and how you will be assessed will be clearly disclosed and highly competitive.

5. **Information Security** – Your personal data will be protected from unauthorized access by state-of-the-art systems and facilities. Access to personal information will be strictly limited to those with a need to know.

6. **Privacy Protection** – Our privacy policies will be prominently disclosed in our agreements and on our web site. Information about you will only be given to merchants with your express permission.

7. **Fast, Accurate Information** – Transactions are to be executed quickly and without error. We will ensure that your records, payment postings, billing statements, and credit reports are accurate and up-to-date. If, despite our best efforts, an error does occur, we will own up to it and correct it promptly.

8. **Easy Dispute Resolution** – We will provide an efficient, user-friendly process to acknowledge, review and resolve disputes. If a problem is not resolved to your satisfaction in a timely manner, you have the right to contact your Relationship Manager.

9. **Consumer Education** – We will provide you with consumer information so that you can enhance your financial well-being while minimizing the time you spend on financial matters. And if you don't want this information, just say so.

10. **Plain Language** – We hate fine print and "legalese" just as much as you do. We will always try to be up-front, clear and easy to understand when we communicate with you.

## JUNIPER PRIVACY POLICY

### Privacy

At Juniper Bank, we respect your right to personal privacy, online and off. Our privacy policy has been verified by BBBOnLine Privacy Program, an independent organization that objectively reviews and audits privacy and security practices to promote trust and confidence on the internet. More information about BBBOnLine is available at www.bbbonline.org. Our Privacy Policy is designed to provide you with protection and value. And it's written in "plain English." Here are the highlights:

· We do not sell information about you or your accounts.

· When we share information, it is only according to the guidelines described in the Juniper Privacy Policy.

· We do not share information with third party marketers unless you expressly authorize us to share the information.

· You control how we contact you. As described in our Privacy Policy, you may exercise your options on line, by mail or by phone.

We have developed state-of-the-art security to protect against the misuse of your information.

Our Privacy Policy will evolve to meet the changing world in which we operate and we will promptly advise you of any change.

I invite you to read our Privacy Policy below. If you have any questions or if anything is unclear, please visit our website at www.Juniper.com, email us at Privacy@Juniper.com or contact our Customer Service Center at 1-888-232-0780.

Larry Drexler
Good Counsel
Juniper Bank

**Juniper Privacy Policy.** Juniper Bank believes that Privacy is a cornerstone of our customer relationship. In designing our business, we strive to find methods to guard your privacy while affording you opportunities to save time and money.

· We do **not** sell information about our customers, their accounts or transactions to others for their use. We do share information as described in this Privacy Policy.

· We do not share information about your accounts or transactions except in the limited circumstances described below.

· When we do share information it is limited to the information necessary for the particular circumstance and only under strict controls to prevent misuse.

· We restrict access to the information we obtain about you to only those employees and service providers who need to know that information to provide you products or services.

· We maintain physical, electronic and procedural safeguards that comply with federal regulations to guard against misuse of the information we obtain.

### Your Privacy Options

### Offers of Goods and Services.

Juniper provides a number of information-sharing options. If you access your Account online, select the Alerts/Profile page where you can choose not to accept offers for (a) financial products from Juniper, its affiliates, and financial institutions with which Juniper partners and/or (b) offers of goods and services from unaffiliated merchants. You can also elect the method by which you will receive the offers: mail, e-mail, or telephone.

You may also exercise or change your choices by writing or by calling our Customer Service Center. If you do not contact us to make an election or enter your preferences online, we will send you offers for products and services from Juniper, its affiliates, and financial marketing partners, as well as offers of third-party goods and services by mail, e-mail and telephone. (We will, of course, contact you regarding your Account and related items regardless of your election.)

If you would like to review or change your election you may do so, at any time, by visiting our website at www.Juniper.com, by calling us at 1-888-232-0780 or by writing to Juniper Bank, PO Box 8801, Wilmington, DE 19899-8801.

### Collection of Information.

Juniper collects customer information from a variety of sources:

1) Application information (the information you provide us on your applications and other forms such as names, addresses, telephone numbers, birthday, social security numbers, level of family income, employer's name, and employer's address);

2) Transaction information (your transactions with us and with our affiliates and partners, and your use of our products);

3) Credit reports (information from consumer reporting agencies);

4) Correspondence (the information you provide when communicating in writing, online, or by phone with our Customer Service Center, as well as our response and follow-up correspondence with third parties concerning, for example, resolution of disputed transactions);

5) Marketing partners and publicly available databases. (We receive information from our marketing partners, e.g., colleges, universities, charities, financial institutions, and other businesses and public databases, which are used to help us serve you.)

We use this information to evaluate your applications, establish and maintain your Accounts, carry out your transactions, provide you with high-quality service, prevent fraud, and, unless you instruct us otherwise, inform you of offers for other Juniper products as well as products and services offered by third parties. We may also use this information to confirm your identity when you call us to inquire about your Accounts.

### Cookies.

"Cookies" are small computer files that are automatically placed on your computer's hard drive when you are connected to a website or remote server so that the website can recognize you upon your return to the website and tailor your experience based on your earlier use of the site. "Action tags" (also known as Web Beacons, Trackers, or Bugs) are invisible pixel .gif files placed on web pages that are used to track web navigation to those pages.

Juniper uses a cookie for each computer that visits its site. The cookie is integral to the customer experience and is necessary to use our online services. It allows Juniper to customize the website presentation based on your Accounts. While cookies, including Juniper's, can be disabled, if you disable our cookie you will not be able to use our website.

The Juniper cookie does not collect information from your hard drive; rather, it allows us to recognize you and know how you navigated through our site. It is also part of our effort to detect and stop fraud.

Cookies are also used by our partners in the Loan and Insurance Centers. These cookies allow those vendors to recognize you and monitor your use of the site. For more information about their use of cookies, see their privacy policies, links to which are available in the online version of this Privacy Policy.

Juniper also places web advertisements that link to our site from other websites. The companies that place or "serve" the advertisements use their own cookies, which are different from the cookie on the site on which the advertising appears. The cookies used by the companies that

**JA106**



serve ads for Juniper do not track your name, address, e-mail address, or phone number. The ad server's cookie does recognize your computer and allows the ad server to determine automatically which ads to show you, based on your use of the Juniper site, other sites you have visited, and ads you have previously seen and/or responded to. The ad server also uses action tags to understand how a person navigated on our site after responding to one of our banner ads. This information is never linked to an individual and is only used in aggregate with other information gathered by visitors to our site. You have the right to elect not to participate in this anonymous tracking of information, which is used to select which ads to display when you visit certain websites. In order to determine your comfort level with these companies' information practices, you should review their privacy policies. Juniper posts links to the privacy policies of the advertising companies it is currently using in the online version of this policy. Click on the advertiser name to go to its website to learn more about that agency's privacy policy, its use of cookies and action tags, and the options available to you in relation to those cookies.

At present, Juniper does not include advertising on its own website. To the extent Juniper does allow advertisements, we will post a link from our online Privacy Policy to the privacy policies of agencies serving the ads. Juniper recommends that you review each site's privacy policy including their use of cookies to understand the site's information-handling practices and your options.

**Sharing Information.**
Juniper Bank may disclose information about you to the following types of third parties: service companies (companies that provide services to Juniper in order to process transactions, provide statements, maintain our website and provide customer service, including customer contact); affiliates (companies owned by Juniper's owner Juniper Financial Corp.); non-financial companies (merchants who offer non-financial goods and services to our customers); partners (universities, colleges, charities, and financial institutions through which we market products); financial service providers (companies with which we partner to market financial products, such as those participating in our Loan Center); and credit bureaus, collection agencies, law enforcement regulators, and professionals such as lawyers and accountants. Outlined below is the information shared with each type of third party and, as appropriate, your options.

**i. Juniper Financial Corporation and Affiliates.**
Juniper Financial Corp. is a Delaware bank holding company that owns Juniper Bank. As stated in our Account Agreements and applications, we may share information with our affiliates (companies that are at least 50 percent owned by Juniper Financial Corp). The information sharing by affiliates may be related to one or more of four areas: servicing your Account; regulatory and legal compliance; fraud and loss protection; and/or furnishing information about offers of goods and services offered by our affiliates. You may elect not to receive offers from our affiliates, and thereby prevent information from being shared for that purpose, by visiting us online at www.Juniper.com or by calling our Customer Service Center at 1-888-232-0780. For more information regarding your options regarding information sharing with our affiliates, see "Your Privacy Options" on page 1.

**ii. Sharing Information with Service Companies.**
In order to provide quality service and statements, both online and offline, Juniper Bank contracts with service providers for essential roles in processing transactions, producing statements and providing customer service including contacting customers. We may disclose some or all of the information we collect to these processors and service providers but only the information needed to provide the service. Each of Juniper's service providers has entered into a contract with Juniper that forbids them from using information provided by Juniper for any purpose other than providing the service for Juniper customers. Juniper takes security precautions to monitor the use of the information and prevent the use of the information for any other purpose.

**iii. Information Sharing with Merchants.**
Juniper does not share any information with unrelated merchants for the purpose of extending offers of goods and services without your consent. The manner and use of information varies according to the method used to deliver the offer.

a. Mail and e-mail offers. We may provide offers of goods and services to you by mail and e-mail without sharing information with the merchants who provide these goods and services. We do this by controlling the process by which the offers are extended. For example, a merchant wants to make a discount offer to Juniper Account holders. Based on our knowledge of our customers, we select the Account holders we believe will most likely be interested in the offer and arrange to have a service provider mail or e-mail the offer to you under the same security precautions we use to send a monthly statement. The only information we provide the mail or e-mail service provider is your name and address. Our contract with the service provider prohibits use of the name and address for any other purposes, and we take security precautions to monitor compliance. The merchant gets no information about you unless, and until, you respond to the offer. For more information about consent to receive offers, see "Your Privacy Options" on page 1.

b. Phone offers. Juniper may provide offers of goods and services by telephone. In doing so, we do not disclose any of your personal information to merchants on whose behalf we extend offers of goods and services. To the extent we engage a service provider to assist us in extending the offer, the only information we will provide the service provider is your name, address, phone number, and an internal reference number. We provide your name, address, and phone number to allow our service provider to contact you. The internal reference number cannot be used to process a charge to your Account. The internal reference number is used by the service provider to advise Juniper that you have agreed to a transaction. When you accept an offer, Juniper uses the internal reference number to match the transaction to your Account to allow the transaction to be processed without you giving your Account number over the phone. This process provides two advantages: first, it minimizes the possibility of misuse of your Account by limiting those with access to your Account number; and second, you know that the offer is being extended by Juniper and will include a generous return and refund policy to allow you to shop in confidence. We also take security precautions to monitor and prevent misuse of the information provided to the service provider. For more information about your consent to receive offers, see "Your Privacy Options" on page 1.

**iv. Information Sharing with Partners.**
Juniper offers its products in conjunction with colleges, universities, charities, financial institutions, and other businesses. By joining Juniper through one of these endorsed relationships, you agree to the sharing of information with that partner. These relationships are clearly stated in the Account application, and by applying for these products you agree to the information sharing by Juniper and the partner, which may include: your name, address, phone number, and e-mail address. To the extent a program includes a rewards program or other benefit based on Account usage, we will provide the partner with information necessary to manage the program, including, as an example and not a limitation, number of transactions and dollar amount of purchases, payments, and credits. By applying for these products, you consent to sharing information necessary to support the particular program.

**v. Joint Marketing.**
From time to time, Juniper may enter into marketing agreements with other financial institutions to jointly offer a product. In these cases, we may share all information we collect about you to determine your eligibility for the products and to extend an offer to you. This information sharing will be subject to the same contractual restrictions and security precautions used for sharing information with service providers and vendors. Your options regarding these offers (and the sharing of information) are the same as those available for information sharing with a Juniper affiliate.

**vi. Credit Reports and Other Uses of Information.**
In applying for an Account, you agree that we may request consumer credit reports from one or more credit reporting agencies in connection with your application and the administration of your Account. You also authorize us to exchange credit information concerning you or your use of the Account with (and answer questions and requests from) others, such as merchants, other lenders, and credit reporting agencies.

We also share information with collection agencies, lawyers, accountants, auditors, bank regulators, and law enforcement as may be necessary in the administration of your Account or to respond to a legal inquiry or subpoena.

**Minors.**
Juniper does not knowingly offer its products and services to minors. Similarly, Juniper does not collect information about children, except to identify beneficiaries. Our application approval process is designed to identify applications submitted by children and to prevent their opening an Account. Juniper may offer Uniform Gifts to Minor Accounts, which typically include the name of the minor but may only be opened with an adult signatory on the Account.

**Access to Account Information and Correction of Errors.**
You have the right to access your Account details and transaction information, including your application. Sixteen months of statements are available on the Juniper website. If you have a question or believe there is an error on your Account, write, e-mail, or call us as soon as possible so as not to lose any rights. When contacting us be sure to include your name and Account number, along with a description of the error including the dollar value.

**Questions.**
Juniper is committed to customer service and privacy. If you have any questions, comments, or concerns regarding our Privacy Policy and its implementation, please do not hesitate to visit www.Juniper.com to send us an e-mail, or call us at 1-888-232-0780.

## JUNIPER BANK CARDMEMBER AGREEMENT

**Introduction.**
This Agreement establishes the terms of your Credit Card Cardmember Account ("Account") with Juniper Bank, Wilmington, Delaware. Please read it carefully and keep it with your records.



# JA107

You do not need to sign this Agreement, but please sign the back of your credit card (the "Card"), if you have not already done so. All extensions of credit in connection with your Account are being made by Juniper Bank.

**Definitions.**

"You" and "Your" refer to each person who has applied for the Account and each person who has agreed to be responsible for the Account. The words "We," "Us" and "Our" refer to Juniper Bank.

**Using Your Account/Acceptance of These Terms.**

By signing, keeping or using your Card or Account, you agree to the terms and conditions of this Agreement. You may use your Card or Account to pay for goods, services or amounts owed wherever the Card is accepted ("Purchases"), to obtain funds using Convenience Checks and to transfer all or part of balances from Visa, MasterCard, Optima and Discover credit card accounts that you have with other banks or lenders ("Balance Transfers"). You also may use the Card to obtain cash loans ("Cash Advances") at any financial institution or automated teller machine that accepts the Card. You agree that we may credit your Account rather than issue cash refunds when you reverse transactions that were originally charged to your Account. You agree that you will not use your Card or Account in connection with any transaction that is prohibited or unenforceable and that if you do engage in such a transaction you waive any claim that the charge is uncollectible on the grounds the transaction was prohibited or unenforceable. The Card must be returned to us upon request.

**Convenience Checks.**

We may issue "Convenience Checks," which can be used to access your credit line. There is no grace period on Convenience Check transactions. Each Convenience Check will contain your Account number and may be used only by the person(s) whose name(s) is/are printed on it. Each must be completed and signed in the same manner as a regular personal check. If we provide Convenience Checks to you, you may not use them to pay any amount you owe under this Agreement or under any other account you may have with us. Unlike purchase transactions, there are no chargeback rights with regard to Convenience Check transactions.

**Obligations on Your Account.**

You authorize us to pay and charge your Account for all Purchases, Balance Transfers, Convenience Checks and Cash Advances made or obtained by you or anyone you authorize to use your Card or Account. You agree to pay us for all of these Purchases, Balance Transfers, Convenience Checks and Cash Advances, plus any finance charges assessed on your Account and any other charges and fees which you may owe under the terms of this Agreement, whether resulting from 1) physical use of your Card or Convenience Checks, 2) mail order or telephone, computer or other electronic transaction made without presenting the Card or 3) any other circumstances where you authorize a charge, or authorize someone else to make a charge, to your Account. Each person who has agreed to be responsible on the Account is responsible to pay the full amount owed on the Account. We may require that you pay the full amount owed without first asking any other person(s) to pay. Instructions for making payments are on your monthly billing statement. Payment that complies with the requirements specified on or with your monthly billing statement, including the time of receipt, will be credited on the business day they are received. There may be a delay of up to five (5) days in crediting payments that are not made in accordance with those instructions. All payments must be made in U.S. dollars. Any payment made by check or other negotiable instrument or direct debit must be drawn on a U.S. bank or a U.S. branch of a foreign bank. We reserve the right to accept payments made in a foreign currency. If we do, we will select the foreign currency rate at our discretion. Your available credit may not be increased by the amount of the payment until we collect the funds from the bank on which your payment is drawn. Subject to any mandatory provisions of applicable law, **we will apply your payments to the balances in your Account in whatever manner we determine.**

**Credit Line/Authorized Usage.**

Your credit line is shown on the folder containing your Card. We may change your credit line from time to time—either increase or decrease it—in our sole discretion. Your latest credit line will appear on your monthly billing statement. You agree not to make a Purchase, authorize a Balance Transfer, use a Convenience Check or obtain a Cash Advance that would cause the unpaid balance of your Account to exceed your credit line. We may honor Purchases, Balance Transfers, Convenience Checks and/or Cash Advances in excess of your credit line at our sole discretion. If we do, this Agreement applies to that excess and you agree to pay the excess immediately if we request that you do so. In addition, we may impose an over your credit line charge as set forth in the Table of Finance and Other Charges. You agree that we may change or cancel your credit line at any time without affecting your obligation to pay amounts that you owe under this Agreement. We may designate that only a portion of your credit line is available for Cash Advances. If we do and you exceed your line, you will be considered to have exceeded your credit line for all purposes of this Agreement. We may limit the authorizations to make Purchase, Cash Advance, Balance Transfer and/or Convenience Check transactions that may be accomplished with your Card or Account.

**Monthly Billing Statements.**

We will send an electronic and a paper billing statement, unless otherwise agreed, at the end of each monthly billing cycle in which your Account has a debit or credit balance of more than $1.00 or if a finance charge has been imposed, unless we deem your account uncollectible or if delinquency collection proceedings have been instituted by sending your Account to an outside collection agency or attorney for collection. Among other things, your monthly statement will show your Current Balance, any finance charge, your credit line, available credit, Minimum Payment Due and the Payment Due Date. For those who receive electronic billing statements, we will send you monthly an e-mail to the e-mail address you provide us notifying you when your new statement is available. It is your responsibility to make sure that the e-mail address you provide us is current.

**Minimum Payment Due.**

If the Current Balance shown on your monthly statement is less than $15, your Minimum Monthly Payment Due (due by Payment Due Date) is that Current Balance. Otherwise, the Minimum Payment Due for each billing cycle will be the greater of $15 or the total of 1) 2% of the Current Balance, plus 2) any applicable Annual Membership Charge, Stop Payment Fee, Duplicate Copy of Billing Statement Fee, and/or Fast Card Fee assessed during statement period, plus 3) any amount past due, plus 4) if we so elect, any amount over your credit line at the time of billing. At any time, you may pay more than the Minimum Payment Due up to the full amount that you owe us. In the event your APR is greater than 23.99%, the Minimum Payment Due will be increased to the total of 1) 2.5% of the Current Balance, plus 2) any applicable Annual Membership Charge, Stop Payment Fee, Duplicate Copy of Billing Statement Fee, and/or Fast Card Fee assessed during statement period, plus 3) any amount past due, plus 4) if we so elect, any amount over your credit line at the time of billing.

**Accrual of Finance Charges and Grace Period.**

We calculate the "balance subject to finance charge" separately for Purchases, for Balance Transfers and Convenience Checks and for Cash Advances. On Purchases, finance charges begin to accrue as of the transaction date. However, you will have a grace period on Purchases (except for purchases of money orders, traveler's checks, foreign currency, lottery tickets, gambling chips or wire transfers, which are treated as Convenience Checks for finance charge calculation purposes) and you will not pay a periodic finance charge on Purchases in any given billing cycle if you pay your Current Balance in full by the Payment Due Date on your current statement. For Balance Transfers and Convenience Checks a periodic finance charge will accrue from the day we send the Balance Transfer to the payee or the day the payee accepts the Convenience Check. For Cash Advances a periodic finance charge will accrue from the day you take the Cash Advance. There is no grace period on Balance Transfers, Convenience Checks and Cash Advances.

**Periodic Rate Finance Charges.**

To determine the periodic rate finance charge, we apply the applicable daily periodic rate, stated in the Table of Finance and Other Charges, on the back page of this booklet, to the daily balances of i) Purchases, ii) Balance Transfers and Convenience Checks, and iii) Cash Advances. The daily balances for Purchases, for Balance Transfers and Convenience Checks and for Cash Advances are calculated separately and determined as follows: We take the beginning balances for each feature on your Account each day, including any periodic finance charges calculated on the previous day's balance, add to the respective balances any new transaction, subtract any payments or credits and make other adjustments. All charges are treated as Purchases except Balance Transfer Finance Charges and Transaction Finance Charges, which are treated as Balance Transfers, and Cash Advance Finance Charges, which are treated as Cash Advances. A credit balance is treated as a balance of zero. If you multiply the average daily balances as disclosed on your monthly billing statement by the number of days in the billing period and by the applicable daily periodic rates, the results will be the finance charges assessed, except for minor variations caused by rounding. If we have "special" or "promotional" offers in effect from time to time we will separately identify them on your monthly billing statement and separately disclose the balances to which such special offers apply. These separate balances and the related periodic finance charge will be calculated in the same manner as described above.

**Other Finance Charges.**

We calculate another portion of the finance charge on your Account by adding a one-time Cash Advance Finance Charge on each Cash Advance when it is obtained. The amount of the Cash Advance Finance Charge is stated in the Table of Finance and Other Charges.

If you use your Card or Account to do a Balance Transfer, we will charge the one-time Balance Transfer Finance Charge disclosed in the Table of Finance and Other Charges for each such Balance Transfer. If you use a Convenience Check, we will charge a Convenience Check Transaction Charge. If you purchase money orders, wire transfers, traveler's checks, lottery tickets, gambling chips or foreign currency, we will charge a one-time Transaction Finance Charge for each such transaction. The present amounts of those charges are stated in the Table of Finance and Other Charges.

The total finance charges on your Account for a monthly billing cycle will be the sum of the periodic finance charges plus any Cash Advance, Balance Transfer or any Transaction Finance Charges. The minimum periodic rate FINANCE CHARGE in any billing cycle you owe a periodic rate finance charge is $1.00. This Agreement provides for compounding of finance charges (interest). Periodic finance charges are subject to change as described in the Table of Finance and Other Charges and the section entitled, "Changes in This Agreement."

**Other Interest Charges.**

In addition to the finance charges discussed above, we may assess the interest charges listed below. The present amount of such charges is stated in the Table of Finance and Other Charges.

Late Charge—If we do not receive a payment from you in at least the amount of your Minimum Payment Due by the Payment Due Date shown on your monthly statement, we may charge you a Late Charge. You may be charged one Late Charge for each Minimum Payment Due which is not paid by the Payment Due Date.

Returned Payment Charge—If your bank does not honor a check or direct debit you deliver to us, or we must return a check because it is not signed or is otherwise irregular, we may charge you a Returned Payment Charge.

Returned Convenience Check Charge—If we 1) stop payment on a Convenience Check at your request or 2) return a Convenience Check unpaid because it exceeds your available credit line at the time it is processed, your Account is closed or otherwise does not have charge privileges, you did not comply with our instructions regarding the check or your Account is past due, we may charge you a Returned Convenience Check Charge.

Over Your Credit Line Charge—If your account balance exceeds your credit line at any time during the monthly Billing Cycle, we may charge you an Over Your Credit Line Charge.

**Administrative Charges.**

If you request photocopies of monthly billing statements, or if you request any special services such as obtaining Cards on an expedited basis, you agree to pay our reasonable charges for such services, in effect at that time. The present charges for such services are specified in the Table of Finance and Other Charges.

**Default/Collection Costs.**

Unless otherwise prohibited by law, your Account will be in default and we may demand immediate payment of the entire amount you owe us if: 1) in any month we do not receive your Minimum Payment Due by the Payment Due Date; 2) you make Purchases, initiate Balance Transfers, use Convenience Checks or obtain Cash Advances in excess of your credit line; 3) you fail to comply with this Agreement; 4) there is a filing for your bankruptcy; 5) you die or become incapacitated; or 6) we believe in good faith that the payment or performance of your obligations under this Agreement is impaired for any other reason. As permitted by applicable law, you agree to pay all collection expenses actually incurred by us in the collection of amounts you owe under this Agreement (including court or arbitration costs and the fees of any collection agency to which we refer your Account) and, in the event we refer your Account after your default to an attorney who is not our regularly salaried employee, you agree to pay the reasonable fees of such attorney. We will not be obligated to honor any attempted use of your Account if a default has occurred or we have determined to terminate your Account or limit your Account privileges (as discussed below).

**Arbitration**

Any claim, dispute or controversy ("Claim") by either you or us against the other, or against the employees, agents or assigns of the other, arising from or relating in any way to this Agreement or your Account, or any transaction on your Account including (without limitation) statutory tort and contract claims and Claims regarding the applicability of this arbitration clause or the validity of the entire Agreement, shall be resolved, upon the election by you or us, by binding arbitration under the rules and procedures of the arbitration Administrator selected at the time the Claim is filed. The Administrator selection process is set forth below. For purposes of the foregoing sentence, "you" includes any authorized user on the Account.

The party initiating arbitration shall select the entity that will serve as administrator for the arbitration process from among the following providers (each an "Administrator") provided that if we commence the arbitration, you have the right to have that the other provider be used in lieu of our choice:

National Arbitration Forum, www.arb-forum.com, or P.O. Box 50191, Minneapolis, Minnesota, 55405, 1-800-474-2371; or

American Arbitration Association, www.adr.org 950 Warren Avenue, East Providence, Rhode Island, 102914, 1-866-293-4053

Each administrator provides information about arbitration, its arbitration rules and procedures, fee schedule and claims forms at its web site or by mail as set forth above.

F01-8056-5 -0703     CP03-16098

**JA109**

F01-8056-5-0703  7/30/03  10:36 AM  Page 2

If you commence arbitration, you select one of the Administrators and must provide us the notice required by that Administrator's rules and procedures. The notice may be sent to us at Juniper Bank, PO Box 8801 Wilmington, DE 19899-8801. If we commence arbitration, we will select the Administrator and provide you notice at your last known billing address. We agree to honor your request to change administrators, **provided** that (i) your Account is not sixty days or more past due; and (ii) we receive the request within thirty days of the notice of commencement of arbitration.

We will not initiate arbitration or seek to enforce this arbitration provision in any action you bring before the Justice of the Peace Court in Delaware, or the equivalent court in your home jurisdiction, **provided** that the action remains in that court, is made on behalf of you and/or your authorized user only and is **not** made part of a class action, private attorney general action or other representative or collective action. In any arbitration that you elect to file that could be heard in small claims court, we will pay the filing fees and other arbitration fees.

Any arbitration hearing at which you appear will take place at a location within the federal judicial district that includes your billing address at the time the Claim is filed. This arbitration agreement is made pursuant to a transaction involving interstate commerce, and shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16. Judgment upon any arbitration award may be entered in any court having jurisdiction. No class actions, other representative actions, or joinder or consolidation of any Claim with a Claim of any other person or entity shall be allowable in arbitration, without the written consent of both you and us.

This arbitration agreement applies to all Claims now in existence or that may arise in the future except for Claims by or against any unaffiliated third party to whom ownership of your Account may be assigned after default. This arbitration agreement survives the termination of the Cardmember Agreement or the Account relationship. Nothing in this Agreement shall be construed to prevent any party's use of (or advancement of any claims, defenses, or offsets in) bankruptcy or repossession, replevin, judicial foreclosure or any other prejudgment or provisional remedy relating to any collateral, security or property interests for contractual debts now or hereafter owed by either party to the other under this Agreement.

IF YOU OR WE CHOOSE ARBITRATION WITH RESPECT TO A CLAIM, IT WILL BE BINDING AND NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM THROUGH A COURT. IF ARBITRATION IS CHOSEN YOU AND WE WILL NOT HAVE THE RIGHTS THAT ARE PROVIDED IN COURT INCLUDING THE RIGHT TO A TRIAL BY JURY AND THE RIGHT TO PARTICIPATE OR BE REPRESENTED IN LITIGATION FILED IN COURT BY OTHERS SUCH AS CLASS ACTION LITIGATIONS. OTHER RIGHTS SUCH AS THE RIGHT TO DISCOVERY AND THE RIGHT TO APPEAL ARE ALSO LIMITED OR ELIMINATED BY ARBITRATION.

**Termination.**
We may terminate your privileges under this Agreement or limit your right to make Purchases, initiate Balance Transfers, use Convenience Checks or obtain Cash Advances at any time for any reason without prior notice. If we ask, you must return your Cards and any unused Convenience Checks to us, cut in half. You agree that you will not try to make a Purchase, use a Convenience Check, initiate a Balance Transfer or obtain a Cash Advance after you have been notified that your privilege to use your Account has been terminated. You may terminate this Agreement at any time. If you do, you must return to us all Cards and Convenience Checks previously issued on the Account. If you call us, we may require that you confirm your termination in writing. Termination will not affect existing obligations under this Agreement or your liability for all charges posted to your Account prior to the time all Cards and unused Convenience Checks issued on your Account are returned to us.

**Consent to Receive Electronic Notices.**
By accepting this Agreement, you affirmatively consent to receive all periodic billing statements and all other notices electronically when legally allowed, if you provide us an e-mail address and other legally required consent, and otherwise by paper at the address shown in your files. If this is a joint Account, we can send statements and notices to either of you. You promise to inform us promptly in writing of any change in your e-mail address or your U.S. mail address. You may update this information by visiting www.Juniper.com and sending us an e-mail or telephoning us at the telephone number provided below (under "Inquiries or Questions"). We may in our discretion accept address corrections from the United States Postal Service. If at any time you need a paper copy of statements or notices, or you change your mind and prefer to receive all your statements and notices in paper rather than electronic form, telephone us at the number provided below or visit us at www.Juniper.com and send us an e-mail. In order to access your statements and notices electronically, you must have a computer equipped with at least a 40-bit JavaScript-enabled Netscape or Microsoft browser at the Version level 4.0 or higher. In order to retain your statements and notices, you must have a printer attached to your computer that can print them out or a drive or other storage device onto which you can download them. By accepting this Agreement, you confirm that you have the software and equipment that satisfies these requirements to enable you to access and retain your statements and notices electronically.

**Foreign Currency Transactions.**
We and MasterCard or Visa (or their affiliates) will convert transactions in foreign currencies into U.S. Dollars. MasterCard or Visa will use their currency conversion procedures that are current at the time of the transaction. Currently, the currency conversion rate they use is either the wholesale market rate or the government-mandated rate in effect under those procedures increased by one percent. The currency conversion rate used on the conversion date may differ from the rate in effect on the date you used your Card or Account.

**Foreign Country Transaction Fee.**
If you use your Card or Account to do a transaction with a business, other entity or person located outside the United States, we will charge the Foreign Country Transaction Fee disclosed in the Table of Finance and Other Charges for each such transaction, excluding Cash Advances. The Foreign Country Transaction Fee is in addition to the MasterCard or Visa Foreign Currency Conversion charge discussed above.

**Skip/Promotional Features.**
From time to time, we may let you skip or reduce one or more monthly payments during a year and/or we may temporarily reduce or eliminate certain finance charges on all or a portion of your Account balance or offer you other special terms. If we do, we will advise you of the scope and duration of the applicable skip or promotional feature. When the skip or promotional feature ends, your regular rates and terms will resume.

**Changes in This Agreement.**
We can at any time change this Agreement, including the annual percentage rate and any fees, and can add or delete provisions relating to your Account or to the nature, extent and enforcement of the rights and obligations you or we may have under this Agreement. We will notify you of any change, addition or deletion. As permitted by applicable law, any change, addition or deletion to this Agreement will become effective at the time stated in our notice and, unless we state otherwise, the change, addition or deletion will apply to all outstanding balances in your Account as well as to new transactions. The notice we send you may state that you may notify us in writing within a specified time period that you do not wish to accept the changes, additions and deletions we are making. You will be deemed to accept all the changes, additions and deletions accompanying the notice and to ratify and confirm all the provisions of your Agreement and your acceptance of all the changes, additions and deletions described in other notices previously sent to you if 1) you do not notify us that you do not agree to the change, addition or deletion in a timely manner, or 2) you use the Card or Account after the conclusion of the specified time period.

**Changes to Your Periodic Rate.**
We have established Periodic Rates on your account based on your particular credit performance history at the time of the offer. We will periodically review your credit performance including, but not limited to, your usage of the Card and your payment history on the Card, and on other creditors accounts including timeliness of payment, if you exceed your credit line or if you make a payment that is not honored by your bank. If you do not maintain your past level of credit performance, we may increase your Periodic Rates.

**Credit Information.**
You agree that we may request consumer credit reports from one or more credit reporting agencies in connection with your application and the administration of your Account. You also authorize us to exchange credit information concerning you or your Account with (and answer questions and requests from) others, such as merchants, other lenders and credit reporting agencies.

**Phone Calls/Electronic Communications.**
In the regular course of our business, for quality control purposes, we may monitor and record phone conversations made or received by our employees. Similarly, we may monitor and record e-mail or conversations on our website between you and our employees. You agree that we will have such right with respect to all phone conversations, e-mail or conversations between you and our employees, whether initiated by you or any of our employees.

**Refusal to Honor Card.**
We are not responsible for refusals to honor your Card or Convenience Checks. And, except as otherwise required by applicable law or regulation, we will not be responsible for merchandise or services purchased or leased through use of your Account.

**Irregular Payments and Delay in Enforcement.**
We can accept late payments, partial payments, checks and money orders marked "Paid in Full" or language having the same effect without losing any of our rights under this Agreement. We can also delay enforcing our rights under this Agreement any number of times without losing them. The fact that we may at any time honor a Purchase, Balance Transfer, Convenience Check or Cash Advance in excess of your maximum credit line does not obligate us to do so again.

**Liability for Unauthorized Use of Your Account.**
If your Card or Convenience Checks are lost or stolen or if you have reason to think someone may use your Account without your permission, you must notify us at once. Please either visit

JA110



www.Juniper.com and send us an e-mail or telephone us at 1-888-232- 0780 concerning the loss or theft of your Card or Convenience Checks or the possible unauthorized use of your Account. Do not use the Card, Account number or any Convenience Checks after they have been reported lost or stolen, even if they are found or returned. You will not be liable for unauthorized use of your Account; however, you must identify for us the charges that were not made by you or someone authorized by you and through which you received no benefit. We may require you to provide us with certain information and to comply with our investigation procedures. We may terminate or limit access to your Account if you have notified us or we have determined that your Card or Convenience Checks may have been lost or stolen, or that there may be unauthorized access to your Account.

**Assignment.**
We may at any time assign your Account, any sums due on your Account, this Agreement or our rights or obligations under this Agreement. The person(s) to whom we make any such assignment shall be entitled to all of our rights under this Agreement, to the extent assigned.

**GOVERNING LAW.**
THIS AGREEMENT AND YOUR ACCOUNT WILL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE AND, AS APPLICABLE, FEDERAL LAW.

**Inquiries or Questions.**
You may address any inquiries or questions which you have about your Account to Juniper Bank, by visiting www.Juniper.com and sending us an e-mail, writing us at Juniper Bank, P.O. Box 8801, Wilmington, DE 19899-8801, or calling us at 1-888-232-0780. If you telephone us instead of writing, you may lose certain rights the law gives you to dispute billing errors (see "Your Billing Rights").

## YOUR BILLING RIGHTS

**Keep This Notice for Future Use.**
This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify Us in Case of Errors or Questions About Your Bill.**
If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at Juniper, P.O. Box 8802, Wilmington, DE 19899-8802. Do not write on your bill; use a separate sheet of paper. Alternatively, you may visit www.Juniper.com and send us an e-mail. Write to us as soon as possible. We must hear from you no later than 60 days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter or e-mail, give us the following information:
· Your name and Account number.
· The dollar amount of the suspected error.
· Describe the error and explain, if you can, why you believe there is an error.

If you need more information about a transaction, describe the item you are not sure about.

**Your Rights and Our Responsibilities After We Receive Your Written Notice.**
We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct. After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your credit line. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due. If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill, and we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is. If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct. If you have a problem with the quality of property or services that you purchased with a credit card (this does not apply to Convenience Check transactions), and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right:

(a) You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current mailing address, and (b) the purchase price must have been more than $50. These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or service.

## Important Information About Your Gold Crown Club International Points

a. When you applied for your Account, we asked whether the Primary Cardmember was a member of Best Western's Gold Crown Club® International Program (the "Program"). If you answered yes and gave us the Primary Cardmember's membership number, we will not issue a different membership number to you. If you answered no or did not give us the membership number, we will issue the Primary Cardmember a membership number and ask Best Western to enroll the Primary Cardmember in the Program. Only one Program membership will be established regardless of whether your Account is an individual account or an account with an authorized user. If the Account has an authorized user, we will enroll the Primary Cardmember. The Primary Cardmember can be eligible to receive and redeem Gold Crown Club International points subject to the terms and conditions of the Best Western Gold Crown Club International Rules & Procedures, as established, modified, supplemented and/or amended by Best Western from time to time (the "Program Rules").

b. On the closing date of each billing cycle that your Account remains open and current, we will report to Best Western the Net Purchases charged to your Account during a billing cycle and request that Best Western award Gold Crown Club International points credit equivalent to one point for every three dollars of Net Purchases charged to the Account at any Best Western hotel and one point for every five dollars of Net Purchases charged to the Account anywhere else. If your Account is not open and/or current on the date a billing cycle closes, we will report no Net Purchases to Best Western for that billing cycle. We will ask that points credit be awarded to the Primary Cardmember, regardless of who made the "Purchase." Net Purchases for a billing cycle are determined by totaling all new Purchases added to the Account during the billing cycle, then subtracting credits posted to the Account during the period for returned Purchases and/or adjustments. For purposes of reporting Net Purchases, we may round up or down to whole dollar amounts. If credits for returned Purchases exceed new Purchases during a billing cycle, we will report negative Net Purchases and ask Best Western to reduce the Primary Cardmember's accrued points credit accordingly. Net Purchases does not include fees, charges, credit insurance premiums, or transactions posting as Cash Advances or non-qualifying Balance Transfers, whether received from financial institutions, automated teller machines, by use of JUNIPER BANK checks, or by any other means. We reserve the right to exclude from Net Purchases unauthorized Purchases, Purchases which are added to your Account after you are past due or overlimit. We may ask Best Western to withdraw point credit previously awarded if your Account is more than sixty (60) days past due, or if the points credit was awarded on Purchases not authorized by you. We are not responsible to award points credit under the Program, to arrange or provide for any services related to travel or the use of points credit, for any delay, failure, or refusal by Best Western to award or redeem points credit, or for any decision by Best Western to revoke or cancel points or membership in the Program.

c. Best Western is not a party to the agreement between you and us, does not participate in any extension of credit or decision to extend credit under these regulations, and has no authority regarding the Account. JUNIPER BANK is the sole creditor and owner of the Account. You authorize us to share information about your account with Best Western to the extent needed to administer the program. You agree that we may share Account information as set forth in Juniper Bank's Privacy Policy.

d. We will show on your monthly Account statement the Primary Cardmember's accrued points credits as reflected in our records. You understand that there will be a delay between the date you make a Purchase, the date we report Net Purchases to Best Western, and the date that Best Western acts upon the information, and that, for this and other reasons, our records and the records of Best Western regarding the Primary Cardmember's accrued points may differ. You understand and agree that points credit is not received by the Primary Cardmember until awarded by Best Western, and that, in the event of any discrepancy between our records and Best Western's records of the Primary Cardmember's accrued points credits, the records of Best Western will control.

e. Best Western will award one point for every three dollars ($3.00) of Net Purchases made at a Best Western hotel on a Cardmember's Best Western MasterCard rounded to the nearest dollar and one point will be awarded for every five dollars ($5.00) of Net Purchases made anywhere else on a Cardmember's Best Western MasterCard rounded to the nearest dollar. From time to time, we may offer bonuses or awards of points credit or other premiums (for example, First Use Points, First Use Certificates,



**JA111**

and Promotional Points) to new Best Western MasterCard Cardmembers. Unless otherwise stated in the offer, these bonuses and/or awards are intended for persons who are not, and have not previously been, Best Western MasterCard Cardmembers. You understand and agree that, unless we otherwise state, you are no longer eligible to receive these bonuses and/or awards for any new Best Western MasterCard account you open after this Account is opened. If you receive a bonus or award for which you are not eligible, we may direct Best Western to revoke the bonus or award, or reduce your points credit by the amount of the award, or charge your account for the fair value of the bonus or award, at our option.

**Upon the first debit activity in the Cardmember's Account, they will be awarded a Global Free Room Night Voucher. Please allow 4 to 6 weeks for delivery. Best Western Global Free Room Night Vouchers ("Vouchers") are valid for single or double occupancy and entitle the bearer to one room night free accommodations at any Best Western brand lodging establishment worldwide. Bearer will be responsible for any separate charges incurred, including but not limited to food and beverage, movie rental, etc. Bearer will not be charged for room taxes. All other tax liabilities are the sole and exclusive responsibility of the user. Vouchers are fully transferable and can be used at any Best Western brand lodging establishment in Asia, Australia, Europe, Central America, North America and South America that accepts the point value printed on the face of the Voucher. Vouchers are not exchangeable for cash. The voucher must be used within 6 months from the date of issue to be valid. No blackout days apply. Subject to lodging establishment room availability. To check availability and make room reservations using the Vouchers, please call 800-782-9422 and ask for rate code "FX".**

## TABLE OF FINANCE AND OTHER CHARGES

| | |
|---|---|
| Please see the enclosed insert for information regarding your introductory **Annual Percentage Rate (APR)**. | |
| Variable **APR** on Purchases, Balance Transfers and Convenience Checks after the introductory period | 9.99% as of 7/22/03 |
| Variable **APR** on Cash Advances (see below) is | 19.99% as of 7/22/03 |
| Variable **APR** for Default Payments (see below) is | up to 23.99% as of 7/22/03 |

The Daily Periodic Rates used to determine your Periodic Rate finance charge for Purchases, and for Balance Transfers, Convenience Checks and for Cash Advances and Default payments are variable rates. The Daily Periodic Rates will be calculated on the 22nd day (or the next business day if the 22nd is not a business day) of each month (the "Determination Date") and will equal 1/365th of the sum of 1) the highest listed U.S. Prime Rate in the Money Rates section of *the Wall Street Journal* on the applicable Determination Date (the "Prime Rate"), plus 2) 5.74% for Purchases, Balance Transfers, and Convenience Checks, 15.74% for Cash Advances and up to 19.74% for Default payments.

The APR for Purchases, Balance Transfers and Convenience Checks will never be less than 9.99%, corresponding to a Daily Periodic Rate of 0.02737%, the APR for Cash Advances will never be less than 19.99%, corresponding to a Daily Periodic Rate of 0.05477% and the APR for Defaults will be determined at the time of Default based on your Juniper Account history and your performance on non-Juniper Accounts. The maximum Default Rate is established by the variable rate formula set forth above. The new Daily Periodic Rate will be applied to your Account (including existing balances) as of the first day of the billing cycle that begins on or after the Determination Date. The annual percentage rate corresponding to the Daily Periodic Rate will be the Daily Periodic Rate, multiplied by 365.

The Daily Periodic Rate and the corresponding annual percentage rate may increase or decrease monthly if there is an increase or decrease in the Prime Rate. There is no limitation on the amount of any increase.

If you do not pay at least the Minimum Payment Due in time to be credited as of the Payment Due Date, the Daily Periodic Rate for balances transferred in the first billing cycle will change to the Daily Periodic Rate after the first cycle on Purchases, Balance Transfers and Convenience Checks as set forth above. If you do not pay at least the Minimum Payment Due in time to be credited as of the Payment Due Date or your account is over your credit line and/or your payment is not honored by your bank, the Daily Periodic Rate for all balances will change to the Default rate.

As of 7/22/03 the Prime Rate was 4.00%. The corresponding Daily Periodic Rate for Purchases, Balance Transfers and Convenience Checks after the Introductory Period would have been 0.02737%, Cash Advances would have been 0.05477% and for Default payments would have been a maximum of 0.06573%. The corresponding **ANNUAL PERCENTAGE RATES** would have been 9.99%, 19.99% and 23.99% respectively.

All of the above rates may vary. Any such increase or decrease will cause a corresponding increase or decrease in the amounts of finance charges assessed and possibly in the Minimum Payment Due.

| | |
|---|---|
| Cash Advance **FINANCE CHARGE** | 3% of the transaction amount (with a minimum of $5) (together with any surcharge imposed by ATM owner) |
| Balance Transfer and Convenience Check **FINANCE CHARGE** | 3% of the transaction amount (with a minimum of $5 and a maximum of $50) |
| Transaction **FINANCE CHARGE** Purchase of money orders, traveler's checks, foreign currency, lottery tickets, gambling chips, or wire transfers | 3% of the transaction amount (with a minimum of $5) |
| Foreign Country Transactions | 2% of the US Dollar transaction amount |
| Minimum Periodic Rate **FINANCE CHARGE** (in any billing cycle a periodic rate finance charge is due) | $1 |
| Annual Membership Charge | $0 |
| Other Charges Returned Payment Charge | $29 |
| Returned Convenience Check Charge | $29 |
| Over Your Credit Line Charge | $25 |
| Late Charge | For Balances ≤ $1,000: $25<br>For Balances > $1,000: $35<br>For Balances <$100: $25<br>For Balances $100 - $999.99: $29<br>For Balances ≥$1,000: $35 |
| Administrative Charges Duplicate Copy of Billing Statement | $3 |
| Fast Card Fee | $10 |
| Stop Convenience Check Payment Fee | $29 |

**Member FDIC**



**www.juniper.com**

Juniper Bank, Wilmington, Delaware



F01-8056-5 -0703    CP03-16098                                Print Date: 07/2003



# Credit Card Cardmember Agreement

# Cardmember Bill of Rights

# Juniper Privacy Policy

# Best Western Gold Crown Club

# Terms and Conditions

**Retain for your records**

**JA113**

# EXHIBIT 3

# M E R C U R Y

Card Services
PO Box 84064
Columbus, GA 31908

ANGELITA BAILEY
1140 HERITAGE PL APT B
WALDORF, MD 20602-1829

July 23, 2018

Dear ANGELITA BAILEY

We are writing to inform you that your Juniper Mastercard ® account issued by Barclays Bank Delaware (Barclaycard) ending in 9947 has been sold and is being converted on September 24, 2018 (the "Account Conversion Date") to a Mercury Mastercard® account issued by First Bank & Trust, Brookings SD. This correspondence includes important information regarding the conversion and terms of your account.

Until September 24, 2018, please continue to use your Juniper Mastercard ® credit card and direct any account inquiries to Barclaycard. You should receive your new Mercury Mastercard ® one to two weeks before the Account Conversion Date, and can activate and use the account beginning on the Account Conversion Date. Please see the Frequently Asked Questions (FAQs) for more information about making payments up to the Account Conversion Date and thereafter.

**Important information about your account:** Enclosed are the terms that will apply to your new account on the conversion date. This includes your new Cardmember Agreement and Privacy Policy. Please retain this information for your records.

**Changes to Certain Fees and the Minimum Payment Due:**
- **Returned Check Fee** - We may charge you a Returned Check fee of $25 if we return a Check unpaid because it exceeds the available credit line at the time it is processed; your Account is past due, closed or otherwise does not have charge privileges; or you did not comply with the instructions regarding the Check. The amount of the Returned Check Fee will not exceed the amount of the returned Check.
- **Check Stop Payment Fee** - If you ask us to stop payment on a Check, we may charge you a Check Stop Payment Fee of $25.
- **Expedited Card Fee** - If you request expedited delivery for a replacement Card (for example, to replace a lost or stolen Card), we may charge you an Expedited Card Fee of $25.
- **Minimum Payment Due** - For some accounts we are lowering the minimum payment amount; please read the Minimum Payment Due section of the Cardmember Agreement for information about your Minimum Payment Due.

**Your Annual Percentage Rates (APRs), Minimum Interest Charge, and Other Fees:**
- No changes are being made to the APRs on your account. The enclosed Pricing Schedule reflects your account specific pricing information, but does not include any promotional or other special interest rates on your account. The terms of any promotional or other special interest rate offers on your account remain in effect, in accordance with their terms, and are unchanged by this notice.
- No changes are being made to the Minimum Interest Charge.
- No changes are being made to other fees, such as the Balance Transfer Fee, Cash Advance Fee, Late Payment Fee, or Returned Payment Fee.

**Jury Trial Waiver and Arbitration Clause Changes:**
Your Cardmember Agreement contains a Jury Trial Waiver and Arbitration Clause. Please read that section carefully. You may reject the Jury Trial Waiver and Arbitration Clause ("opt-out") by following the steps noted in that section

## JA115

within 60 days after you have accepted the Agreement. The Account Conversion Date will be considered the date you accepted the Agreement, for purposes of this opt-out, because you have an existing Account.

Please note, if there is a change in your account status prior to the Account Conversion Date, your account may be closed and you may not receive a new card.

## FREQUENTLY ASKED QUESTIONS

**Q. Where do I direct my payments and what are the payment requirements?**
A.  You can continue to mail payments to Barclaycard until the Account Conversion Date. However, any electronic or phone payments scheduled with Barclaycard after September 21, 2018 at 11:59 p.m. ET will be cancelled. Starting on the Account Conversion Date you should make your payments as follows:

**Payments by mail:** Card Services, P.O. Box 70168, Philadelphia, PA 19176-0168
**Payments by express mail:** Lockbox Services, Box #70168, 400 White Clay Center Dr, Newark, DE 19711.
**Payment by phone or website:** Payments made through our website, www.mercurycards.com, or by calling 1-866-686-2158 and completed on a Business Day by midnight Eastern Time, will be credited as of that day. Otherwise, it will be credited on the next Business Day.
**When Your Payment Will be Credited:** If we receive your payment in proper form at the proper address by 5 p.m. Eastern Time, on a Business Day, it will be credited as of that day. A payment received there in proper form after that time will be credited as of the next Business Day. If the payment due date falls on a day when we do not receive or accept payments, the payment will not be treated as late if it is credited the next Business Day. Business Day means Monday through Friday, excluding federal holidays. Allow at least 7 days for payments by regular mail to reach us. There may be a delay of up to 5 days in crediting a payment we receive that is not in proper form or not sent to the correct address.
**Proper Form:** For a payment sent by regular or express mail, proper form is a single check or money order, in U.S. dollars, drawn on a U.S. institution, with a single payment coupon from your billing statement. Include your name and the last four digits of your Account number. Unless sent by express mail, please use the envelope we provided. No cash or foreign currency. No staples or paper clips. No extra pieces of paper.
**Electronic Check Conversion:** When you provide a check as payment on this Account, you authorize us to use information from your check to make a one-time electronic fund transfer from your bank account or to process the payment as a check transaction. When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your bank account on the same day we receive your payment, and you will not receive your check back from your financial institution.

## Q. When can I start to use my new card?
A.  On the Account Conversion Date you can start to use your new card and you will no longer be able to use your credit card issued by Barclaycard.

This card is issued by First Bank & Trust, Brookings, SD pursuant to a license by Mastercard International.

# JA116

**ANGELITA BAILEY**
**Your Credit Card Account Ending in: 9947**

**The following Pricing Schedule is part of your Cardmember Agreement.**

| Interest Rates and Interest Charges | |
|---|---|
| **Annual Percentage Rate (APR) for Purchases** | **13.99%**<br>This APR will vary with the market based on the Prime Rate. |
| **APR for Balance Transfers** | **13.99%**<br>This APR will vary with the market based on the Prime Rate. |
| **APR for Cash Advances** | **14.75%**<br>This APR will vary with the market based on the Prime Rate. |
| **Paying Interest** | Your due date is at least 23 days after the close of each billing period. We will not charge you any interest on Purchases if you pay your entire balance by the due date each month. We will begin charging interest on Cash Advances and Balance Transfers on the transaction date. |
| **Minimum Interest Charge** | If you are charged interest, the charge will be no less than $0.50. |
| **For Credit Card Tips from the Consumer Financial Protection Bureau** | **To learn more about factors to consider when applying for or using a credit card, visit the website of the Consumer Financial Protection Bureau at http://www.consumerfinance.gov/learnmore** |

| Fees | |
|---|---|
| **Annual Fee** | $0 |
| **Transaction Fees** | |
| ▪ Balance Transfer | Either **$5** or **4%** of the amount of each Balance Transfer, whichever is greater. |
| ▪ Cash Advance | Either **$10** or **5%** of the amount of each Cash Advance, whichever is greater. |
| ▪ Foreign Transaction | **3%** of each Purchase in U.S. dollars. |
| **Penalty Fees** | |
| ▪ Late Payment | Up to **$37.** |
| ▪ Returned Payment | Up to **$37.** |

**How We Will Calculate Your Balance:** We use a method called Daily Balance Method (Including New Transactions). See your Cardmember Agreement for details.

**Billing Rights:** Information on your rights to dispute transactions and how to exercise those rights is provided in your Cardmember Agreement.

**Variable Rate Information:** The Purchase and Balance Transfer APR is equal to the Prime Rate plus a Margin of 8.99%, this corresponds to a daily periodic rate of 0.0383%. The Cash Advance APR is equal to the Prime Rate plus a Margin of 9.75%, this corresponds to a daily periodic rate of 0.0404%. You authorize us to round interest charges to the nearest cent. These are the APRs in effect as of 06/29/2018 based on a Prime Rate of 5.00%.

# JA117

## FEES

**Minimum Interest Charge -** If you are charged interest, the charge will be no less than the amount shown in your Pricing Schedule.

**Balance Transfer Fee -** We may charge you this Fee for each Balance Transfer. See your Pricing Schedule for the fee amount.

**Cash Advance Fee -** We may charge you this Fee for each Cash Advance. See your Pricing Schedule for the fee amount.

**Foreign Transaction Fee -** A Foreign Transaction Fee may be charged for any Purchase that is made in a foreign currency and that is made outside the U.S. (A Purchase is made outside the U.S. unless it is made with a U.S. merchant and processed completely in the U.S.). See your Pricing Schedule for the fee amount. This fee is based on the amount of the Purchase after conversion to U.S. Dollars.

**Late Fee -** A Late Fee may be charged if you do not pay at least the Minimum Payment Due by the Payment Due Date. The Late Fee is $27 and, if you make another Late Payment within the next 6 Billing Periods, the Late Fee will be $37. The amount of your Late Fee will never be higher than your Minimum Payment Due immediately prior to assessment of the fee.

**Returned Payment Fee -** A Returned Payment Fee may be charged if you make a payment that is not honored by your financial institution, even if the payment is honored after it is resubmitted. The Returned Payment Fee is $27 and, if another payment is returned within the next 6 Billing Periods the returned Payment Fee will be $37. The amount of your Returned Payment Fee will never be higher than your Minimum Payment Due immediately prior to assessment of the fee.

**Returned Check Fee -** We may charge you a Returned Check fee of $25 if we return a Check unpaid because it exceeds the available credit line at the time it is processed; your Account is past due, closed or otherwise does not have charge privileges; or you did not comply with the instructions regarding the Check. The amount of the Returned Check Fee will not exceed the amount of the returned Check.

**Over Limit Fee -** None. We do not charge you an Over Limit Fee if your balance exceeds your credit line.

**Check Stop Payment Fee -** If you ask us to stop payment on a Check, we may charge you a Check Stop Payment Fee of $25.

**Expedited Card Fee -** If you request expedited delivery for a replacement Card (for example, to replace a lost or stolen Card), we may charge you an Expedited Card Fee of $25.

## ANNUAL PERCENTAGE RATES ("APRs")

**Variable APRs -** Your Pricing Schedule may include variable APRs. A variable APR is an APR that can change each Billing Period. These APRs are determined by adding a certain percentage amount (called the Margin) to the Prime Rate. Variable APRs will increase or decrease when the Prime Rate changes. The APR change will take effect on the first day of the Billing Period that begins during the same calendar month that the Prime Rate changes. An increase in the APR will increase your interest charges and may increase your Minimum Payment Due. The new APR will apply to existing balances, as well as balances added to your Account after the change.

## PAYMENTS

**Payment Instructions -** You are responsible for paying all amounts due on your Account, including charges made by Authorized Users. All payments must be in U.S. dollars. Check and electronic payments must be drawn on funds on deposit in the U.S. Payments made in a foreign currency may be refused. If a foreign currency payment is accepted, we may charge your Account our cost to convert it to U.S. dollars. Your billing statement provides the terms for making payments and we will credit payments to your Account in accordance with those terms. There may be a delay in processing and crediting a payment to your Account if a payment is mailed to an address other than the payment address designated on your billing statement. Late payments, partial payments or payments marked "payment in full" or with any other restrictive endorsement can be accepted by us without losing any of our rights under this Agreement.

**Minimum Payment Due -** Each Billing Period you must pay at least the Minimum Payment Due by the Payment Due Date shown on your billing statement. To calculate your Minimum Payment Due, we start with any amount past due, then we add the larger of the following:

    (1) $15 or

    (2) 1% of the New Balance (which calculation is rounded to the nearest penny) plus any billed interest or minimum interest charge, plus any Late Fee or Returned Payment Fee for the Billing Period.

The Minimum Payment Due may also include amounts by which you exceed your Account Credit Line. It will not exceed the New Balance. You may pay more than the Minimum Payment Due, up to your entire Account balance, at any time. You are not permitted to pre-pay toward future Minimum Payment Due amounts. A payment is required in each Billing Period in which there is a Minimum Payment Due. Credits, refunds and other adjustments are not considered payments and will not be applied toward your Minimum Payment Due requirement.

**How We Apply Payments and Credits -** Payment for up to the Minimum Payment Due amount will be applied at our discretion, and may be applied first to fees and interest, then to the balance with the lowest APR on your Account, and then to balances with higher APRs. Payment amounts in excess of the Minimum Payment Due will first be applied to the balances with the higher APRs before balances with lower APRs, except as otherwise required by applicable law. Credits will be applied at our discretion.

**How We Apply Payments May Impact Your Grace Period -** If you do not pay the New Balance shown on your statement in full by the Payment Due Date each month, depending on the balance to which we apply your payment, you may not receive a grace period on new Purchases.

## INTEREST CHARGES

**How We Will Calculate Interest - Daily Balance Method (Including Current Transactions) -** We calculate interest separately for each different balance (for example, Purchases at the current rate, Balance Transfers at the current rate, Cash Advances at the current rate, and different promotional balances). Your billing statement shows each balance in the "Balance Subject to Interest Rate." For each balance, we calculate the interest for the Billing Period by multiplying the applicable daily periodic rate by the Daily Balance each day. To get a daily periodic rate, we divide the APR by 365. You authorize us to round interest to the nearest cent. The total interest charged for a Billing Period equals the sum of the interest charged on each balance each day.

To calculate interest, we first calculate a Daily Balance for each balance Subject to Interest Rate. We start with the beginning balance each day. The beginning balance for the first day of the Billing Period is the balance at the end of the prior Billing Period. Each day, we add any new transactions and fees; subtract any payments or credits applied to that balance; and make other adjustments. We add Balance Transfer fees to the applicable Balance Transfer balance. We add Cash Advance Fees to the applicable Cash Advance balance. We generally add other fees to the standard Purchase balance. We add any interest calculated on the previous day's balance. (This means interest is compounded daily.) A credit balance is treated as a balance of zero. This gives us the Daily Balance for that balance.

**When Interest Charges Begin -** We will begin charging interest on Cash Advances, Balance Transfers and Purchases on the transaction date. However, you can avoid paying interest on Purchases as described below. You cannot avoid paying interest on Balance Transfers or Cash Advances. You will pay interest on Balance Transfers and Cash Advances from the transaction date until you pay the total amount you owe us.

**How to Avoid Paying Interest on Purchases ("Grace Period") -** You will not be charged interest on Purchases in a Billing Period in which you pay the New Balance in full by the Payment Due Date. If you don't pay your New Balance in full by the Payment Due Date in a Billing Period, you'll pay interest on existing Purchases, and new Purchases in that billing period, from the transaction date, subject to applicable law.

# JA118

M E R C U R Y

Card Services
PO Box 84064
Columbus, GA 31908

ANGELITA BAILEY
1140 HERITAGE PL APT B
WALDORF, MD 20602-1829

August 10, 2018

Dear ANGELITA BAILEY,

We recently mailed you a letter, dated July 23, 2018, to inform you that your credit card account issued by Barclays Bank Delaware (Barclays) was sold and will be converted to a Mercury Mastercard ® account issued by First Bank & Trust, Brookings, SD on September 24, 2018.

That letter incorrectly identified the last 4 digits of your account issued by Barclays. Please note, the last 4 digits of that account are 9684.

We apologize for any confusion this may have caused.

Please continue to direct any account inquiries regarding this credit card account to Barclays, up until September 24, 2018. Barclays Customer Service is available 24 hours a day, 7 days a week at 888-232-0780.

Sincerely,

Card Services

The Mercury card is issued by First Bank & Trust, Brookings, SD pursuant to a license by Mastercard International.

**JA119**

CIT002/20180813/CCZH0M12/9245/ZH0/MP/002//

# EXHIBIT 4

**The following Pricing Schedule is part of the Cardmember Agreement.**

The below information is an example of the terms available to recent applicants as of the last business day of the calendar quarter that ended 9/30/2020. These account terms may not be available after that date.

| Interest Rates and Interest Charges | |
|---|---|
| **Annual Percentage Rate (APR) for Purchases** | **23.99% to 28.99%**<br>This APR will vary with the market based on the Prime Rate. |
| **APR for Balance Transfers** | 23.99% to 28.99%<br>This APR will vary with the market based on the Prime Rate. |
| **APR for Cash Advances** | 25.99% to 30.99%<br>This APR will vary with the market based on the Prime Rate. |
| **Paying Interest** | Your due date is at least 23 days after the close of each billing period. We will not charge you any interest on Purchases if you pay your entire balance by the due date each month. We will begin charging interest on Cash Advances and Balance Transfers on the transaction date. |
| **Minimum Interest Charge** | If you are charged interest, the charge will be no less than $0.50. |
| **For Credit Card Tips from the Consumer Financial Protection Bureau** | **To learn more about factors to consider when applying for or using a credit card, visit the website of the Consumer Financial Protection Bureau at http://www.consumerfinance.gov/learnmore** |

| Fees | |
|---|---|
| **Annual Fee** | None |
| **Transaction Fees** | |
| •   Balance Transfer | Either **$5** or **4%** of the amount of each Balance Transfer, whichever is greater. |
| •   Cash Advance | Either **$10** or **5%** of the amount of each Cash Advance, whichever is greater. |
| •   Foreign Transaction | **3%** of each Purchase in U.S. dollars. |
| **Penalty Fees** | |
| •   Late Payment | Up to **$40.** |
| •   Returned Payment | Up to **$40.** |

**How We Will Calculate Your Balance:** We will use a method called "average daily balance (including new transactions)".

**Billing Rights:** Information on your rights to dispute transactions and how to exercise those rights is provided in your Cardmember Agreement.

As of the quarter that ended 09/30/2020, the Prime Rate was 3.25%.  Variable Purchase and Balance Transfer APRs are calculated by adding a Margin of 23.99% to 28.99% to the Prime Rate. This corresponds to a daily periodic rate of .0657% to .0794%. Variable Cash Advance APRs are calculated by adding a Margin of 25.99% to 30.99% to the Prime Rate.  This corresponds to a daily periodic rate of .0712% to .0849%.

# MERCURY MASTERCARD® CARDMEMBER AGREEMENT

# JA122

This Agreement governs the use of your Account. The enclosed Pricing Schedule is part of this Agreement. Please read this Agreement, including the Pricing Schedule, and keep them for your records.

**DEFINITIONS**

"**Account**" means your Mercury Mastercard® Account with us established by this Agreement.

"**Affiliate**" means our parent corporations, subsidiaries and affiliates.

"**Authorized User**" means any person you allow to use your Card or Account.

"**Balance Transfer**" means transferring a balance from another creditor to your Account by accepting an offer from us, which we may make to you from time to time at our sole discretion, or use of a Check we provide to you for such purpose, in accordance with any limitations or restrictions we place upon such offer at the time it is made.

"**Billing Period**" means the period of time covered by the billing statement we send to you. A Billing Period is usually 28 to 33 days.

"**Business Day**" means Monday through Friday, excluding federal holidays.

"**Card**" means a card or other access devices, including your Account number or virtual card, that we issue to you, or someone you authorize, to receive credit under this Agreement.

"**Cash Advance**" means use of your Card to obtain cash from an ATM, financial institution, or other location; to make a payment to load a stored value card or account; or to purchase items that are convertible to cash, such as stored value cards, lottery tickets, money orders, casino chips, foreign currency, or similar items. It also means use of a Check we provide to you for use as a Cash Advance.

"**Check**" means any Check we may, in our discretion, send you to access your Account.

"**Covered Borrower**" means a consumer who is entitled to the Limitations on Terms of Consumer Credit Extended to Service Members and Dependents. A consumer becomes a Covered Borrower pursuant to a determination made in accordance with 32 C.F.R. 232.5(b).  A consumer ceases to be a Covered Borrower when he or she is no longer a member of the Armed Forces serving on active duty or a dependent of such member, as defined under 32 C.F.R. 232.3(g).

"**Prime Rate**" means the highest rate of interest listed as the U.S. Prime Rate in the Money Rates section of *The Wall Street Journal* on the last Business Day of the month.

"**Purchase**" means the use of your Account to buy or lease goods or services at participating merchants.  However, the purchase of foreign currency or of cash equivalents, like casino chips or lottery tickets, is treated as a Cash Advance not a Purchase.

"**We,**" "**us**" and "**our**" refer to First Bank & Trust, Brookings, SD, the issuer of your Card.

"**You,**" "**your**" or "**yours**" refer to you and any other person who is also contractually liable under this Agreement.

**AGREEMENT ACCEPTANCE**

You accept this Agreement if you use the Account. You also accept this Agreement if you do not cancel the Account within 45 days of the Account open date.

**This Agreement contains a Jury Trial Waiver and Arbitration Clause.  Please read that section carefully because it will have a substantial effect on your rights, including your right to bring or participate in a class action or have a jury trial in the event of a Dispute between you and us. However, you may reject the Jury Trial Waiver and Arbitration Clause ("opt-out") by following the steps noted in that section within 60 days after you have accepted the Agreement.**

**CHANGES TO YOUR ACCOUNT**

The rates, fees and terms of this Agreement (including its Jury Trial Waiver and Arbitration Clause), may change and we may add or delete any term. When required by law, we will provide advance written notice of any changes and any right to reject the changes.

**ACCOUNT USE**

**Permitted Uses -** Your Account may be used for Purchases, Balance Transfers and Cash Advances. The Account may not be used for illegal transactions.  This Account is to be used for consumer purposes, not for business purposes.  However, even if the Account is used for business purposes, this Agreement will still apply to those transactions, and you are responsible for repayment.  The Account may be closed if it is used for business purposes.

**Checks -** A Check we send you to access your Account will be treated as a Cash Advance unless we tell you otherwise.  You may not use a Check to pay any amount you owe us. We may elect to not honor a Check if the Check may cause your Account balance to exceed the Cash Advance or other applicable credit line on your Account.  If you want to stop payment on a Check, notify Customer Service immediately.  If you ask us to stop payment, we will make reasonable efforts not to pay that Check. However, if the Check is paid despite these efforts, we will not be liable to you for paying that Check. We may not be able to stop payment if we receive your stop payment request after we have started processing the Check. Please see the Fees section in this Agreement for information regarding the Check Stop Payment Fee.

**Purchases and Cash Advances in Foreign Currencies -** If you make a transaction in a foreign currency (including, for example, online Purchases from foreign merchants), the transaction will be converted into a U.S. dollar amount by Visa or Mastercard, depending on which Card is used, using their procedures in effect at the time the transaction is processed. Currently, they use a wholesale market rate or a government-mandated rate.  These procedures may change without notice.  The conversion rate you get may differ from the rate on the transaction date or post-date and from the rate Visa or Mastercard gets.  A merchant or other third party may convert a transaction into U.S. dollars or another currency, using a rate they select, before sending it to Visa or Mastercard.

**Credit Line -** We assign a credit line for your Account. You must keep your Account balance below your credit line. We may request immediate payment of any amount that exceeds the credit line. We may restrict the amount of the credit line that may be used for Cash Advances. Your Account credit line or your Cash Advance credit line may be increased or decreased at any time, without advance notice. We may delay increasing your available credit by the amount of any payment that we receive for up to 10 Business Days.

**Credit Authorizations -** Transactions may not be authorized for security or other reasons. If we decline to authorize a transaction, or if anyone refuses

your Card, Check, or Account number, we will not be liable to you.

**Automatic Billing Arrangements -** If you set up an automatic billing arrangement with a merchant, you are responsible for providing updated Account number or Card expiration date information to the merchant.  You also authorize us to provide updated Card or Account information to a merchant at our sole discretion.  If you want to cancel automatic billing you must contact the merchant.

**Unauthorized Use -** If you notice the loss or theft of your Card or a possible unauthorized use of your Card, you should immediately call us at the telephone number listed on the back of your Card or the customer service number shown on the front of your billing statement.

**Mobile Devices -** Smart phones, tablets, and other electronic devices (a "Mobile Device") can download, store, and/or access Account information. This means the Mobile Device can be used to access credit on the Account under this Agreement.  Any transaction conducted using your Mobile Device is covered by this Agreement.  Secure your Mobile Device.  Anyone who can access your Account or Card using your Mobile Device can make charges to your Account.  Applications that enable your Mobile Device to access your Account or Card may have separate terms of use.

**Joint Accounts -** If this Account is a Joint Account, each of you agrees to be individually and jointly liable for the entire amount owed on the Account. Each of you also agrees that any notice we send to either of you will serve as notice to both of you.

**AUTHORIZED USERS**

**Liability -** Use of your Account by an Authorized User is subject to the terms of this Agreement. You will be liable for all transactions and any fees or charges resulting from those transactions made by any person you permit to use your Card, Check, Account number, or other credit device with the authorization to obtain credit on your Account, including transactions for which you may not have intended to be liable, even if the amount of those transactions causes a credit line to be exceeded.  If an Authorized User permits someone else to use your Account, you will be liable for those transactions, fees, and charges as well.  If this Account is a Joint Account, each of you agrees to be individually and jointly liable for the entire amount owed on the Account.

**Information -** Authorized Users of this Account may have the same access to information about the Account and its users as the Account holders.

**Additional Card for Authorized User -** You may request an additional Card for an Authorized User.  Before you make this request, you must:

- Let them know that we may report information about the Account to the credit reporting agencies in their name.  This means that information about the Account, including about late payments, missed payments, or other defaults on the Account may appear in their credit report.

- Make a copy of this Agreement available to them.

- Obtain their permission to share their information with us and for us to share it as allowed by applicable law.

**Cancelling an Authorized User -** You must notify us if you wish to cancel the authority of an Authorized User to use your Account.   In some cases, we may close your Account and issue you a new Card.  You remain responsible for any transactions made or authorized by an Authorized User, even if the post-date shown on your statement for that transaction occurs after the date you notify us to cancel the authority of an Authorized User to use your Account.

**FEES**
**(See your Pricing Schedule for Additional Fees)**

**Minimum Interest Charge -** If you are charged interest, the charge will be no less than the amount shown in your Pricing Schedule.

**Balance Transfer Fee -** We may charge you this Fee for each Balance Transfer. See your Pricing Schedule for the fee amount.

**Cash Advance Fee -** We may charge you this Fee for each Cash Advance. See your Pricing Schedule for the fee amount.

**Foreign Transaction Fee -** A Foreign Transaction Fee may be charged for any Purchase that is made in a foreign currency and that is made outside the U.S.  (A Purchase is made outside the U.S. unless it is made with a U.S. merchant and processed completely in the U.S.).  See your Pricing Schedule for the fee amount. This fee is based on the amount of the Purchase after conversion to US Dollars.

**Late Fee -** A Late Fee may be charged if you do not pay at least the Minimum Payment Due by the Payment Due Date. The Late Fee is $29 and, if you make another Late Payment within the next 6 Billing Periods, the Late Fee will be $40. The amount of your Late Fee will never be higher than your Minimum Payment Due  immediately prior to assessment of the fee.

**Returned Payment Fee -** A Returned Payment Fee may be charged if you make a payment that is not honored by your financial institution, even if the payment is honored after it is resubmitted. The Returned Payment Fee is $29 and, if another payment is returned within the next 6 Billing Periods the returned Payment Fee will be $40. The amount of your Returned Payment Fee will never be higher than your Minimum Payment Due immediately prior to assessment of the fee.

**Returned Check Fee -** We may charge you a Returned Check fee of $25 if we return a Check unpaid because it exceeds the available credit line at the time it is processed; your Account is past due, closed or otherwise does not have charge privileges; or you did not comply with the instructions regarding the Check.  The amount of the Returned Check Fee will not exceed the amount of the returned Check.

**Over Limit Fee -** None.  We do not charge you an Over Limit Fee if your balance exceeds your credit line.

**Check Stop Payment Fee -** If you ask us to stop payment on a Check, we may charge you a Check Stop Payment Fee of $25.

**Expedited Card Fee -** If you request expedited delivery for a replacement Card (for example, to replace a lost or stolen Card), we may charge you an Expedited Card Fee of $25.

**Duplicate Statement Fee -** If you request a duplicate copy of a monthly statement, for any purpose other than to assert a billing error, we may charge you a $5 fee for each statement copy requested.

**ANNUAL PERCENTAGE RATES ("APRs")**
**(See your Pricing Schedule for the APRs that apply to your Account)**

**Variable APRs -** Your Pricing Schedule may include variable APRs. A variable APR is an APR that can change each Billing Period. These APRs are determined by adding a certain percentage amount (called the Margin) to the Prime Rate. Variable APRs will increase or decrease when the Prime Rate changes. The APR change will take effect on the first day of the Billing Period that begins during the same calendar month that the Prime Rate changes.

An increase in the APR will increase your interest charges and may increase your Minimum Payment Due. The new APR will apply to existing balances, as well as balances added to your Account after the change.

## PAYMENTS

**Payment Instructions -** You are responsible for paying all amounts due on your Account, including charges made by Authorized Users. All payments must be in U.S. dollars. Check and electronic payments must be drawn on funds on deposit in the U.S.  Payments made in a foreign currency may be refused. If a foreign currency payment is accepted, we may charge your Account our cost to convert it to U.S. dollars.  Your billing statement provides the terms for making payments and we will credit payments to your Account in accordance with those terms. There may be a delay in processing and crediting a payment to your Account if a payment is mailed to an address other than the payment address designated on your billing statement. Late payments, partial payments or payments marked "payment in full" or with any other restrictive endorsement can be accepted by us without losing any of our rights under this Agreement.

**Minimum Payment Due -** Each Billing Period you must pay at least the Minimum Payment Due by the Payment Due Date shown on your billing statement. To calculate your Minimum Payment Due, we start with any amount past due, then we add the larger of the following:

(1) $15 or

(2) 1% of the New Balance (excluding any billed interest or minimum interest charge and any Late Fee or Returned Payment Fee for the Billing Period) and then we add to that 1% calculation any billed interest or minimum interest charge and any Late Fee or Returned Payment Fee for the Billing Period, and round the total to the nearest penny.

The Minimum Payment Due may also include amounts by which you exceed your Account Credit Line.  It will not exceed the New Balance.  You may pay more than the Minimum Payment Due, up to your entire Account balance, at any time.  You are not permitted to pre-pay toward future Minimum Payment Due amounts. A payment is required in each Billing Period in which there is a Minimum Payment Due. Credits, refunds and other adjustments are not considered payments and will not be applied toward your Minimum Payment Due requirement.

**How We Apply Payments and Credits -** Payment for up to the Minimum Payment Due amount will be applied at our discretion, and may be applied first to fees and interest, then to the balance with the lowest APR on your Account, and then to balances with higher APRs. Payment amounts in excess of the Minimum Payment Due will first be applied to the balances with the higher APRs before balances with lower APRs, except as otherwise required by applicable law. Credits will be applied at our discretion.

**How We Apply Payments May Impact Your Grace Period -** If you do not pay the New Balance shown on your statement in full by the Payment Due Date each month, depending on the balance to which we apply your payment, you may not receive a grace period on new Purchases.

## INTEREST CHARGES

**How We Calculate Interest - Average Daily Balance Method (Including Current Transactions) -** We calculate interest separately for each different balance (for example, Purchases at the current rate, Balance Transfers at the current rate, Cash Advances at the current rate, and different promotional balances).  Your billing statement shows each balance in the "Balance Subject to Interest Rate." For each balance, we calculate the interest for the Billing Period by multiplying the applicable daily periodic rate by the Average Daily Balance by the number of days in the Billing Period.  To get a daily periodic rate, we divide the APR by 365.  You authorize us to round interest to the nearest cent.  This interest on each balance is added to that balance at the end of the Billing Period.  The total interest charged for a Billing Period equals the sum of the interest charged on each balance.

For each balance, to determine an "Average Daily Balance," we calculate a daily balance each day of the billing period.  Interest charges accrue on a Purchase, Balance Transfer, Cash Advance, fee or interest charge from the day we add it to the daily balance.  We start with the beginning balance each day.  The beginning balance for the first day of the Billing Period is the balance at the end of the prior Billing Period.  Each day, we add any new transactions and fees; subtract any payments or credits applied to that balance; and make other adjustments.  We add Balance Transfer fees to the applicable Balance Transfer balance.  We add Cash Advance Fees to the applicable Cash Advance balance.  We generally add other fees to the standard Purchase balance. This gives us the daily balance.  A credit balance is treated as a balance of zero. Then, we add up all the balances of that balance type for the Billing Period, and divide the total by the number of days in the Billing Period.  This gives us the Average Daily Balance for the balance.

**When Interest Charges Begin -** We will begin charging interest on Cash Advances, Balance Transfers and Purchases on the transaction date. However, you can avoid paying interest on Purchases as described below. You cannot avoid paying interest on Balance Transfers or Cash Advances. You will pay interest on Balance Transfers and Cash Advances from the transaction date until you pay the total amount you owe us.

**How to Avoid Paying Interest on Purchases ("Grace Period") -** You will not be charged interest on Purchases in a Billing Period in which you pay the New Balance in full by the Payment Due Date.   If you don't pay your New Balance in full by the Payment Due Date in a Billing Period, you'll pay interest on existing Purchases, and new Purchases in that billing period, from the transaction date, subject to applicable law.

## ADDITIONAL IMPORTANT INFORMATION

**Default -** You default if you don't pay at least the Minimum Payment Due by the Payment Due Date; you have a Returned Payment; you exceed your Credit Line; you use your Account for an illegal transaction; you file for bankruptcy or some other insolvency proceeding is filed by or against you; you do not comply with any other term of this Agreement; you default under any other Cardmember Agreement you have with us; or you are declared incompetent or mentally incapacitated, or you die.  If you default we may declare the entire Account balance immediately due and payable, without notice, to the extent allowed by law, and close your Account.

**Closing or Suspending Your Account -** You may close your Account at any time. You may close your Account by calling the number on the back of your Card or by notifying us in writing at the Customer Service address on your billing statement or at www.mercurycards.com.  You will remain responsible for any amount you owe us under this Agreement. Any Joint Account holder may close a Joint Account.  However, all Joint Account holders will remain responsible for paying all amounts owed.  We may close, suspend, or not renew your Account or Card at any time, for any reason, with prior notice to the extent required by law. We may cancel your current Card and issue you a substitute Card at any time.

If you or we close your Account, the terms of this Agreement will continue to apply and you must pay us all amounts you owe on the Account, which may include amounts that we have not yet billed to you. Until you pay us in full, we may continue to charge applicable fees as well as interest on the amount you owe us.

**Collection Costs -** To the extent permitted by law, you are liable to us for our legal costs if we refer collection of your Account to a lawyer who is not our salaried employee. These costs may include reasonable attorneys' fees, as well as costs and expenses of any legal action.

**Privacy -** You authorize us to share information about you and your Account as permitted by law.  See our Privacy Notice at www.mercurycards.com for details about our information sharing practices.

## JA125

**Credit Reporting -** We may from time to time review your credit, employment, and income records. Upon request, we will give you the name and address of any consumer reporting agency that furnished a report on you. We may report information about the status and payment of your Account to credit bureaus and other creditors. We may report Account information in your name. Late payments, missed payments, or other defaults on your Account may be reflected in your credit report. We may also report Account information in the name of Authorized Users. If you think we reported incorrect information, please write us at Card Services, PO Box 84064 Columbus, GA 31908. Please include your name, address, phone number, and Account number.

**Contact Authorization -** You agree that we, and any other owner or servicer of your Account, may contact you through any channel of communication, for any purpose, as permitted by applicable law. You agree to provide us with and maintain a current mailing address, telephone number, and (unless you apply for your Account by telephone) email address, and you agree to notify us immediately of any changes to that mailing address, telephone number or email address. You agree that we (and our affiliates, agents and contractors, such as debt collection agencies and service providers, and any other owner or servicer of your Account) may use the telephone number(s) and email address(es) that you provide to us to contact you for informational, servicing or collections purposes. In addition, when you provide us with a telephone number, you expressly authorize us (and our affiliates, agents and contractors, such as debt collection agencies and service providers, and any other owner or servicer of your Account) to contact you at that number by voice or text using automatic telephone dialing equipment and artificial or prerecorded voice messages. These communications may be monitored or recorded. You authorize these contacts by voice or text even if the number is a mobile phone number or converts to a mobile phone number, and even if you are charged by your service provider. These contacts by voice or text may concern debt collection, notification of potential fraud, or other Account-servicing matters. This authorization covers successors, assigns, affiliates, agents and contractors.

**Changing Contact Preferences -** You may change your preferences or update your contact information at www.mercurycards.com or by calling the Customer Service number shown on the front of your billing statement.

**Access To Your Mobile Subscriber Details -** You authorize your wireless operator (AT&T, Sprint, T-Mobile, US Cellular, Verizon, or any other branded wireless operator) to use your mobile number, name, address, email, network status, customer type, customer role, billing type, mobile device identifiers (IMSI and IMEI) and other subscriber status details, if available, solely to allow verification of your identity and to compare information you provided with your wireless operator Account profile information for the duration of the business relationship. See our Privacy Policy for how we treat your data.

**Governing Law -** This Agreement is governed by applicable federal law and by South Dakota law, without regard to South Dakota's conflict of laws principles.

**Compliance with the Military Lending Act:** Your Cardmember Agreement shall be interpreted to comply with the Military Lending Act, including its restrictions on permissible loan terms and limitations on interest and fees. The limitations on interest and fees apply to individuals during the period that they are Covered Borrowers. As applied to Covered Borrowers, any interest or fees in excess of the permitted limit shall be reduced by the amount necessary to satisfy that limit and any amounts collected in excess of the permitted limit shall be refunded by crediting the Covered Borrower's Account or by making a direct payment to the Covered Borrower; the Jury Trial Waiver and Arbitration Clause shall not apply; and any other provision of your Cardmember Agreement that is inconsistent with the Military Lending Act shall not apply.

A consumer becomes a "Covered Borrower" who is entitled to the Limitations on Terms of Consumer Credit Extended to Service Members and Dependents pursuant to a determination made in accordance with 32 C.F.R. 232.5(b). A consumer ceases to be a "Covered Borrower" when he or she is no longer a member of the Armed Forces serving on active duty or a dependent of such member, as defined under 32 C.F.R. 232.3(g).

**Severability -** If any part of this Agreement conflicts with applicable law, that provision will be considered modified to conform to applicable law. However, if you are otherwise subject to arbitration of Disputes in accordance with this Agreement, but any part or parts of your Agreement to arbitrate are declared unenforceable, then you and we agree that such specific part or parts shall be of no force or effect and shall be severed, but the remainder of this Agreement to arbitrate shall continue in full force and effect. If, however, the entire Agreement to arbitrate or your waiver of the right to bring or participate in a class or representative action is unenforceable, then the Agreement to arbitrate shall be of no force or effect.

**Enforcing this Agreement -** We may delay enforcing or not enforce any of our rights under this Agreement without losing or waiving any of them.

**Assignment of Account -** We may assign any or all of our rights and obligations under this Agreement. You may not assign any of your rights or obligations under this Agreement.

**ARBITRATION**
**This Jury Trial Waiver and Arbitration Clause does not apply to you if you are a Covered Borrower under the Military Lending Act.**

**JURY TRIAL WAIVER AND ARBITRATION CLAUSE**

By accepting this Agreement, you agree to this Jury Trial Waiver and Arbitration Clause ("Clause"). This Clause is in question and answer form to make it easier to understand. Even so, this Clause is part of this Agreement and is legally binding. **Under this Clause, you waive the right to have any Dispute heard by a judge and jury and you waive the right to bring or participate in a class, representative or private attorney general action regarding any Dispute. You may "opt out" of this Clause in the manner set out in the section of the Clause entitled "Is this Clause Required."**

**BACKGROUND AND SCOPE**

| Question | Short Answer | Further Detail |
|---|---|---|
| **What is arbitration?** | **An alternative to court** | In arbitration, a third party arbitrator ("TPA") decides Disputes. |
| **Is it different from court and jury trials?** | **Yes** | There is no jury. It may be less formal, faster, and less expensive than a lawsuit. Pre-hearing fact-finding (called "discovery") is limited. Appeals are limited. Courts rarely overturn arbitration awards. |

| Is this Clause required? | No | If you do not want this Clause to apply to Disputes, you must send us a signed notice within 60 calendar days after accepting this Agreement. You must send the notice in writing to Card Services, attn. Compliance Department, PO Box 84064, Columbus, GA 31908. You must provide your name, address and the date. You must state that you "opt out" of the arbitration clause. If you do not opt out in compliance with the instructions set forth in this box, then this Clause will apply to Disputes. |
|---|---|---|
| What is this Clause about? | The parties' agreement to arbitrate Disputes | You and we agree that any party may elect to arbitrate or require arbitration of any "Dispute" as defined below. |
| Who does the Clause cover? | You, us, and certain "Related Parties" | This Clause governs you and us. It also covers certain "Related Parties." These include: (1) our parent companies, subsidiaries, and affiliates; (2) our employees, directors, officers, shareholders, members, representatives, and agents; and (3) any person or entity that your or we assert is potentially liable for the conduct at issue in a Dispute. |
| What Disputes does the Clause cover? | All Disputes | This Clause governs all "Disputes" between you and us (or any Related Party). In this Clause, the word "Disputes" means any claim, counterclaim, cross-claim, complaint, cross-complaint, controversy, or dispute between you or us arising under, out of, or directly or indirectly related to your application, this Agreement or your relationship with us. It includes claims related to any prior applications or agreements. It includes extensions, renewals, refinancings, or payment plans. It includes claims related to collections, privacy, and customer information. It includes claims related to the validity in general of this Agreement. Without limiting the generality of the foregoing, the term Dispute shall include any claim, controversy or dispute without regard to when it arose; whether it is based in contract, tort, statute, regulation, common law, or equity; or whether the remedy sought is legal or equitable, including claims for compensatory, monetary and/or punitive damages, restitution and/or disgorgement, or injunctive relief, including public injunctive relief. Dispute also includes any claim, defense or dispute concerning the formation, existence, validity, enforceability, revocation or scope of this Clause. |
| Who is the arbitration company? | Usually AAA or JAMS | The arbitration company will be one of the following:<br>• The American Arbitration Association ("AAA"), 1-800-778-7879, www.adr.org<br>• JAMS, 1-800-352-5267, www.jamsadr.com<br>• Another arbitration company agreed to by you and us.<br><br>If all the above options are unavailable, a court will appoint an arbitration company to administer the arbitration. However, the court may not select an arbitration company if that company's arbitration rules would permit class arbitration contrary to this Clause. Similarly, if the AAA or JAMS rules are changed to allow class arbitration contrary to this Clause then they are disqualified from serving as the arbitration company. |
| How is the TPA selected? | By agreement or by the arbitration company | Selection of the TPA is governed by the rules of the arbitration company. In general, the arbitration company's rules allow you and us to try to agree on the TPA. However, if you and we cannot agree, then the arbitration company will select the TPA in accordance with its rules and the criteria set forth in this box.<br>The TPA must be a lawyer with at least ten years of experience or a retired judge unless you and we otherwise agree. |
| Can Disputes be litigated? | Sometimes | Either party may bring a lawsuit subject to the other party's right to demand arbitration. We will not demand arbitration of any lawsuit you bring (whether complaint, cross-claim or counterclaim) as an individual action in small-claims court; however, if such compliant, cross-claim or counterclaim is not brought on an individual only basis or is transferred or removed to a different court, we may then exercise our right to arbitrate the Dispute according to this Clause. |
| Does arbitration involve giving up any rights? | Yes | **For Disputes subject to this Clause, you give up your right to:**<br>**1. Have a jury hear and decide your Dispute.**<br>**2. Have courts, other than small-claims courts, decide Disputes.**<br>**3. Serve as a private attorney general or in a representative capacity.**<br>**4. Join your Dispute with a dispute between us and other borrowers.**<br>**5. Bring or be a class member in a class action or class arbitration.**<br>**We also give up the right to a jury trial and to have courts decide Disputes you wish to arbitrate.** |
| Is a class arbitration permitted? | No | **The TPA is not allowed to handle any Dispute on a class, private attorney general or representative basis.** All Disputes subject to this Clause must be decided in an **individual** arbitration or an **individual** small-claims action. Any arbitral award on a class basis shall be void and shall not be subject to confirmation and no judgment shall enter thereon. |
| May a California borrower arbitrate a claim for public injunctive relief under this Clause? | Yes | This Clause shall not be construed to prevent you from seeking in the arbitration the remedy of public injunctive relief if (a) you reside in California, (b) you resided in California at the time you entered into this Clause, or (c) the billing address for your account is a California address. |
| Will borrower actions make | No | This Clause stays in force even if you: (1) close the Account; (2) default, renew, prepay or pay your Account in full; or (3) go into or through bankruptcy. |

| | | |
|---|---|---|
| this Clause ineffective? | | |

**PROCESS**

| Question | Short Answer | Further Detail |
|---|---|---|
| What must you or we do before starting a lawsuit or arbitration? | Send a written Dispute notice and work to resolve the Dispute | Before starting a lawsuit or arbitration, the complaining party must give the other party written notice of the Dispute. The notice must provide the complaining party's name, address and date. The notice must explain in reasonable detail the nature of the Dispute and any supporting facts. If you are the complaining party, you must send the notice in writing (and not electronically) to Card Services, attn. Compliance Department, PO Box 84064, Columbus, GA 31908. You, or an attorney representing you, must sign the notice and must provide a phone number where you (or your attorney) can be reached. A collections letter from us to you will serve as our written notice of a Dispute. Once a Dispute notice is sent, the complaining party must give the other party a reasonable opportunity over the next 30 days to resolve the Dispute on an individual basis. |
| How does arbitration start? | Following the rules of the selected arbitration company | If the parties do not reach an agreement to resolve the Dispute within 30 days after notice of the Dispute is received, the complaining party may start a lawsuit or arbitration, subject to the right of the other to demand arbitration of the Dispute according to the terms of this Clause. To start arbitration, the complaining party picks the arbitration company and follows the arbitration company's rules. If one party starts or threatens a lawsuit, the other party can demand arbitration. This demand can be made in court papers. It can be made if a party starts a lawsuit on an individual basis and then tries to pursue a class action. Once an arbitration demand is made, no lawsuit can be brought and any existing lawsuit must stop.  Either you or we may seek to stay a lawsuit or enforce arbitration as provided for in the FAA if either your or we fail to abide by the terms of this Clause.<br><br>Once an arbitration is started, the arbitration will be conducted under this Clause and the rules of the arbitration company in effect at the time the arbitration is commenced. But, arbitration rules that conflict with this Clause do not apply. |
| Will any hearing be held nearby? | Yes | The TPA may decide that an in-person hearing is unnecessary and that he or she can resolve a Dispute based on written filings and/or a conference call. But, any in-person arbitration hearing must be held at a place within the federal judicial district of the mailing address that you provided to us. |
| What about appeals? | Very limited | Appeal rights under the FAA are very limited. Except for FAA appeal rights and except for Disputes involving more than $50,000 (including Disputes involving requests for injunctive relief that could cost us more than $50,000), the TPA's award will be final and binding. For Claims involving more than $50,000, any party may appeal the award to a panel of three TPAs appointed by the arbitration company, which will reconsider from the start anything in the initial award that is appealed. The panel's decision will be final and binding, except for any FAA appeal right. Any appropriate court may enter judgment upon the arbitrator's award. |

**ARBITRATION FEES AND AWARDS**

| Question | Short Answer | Further Detail |
|---|---|---|
| Who bears arbitration fees? | Usually, we do. | Arbitration fees are fees charged by the arbitration company or the TPA. We will pay all filing, administrative, hearing and TPA fees if you cannot get a waiver of such fees, and ask us to pay. |
| When will we cover your legal fees and costs? | If you win | If you win an arbitration, we will pay the reasonable fees and costs for your attorneys, experts, and witnesses. We will also pay these amounts if required under applicable law or the arbitration company's rules or if payment is required to enforce this Clause. The TPA shall not limit his or her award of these amounts because your Dispute is for a small amount. |
| Will you ever owe us for arbitration or attorneys' fees? | Only for bad faith | The TPA can require you to pay our fees if (and only if): (1) the TPA finds that you have acted in bad faith (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)); and (2) this power does not make this Clause invalid or require the TPA or arbitration company to decline to participate in the arbitration. |
| Can a failure to resolve a Dispute informally result in a larger recovery for you? | Yes | You are entitled to an arbitration award of at least $3,000 if: (1) You give us notice of a Dispute on your own behalf (and not on behalf of any other party) and comply with all of the requirements of this Clause (including the requirements described in response to the question reading "What must a party do before starting a lawsuit or arbitration?"; and (2) the TPA awards you money damages greater than the last amount you requested at least ten days before the arbitration commenced. This is in addition to the attorneys' fees and expenses (including expert witness fees and costs) to which you are otherwise entitled. This $3,000 minimum award is a single award that applies to all Disputes you have raised or could have raised in the arbitration. Multiple awards of $3,000 are not contemplated by this Clause. Settlement demands and offers are strictly confidential. They may not be used in any proceeding by either party except to justify a minimum recovery of $3,000. |

**JA128**

| Can an award be explained? | Yes | A party may request an explanation from the TPA, within 14 days of the ruling. Upon such request, the TPA will explain the ruling in writing. |
|---|---|---|

**YOUR BILLING RIGHTS**

**Keep This Document For Future Use**

**This notice tells you about your rights and our responsibilities under the Fair Credit Billing Act.**

**What To Do If You Find A Mistake On Your Statement**
If you think there is an error on your bill, write to us at:

> Card Services - Dispute Resolution
> PO Box 84064
> Columbus, GA 31908

In your letter, give us the following information:
- Account information*:* Your name and Account number.
- Dollar amount*:* The dollar amount of the suspected error.
- Description of problem: If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us:
- Within 60 days after the error appeared on your statement.
- At least 3 business days before an automated payment is scheduled, if you want to stop payment on the amount you think is wrong.

You must notify us of any potential errors in writing. You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.

**What Will Happen After We Receive Your Letter**
When we receive your letter, we must do two things:
1. Within 30 days of receiving your letter, we must tell you that we received your letter. We will also tell you if we have already corrected the error.
2. Within 90 days of receiving your letter, we must either correct the error or explain to you why we believe the bill is correct.

While we investigate whether or not there has been an error:
- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.

After we finish our investigation, one of two things will happen:
- If we made a mistake: You will not have to pay the amount in question or any interest or other fees related to that amount.
- If we do not believe there was a mistake: You will have to pay the amount in question, along with applicable interest and fees. We will send you a statement of the amount you owe and the date payment is due. We may then report you as delinquent if you do not pay the amount we think you owe.

If you receive our explanation but still believe your bill is wrong, you must write to us within 10 days telling us that you still refuse to pay. If you do so, we cannot report you as delinquent without also reporting that you are questioning your bill. We must tell you the name of anyone to whom we reported you as delinquent, and we must let those organizations know when the matter has been settled between us.

If we do not follow all of the rules above, you do not have to pay the first $50 of the amount you question even if your bill is correct.

**Your Rights If You Are Dissatisfied With Your Credit Card Purchases**
If you are dissatisfied with the goods or services that you have purchased with your credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the purchase.

To use this right, all of the following must be true:
1. The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50. (*Note:* Neither of these is necessary if your purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services.)
2. You must have used your credit card for the purchase. Purchases made with cash advances from an ATM or with a check that accesses your credit card account do not qualify.
3. You must not yet have fully paid for the purchase.

If all of the criteria above are met and you are still dissatisfied with the purchase, contact us in writing at:

> Card Services - Dispute Resolution
> PO Box 84064
> Columbus, GA 31908

While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay, we may report you as delinquent.

This card is issued by First Bank & Trust, Brookings, SD pursuant to a license by Mastercard International.

# JA129

# EXHIBIT 5

## MERCURY MASTERCARD® CARDMEMBER AGREEMENT

F03-Y385-1 -0520

This Agreement governs the use of your Account. The enclosed Pricing Schedule is part of this Agreement. Please read this Agreement, including the Pricing Schedule, and keep them for your records.

**DEFINITIONS**

**"Account"** means your Mercury Mastercard® Account with us established by this Agreement.

**"Affiliate"** means our parent corporations, subsidiaries and affiliates.

**"Authorized User"** means any person you allow to use your Card or Account.

**"Balance Transfer"** means transferring a balance from another creditor to your Account by accepting an offer from us, which we may make to you from time to time at our sole discretion, or use of a Check we provide to you for such purpose, in accordance with any limitations or restrictions we place upon such offer at the time it is made.

**"Billing Period"** means the period of time covered by the billing statement we send to you. A Billing Period is usually 28 to 33 days.

**"Business Day"** means Monday through Friday, excluding federal holidays.

**"Card"** means a card or other access devices, including your Account number or virtual card, that we issue to you, or someone you authorize, to receive credit under this Agreement.

**"Cash Advance"** means use of your Card to obtain cash from an ATM, financial institution, or other location; to make a payment to load a stored value card or account; or to purchase items that are convertible to cash, such as stored value cards, lottery tickets, money orders, casino chips, foreign currency, or similar items. It also means use of a Check we provide to you for use as a Cash Advance.

**"Check"** means any Check we may, in our discretion, send you to access your Account.

**"Covered Borrower"** means a consumer who is entitled to the Limitations on Terms of Consumer Credit Extended to Service Members and Dependents. A consumer becomes a Covered Borrower pursuant to a determination made in accordance with 32 C.F.R. 232.5(b). A consumer ceases to be a Covered Borrower when he or she is no longer a member of the Armed Forces serving on active duty or a dependent of such member, as defined under 32 C.F.R. 232.3(g).

**"Prime Rate"** means the highest rate of interest listed as the U.S. Prime Rate in the Money Rates section of *The Wall Street Journal* on the last Business Day of the month.

**"Purchase"** means the use of your Account to buy or lease goods or services at participating merchants. However, the purchase of foreign currency or of cash equivalents, like casino chips or lottery tickets, is treated as a Cash Advance not a Purchase.

**"We," "us"** and **"our"** refer to First Bank & Trust, Brookings, SD, the issuer of your Card.

**"You," "your"** or **"yours"** refer to you and any other person who is also contractually liable under this Agreement.

**AGREEMENT ACCEPTANCE**

You accept this Agreement if you use the Account. You also accept this Agreement if you do not cancel the Account within 45 days of the Account open date.

**This Agreement contains a Jury Trial Waiver and Arbitration Clause. Please read that section carefully because it will have a substantial effect on your rights, including your right to bring or participate in a class action or have a jury trial in the event of a Dispute between you and us. However, you may reject the Jury Trial Waiver and Arbitration Clause ("opt-out") by following the steps noted in that section within 60 days after you have accepted the Agreement.**

**CHANGES TO YOUR ACCOUNT**

The rates, fees and terms of this Agreement (including its Jury Trial Waiver and Arbitration Clause), may change and we may add or delete any term. When required by law, we will provide advance written notice of any changes and any right to reject the changes.

**ACCOUNT USE**

**Permitted Uses** – Your Account may be used for Purchases, Balance Transfers and Cash Advances. The Account may not be used for illegal transactions. This Account is to be used for consumer purposes, not for business purposes. However, even if the Account is used for business purposes, this Agreement will still apply to those transactions, and you are responsible for repayment. The Account may be closed if it is used for business purposes.

**Checks** – A Check we send you to access your Account will be treated as a Cash Advance unless we tell you otherwise. You may not use a Check to pay any amount you owe us. We may elect to not honor a Check if the Check may cause your Account balance to exceed the Cash Advance or other applicable credit line on your Account. If you want to stop payment on a Check, notify Customer Service immediately. If you ask us to stop payment, we will make reasonable efforts not to pay that Check. However, if the Check is paid despite these efforts, we will not be liable to you for paying that Check. We may not be able to stop payment if we receive your stop payment request after we have started processing the Check. Please see the Fees section in this Agreement for information regarding the Check Stop Payment Fee.

**Purchases and Cash Advances in Foreign Currencies** – If you make a transaction in a foreign currency (including, for example, online Purchases from foreign merchants), the transaction will be converted into a U.S. dollar amount by Visa or Mastercard, depending on which Card is used, using their procedures in effect at the time the transaction is processed. Currently, they use a wholesale market rate or a government-mandated rate. These procedures may change without notice. The conversion rate you get may differ from the rate on the transaction date or post-date and from the rate Visa or Mastercard gets. A merchant or other third party may convert a transaction into U.S. dollars or another currency, using a rate they select, before sending it to Visa or Mastercard.

**Credit Line** – We assign a credit line for your Account. You must keep your Account balance below your credit line. We may request immediate payment of any amount that exceeds the credit line. We may restrict the amount of the credit line that may be used for Cash Advances. Your Account credit line or your Cash Advance credit line may be increased or decreased at any time, without advance notice. We may delay increasing your available credit by the amount of any payment that we receive for up to 10 Business Days.

**Credit Authorizations** – Transactions may not be authorized for security or other reasons. If we decline to authorize a transaction, or if anyone refuses your Card, Check, or Account number, we will not be liable to you.

**Automatic Billing Arrangements** – If you set up an automatic billing arrangement with a merchant, you are responsible for providing updated Account number or Card expiration date information to the merchant. You also authorize us to provide updated Card or Account information to a merchant at our sole discretion. If you want to cancel automatic billing you must contact the merchant.

**Unauthorized Use** – If you notice the loss or theft of your Card or a possible unauthorized use of your Card, you should immediately call us at the telephone number listed on the back of your Card or the customer service number shown on the front of your billing statement.

**Mobile Devices** – Smart phones, tablets, and other electronic devices (a "Mobile Device") can download, store, and/or access Account information. This means the Mobile Device can be used to access credit on the Account under this Agreement. Any transaction conducted using your Mobile Device is covered by this Agreement. Secure your Mobile Device. Anyone who can access your Account or Card using your Mobile Device can make charges to your Account. Applications that enable your Mobile Device to access your Account or Card may have separate terms of use.

**Joint Accounts** – If this Account is a Joint Account, each of you agrees to be individually and jointly liable for the entire amount owed on the Account. Each of you also agrees that any notice we send to either of you will serve as notice to both of you.

**AUTHORIZED USERS**

**Liability** – Use of your Account by an Authorized User is subject to the terms of this Agreement. You will be liable for all transactions and any fees or charges resulting from those transactions made by any person you permit to use your Card, Check, Account number, or other credit device with the authorization to obtain credit on your Account, including transactions for which you may not have intended to be liable, even if the amount of those transactions causes a credit line to be exceeded. If an Authorized User permits someone else to use your Account, you will be liable for those transactions, fees, and charges as well. If this Account is a Joint Account, each of you agrees to be individually and jointly liable for the entire amount owed on the Account.

**Information** – Authorized Users of this Account may have the same access to information about the Account and its users as the Account holders.

**Additional Card for Authorized User** – You may request an additional Card for an Authorized User. Before you make this request, you must:
- Let them know that we may report information about the Account to the credit reporting agencies in their name. This means that information about the Account, including about late payments, missed payments, or other defaults on the Account may appear in their credit report.
- Make a copy of this Agreement available to them.
- Obtain their permission to share their information with us and for us to share it as allowed by applicable law.

**Cancelling an Authorized User** – You must notify us if you wish to cancel the authority of an Authorized User to use your Account. In some cases, we may close your Account and issue you a new Card. You remain responsible for any transactions made or authorized by an Authorized User, even if the post-date shown on your statement for that transaction occurs after the date you notify us to cancel the authority of an Authorized User to use your Account.

**JOB SPECS:**
*Flat Size:*
8" x 28"

*Finished Size:*
8" x 3.75"

*Colors:*
Front: **Black**
Back: **Black**

*Bleed:* **No**

*Note:* none

# JA131

**FEES**
**(See your Pricing Schedule for Additional Fees)**

**Minimum Interest Charge** – If you are charged interest, the charge will be no less than the amount shown in your Pricing Schedule.

**Balance Transfer Fee** – We may charge you this Fee for each Balance Transfer. See your Pricing Schedule for the fee amount.

**Cash Advance Fee** – We may charge you this Fee for each Cash Advance. See your Pricing Schedule for the fee amount.

**Foreign Transaction Fee** – A Foreign Transaction Fee may be charged for any Purchase that is made in a foreign currency and that is made outside the U.S. (A Purchase is made outside the U.S. unless it is made with a U.S. merchant and processed completely in the U.S.). See your Pricing Schedule for the fee amount. This Fee is based on the amount of the Purchase after conversion to US Dollars.

**Late Fee** – A Late Fee may be charged if you do not pay at least the Minimum Payment Due by the Payment Due Date. The Late Fee is $29 and, if you make another Late Payment within the next 6 Billing Periods, the Late Fee will be $40. The amount of your Late Fee will never be higher than your Minimum Payment Due immediately prior to assessment of the fee.

**Returned Payment Fee** – A Returned Payment Fee may be charged if you make a payment that is not honored by your financial institution, even if the payment is honored after it is resubmitted. The Returned Payment Fee is $29 and, if another payment is returned within the next 6 Billing Periods the returned Payment Fee will be $40. The amount of your Returned Payment Fee will never be higher than your Minimum Payment Due immediately prior to assessment of the fee.

**Returned Check Fee** – We may charge you a Returned Check fee of $25 if we return a Check unpaid because it exceeds the available credit line at the time it is processed; your Account is past, closed or otherwise does not have charge privileges; or you did not comply with the instructions regarding the Check. The amount of the Returned Check Fee will not exceed the amount of the returned Check.

**Over Limit Fee** – None. We do not charge you an Over Limit Fee if your balance exceeds your credit line.

**Check Stop Payment Fee** – If you ask us to stop payment on a Check, we may charge you a Check Stop Payment Fee of $25.

**Expedited Card Fee** – If you request expedited delivery for a replacement Card (for example, to replace a lost or stolen Card), we may charge you an Expedited Card Fee of $25.

**Duplicate Statement Fee** – If you request a duplicate copy of a monthly statement, for any purpose other than to assert a billing error, we may charge you a $5 fee for each statement copy requested.

**ANNUAL PERCENTAGE RATES ("APRs")**
**(See your Pricing Schedule for the APRs that apply to your Account)**

**Variable APRs** – Your Pricing Schedule may include variable APRs. A variable APR is an APR that can change each Billing Period. These APRs are determined by adding a certain amount (called the Margin) to the Prime Rate. Variable APRs will increase or decrease when the Prime Rate changes. The APR change will take effect on the first day of the Billing Period that begins during the same calendar month that the Prime Rate changes. An increase in the APR will increase your interest charges and may increase your Minimum Payment Due. The new APR will apply to existing balances, as well as balances added to your Account after the change.

**PAYMENTS**

**Payment Instructions** – You are responsible for paying all amounts due on your Account, including charges made by Authorized Users. All payments must be in U.S. dollars. Check and electronic payments must be drawn on funds on deposit in the U.S. Payments made in a foreign currency may be refused. If a foreign currency payment is accepted, we may charge your Account our cost to convert it to U.S. dollars. Your billing statement provides the terms for making payments and we will credit payments to your Account in accordance with those terms. There may be a delay in processing and crediting a payment to your Account if a payment is mailed to an address other than the payment address designated on your billing statement. Late payments, partial payments or payments marked "payment in full" or with any other restrictive endorsement can be accepted by us without losing any of our rights under this Agreement.

**Minimum Payment Due** – Each Billing Period you must pay at least the Minimum Payment Due by the Payment Due Date shown on your billing statement. To calculate your Minimum Payment Due, we start with any amount past due, then we add the larger of the following:

(1) $15 or
(2) 1% of the New Balance (excluding any billed interest or minimum interest charge and any Late Fee or Returned Payment Fee for the Billing Period) and then we add to that 1% calculation any billed interest or minimum interest charge and any Late Fee or Returned Payment Fee for the Billing Period, and round the total to the nearest penny.

The Minimum Payment Due may also include amounts by which you exceed your Account Credit Line. It will not exceed the New Balance. You may pay more than the Minimum Payment Due, up to your entire Account balance, at any time. You are not permitted to pre-pay toward future Minimum Payment Due amounts. A payment is required in each Billing Period in which there is a Minimum Payment Due. Credits, refunds and other adjustments are not considered payments and will not be applied toward your Minimum Payment Due requirement.

**How We Apply Payments and Credits** – Payment for up to the Minimum Payment Due will be applied at our discretion, and may be applied first to fees and interest, then to the balance with the lowest APR on your Account, and then to balances with higher APRs. Payment amounts in excess of the Minimum Payment Due will first be applied to the balances with the higher APRs before balances with lower APRs, except as otherwise required by applicable law. Credits will be applied at our discretion.

**How We Apply Payments May Impact Your Grace Period** – If you do not pay the New Balance shown on your statement in full by the Payment Due Date each month, depending on the balance to which we apply your payment, you may not receive a grace period on new Purchases.

**INTEREST CHARGES**

**How We Calculate Interest - Average Daily Balance Method (Including Current Transactions)** – We calculate interest separately for each different balance (for example, Purchases at the current rate, Balance Transfers at the current rate, Cash Advances at the current rate, and different promotional balances). Your billing statement shows each balance in the "Balance Subject to Interest Rate." For each balance, we calculate the interest for the Billing Period by multiplying the applicable daily periodic rate by the Average Daily Balance by the number of days in the Billing Period. To get a daily periodic rate, we divide the APR by 365. You authorize us to round interest to the nearest cent. This interest on each balance is added to that balance at the end of the Billing Period. The total interest charged for a Billing Period equals the sum of the interest charged on each balance.

For each balance, to determine an "Average Daily Balance," we calculate a daily balance each day of the billing period. Interest charges accrue on a Purchase, Balance Transfer, Cash Advance, fee or interest charge from the day we add it to the daily balance. We start with the beginning balance each day. The beginning balance for the first day of the Billing Period is the balance at the end of the prior Billing Period. Each day, we add any new transactions and fees; subtract any payments or credits applied to that balance; and make other adjustments. We add Balance Transfer fees to the applicable Balance Transfer balance. We add Cash Advance Fees to the applicable Cash Advance balance. We generally add other fees to the standard Purchase balance. This gives us the daily balance. A credit balance is treated as a balance of zero. Then, we add up all the balances of that balance type for the Billing Period, and divide the total by the number of days in the Billing Period. This gives us the Average Daily Balance for the balance.

**When Interest Charges Begin** – We will begin charging interest on Cash Advances, Balance Transfers and Purchases on the transaction date. However, you can avoid paying interest on Purchases as described below. You cannot avoid paying interest on Balance Transfers or Cash Advances. You will pay interest on Balance Transfers and Cash Advances from the transaction date until you pay the total amount you owe us.

**How to Avoid Paying Interest on Purchases ("Grace Period")** – You will not be charged interest on Purchases in a Billing Period in which you pay the New Balance in full by the Payment Due Date. If you don't pay your New Balance in full by the Payment Due Date in a Billing Period, you'll pay interest on existing Purchases, and new Purchases in that billing period, from the transaction date, subject to applicable law.

**ADDITIONAL IMPORTANT INFORMATION**

**Default** – You default if you don't pay at least the Minimum Payment Due by the Payment Due Date; you have a Returned Payment; you exceed your Credit Line; you use your Account for an illegal transaction; you file for bankruptcy or some other insolvency proceeding is filed by or against you; you do not comply with any other term of this Agreement; you default under any other Cardmember Agreement you have with us; or you are declared incompetent or mentally incapacitated, or you die. If you default we may declare the entire Account balance immediately due and payable, without notice, to the extent allowed by law, and close your Account.

**Closing or Suspending Your Account** – You may close your Account at any time. You may close your Account by calling the number on the back of your Card or by notifying us in writing at the Customer Service address on your billing statement or at www.mercurycards.com. You will remain responsible for any amount you owe us under this Agreement. Any Joint Account holder may close a Joint Account. However, all Joint Account holders will remain responsible for paying all amounts owed. We may close, suspend, or not renew your Account or Card at any time, for any reason, with prior notice to the extent required by law. We may cancel your current Card and issue you a substitute Card at any time.

If you or we close your Account, the terms of this Agreement will continue to apply and you must pay us all amounts you owe on the Account, which may include amounts that we have not yet billed to you. Until you pay us in full, we may continue to charge applicable fees as well as interest on the amount you owe us.

**Collection Costs** – To the extent permitted by law, you are liable to us for our legal costs if we refer collection of your Account to a lawyer who is not our salaried employee. These costs may include reasonable attorneys' fees, as well as costs and expenses of any legal action.

**Privacy** – You authorize us to share information about you and your Account as permitted by law. See our Privacy Notice at mercurycards.com for details about our information sharing practices.

**Credit Reporting** – We may from time to time review your credit, employment, and income records. Upon request, we will give you the name and address of any consumer reporting agency that furnished a report on you. We may report information about the status and payment of your Account to credit bureaus and other creditors. We may report Account information in your name. Late payments, missed payments, or other defaults on your Account may be reflected in your credit report. We may also report Account information in the name of Authorized Users. If you have reported incorrect information, please write us at Card Services, PO Box 84064 Columbus, GA 31908. Please include your name, address, phone number, and Account number.

**Contact Authorization** – You agree that we, and any other owner or servicer of your Account, may contact you through any channel of communication, for any purpose, as permitted by applicable law. You agree to provide us with and maintain a current mailing address, telephone number, and (unless you apply for your Account by telephone) email address, and you agree to notify us immediately of any changes to that mailing address, telephone number or email address. You agree that we (and our affiliates, agents and contractors, such as debt collection agencies and service providers, and any other owner or servicer of your Account)

may use the telephone number(s) and email address(es) that you provide to us to contact you for informational, servicing or collections purposes. In addition, when you provide us with a telephone number, you expressly authorize us (and our affiliates, agents and contractors, such as debt collection agencies and service providers, and any other owner or servicer of your Account) to contact you at that number by voice or text using automatic telephone dialing equipment and artificial or prerecorded voice messages. These communications may be monitored or recorded. You authorize these contacts by voice or text even if the number is a mobile phone number or converts to a mobile phone number, and even if you are charged by your service provider. These contacts by voice or text may concern debt collection, notification of potential fraud, or other Account-servicing matters. This authorization covers successors, assigns, affiliates, agents and contractors.

**Changing Contact Preferences** – You may change your preferences or update your contact information at www.mercurycards.com or by calling the Customer Service number shown on the front of your billing statement.

**Access To Your Mobile Subscriber Details.** You authorize your wireless operator (AT&T, Sprint, T-Mobile, US Cellular, Verizon, or any other branded wireless operator) to use your mobile number, name, address, email, network status, customer type, customer role, billing type, mobile device identifiers (IMSI and IMEI) and other subscriber status details, if available, solely to allow verification of your identity and to compare information you provided with your wireless operator Account profile information for the duration of the business relationship. See our Privacy Policy for how we treat your data.

**Governing Law** – This Agreement is governed by applicable federal law and by South Dakota law, without regard to South Dakota's conflict of laws principles.

**Severability** – If any part of this Agreement conflicts with applicable law, that provision will be considered modified to conform to applicable law. However, if you are otherwise subject to arbitration of Disputes in accordance with this Agreement, but any part or parts of your Agreement to arbitrate are declared unenforceable, then you and we agree that such specific part or parts shall be of no force or effect and shall be severed, but the remainder of this Agreement to arbitrate shall continue in full force and effect. If, however, the entire Agreement to arbitrate or your waiver of the right to bring or participate in a class or representative action is unenforceable, then the Agreement to arbitrate shall be of no force or effect.

**Enforcing this Agreement** – We may delay enforcing or not enforce any of our rights under this Agreement without losing or waiving any of them.

**Assignment of Account** – We may assign any or all of our rights and obligations under this Agreement. You may not assign any of your rights or obligations under this Agreement.

**ARBITRATION**
**This Jury Trial Waiver and Arbitration Clause does not apply to you if you are a Covered Borrower under the Military Lending Act.**

**JURY TRIAL WAIVER AND ARBITRATION CLAUSE**
By accepting this Agreement, you agree to this Jury Trial Waiver and Arbitration Clause ("Clause"). This Clause is in question and answer form to make it easier to understand. Even so, this Clause is part of this Agreement and is legally binding. **Under this Clause, you waive the right to have any Dispute heard by a judge and jury and you waive the right to bring or participate in a class, representative or private attorney general action regarding any Dispute. You may "opt out" of this Clause in the manner set out in the section of the Clause entitled "Is this Clause Required."**

**BACKGROUND AND SCOPE**

| Question | Short Answer | Further Detail |
|---|---|---|
| What is arbitration? | An alternative to court | In arbitration, a third party referee ("TPA") decides Disputes. |
| Is it different from court and jury trials? | Yes | There is no jury. It may be less formal, faster, and less expensive than a lawsuit. Pre-hearing fact-finding (called "discovery") is limited. Appeals are limited. Courts rarely overturn arbitration awards. |
| Is this Clause required? | No | If you do not want this Clause to apply to Disputes, you must send us a signed notice within 60 calendar days after accepting this Agreement. You must send the notice in writing to Card Services, attn. Compliance Department, PO Box 84064, Columbus, GA 31908. You must provide your name, address and the date. You must state that you "opt out" of the arbitration clause. If you do not opt out in compliance with the instructions set forth in this box, then this Clause will apply to Disputes. |
| What is this Clause about? | The parties' agreement to arbitrate Disputes | You and we agree that any party may elect to arbitrate or require arbitration of any "Dispute" as defined below. |
| Who does the Clause cover? | You, us, and certain "Related Parties" | This Clause governs you and us. It also covers certain "Related Parties." These include: (1) our parent companies, subsidiaries, and affiliates; (2) our employees, directors, officers, shareholders, members, representatives, and agents; and (3) any person or entity that your or we assert is potentially liable for the conduct at issue in a Dispute. |
| What Disputes does the Clause cover? | All Disputes | This Clause governs all "Disputes" between you and us (or any Related Party). In this Clause, the word "Disputes" means any claim, counterclaim, cross-claim, complaint, cross-complaint, controversy, or dispute between you or us arising under, out of, or directly or indirectly related to your application, this Agreement or your relationship with us. It includes claims related to any prior applications or agreements. It includes extensions, renewals, refinancings, or payment plans. It includes claims related to collections, privacy, and customer information. It includes claims related to the validity in general of this Agreement. Without limiting the generality of the foregoing, the term Dispute shall include any claim, controversy or dispute without regard to when it arose; whether it is based in contract, tort, statute, regulation, common law, or equity; or whether the remedy sought is legal or equitable, including claims for compensatory, monetary and/or punitive damages, restitution and/or disgorgement, or injunctive relief, including public injunctive relief. Dispute also includes any claim, defense or dispute concerning the formation, existence, validity, enforceability, revocation or scope of this Clause. |
| Who is the arbitration company? | Usually AAA or JAMS | The arbitration company will be one of the following:<br>• The American Arbitration Association ("AAA"), 1-800-778-7879, www.adr.org<br>• JAMS, 1-800-352-5267, www.jamsadr.com<br>• Another arbitration company agreed to by you and us.<br>If all the above options are unavailable, a court will appoint an arbitration company to administer the arbitration. However, the court may not select an arbitration company if that company's arbitration rules would permit class arbitration contrary to this Clause. Similarly, if the AAA or JAMS rules are changed to allow class arbitration contrary to this Clause then they are disqualified from serving as the arbitration company. |
| How is the TPA selected? | By agreement or by the arbitration company | Selection of the TPA is governed by the rules of the arbitration company. In general, the arbitration company's rules allow you and us to try to agree on the TPA. However, if you and we cannot agree, then the arbitration company will select the TPA in accordance with its rules and the criteria set forth in this box.<br>The TPA must be a lawyer with at least ten years of experience or a retired judge unless you and we otherwise agree. |
| Can Disputes be litigated? | Sometimes | Either party may bring a lawsuit subject to the other party's right to demand arbitration. We will not demand arbitration of any lawsuit you bring (whether complaint, cross-claim or counterclaim) as an individual action in small-claims court; however, if such compliant, cross-claim or counterclaim is not brought as an individual action on an individual only basis or is transferred or removed to a different court, we may then exercise our right to arbitrate the Dispute according to this Clause. |
| Does arbitration involve giving up any rights? | Yes | **For Disputes subject to this Clause, you give up your right to:**<br>  1. Have a jury hear and decide your Dispute.<br>  2. Have courts, other than small-claims courts, decide Disputes.<br>  3. Serve as a private attorney general or in a representative capacity.<br>  4. Join your Dispute with a dispute between us and other borrowers.<br>  5. Bring or be a class member in a class action or class arbitration.<br>**We also give up the right to a jury trial and to have courts decide Disputes you wish to arbitrate.** |
| Is a class arbitration permitted? | No | **The TPA is not allowed to handle any Dispute on a class, private attorney general or representative basis.** All Disputes subject to this Clause must be decided in an **individual** arbitration or an **individual** small-claims action. Any arbitral award on a class basis shall be void and shall not be subject to confirmation and no judgment shall enter thereon. |
| May a California borrower arbitrate a claim for public injunctive relief under this Clause? | Yes | This Clause shall not be construed to prevent you from seeking in the arbitration the remedy of public injunctive relief if (a) you reside in California, (b) you resided in California at the time you entered into this Clause, or (c) the billing address for your account is a California address. |
| Will borrower actions make this Clause ineffective? | No | This Clause stays in force even if you: (1) close the Account; (2) default, renew, prepay or pay your Account in full; or (3) go into or through bankruptcy. |

**PROCESS**

| Question | Short Answer | Further Detail |
|---|---|---|
| What must you or we do before starting a lawsuit or arbitration? | Send a written Dispute notice and work to resolve the Dispute | Before starting a lawsuit or arbitration, the complaining party must give the other party written notice of the Dispute. The notice must provide the complaining party's name, address and date. The notice must explain in reasonable detail the nature of the Dispute and any supporting facts. If you are the complaining party, you must send the notice in writing (and not electronically) to Card Services, attn. Compliance Department, PO Box 84064, Columbus, GA 31908. You, or an attorney representing you, must sign the notice and must provide a phone number where you (or your attorney) can be reached. A collections letter from us to you will serve as our written notice of a Dispute. Once a Dispute notice is sent, the complaining party must give the other party a reasonable opportunity over the next 30 days to resolve the Dispute on an individual basis. |
| How does arbitration start? | Following the rules of the selected arbitration company | If the parties do not reach an agreement to resolve the Dispute within 30 days after notice of the Dispute is received, the complaining party may start a lawsuit or arbitration, subject to the right of the other to demand arbitration of the Dispute according to the terms of this Clause. To start arbitration, the complaining party picks the arbitration company and follows the arbitration company's rules. If one party starts or threatens a lawsuit, the other party can demand arbitration. This demand can be made in court papers. It can be made if a party starts a lawsuit on an individual basis and then tries to pursue a class action. Once an arbitration demand is made, no lawsuit can be brought and any existing lawsuit must stop. Either you or we may seek to stay a lawsuit or enforce arbitration as provided for in the FAA if either your or we fail to abide by the terms of this Clause.<br>Once an arbitration is started, the arbitration will be conducted under this Clause and the rules of the arbitration company in effect at the time the arbitration is commenced. But, arbitration rules that conflict with this Clause do not apply. |
| Will any hearing be held nearby? | Yes | The TPA may decide that an in-person hearing is unnecessary and that he or she can resolve a Dispute based on written filings and/or a conference call. But, any in-person arbitration hearing must be held at a place within the federal judicial district of the mailing address that you provided to us. |
| What about appeals? | Very limited | Appeal rights under the FAA are very limited. Except for FAA appeal rights and except for Disputes involving more than $50,000 (including Disputes involving requests for injunctive relief that could cost us more than $50,000), the TPA's award will be final and binding. For Claims involving more than $50,000, any party may appeal the award to a panel of three TPAs appointed by the arbitration company, which will reconsider from the start anything in the initial award that is appealed. The panel's decision will be final and binding, except for any FAA appeal right. Any appropriate court may enter judgment upon the arbitrator's award. |

**ARBITRATION FEES AND AWARDS**

| Question | Short Answer | Further Detail |
|---|---|---|
| Who bears arbitration fees? | Usually, we do. | Arbitration fees are fees charged by the arbitration company or the TPA. We will pay all filing, administrative, hearing and TPA fees if you cannot get a waiver of such fees, and ask us to pay. |
| When will we cover your legal fees and costs? | If you win | If you win an arbitration, we will pay the reasonable fees and costs for your attorneys, experts, and witnesses. We will also pay these amounts if required under applicable law or the arbitration company's rules or if payment is required to enforce this Clause. The TPA shall not limit his or her award of these amounts because your Dispute is for a small amount. |
| Will you ever owe us for arbitration or attorneys' fees? | Only for bad faith | The TPA can require you to pay our fees if (and only if): (1) the TPA finds that you have acted in bad faith (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)); and (2) this power does not make this Clause invalid or require the TPA or arbitration company to decline to participate in the arbitration. |
| Can a failure to resolve a Dispute informally result in a larger recovery for you? | Yes | You are entitled to an arbitration award of at least $3,000 if: (1) You give us notice of a Dispute on your own behalf (and not on behalf of any other party) and comply with all of the requirements of this Clause (including the requirements described in response to the question reading "What must a party do before starting a lawsuit or arbitration?)"; and (2) the TPA awards you money damages greater than the last amount you requested at least two days before the arbitration commenced. This is in addition to the attorneys' fees and expenses (including expert witness fees and costs) to which you are otherwise entitled. This $3,000 minimum award is a single award that applies to all Disputes you have raised or could have raised in the arbitration. Multiple awards of $3,000 are not contemplated by this Clause. Settlement demands and offers are strictly confidential. They may not be used in any proceeding by either party except to justify a minimum recovery of $3,000. |
| Can an award be explained? | Yes | A party may request an explanation from the TPA, within 14 days of the ruling. Upon such request, the TPA will explain the ruling in writing. |

**YOUR BILLING RIGHTS**

**Keep This Document For Future Use**

**This notice tells you about your rights and our responsibilities under the Fair Credit Billing Act.**

**What To Do If You Find A Mistake On Your Statement**

If you think there is an error on your bill, write to us at:

Card Services - Dispute Resolution
PO Box 84064
Columbus, GA 31908

In your letter, give us the following information:

- Account information: Your name and Account number.
- Dollar amount: The dollar amount of the suspected error.
- Description of problem: If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us:

- Within 60 days after the error appeared on your statement.
- At least 3 business days before an automated payment is scheduled, if you want to stop payment on the amount you think is wrong.

You must notify us of any potential errors in writing. You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.

**What Will Happen After We Receive Your Letter**

When we receive your letter, we must do two things:

1. Within 30 days of receiving your letter, we must tell you that we received your letter. We will also tell you if we have already corrected the error.
2. Within 90 days of receiving your letter, we must either correct the error or explain to you why we believe the bill is correct.

While we investigate whether or not there has been an error:

- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.

After we finish our investigation, one of two things will happen:

- If we made a mistake: You will not have to pay the amount in question or any interest or other fees related to that amount.
- If we do not believe there was a mistake: You will have to pay the amount in question, along with applicable interest and fees. We will send you a statement of the amount you owe and the date payment is due. We may then report you as delinquent if you do not pay the amount we think you owe.

If you receive our explanation but still believe your bill is wrong, you must write to us within 10 days telling us that you still refuse to pay. If you do so, we cannot report you as delinquent without also reporting that you are questioning your bill. We must tell you the name of anyone to whom we reported you as delinquent, and we must let those organizations know when the matter has been settled between us.

If we do not follow all of the rules above, you do not have to pay the first $50 of the amount you question even if your bill is correct.

**Your Rights If You Are Dissatisfied With Your Credit Card Purchases**

If you are dissatisfied with the goods or services that you have purchased with your credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the purchase.

To use this right, all of the following must be true:

1. The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50. (Note: Neither of these is necessary if your purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services.)
2. You must have used your credit card for the purchase. Purchases made with cash advances from an ATM or with a check that accesses your credit card account do not qualify.
3. You must not yet have fully paid for the purchase.

If all of the criteria above are met and you are still dissatisfied with the purchase, contact us in writing at:

Card Services - Dispute Resolution
PO Box 84064
Columbus, GA 31908

While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay, we may report you as delinquent.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Southern Division**

| | | |
|---|---|---|
| ANGELITA BAILEY, | : | |
| | : | |
| individually, and on behalf of | : | |
| all others similarly situated, | : | |
| | : | Civil Action No. 8:23-cv-827-DKC |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MERCURY FINANCIAL, LLC, | : | |
| | : | |
| Defendant. | : | |

_____

**Plaintiff's Opposition to Defendant's Motion to**
**Compel Arbitration and Stay Proceedings**
**and to Strike Class Allegations**

Richard S. Gordon (Fed. Bar No. 06882)
rgordon@GWCfirm.com
Benjamin H. Carney (Fed. Bar No. 27984)
bcarney@GWCfirm.com
GORDON, WOLF & CARNEY, Chtd.
100 W. Pennsylvania Ave., Suite 100
Towson, Maryland 21204
Tel. (410) 825-2300
Fax. (410) 825-0066

Attorneys for Plaintiff

## **Table of Contents**

Introduction ……………………………………………………………………………... 1

I.    FACTS AND BACKGROUND ................................................................. 4

      A.    MERCURY'S UNLICENSED LENDING SCHEME ALLEGED IN THE COMPLAINT. ....... 4

      B.    PLAINTIFF'S EXPERIENCE WITH MERCURY ............................................ 5

      C.    WHO IS MERCURY AND WHAT IS DEFENDANT'S VIEW OF ITS ROLE HERE?......... 6

      D.    "FACTS" PRESENTED BY MERCURY'S MOTION .................................... 7

            1.    The Arbitration Provisions Are Part of the Cardholder Agreements........ 9

            2.    The Cardholder Agreements Allow Unilateral Changes to Any Terms At Any Time, with No Advance Notice ........................................................ 9

            3.    The 2018 and 2020 Versions of FB&T's Agreement Do Not Identify Mercury as a Party to the Agreement, Either Expressly or by Implication.......... 10

II.   LEGAL STANDARDS.......................................................................... 10

      A.    ARBITRATION CANNOT BE COMPELLED IN THE ABSENCE OF A BINDING ARBITRATION OR DELEGATION AGREEMENT. ............................................ 10

      B.    THERE IS NO PRESUMPTION IN FAVOR OF FINDING THAT AN ARBITRATION AGREEMENT EXISTS. ......................................................................... 11

      C.    A SPECIFIC CHALLENGE TO THE EXISTENCE OF AN ARBITRATION OR DELEGATION AGREEMENT IS FOR THE COURT TO DECIDE. ......................................... 12

      D.    THE ALLEGATIONS OF THE COMPLAINT ARE TAKEN AS TRUE ........................ 12

      E.    ANY AMBIGUITY ABOUT THE EXISTENCE OF AN ARBITRATION AGREEMENT IS RESOLVED AGAINST ARBITRATION ........................................................ 12

III.  NO ARBITRATION OR DELEGATION AGREEMENTS LEGALLY EXIST....... 13

      A.    THE CONTRACT FORMATION QUESTIONS HERE ARE GOVERNED BY MARYLAND LAW ........................................................................................ 14

      B.    THIS COURT DECIDES WHETHER ARBITRATION OR DELEGATION AGREEMENTS EXIST ....................................................................................... 16

      C.    NO ARBITRATION OR DELEGATION AGREEMENTS EXIST BECAUSE OF THE UNILATERAL CHANGE-IN-TERMS CLAUSE .................................................... 17

# **JA136**

1.    Whether A Purported Agreement Is Illusory Is a Question of Contract Formation. ........................................................................................................... 18

2.    If One Party Can Unilaterally Exempt Themselves from Arbitration, an Arbitration "Agreement" Is Illusory ...................................................................... 18

3.    The Purported Arbitration and Delegation "Agreements" Can Be Changed at Any Time, Retroactively, Without Notice, Rendering Them Illusory .................................................................................................................. 19

4.    No Notice Requirement Saves the Illusory "Agreements" ....................... 19

5.    This Court Has Repeatedly Held in Materially Identical Circumstances that Arbitration Cannot Be Compelled ................................................................ 22

6.    Other Courts Have Repeatedly Held in Materially Identical Circumstances that Arbitration Cannot Be Compelled. ...................................... 24

7.    The Court Is Allowed to Consider the Unilateral Modification Clause ... 24

8.    The Unilateral Modification Clause Makes the Arbitration and Delegation Provisions Illusory, Whether or Not the Provisions Were Actually Modified ...... 25

D.    THE ARBITRATION AND DELEGATION PROVISIONS VIOLATE FUNDAMENTAL MARYLAND PUBLIC POLICY ................................................................................ 26

E.    ANY AND ALL RIGHTS UNDER ANY DELEGATION OR ARBITRATION AGREEMENTS HAVE BEEN ASSIGNED AWAY .................................................................................. 26

F.    ANY ARBITRATION RIGHTS ARE WAIVED BECAUSE THE CURRENT OWNER OF THE CARDHOLDER AGREEMENT, VELOCITY, CHOSE COURT AND NOT ARBITRATION 29

G.    PLAINTIFF SPECIFICALLY CHALLENGES THE DELEGATION CLAUSE ................... 30

IV.  MERCURY'S MOTION TO STRIKE CLASS ALLEGATIONS IS WITHOUT MERIT ................................................................................................................. 31

V.    AT A MINIMUM, DISCOVERY IS REQUIRED. ...................................... 32

VI.  CONCLUSION ................................................................................. 34

JA137

## Table of Authorities

### Cases

*Accrued Fin. Servs., Inc. v. Prime Retail, Inc.*, 298 F.3d 291 (4th Cir. 2002) ........................................ 26

*Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355 (4th Cir. 2012) ...................................................... 12

*Am. Gen. Life & Acc. Ins. Co. v. Wood*, 429 F.3d 83 (4th Cir. 2005) ................................................ 22

*Archer W. Contractors, LLC v. Synalloy Fabrication, LLC*, No. CCB-14-3031, 2016 WL 930965 (D. Md. Mar. 11, 2016) ................................................. 15

*Baker v. Antwerpen Motorcars Ltd.*, 807 F. Supp. 2d 386 (D. Md. 2011) ............................................. 14

*Baker v. Bristol Care, Inc.*, 450 S.W.3d 770 (Mo. 2014) ................................................................. 19, 21

*Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225 (4th Cir. 2019) ............................................ 12, 16

*Brent v. Priority 1 Auto. Grp., BMW of Rockville*, No. PWG-14-1705, 2016 WL 9724975 (D. Md. Aug. 4, 2016) ................................................. 23

*Cain v. Midland Funding, LLC*, 156 A.3d 807 (Md. 2017) ................................................................. 14

*Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582 (D. Md. 2013) ................................... 23

*Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202 (5th Cir. 2012) .................................................... 22

*Castellanos v. Mariner Fin., LLC*, No. CV MJG-17-3168, 2018 WL 488725 (D. Md. Jan. 19, 2018) ................................................. 29

*Cheek v. United Healthcare of Mid-Atl., Inc.*, 835 A.2d 656 (Md. 2003) ...................... 3, 18, 19, 23, 25

*Coady v. Nationwide Motor Sales Corp.*, 32 F.4th 288 (4th Cir. 2022) .......................... 3, 11, 16, 18, 19

*Convergence Mgmt. Assocs., Inc. v. Callender*, No. CV TDC-15-4015, 2016 WL 6662253 (D. Md. Nov. 10, 2016) ................................................. 12

*Damato v. Time Warner Cable, Inc.*, 2013 WL 3968765 (E.D.N.Y. July 31, 2013) ................................................. 18

*Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213 (1985) ................................................................. 11

*Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330 (4th Cir. 2017) ................................................... 4, 24

*DIRECTV, Inc. v. Mattingly*, 829 A.2d 626 (Md. 2003) ................................................................. 20

*Dumais v. Am. Golf Corp.*, 299 F.3d 1216 (10th Cir. 2002) ............................................................ 13

*Galloway v. Santander Consumer USA, Inc.*, No. CCB–13–3240, 2014 WL 4384641 (D.Md. Sept.3, 2014) ............................................................... 34

*Gibbs v. Haynes Invs., LLC*, 967 F.3d 332 (4th Cir. 2020) ................. 4, 25

*Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286 (4th Cir. 2020) .......................... 4, 30

*Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010) ............... 11, 16

*Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 575 F. Supp. 2d 696 (D. Md. 2008) ............................................................... 21

*Hayes v. Delbert Servs. Corp.*, 811 F.3d 666 (4th Cir. 2016) ............... 4, 24

*Haymount Urgent Care PC v. GoFund Advance, LLC*, No. 22-CV-1245 (JSR), 2022 WL 6994507 (S.D.N.Y. Oct. 12, 2022) ............................... 3, 32

*Hejamadi v. Midland Funding, LLC*, No. 18CV13203KSHCLW, 2022 WL 970248 (D.N.J. Mar. 31, 2022) ............................................ 27

*Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540 (4th Cir. 2005) ................. 24

*Holloman v. Cir. City Stores, Inc.*, 894 A.2d 547 (Md. 2006) ............... 13, 22

*In re Wholesale Grocery Prod. Antitrust Litig.*, 850 F.3d 344 (8th Cir. 2017) .................... 27

*In re Zappos.com, Inc., Customer Data Sec. Breach Litig.*, 893 F. Supp. 2d 1058 (D. Nev. 2012) ............................................................... 24

*James v. Synovus Bank*, No. CV TDC-19-1137, 2020 WL 1479115 (D. Md. Mar. 26, 2020) ............................................................... 15

*Jialu Wu v. iTalk Glob. Commc'ns, Inc.*, No. CV207150PSGPJWX, 2020 WL 8461696 (C.D. Cal. Oct. 21, 2020) ............................... 16

*Jones v. Prosper Marketplace, Inc.*, No. GJH-21-1126, 2022 WL 834210 (D. Md. Mar. 21, 2022) ................................... 3, 14, 23, 24, 25

*Koch v. Compucredit Corp.*, 543 F.3d 460 (8th Cir. 2008) ................. 27

*Levin v. Alms & Assocs., Inc.*, 634 F.3d 260 (4th Cir. 2011) ................. 22

*Loc. Union No. 637, Int'l Bhd. of Elec. Workers, AFL-CIO v. Davis H. Elliot Co.*, 13 F.3d 129 (4th Cir. 1993) ............................................... 11

*Lyles v. Chegg, Inc.*, No. CV RDB-19-3235, 2020 WL 1985043 (D. Md. Apr. 27, 2020) ............................................................... 12, 17

*Lyons v. PNC Bank, Nat'l Ass'n*, 26 F.4th 180 (4th Cir. 2022) ............... 20

**JA139**

*Mey v. DIRECTV, LLC*, 971 F.3d 284 (4th Cir. 2020) ................................................ 11

*Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 867 F.3d 449 (4th Cir. 2017) ........................................................................... 11

*Morgan v. Caliber Home Loans, Inc.*, No. 8:19-CV-02797-PX, 2022 WL 16964705 (D. Md. Nov. 16, 2022) ............................................................................. 31

*Morgan v. Sundance, Inc.*, 142 S. Ct. 1708 (2022) ........................................... 11, 29

*Morrison v. Amway Corp.*, 517 F.3d 248 (5th Cir. 2008) .................................... 22

*Moses H. Cone Memorial Hospital v. Mercury Const.*, 460 U.S. 1 (1983) ............ 10

*Mould v. NJG Food Serv. Inc.*, 986 F. Supp. 2d 674 (D. Md. 2013) ..................... 25

*MZM Constr. Co., Inc. v. New Jersey Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386 (3d Cir. 2020) ......................................................................................... 10

*Newman v. Direct Energy, LP*, No. GJH-21-2446, 2022 WL 4386235 (D. Md. Sept. 22, 2022) ....................................................................................................... 31

*Nitro-Lift Techs., L.L.C. v. Howard*, 568 U.S. 17 (2012) .................................... 17

*Noohi v. Toll Bros.*, 708 F.3d 599 (4th Cir. 2013) .............................. 11, 14, 18

*Novic v. Credit One Bank, Nat'l Ass'n*, 757 F. App'x 263 (4th Cir. 2019) ............ 28

*Novic v. Midland Funding, LLC*, 271 F. Supp. 3d 778 (D. Md. 2017) ............. 28, 29

*Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176 (4th Cir. 2009) ............................. 7

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967) ................. 11

*Raley v. Whitestake Improvements LLC*, No. CV DLB-22-194, 2022 WL 3975189 (D. Md. Sept. 1, 2022) ............................................................................. 23

*Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63 (2010) ....................... 10, 17, 30

*Roberts v. Total Health Care, Inc.*, 709 A.2d 142 (Md. 1998) ............................. 27

*Robinson v. Virginia Coll., LLC*, 788 F. App'x 697 (11th Cir. 2019) .................... 32

*Rose v. New Day Fin., LLC*, 816 F.Supp.2d 245 (D.Md.2011) ............................. 34

*Rowland v. Sandy Morris Fin. & Est. Plan. Servs., LLC*, 993 F.3d 253 (4th Cir. 2021) ........................................................................................................ 12, 15, 33

**JA140**

*Three M Enterprises, Inc. v. Texas D.A.R. Enterprises, Inc.*, 368 F. Supp. 2d 450 (D. Md. 2005) ............................................................................................... 26

*Thornton v. Habibi*, No. 20-CV-2468-PX, 2021 WL 1856648 (D. Md. May 10, 2021) ............................................................................................................ 2

*Torres v. S.G.E. Mgmt., LLC*, 397 Fed.Appx. 63 (5th Cir.2010) .................... 22

*Underwood v. Future Income Payments, LLC*, No. SAC-V-171570-DOCDFMX, 2018 WL 4964333 (C.D. Cal. Apr. 26, 2018) ................................................ 31

*Upper Lakes Towing Co. v. ZF Padova SPA*, No. 2:08-CV-63, 2009 WL 4730762 (W.D.Mich. Dec. 4, 2009) .............................................................. 2

*Watkins v. Carr*, No. CV PX-17-0819, 2018 WL 10741730 (D. Md. Jan. 12, 2018) ............................................................................................................... 17

*Whitten v. Apria Healthcare Grp., Inc.*, No. PWG-14-CV-3193, 2015 WL 2227928 (D. Md. May 11, 2015) ................................................................... 34

*Williams v. Potomac Fam. Dining Grp. Operating Co., LLC*, No. GJH-19-1780, 2019 WL 5309628 (D. Md. Oct. 21, 2019) ................................................. 31

*Windesheim v. Verizon Network Integration Corp.*, 212 F. Supp. 2d 456 (D. Md. 2002) .......................................................................................................... 18

*Wittholn v. Fed. Ins. Co.*, 164 F.App'x 395 (4th Cir. 2006) ........................... 7

**Statutes**

9 U.S.C. §1 ............................................................................................... 12, 16

Md. Code Ann., Com. Law § 12-301 ................................................................ 1

Md. Code Ann., Com. Law § 12-314 ............................................................. 26

**Rules**

Fed. R. Civ. P. 12 ........................................................................................... 12

Fed.R.Civ.P. 56 ............................................................................................. 34

**JA141**

Plaintiff, Angelita Bailey ("Plaintiff"), opposes the Motion to Compel Arbitration and Stay Proceedings and to Strike Class Allegations (the "Motion") (ECF No. 7) and memorandum in support ("Memo") (ECF No. 7-1) filed by Defendant, Mercury Financial, LLC ("Mercury").

## Introduction

This case is brought by the Plaintiff against a single Defendant, Mercury Financial, LLC. It challenges Mercury's $59 million unlicensed and predatory scheme to make and collect unlawful small loans to Maryland residents, like Plaintiff. *See* ECF No. 3 ("Complaint"), e.g., ¶ 1. Mercury advertises that it is "the largest non-bank credit card company in the U.S." and that "[t]o date, the Company has extended $2.5 billion in credit lines," including $59 million to Plaintiff and members of the Class, all of whom are Maryland residents, all of whom were extended credit by Mercury, and all of whom obtained their Mercury loans in Maryland. *See* Complaint, e.g., ¶ 3; *see also* ECF No. 1 (Mercury's "Notice of Removal") ¶ 24. Indeed, the Complaint details how Mercury extended credit to the Plaintiff and each Class member of less than $25,000 – and Mercury's Notice of Removal asserts that class members' accounts total $59 million. *See id.* Simple math shows that Mercury has extended credit to Class members in more than 2,300 small loan transactions in Maryland ($59 million / $25,000 = 2,360).

Although Mercury is most certainly in the business of extending loans of less than $25,000 to thousands of Maryland residents, Mercury has chosen not to get the license plainly required for such a business under the Maryland Consumer Loan Law ("MCLL"), Md. Code Ann., Com. Law §§ 12-301 *et seq. See* Complaint, *e.g.*, ¶ 26; *see also* MCLL § 12-302 (requiring license). As a result, its loans to Plaintiff and Class members are void and unenforceable, and no person may receive or retain amounts in connection with those loans. *See* Complaint ¶¶ 8-9; *see also, e.g.,* MCLL § 12-314.

1

Mercury knows that it is operating outside of the law. *See* Compl. ¶ 27. Yet Mercury does not concern itself with complying with Maryland law because it believes that it is protected from any challenge and can freely operate outside the law by virtue of an arbitration agreement that purports to delegate to an arbitrator the question of whether arbitration is appropriate. *See* Defendant's Motion.[1]

As an initial observation, Defendant's argument that it can force Plaintiff into arbitration is perplexing, at best, because nothing in the plain text of the "Cardmember Agreement" Mercury relies upon even *mentions* Mercury Financial, LLC. The "Cardmember Agreement" Mercury relies upon purports to allow "'We,' 'us' and 'our'" to compel arbitration – but those terms are expressly limited to mean only "First Bank & Trust, Brookings, SD, the issuer of your Card." *See* Def. Exh. 4 at 2 (ECF 7-5). Mercury Financial is not mentioned, not even once, in the Cardholder Agreement.[2]

Furthermore, even if Mercury was the "we" who can purportedly force arbitration, the purported arbitration and delegation clauses it relies upon do not constitute agreements, because they are subject to a unilateral modification clause, under which "we" can **change** the clauses

---

[1] Plaintiff specifically challenges the formation and existence of any arbitration agreement – including specifically any "delegation clause" agreement to arbitrate the question of arbitrability. *See Gibbs v. Haynes Invs., LLC*, 967 F.3d 332, 338 (4th Cir. 2020) (explaining that "the party must at least reference the [delegation] provision in its opposition to a motion to compel arbitration."); *Thornton v. Habibi*, No. 20-CV-2468-PX, 2021 WL 1856648, at *4 (D. Md. May 10, 2021) (same).

[2] The arbitration and delegation provisions mention "Related Part[ies]," but Mercury certainly has not presented any evidence to show that it is a "Related Party" as that term is defined. *See* ECF No. 7-5 at 3. As a result, by its terms, the arbitration and delegation provisions do not "Cover[]" Mercury. Furthermore, the present dispute – which is between Plaintiff and Mercury, not between Plaintiff and FB&T – is not even a "Dispute" covered by the arbitration and delegation provisions because "Dispute[s]" are expressly limited to include only disputes with FB&T and Related Parties. *See id.*; *see also Upper Lakes Towing Co. v. ZF Padova SPA*, No. 2:08–CV–63, 2009 WL 4730762 at *3 (W.D.Mich. Dec. 4, 2009) (where arbitration provision was similarly limited, allowing "Defendant to enforce this provision against Plaintiff would be inconsistent with the plain meaning of the text and would "override the clear intent of the parties[.]")

retroactively, ***at any time***. As addressed in Part III.C below, under well-settled law from the Fourth Circuit, the Maryland Supreme Court, and this Court, such unilateral modification clauses render arbitration and delegation clauses illusory and legally non-existent. *See*, *e.g.*, *Coady v. Nationwide Motor Sales Corp.*, 32 F.4th 288 (4th Cir. 2022) (unilateral change-in-terms provision renders arbitration agreement without consideration and illusory); *Cheek v. United Healthcare of Mid-Atl., Inc.*, 835 A.2d 656 (Md. 2003) (same); *Jones v. Prosper Marketplace, Inc.*, No. GJH-21-1126, 2022 WL 834210, at *16 (D. Md. Mar. 21, 2022) (arbitration agreement was illusory where similar lender included unilateral change-in-terms provision in consumer finance contract which also contained arbitration and delegation provisions).

Although the illusory nature of the asserted Arbitration agreement is sufficient, in and of itself, to deny Mercury's Motion, there are other reasons why no arbitration or delegation agreements legally exist here. For example, FB&T's Arbitration & Delegation Provisions also are void *ab initio* because they are contrary to the public policy of Maryland under the MCLL. *See* Part III.D, *infra*. And, "all" rights under the Arbitration & Delegation Provisions were assigned away to a different party. *See* Part III.E, *infra*.

Likewise, Mercury's Motion to strike Plaintiff's class action allegations also must be denied for a number of reasons. As discussed in Part IV, below, the purported class action waiver Mercury relies upon in the FB&T Agreement is part of the illusory and inapplicable Arbitration & Delegation Provisions and is equally unenforceable. That purported class waiver also applies only in arbitration, not court. And, in any event, it would be premature to strike class allegations without discovery, when the purported class waiver is part of an agreement which Plaintiff alleges is void under state law. *See*, *e.g.*, *Haymount Urgent Care PC v. GoFund Advance, LLC*, No. 22-CV-1245 (JSR), 2022 WL 6994507, at *6 (S.D.N.Y. Oct. 12, 2022) ("if the Court were to grant defendants the relief they request and strike plaintiffs' class allegations on the pleadings, it

3

**JA144**

would necessarily have to enforce against plaintiffs a provision in an allegedly void contract before any determination as to the validity of that contract has been made.") *See* Part IV, *infra*.

For these and the other reasons set forth in this Opposition, the Court should deny the Motion.[3]

## I.    Facts and Background

### A.   Mercury's Unlicensed Lending Scheme Alleged in the Complaint.

As alleged in the Complaint, Mercury is a small-loan lender that makes loans to consumers and made consumer loans to Plaintiff and Class members. Complaint ¶ 21. Mercury advertises that it "target[s] consumers through direct mail, digital affiliates, email origination channels and co-branded partnerships. To date, the Company has extended $2.5 billion in credit lines and helped nearly a million customers with a credit card that earns rewards, carries no monthly fee for issuance or availability, and has an affordable APR." *Id.* ¶ 22. Credit limits on Mercury's accounts with Plaintiff and Class members are and were all less than $25,000.00. *Id.* ¶ 23.

Although Mercury made consumer loans to Plaintiff and each Class member of less than $25,000, when the borrower was a resident of Maryland and the application for the loan originated in Maryland, it does not have the MCLL license required to do so. *Id.* ¶ 24. Mercury does not have, and has chosen not to obtain, a license under the MCLL. *Id.* ¶ 26. Mercury has a sophisticated and experienced compliance and legal department. *Id.* ¶ 27. Mercury knows that its credit business is in violation of Maryland law and the MCLL. *Id.*

---

[3] In recent years, the Fourth Circuit has consistently rejected the overreaching arbitration agreements of similar predatory lenders. *See Gibbs v. Haynes Invs., LLC*, 967 F.3d 332 (4th Cir. 2020); *Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286, 290 (4th Cir. 2020); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330 (4th Cir. 2017); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666 (4th Cir. 2016).

### B.  Plaintiff's Experience with Mercury

Plaintiff had a "Mercury" branded credit card account which was owned by Mercury. *Id.* ¶ 28. Plaintiff accepted the credit card agreement for the credit card account in Maryland. *Id.* Plaintiff's application for the account originated in Maryland, where she resides and resided at the time she obtained the account, and the credit extended under the account was extended for personal, family, and household purposes. *Id.* ¶ 29. The credit limit for Plaintiff's Mercury credit card account – which Mercury identified in correspondence to Plaintiff as her "credit line" – was $5,250. *Id.* ¶ 30. At no time was Mercury's loan to Plaintiff for more than $6,000. *Id.* ¶ 31. Plaintiff's credit card agreement does not contain a written election providing that the agreement would be governed by a subtitle of the Maryland Code other than the MCLL – such as Subtitle l, Subtitle 4, Subtitle 9, or Subtitle 10 of the Maryland Commercial Law Article. *Id.* ¶ 32.

Although it was unlicensed to make its small loans to Plaintiff, Mercury repeatedly extended consumer credit to Plaintiff of less than $6,000. *Id.* ¶ 33. For example, one month Plaintiffs "Mercury" credit card account had a balance of $4,583.09, which was credit Mercury extended to Plaintiff. *Id.* ¶ 34. The previous month, her account balance had been $4,374.24. In the intervening period, Mercury had extended additional credit to her in the amount of $307.50. During that same period, Plaintiff had made a payment to Mercury on the account of $94.73 and had a credit to her account of $3.92. *Id.* Mercury sent Plaintiff correspondence which demanded that Plaintiff make an additional "minimum payment" of $99.30 to Mercury on Mercury's void and unenforceable loan to Plaintiff and asked her to make the payment to Mercury at www.mercurycards.com. *Id.*

The next month, Plaintiff's "Mercury" credit card account had a balance of $4,527.54, which was credit Mercury extended to Plaintiff. *Id.* ¶ 35. The previous month, her account balance had been $4,583.09, as detailed above. *Id.* In the intervening period, Mercury had

5

**JA146**

extended additional credit to her in the amount of $52.54. *Id.* During that same period, Plaintiff

had made a payment to Mercury on the account of $108.09. *Id.* Mercury sent Plaintiff

correspondence which demanded that Plaintiff make an additional "minimum payment" of

$97.29 to Mercury on Mercury's void and unenforceable loan to Plaintiff and asked her to make

the payment to Mercury at www.mercurycards.com. *Id.*

Plaintiff's Complaint details multiple other instances of Mercury's extension of credit to

and collection from her, without an MCLL license. *Id.* ¶¶ 36-41.

### C. Who is Mercury and What is Defendant's View of its Role Here?

Remarkably, Mercury's Motion has a very different take on Mercury's role vis-à-vis

Plaintiff's loan account.  While the Complaint relates that Mercury is a limited liability company

separately organized under the laws of Delaware which formerly was known as CreditShop,

LLC, Complaint ¶17, the Motion and its related Exhibits only vaguely reference what Mercury is

and purportedly does.  According to the Defendant "Mercury's principal business is servicing

and marketing consumer credit cards that are issued by" FB&T.  Def. Exh. 1. (Declaration of

Mercury Financial, LLC ("Mercury's Declaration")) ¶4 (ECF 7-2).

Beyond describing Mercury this way – as a servicing and marketing company – the

Motion and its exhibits say little, if anything more about Mercury or its connections to FB&T.

Mercury is never described as an "affiliate" of FB&T.  Nor is it identified as a subsidiary,

representative, or agent of FB&T.  Nor does Mercury even argue or present evidence that

Mercury was an assignee of Ms. Bailey's loan.  To the contrary, according to Mercury's

Declaration, Def. Exh. 1, Mercury never owned Ms. Bailey's credit card account; instead, FB&T

owns it.  *See e.g.*, Def. Exh. 1 at ¶ 11.  Indeed, Mercury's Motion gives the Court every impression

that FB&T still owns Ms. Bailey's loan account.

## JA147

We know, of course, that Mercury's assertion is both incorrect and misleading.  In fact, Ms. Bailey's loan account has been sold or assigned multiple times over the years; at present, FB&T does not own Ms. Bailey's account at all.

According to Court papers filed in October 2022 in the Charles County Maryland District Court against Ms. Bailey – relating to the very loan account at issue in this action – while Barclay Bank Delaware assigned Ms. Bailey's account to FB&T on March 24, 2017, on November 9, 2017, FB&T assigned all of its interests in the Ms. Bailey's loan to "CreditShop, Inc."  CreditShop thereafter assigned all of its interests in Ms. Bailey's account to a company named Velocity Investments, LLC ("Velocity") on October 13, 2020.  *See* **Exhibit 2**[4], District Court Complaint at 2, 46.[5]

Moreover, it is apparent from the face of the District Court Complaint, **Exhibit 2**, that Velocity, "as assignee of the original creditor," sued Ms. Bailey on October 21, 2022, "for the balance due and owning" on the credit extended (according to the Complaint in this case) by Mercury.

### D.  "Facts" Presented by Mercury's Motion

Mercury's Motion seeks to force Plaintiff's claims into arbitration under FB&T's Cardmember Agreement. Mercury's Declaration, Def. Exh. 1 (ECF # 7-2) discusses several purported versions of "Cardholder Agreements," and it asserts that a "current" Cardholder

---

[4] It is generally accepted that the court may consider and take judicial notice of matters of public record, including state court records. *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *see also Wittholn v. Fed. Ins. Co.*, 164 F.App'x 395, 396 (4th Cir. 2006) (per curiam) (concluding that court "may consider official public records, document central to plaintiff's claim, and documents sufficiently referred to in the complaint so long as the authenticity of these documents is not disputed.")

[5] Plaintiffs have manually added page numbers to the District Court Complaint (in red at the bottom of each page) for the Court's convenience.

Agreement, Def. Exh. 4 (ECF 7-5) is "[t]he applicable contract" which "contains a valid and enforceable Arbitration Provision." Memo at 1.  It is undated though its introductory paragraph includes the date "9/30/2020."  Def. Exh. 4 (the "2020 Version").

In addition to the purported "current" Agreement, Mercury's Motion discusses provisions in two other cardmember agreements[6]: (1) The alleged original Agreement, when Ms. Bailey's account was opened by Barclay's Bank Delaware ("Barclay's"), dating back to October 9, 2006 ("the 2006 Version");[7]  and (2) an FB&T Cardholder Agreement dating from "2018" when FB&T first acquired Ms. Bailey's account (the "2018 Version").  *See* Def. Exh. 5 (ECF 7-6).  No matter the Version, Mercury contends that the Cardmember Agreement – the 2006 version issued by Barclay's and the 2018 and 2020 Versions issued by FB&T – include purported arbitration and delegation provisions which the issuer reserved the right to change at its whim. These arbitration and delegation provisions are referred to below as the "Arbitration Provisions."

Putting aside that Ms. Bailey did not have any written agreement with Mercury (a fact that Mercury would agree is correct), *see* FN 2, *infra*, Mercury Motion seems to assert that both the 2018 and 2020 Versions of FB&T's Cardmember mandate arbitration of Ms. Bailey's claims.

---

[6] In addition, Mercury also attaches a separate letter regarding FB&T's purchase of Ms. Bailey's, and others, accounts from the original issuer. Def. Exh. 3. The letter is not an agreement but rather purports to spell out terms that FB&T will include in its Cardmember Agreement.  *See* Def. Exh. 3.  It is immaterial. Mercury moves to arbitrate only under "[t]he applicable contract (the 'Cardholder Agreement')" which "govern[s]," and demands arbitration "per the [FB&T] Cardholder Agreement." Def. Memo at 1-2. Moreover, Mercury's Declaration states, "the current ***Cardholder Agreement*** governing the relationship between Mercury and Plaintiff, is attached hereto as Exhibit 4." Mercury's Declaration ¶ 13 (emphasis added).

[7] Mercury's copy of the 2006 Version, Def. Exh. 2 (ECF 7-2), contains miniscule type.  It is unreadable.

### 1. *The Arbitration Provisions Are Part of the Cardholder Agreements*

The Arbitration Provisions at issue here are not separate from the Cardholder Agreements. Instead, both the 2018 and 2020 versions of FB&T's Cardholder Agreements include purported arbitration provisions, and specifically provide that the term "Agreement" includes those provisions. *See* 2018 Version ("This Agreement contains a Jury Trial Waiver and Arbitration Clause."); *see also* 2020 Version (same).  In turn, the Arbitration Provisions contain "delegation clauses" which purport to delegate to an arbitrator the question of arbitrability. *See* 2018 Version in the Arbitration Section ("Dispute also includes any claim, defense or dispute concerning the formation, existence, validity, enforceability, revocation or scope of this Clause"); *See* 2018 Version in the Arbitration Section (same).

### 2. *The Cardholder Agreements Allow Unilateral Changes to Any Terms At Any Time, with No Advance Notice*

The 2018 and 2020 Versions of the FB&T Agreement each provide identical language that permits unilateral changes to the Agreement, including those provisions relating to arbitration:

**CHANGES TO YOUR ACCOUNT**

The rates, fees and terms of this Agreement (including its Jury Trial Waiver and Arbitration Clause), may change and we may add or delete any term.  When required by law, we will provide advance written notice of any changes and any right to reject the changes.

Def. Exh. 4, 2020 Version at 2.

Although the changes can be made upon such notice "[w]hen required by law," the Cardholder Agreement does not suggest that any notice of changes is, in fact, required by law; and there is no restriction preventing the changes from being effective immediately (with or without notice), with retroactive effect. *See id*. There is no time period for notice. *Id*.

9

**JA150**

### 3. The 2018 and 2020 Versions of FB&T's Agreement Do Not Identify Mercury as a Party to the Agreement, Either Expressly or by Implication

As noted in the introduction above, the 2018 and 2020 Versions of the Cardmember Agreement do not name Mercury as a party to either Agreement. The "DEFINITIONS" in each Agreement are clear that:

> "We," "us" and "our" refer to First Bank & Trust, Brookings, SD, the issuer of your Card.

Def. Exh. 4 & 5 (DEFINITIONS Section). Nothing in the FB&T Arbitration & Delegation Provisions expressly covers a company, such as Mercury, that, according to its own Declaration, was principally "servicing and marketing consumer credit cards that are issued by" FB&T. Def. Exh., Mercury Declaration at ¶4.

Moreover, it is indisputable that Mercury Financial, LLC is not named, expressly or implicitly, in either the 2018 or 2020 versions of the Cardmember Agreement.

## II. Legal Standards

### A. Arbitration Cannot Be Compelled in the Absence of a Binding Arbitration or Delegation Agreement

Without both parties' consent, a dispute cannot be sent to arbitration in the absence of a legally binding arbitration agreement. *See Moses H. Cone Memorial Hospital v. Mercury Const.*, 460 U.S. 1, 19-20 (1983). A "delegation agreement" is simply a "mini-arbitration agreement within a broader arbitration agreement within a broader contract." *MZM Constr. Co., Inc. v. New Jersey Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 399 (3d Cir. 2020) ("*MZM*"). *See also Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010) ("*Rent-A-Ctr.*") ("The delegation provision is an agreement to arbitrate threshold issues concerning the arbitration agreement.")

**B.  There Is No Presumption in Favor of Finding that an Arbitration Agreement Exists**

As the Supreme Court recently held, the applicable "policy is to make 'arbitration agreements as enforceable as other contracts, ***but not more so***.'" *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022) (emphasis added, *quoting Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, n. 12 (1967)). The existence of arbitration or delegation agreements is determined "upon the same footing as other contracts." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219 (1985); *see also Loc. Union No. 637, Int'l Bhd. of Elec. Workers, AFL-CIO v. Davis H. Elliot Co.*, 13 F.3d 129, 133 (4th Cir. 1993) ("questions about the existence of the agreement itself or its terms should ***not be interpreted with ... deference to arbitration***. Rather, traditional principles of contract interpretation should apply.") (emphasis added).

Accordingly, there is no presumption in favor of arbitration on the threshold issue of whether any legally formed arbitration (or delegation) agreement *exists*:

> Before we may enforce the Arbitration Agreement, we must be satisfied that a valid agreement exists. The presumption favoring arbitration does not apply to this preliminary question of the Arbitration Agreement's validity.

*Coady*, 32 F.4th at 291 (emphasis added, citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 302–303 (2010); *Noohi v. Toll Bros.*, 708 F.3d 599, 611 n. 6 (4th Cir. 2013); *see also Mey v. DIRECTV, LLC*, 971 F.3d 284, 304 (4th Cir. 2020) (there is no "presumption in favor" of finding that a binding arbitration (or delegation) agreement exists).

Instead, "***a defendant who seeks to compel arbitration ... bears the burden of establishing the existence*** of a binding contract to arbitrate the dispute." *Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 867 F.3d 449, 456 (4th Cir. 2017) ("*Minnieland*") (emphasis added).

11

**JA152**

### C. A Specific Challenge to the Existence of an Arbitration or Delegation Agreement Is For the Court to Decide

The Federal Arbitration Act, 9 U.S.C. §1 *et seq*. ("FAA") "requires that the district court — rather than an arbitrator — decide whether the parties have formed an agreement to arbitrate." *Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd*., 944 F.3d 225, 234 (4th Cir. 2019) ("*Berkeley*"). The Court must also decide whether any delegation agreement has been formed:

> [P]rovisions requiring the arbitration of arbitrability questions do not…preclude a court from deciding that a party never made an agreement to arbitrate *any* issue (which would necessarily encompass an arbitrability issue).

*Id*. at 234 n.9 (emphasis in original). *See also Lyles v. Chegg, Inc*., No. CV RDB-19-3235, 2020 WL 1985043, at *3 (D. Md. Apr. 27, 2020) ("Even when questions of arbitrability have been delegated…the court must decide issues concerning contract formation.")

### D. The Allegations of the Complaint Are Taken As True

The allegations of the Complaint are accepted as true at this stage. *See Rowland v. Sandy Morris Fin. & Est. Plan. Servs., LLC*, 993 F.3d 253, 257 (4th Cir. 2021) (in reviewing a motion to compel arbitration, the Court "'accept[s] as true the allegations of the ... Complaint that relate to the 'underlying dispute between the parties.'") (*quoting Berkeley*, 944 F.3d at 233). *See also Convergence Mgmt. Assocs., Inc. v. Callender*, No. CV TDC-15-4015, 2016 WL 6662253, at *2 (D. Md. Nov. 10, 2016) (on a Fed. R. Civ. P. 12(b)(3) motion, ***"[a]ll well-pleaded allegations in the complaint bearing on the question of venue are taken as true***, and the Court views the facts in the light most favorable to the plaintiff.") (emphasis added, *citing Aggarao v. MOL Ship Mgmt. Co*., 675 F.3d 355, 365-66 (4th Cir. 2012)).

### E. Any Ambiguity About the Existence of an Arbitration Agreement Is Resolved Against Arbitration

Any ambiguities about whether an arbitration agreement exists must be resolved *against* such a finding. *See Cheek*, 835 A.2d at 663-64 (quoting *Dumais v. Am. Golf Corp*., 299 F.3d 1216,

**JA153**

1219 (10th Cir. 2002)). The passage of *Dumais* which *Cheek* relied upon considered conflicting

provisions – one which allowed unilateral modification, one which did not:

> American Golf Corporation's employee handbook...***included an arbitration provision***. ... A provision of the handbook stated that American Golf "reserves the right to at any time change, delete, modify, or add to any of the provisions contained in this handbook at its sole discretion" with the ***exception*** of the arbitration provision. *Id.* ***Another provision stated that American Golf had the right to amend, supplement, or revise everything in the handbook, and this provision did not exclude the arbitration provision***. *Id.*

835 A.2d at 663 (emphasis added). *Dumais* resolved the conflict in favor of finding the agreement

illusory. *Id.* at 664. The Maryland Supreme Court "aligned" itself with that reasoning. *See id.*; *see

also Holloman v. Cir. City Stores, Inc.*, 894 A.2d 547, 553 (Md. 2006) (in *Cheek*, "we aligned ourselves"

with *Dumais*.)

### III.    No Arbitration or Delegation Agreements Legally Exist

The question presented here – namely, whether, under Maryland law, any arbitration or

delegation agreements exist between the Plaintiff and Mercury – involves fundamental contract

principles for the Court, not an arbitrator, to decide. *See Rowland*, 993 F.3d at 258, 260 (holding

that even where the consumer's transaction is Internet-based, "'new commerce on the Internet

...has not fundamentally changed the principles of contract." As discussed below, those

fundamental contract principles dictate that no such agreements exist.

First, because the Cardholder Agreement allows unilateral modification of the arbitration

and delegation "agreements," the consideration required for those agreements in Maryland (a

mutual, binding, promise to arbitrate) does not exist, and the "agreements" were never formed.

Second, Mercury's Arbitration Provisions are void under the MCLL, and the fundamental public

policy of Maryland. And third, because any and all rights that FB&T ever had were assigned to

the current owner of Ms. Bailey's loan account, Velocity, which chose litigation over arbitration

in order to try to collect the very loan challenged in this litigation and thus waived any

**JA154**

arbitration rights the Cardholder Agreement ever provided. *See Cain v. Midland Funding, LLC*, 156 A.3d 807, 820 (Md. 2017) (filing a collection lawsuit waives the right to arbitrate related claims).

### A. The Contract Formation Questions Here Are Governed by Maryland Law

Defendant's Motion takes the position that South Dakota law applies to all questions arising under the FB&T Cardmember Agreement. *See* Memo at 8. Mercury's logic is both simplistic and one-dimensional – the FB&T Cardmember Agreement, it argues, states that South Dakota law applies and the parties are free to specify what state's law applies. *See* Memo at 7.

Specific to the issues now before the Court, Mercury is wrong. The issue presented here – whether an arbitration agreement exists between Plaintiff and Mercury – is one of state law. *See Noohi*, 708 F.3d at 607 ("'The question of whether an enforceable arbitration agreement exists ... is a matter of contract interpretation governed by state law' "); *see also Jones*, 2022 WL 834210, at *12.

Choice-of-law rules prescribe application of Maryland law. "A district court applies the choice-of-law rules of the state in which it sits unless a compelling federal interest directs otherwise." *Baker v. Antwerpen Motorcars Ltd.*, 807 F. Supp. 2d 386, 389 n. 13 (D. Md. 2011) (citations omitted). No compelling federal interest directs using any law other than Maryland's.

As *Baker* held, "Maryland follows the *lex loci contractus* rule, under which 'the law of the jurisdiction where the contract was made controls its validity and construction.'" *Id*. (citation omitted). And, "[f]or choice-of-law purposes, 'a contract is made where the last act necessary to make the contract binding occurs.'" *Id*. (citation omitted).

Putting aside whether Mercury is even a party to the FB&T arbitration agreement, here, the last act that would be necessary to make the arbitration contract "effective" would be the Plaintiff's acceptance and use of the Card. *See* FB&T Cardholder Agreement at 2 ("You accept

14

**JA155**

this Agreement if you use the Account"). The Complaint alleges that Plaintiff's loan application

originated in Maryland, and that Plaintiff was within Maryland at the time she accepted and

used her credit card. *See* Compl. ¶¶ 16 (Plaintiff was "within the state of Maryland at the time she

entered into any agreement for the loan account at issue in this lawsuit."); 28 ("Plaintiff accepted

the credit card agreement for the credit card account in Maryland"); 29 ("Plaintiff's application

for the account originated in Maryland"). Those allegations relate to the underlying dispute

between the parties – indeed, Plaintiff's contention in the underlying lawsuit include that

Maryland law applies and renders Mercury's loan illegal – so they are accepted as true. *See*

*Rowland*, 993 F.3d at 257 (on a motion to compel arbitration "'we accept as true the allegations of

the ... Complaint that relate to the 'underlying dispute between the parties.'") (citation omitted).

No choice-of-law clause could impact the applicability of Maryland law to the issue of

formation. It would "put the cart before the horse" to look to any choice-of-law provision

purportedly agreed to as part of an arbitration or delegation agreement when determining

whether the agreement (including any choice-of-law clause applicable to it) was ever formed. *See*

*James v. Synovus Bank*, No. CV TDC-19-1137, 2020 WL 1479115, at *2 (D. Md. Mar. 26, 2020)

(in the context of determining whether an arbitration agreement in a "Cardholder Agreement"

was ever formed, "it is inappropriate to apply a term of the contract to the question of whether

the parties agreed to the contract in the first place.") (citations omitted); *Archer W. Contractors, LLC*

*v. Synalloy Fabrication, LLC*, No. CCB-14-3031, 2016 WL 930965, at *4 (D. Md. Mar. 11, 2016)

(same).

As one court held in memorable language:

It defies logic to apply the choice-of-law provision of a contract to determine
whether that contract was formed in the first place. As such, in this CAFA diversity
case, which was filed in a California court, by a California Plaintiff, under a
California statute, the Court will apply California law to the threshold issue of

15

**JA156**

contract formation. This issue is separate from which forum's law applies to the *enforceability* or *validity* of any agreement the parties entered.

*Jialu Wu v. iTalk Glob. Commc'ns, Inc.*, No. CV 20-7150 PSG, 2020 WL 8461696, at *2 (C.D. Cal. Oct. 21, 2020) (emphasis in original). The same is true here – this case was filed in Maryland state court, by a Maryland Plaintiff and under Maryland statutes; and it is in federal court on CAFA diversity jurisdiction. No choice-of-law provision could factor into a decision of whether an arbitration or delegation agreement was formed in the first place.

Accordingly, Maryland law applies to the question of the existence of an arbitration agreement between the parties.

### B. This Court Decides Whether Arbitration or Delegation Agreements Exist

"To satisfy itself that [an agreement to arbitrate the particular dispute] ***exists***, the court must resolve any issue that calls into question the ***formation or applicability*** of the specific arbitration clause that a party seeks to have the court enforce." *Granite Rock Co. v Int'l Broth. of Teamsters,* 130 S. Ct. 2847, 2856 (2010) (emphasis added). "The presumption favoring arbitration does not apply to this preliminary question of the Arbitration Agreement's validity." *Coady v. Nationwide Motor Sales Corp.*, 32 F.4th 288, 291 (4th Cir. 2022) (*citing Granite Rock Co.*, 561 U.S. at 302–303). The Federal Arbitration Act, 9 U.S.C. §1 *et seq.* ("FAA") "requires that the district court — rather than an arbitrator — decide whether the parties have ***formed*** an agreement to arbitrate." *Berkeley*, 944 F.3d at 234 (emphasis added).

16

**JA157**

The Court must also decide whether any *delegation* agreement has been formed. *Id*. at 234 n.9. [8] *See also Watkins v. Carr,* No. CV PX-17-0819, 2018 WL 10741730, at *2 (D. Md. Jan. 12, 2018) ("the Court must determine whether the parties entered into an express agreement to arbitrate that is 'validly formed' and 'legally enforceable.' ") (citations omitted); *Lyles*, 2020 WL 1985043, at *3 ("Even when questions of arbitrability have been delegated…the court must decide issues concerning contract formation.") Accordingly, Plaintiff's challenge to the existence of any arbitration or delegation agreements is for this Court, not an arbitrator, to decide.

### C. No Arbitration or Delegation Agreements Exist Because of the Unilateral Change-In-Terms Clause

As noted above, Part I.D.2, the 2018 and 2020 Versions of the FB&T Agreement each provide identical language to permit FB&T to unilaterally change the agreement, including those provisions relating to arbitration:

**CHANGES TO YOUR ACCOUNT**

The rates, fees and terms of this Agreement (including its Jury Trial Waiver and Arbitration Clause), may change and we may add or delete any term.  When required by law, we will provide advance written notice of any changes and any right to reject the changes.

Def. Exh. 4, 2020 Version at 2.

Because of the unilateral change-in-terms clause in the FB&T Agreement, the purported arbitration and delegation "agreements" are illusory, were not legally formed, and do not legally exist as "agreements." They cannot be used to force Plaintiff to arbitrate.

---

[8] A specific challenge to the legal existence of arbitration or delegation agreements – presented here – is distinct from a challenge *only* to an underlying agreement, which does not specifically dispute the "existence of an arbitration agreement," as in *Nitro-Lift Techs., L.L.C. v. Howard*, 568 U.S. 17, 19 (2012), or a delegation provision, as in *Rent-A-Ctr.*, 561 U.S. at 73.

17

**JA158**

### 1. Whether A Purported Agreement Is Illusory Is a Question of Contract Formation

The question of whether an arbitration agreement is illusory is a formation question – the question of whether consideration exists. *See Cheek*, 835 A.2d at 662 (if a promise is illusory, "the result is that **no contract is created**.") (emphasis added) (citation omitted); *see also Noohi*, 708 F.3d at 611 (illusory arbitration agreement lacks consideration."); *Windesheim v. Verizon Network Integration Corp.*, 212 F. Supp. 2d 456, 462 (D. Md. 2002) (Where there is no "consideration— **critical to contract formation**— …[a] promise is "illusory" in the sense that it is not legally enforceable in an action for breach of contract.") (emphasis added).

### 2. If One Party Can Unilaterally Exempt Themselves from Arbitration, an Arbitration "Agreement" Is Illusory

Consideration for an arbitration agreement is only satisfied by a mutual obligation to arbitrate. *See Noohi*, 708 F.3d 599, 609 ("an arbitration provision must be supported by consideration independent of the contract underlying it, namely, mutual obligation."); *Coady*, 32 F.4th at 291 (same).

"Under Maryland law, a promise to arbitrate is illusory—and thus cannot constitute the consideration necessary to support a binding contract—if the employer reserves the right 'to alter, amend, modify, or revoke the Arbitration Policy ... at any time with or without notice.'" *Coady*, 32 F.4th at 292 (*citing Cheek*, 835 A.2d at 662).[9] This rule applies equally where the arbitration "agreement" is contained within a larger agreement which also contains non-

---

[9] This Opposition does not challenge the Cardholder Agreements as a whole as "illusory." Plaintiff *specifically* argues that the unilateral change-in-terms clause makes the arbitration and delegation agreements illusory, because they can be changed at any time to remove Plaintiff's right to compel arbitration. That distinguishes this case from one like *Damato v. Time Warner Cable, Inc.*, 2013 WL 3968765, at *6 (E.D.N.Y. July 31, 2013), where a general challenge to the contract as a whole as "illusory" was sent to the arbitrator.

arbitration terms, when the terms of that larger contract provide that *any* of the agreement's terms can be unilaterally changed without advance notice or an opportunity to reject the changes. *See*, *e.g.*, *Coady*, 32 F.4th at 293 (modification clause applied to an arbitration provision where it was incorporated into the contract which contained the arbitration provision).

This was also the situation in *Dumais*, as discussed above – a decision *Cheek* endorsed. *See* Part II.E, *supra*; *see also Cheek*, 835 A.2d at 663 (in *Dumais*, employee handbook "included" an arbitration provision *as well as* a change-in-terms clause). *See also Johnson v. Menard, Inc.*, 632 S.W.3d 791, 797 (Mo. Ct. App. 2021) (same under Missouri law); *Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 776–77 (Mo. 2014) (same).

### 3. *The Purported Arbitration and Delegation "Agreements" Can Be Changed at Any Time, Retroactively, Without Notice, Rendering Them Illusory*

In both the 2018 and 2020 Versions of the FB&T Agreements, FB&T reserved the unilateral right to unilaterally modify the Arbitration and Delegation Clauses without advance notice or an opportunity for Plaintiff to reject the changes, as discussed above. *See* Part I.D.2, *supra*. It "may change and … add or delete any term," including its Jury Trial Waiver and Arbitration Clause, ***at any time***. *See* Def. Exh. 4, 2020 Version at 2. Accordingly, even if Mercury was the "we" or "us" who could compel arbitration, it or FB&T could also change the arbitration and delegation clauses at will, and there is no binding promise on FB&T's or Mercury's part to arbitrate. As a result, the arbitration and delegation agreements are illusory. *See*, *e.g.*, *Coady*, 32 F.4th at 292.

### 4. *No Notice Requirement Saves the Illusory "Agreements"*

The FB&T Agreement's unilateral change-in-terms provision says that it can change any term of the agreement and further that "When required by law, we will provide advance written

**JA160**

notice of any changes and any right to reject the changes." Def. Exh. 4, 2020 Version at 2. That purported "notice" provision, however, cannot save the illusory arbitration "agreement."

a.    *No Notice is "Required by Law"*

First, no notice of unilateral changes is "required by law" in Maryland. That is a necessary predicate of each of the decisions in *Cheek*, *Coady*, *Jones*, *Caire*, and *Brent*. If notice of changes was "required by law," then notice would have been required before the arbitration provisions in those cases could have been changed, and the agreements would not be illusory.

But in *Cheek*, Maryland's Supreme Court held that under the unilateral modification clause in that case the defendant "**has the right** to 'alter, amend, modify, or revoke the [Employment Arbitration] Policy at its sole and absolute discretion at any time **with or without notice**' and without consent." *Cheek*, 835 A.2d at 663 (emphasis added). That holding is central to *Cheek* and its progeny – including the Fourth Circuit's *Coady* decision. If something in Maryland law independently *requires* notice of unilateral changes, then no one could have "the right" to make unilateral changes *without* notice. *See, e.g.*, *Lyons v. PNC Bank, Nat'l Ass'n*, 26 F.4th 180, 189 (4th Cir. 2022) ("it is well-established in Maryland that 'laws subsisting *at the time of the making of a contract* enter into and form a part thereof as if expressly referred to or incorporated in its terms ....") (emphasis in *Lyons*) (citations omitted). And if the defendant in *Cheek* could not make changes *without* advance notice and a right to opt out, then the *Cheek* defendant *would* be bound by the arbitration provision, and the arbitration provision would not be illusory.

Here, the plain language of the FB&T Agreement explicitly limits the notice to only that which is "required by law." Nothing in the Cardmember Agreement states that notice of changes will be provided, and changes identified, if the law does not require it. That distinguishes this case from one like *DIRECTV, Inc. v. Mattingly*, 829 A.2d 626, 639 (Md. 2003), where "[u]nder the **plain language** of the … customer agreement … petitioner was contractually obligated to

20

**JA161**

provide respondent with "written notice describing" any changes." (emphasis added). The plain language of the arbitration provisions here expressly leaves the question of notice to the operation of *law* – there is no *agreement* to give notice. *See also Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 575 F. Supp. 2d 696, 707 (D. Md. 2008) ("*Mattingly*…made clear that its holding depended on the fact that a party with power to unilaterally modify an agreement should be strictly held to the modification terms ***it sets forth***.") (emphasis added).

> b.   *A Unilateral Modification Clause with Retroactive Effect Makes Arbitration Provisions Illusory Regardless of Notice*

There are a number of Courts outside Maryland that have addressed the sound reasons why arbitration provisions which allow unilateral modifications that could have a retroactive effect, are illusory.

For example, the Supreme Court of Missouri, using logic that is equally applicable in Maryland, explained why a unilateral change clause with a 30-day notice provision, but no prohibition on retroactivity, makes an arbitration clause illusory:

> If Bristol retains unilateral authority to amend the agreement retroactively, its promise to arbitrate is illusory and is not consideration.
>
> Bristol asserts that the requirement of prior written notice means that any modifications must apply prospectively only. ***The fact that Bristol must give prior written notice of an amendment to the arbitration agreement does not preclude Bristol from giving Baker prior written notice that, effective in thirty days, Bristol retroactively is disclaiming a promise made in the arbitration agreement***. For instance, if in the course of an ongoing arbitration process, Bristol concluded that the process was not favorable, Bristol could provide Baker notice that, effective in 30 days, it no longer would consider itself bound by the results of the arbitration.

*Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 776–77 (Mo. 2014) (emphasis added, footnote omitted).

Likewise, a trilogy of persuasive Fifth Circuit decisions explains why a unilateral modification clause plus retroactivity *always* equals an illusory arbitration agreement, regardless of notice:

21

**JA162**

both *Torres*[*v. S.G.E. Mgmt., LLC*, 397 Fed.Appx. 63, 68 (5th Cir.2010)] and *Morrison* [*v. Amway Corp.*, 517 F.3d 248, 254 (5th Cir. 2008)] hold that notice is insufficient when retroactive amendment is possible. In *Torres*, we considered an arbitration provision to which amendments would become binding "upon notice" "or by publication." 397 *Fed.Appx.* at 66. ***Despite the fact that notice was being provided, we held that because amendments became effective immediately and because there was no savings clause excepting pending disputes from amendment, the agreement was illusory.*** *Id.* at 68. Similarly, in *Morrison*, amendments to the arbitration provision were to be "published ... in official Amway literature." 517 F.3d at 254. Despite this provision for notifying its distributors of changes to the arbitration agreement, we still held that the agreement was illusory: "While it is inferable that an amendment thus unilaterally made by Amway to the arbitration provision would not become effective until published, there is nothing to suggest that once published the amendment would be inapplicable to disputes arising, or arising out of events occurring, before such publication." *Id.*

*Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 207–08 (5th Cir. 2012) (emphasis added).

Here, as in *Torres*, *Morrison*, *Carey*, and *Baker*, nothing in the "agreements" prevents eliminating arbitration or delegation entirely or restricting it to certain claims and disputes, retroactively – even if the changes can only be binding "upon notice." *Id.*[10] Nothing exempts pending disputes from unilateral amendment.[11]

### 5. *This Court Has Repeatedly Held in Materially Identical Circumstances that Arbitration Cannot Be Compelled*

This Court has repeatedly held, in circumstances materially identical to those presented here, that unilateral modification clauses render arbitration agreements illusory. For example, in *Jones*, the Court held that "no agreement to arbitrate was formed" where the arbitration

---

[10] Quite different are change in terms provisions requiring advance notice of changes or permitting only prospective application. *See Holloman v. Cir. City Stores, Inc.*, 894 A.2d 547, 554 (Md. 2006) (30-days advance notice of changes required); *Am. Gen. Life & Acc. Ins. Co. v. Wood*, 429 F.3d 83, 91 (4th Cir. 2005) (limitation of changes to "prospective disputes and by specific notice requirements.") Here, the modification provision requires ***no*** advance notice, and ***expressly allows*** retroactive changes.

[11] Some retroactive arbitration clauses are enforceable, *see, e.g., Levin v. Alms & Assocs., Inc.*, 634 F.3d 260, 267 (4th Cir. 2011), but not when coupled with a unilateral modification clause.

provision was in a contract with a similar lender which also contained a "modification provision" which allowed the lender "to change the arbitration provision at any time" – even though notice of changes was *required* by the contract in that case:

> the modification provision gives "unfettered" discretion to Prosper. The modification provision does include a clause that "Prosper will give you notice of material changes to this Agreement[.]" *See, e.g.*, ECF No. 15-5 ¶ 14. But this is not a limitation on Prosper's ability to change terms in the same vein as *Holloman*. Prosper does not promise to give advance notice so that a borrower could invoke arbitration before a change becomes effective, nor does it contain any time limitation. The modification provision allows Prosper to change the arbitration provision at any time. The Court is not persuaded that the notice requirement within the modification provision limits Prosper's discretion enough such that Prosper's promise to arbitrate still constitutes a binding promise.

2022 WL 834210, at *16.[12] This is an even clearer case. The Cardholder Agreement does not promise to give advance notice of changes, or *any* notice, unless "required by law." There is no time limitation on its unilateral amendment powers –the Arbitration Provisions can be changed at any time. There is no binding promise by Mercury (or FB&T) to arbitrate, so there has been no "mutual exchange of promises to arbitrate" and no arbitration agreement exists. *Cheek*, 835 A.2d at 665; *see also Raley v. Whitestake Improvements LLC*, No. CV DLB-22-194, 2022 WL 3975189, at *4 (D. Md. Sept. 1, 2022) (rejecting arbitration motion due to unilateral modification clause); *Coady*, 2020 WL 6785352, at *1 (same); *Brent v. Priority 1 Auto. Grp., BMW of Rockville*, No. PWG-14-1705, 2016 WL 9724975, at *8 (D. Md. Aug. 4, 2016) (same); *Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582, 594 (D. Md. 2013) (same).

---

[12] *Jones* ultimately compelled arbitration, by enforcing a different arbitration agreement *which was not subject to a unilateral modification clause*. *See* 2022 WL 834210, at *16.

As in *Jones*, *Raley*, *Coady*, *Brent*, and *Caire*, the unilateral modification clause in the Cardholder Agreement means that the arbitration and delegation provisions lack mutuality and are illusory under Maryland law.

### 6. Other Courts Have Repeatedly Held in Materially Identical Circumstances that Arbitration Cannot Be Compelled.

Maryland is far from alone in holding that unilateral change-in-terms provisions for arbitration (or delegation) "agreements" render the agreements illusory. The federal court handling multi-district litigation against Zappos.com, for example, collected numerous decisions from across the country concluding that unilateral change-in-terms clauses render arbitration agreements illusory. *See In re Zappos.com, Inc., Customer Data Sec. Breach Litig.*, 893 F. Supp. 2d 1058, 1065-66 (D. Nev. 2012) (collecting cases).

### 7. The Court Is Allowed to Consider the Unilateral Modification Clause

In *Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540 (4th Cir. 2005), the Fourth Circuit forbade looking outside a free-standing, *separate* arbitration agreement, to a *different* document, to find a unilateral modification clause. *See id.* But *Coady* distinguished *Hill* from circumstances like those presented here. 32 F.4th at 292.

Where, as here, an arbitration provision is *part* of a larger contract with a unilateral modification clause, "[t]he agreement is in contrast to *Hill*, in which the arbitration agreement was a completely separate document, and is more similar to *Caire* and *Coady*, in which the arbitration agreements were contained within the contract." *Jones*, 2022 WL 834210, at *14; *see also Hayes*, 811 F.3d at 676 ("it is only natural for us to interpret the arbitration agreement in light of the broader contract in which it is situated."); *Dillon*, 856 F.3d at 336 (the "effect of the arbitration agreement is unambiguous in the context of the whole contract," and was

24

**JA165**

unenforceable); *Gibbs*, 967 F.3d at 341–43  (considering "the terms of both the loan and arbitration agreements").

Here, the unilateral modification provision is within the same document as the Arbitration Provisions. The unilateral modification provision allows modification of virtually any term of the FB&T Agreement and expressly governs the "Arbitration Clause"– "The rates, fees and terms of this Agreement (including its Jury Trial Waiver and Arbitration Clause), may change and we may add or delete any term," Def. Exh. 4, 2020 Version at 2.  Under the plain text of the adhesion[13] contract, the unilateral modification provision applies to the Arbitration and Delegation Clauses.  It is, therefore, invalid.

### 8.  *The Unilateral Modification Clause Makes the Arbitration and Delegation Provisions Illusory, Whether or Not the Provisions Were Actually Modified*

Even if FB&T or Mercury never used the unilateral modification clause to modify the Arbitration Provisions, its mere presence makes the arbitration provision illusory:

> United initiated the arbitration with Cheek; ***it has not revoked nor in any way altered the Arbitration Policy with Cheek at any time***. Nonetheless, the fact that 'United HealthCare reserves the right to alter, amend, modify, or revoke the [Arbitration] Policy at its sole and absolute discretion at any time with or without notice' creates no real promise, and therefore, insufficient consideration to support an enforceable agreement to arbitrate.

*Cheek*, 835 A2d at 662 (emphasis added); *see also Jones*, 2022 WL 834210, at *16 ("It does not matter that [defendant] did not, in fact, change the arbitration provision.") (*citing Cheek*).

---

[13] The "agreements" at issue are of "adhesion." *See Mould v. NJG Food Serv. Inc.*, 986 F. Supp. 2d 674, 678 (D. Md. 2013) (take-it-or-leave it contract is one of adhesion).

### D. The Arbitration and Delegation Provisions Violate Fundamental Maryland Public Policy

The MCLL represents the fundamental public policy of Maryland and provides that loans in violation of the licensing provisions of the statute are "void and unenforceable." *See* MCLL § 12-314(b)(1)(i) ("A loan made in the amount of $25,000 or less, regardless of whether the loan is or purports to be made under this subtitle, is void and unenforceable if…A person who is not licensed under or exempt from the licensing requirements under Title 11, Subtitle 2 of the Financial Institutions Article made the loan.").

The arbitration and delegation provisions that Mercury relies upon here are part of a loan which is void under the MCLL, and no choice-of-law provision can avoid the application of the MCLL, which represents Maryland's fundamental public policy. *See Accrued Fin. Servs., Inc. v. Prime Retail, Inc.,* 298 F.3d 291, 297 (4th Cir. 2002) (a "choice of law provision is enforceable only to the extent that the chosen law does not violate a fundamental public policy of the forum state, Maryland");  *Three M Enterprises, Inc. v. Texas D.A.R. Enterprises, Inc.,* 368 F. Supp. 2d 450, 458 (D. Md. 2005) (Maryland statutory provisions trump choice-of-law clauses where the statutes at issue make waivers "void and unenforceable" and therefore represent fundamental public policy).

### E. Any and All Rights under Any Delegation or Arbitration Agreements Have Been Assigned Away

If Mercury ever had any rights under the FB&T Agreement, they no longer exist because they have all been assigned to a debt buyer, who chose to sue Ms. Bailey instead of pursue arbitration. As reviewed above, Part I.C, in October 2022  Ms. Bailey was sued in the Charles County Maryland District Court to collect the very same sums which Ms. Bailey alleges are non-collectible in this case.  The complaint in that case establishes that on November 9, 2017, FB&T assigned all of its interests in the Ms. Bailey's loan to "CreditShop, Inc" which in turn assigned its interests to Velocity (the current owner of Ms. Bailey's loan account) in October 2020.  *See*

**Exhibit 2**, District Court Complaint for *Velocity Investments, LLC v. Angelita Bailey*, submitted

October 21, 2022. *See* Def. Exh. 4 (ECF 7-5). These assignments were permitted under the terms

of the 2020 Version of FB&T's Agreement:

> **Assignment of Account** - We may assign any or all of our rights and obligations
> under this Agreement. You may not assign any of your rights or obligations under
> this Agreement.

*Id.* So, if any rights ever existed under the Arbitration and Delegation Clauses, FB&T assigned

those rights away.

Under Maryland law, an assignment "transfer[s] all interests in the property from the

assignor to the assignee." *Roberts v. Total Health Care, Inc.*, 709 A.2d 142, 148 (Md. 1998).  In *In re*

*Wholesale Grocery Prod. Antitrust Litig.*, 850 F.3d 344, 350 (8th Cir. 2017), the 8th Circuit stated the

well accepted rule this way:

> In important respects, this case presents the flip side of *Koch v. Compucredit Corp.*, 543
> F.3d 460 (8th Cir. 2008). There, one bank had assigned a contract containing an
> arbitration clause to another. … [W] e held the assignee bank could compel
> arbitration of a dispute arising out of the contract because "[t]hrough the
> assignment, [the assignee] assumed all of [the assignor's] remaining rights and
> obligations under the contract." *Id*. at 465–67. Here, it is the assignors, not their
> assignees, claiming a right to compel arbitration. The clear consequence of Koch's
> logic is that the assignors—in this case, the nonsignatory wholesalers—should have
> nothing left to enforce, since "all of [their] remaining rights" were "assumed" by
> someone else.

850 F.3d at 350.

Here, FB&T's assignment of Ms. Bailey's account  in respect of her FB&T loan account,

to "CreditShop, Inc" which in turn assigned its interests to Velocity, is dispositive.  Neither

FB&T nor Mercury has any remaining rights in the Cardmember Agreement; if anything, these

rights belong to Velocity.  *See Hejamadi v. Midland Funding, LLC*, Civil No. 18-cv-13203 (KSH)

(CLW), 2022 WL 970248, at *5 (D.N.J. Mar. 31, 2022) ("Here, the card agreements' arbitration

provision allows Citibank to assign "any or all of [its] rights ... to a third party," and provides for

**JA168**

survival of the arbitration provision in the event of such a conveyance. … Consistent with that allowance, Citibank conveyed *all* of its rights in and to the accounts to Midland Funding, including the right to arbitrate, when it executed the P&S agreement.") (emphasis in original).

As Judge Bennett reasoned in another case involving a similar assignment chain, the original assignor has no right to compel arbitration:

> For this Court to hold otherwise could mean that each assignee to Ms. Novic's account, despite having transferred all its rights to a subsequent assignee, still maintain the right to compel the Plaintiff to arbitrate. When Credit One assigned all right, title and interest to Ms. Novic's account, it ceased to be a party to the contract. Therefore, Defendant no longer holds the right to compel [arbitration]...

*Novic v. Midland Funding, LLC*, 271 F. Supp. 3d 778, 785 (D. Md. 2017), *vacated and remanded sub nom. Novic v. Credit One Bank, Nat'l Ass'n*, 757 F. App'x 263 (4th Cir. 2019).[14]

This Court's decision in *Crawl*, 2016 WL 8716597 at *5, also confirms that any arbitration or delegation rights Mercury ever had were assigned, ultimately to Velocity. In *Crawl*, the Court carefully analyzed the assignment history of a credit card account. *Id*. It was only because in that case "the servicing and other enforcement rights in the Agreement ***remained assigned to***" a servicer that the servicer "***as assignee and servicer under the transferred Agreement***, may enforce the Agreement's arbitration provision against Crawl." *Id*. at *5-6 (emphasis added). Here, any arbitration or delegation rights do not "remain[] assigned to"

---

[14] *Novic* was vacated on appeal because the plaintiff had not ever specifically challenged the delegation clause – which is a gateway requirement for consideration of any arbitration argument. *See Novic v. Credit One Bank, Nat'l Ass'n*, 757 F. App'x 263, 266 (4th Cir. 2019) (plaintiff "fail[ed] to advance any argument directly challenging the validity of the delegation clause.") The Fourth Circuit's vacatur did not, however, undermine the persuasive value of Judge Bennett's reasoning in a case where the delegation clause *is* challenged. Here, in material contrast with *Novic*, Plaintiff specifically challenges the Delegation Clause and specifically argues any and all Delegation Clause rights have been assigned to Velocity – no such rights remain with FB&T or Mercury. *See, e.g.*, Part III.G, *supra*. That is the "same argument" lodged against the Arbitration Clause, but that is permitted so long as it is specified. *See Gibbs*, 966 F.3d at 291.

FB&T, Mercury or any other entity in the prior chain of ownership. Accordingly, even if it could have compelled arbitration at some point in time, "all" of Mercury's rights under the Cardholder Agreement, including any arbitration or delegation rights, were assigned away. *See* **Exhibit 2**, District Court Complaint at p. 46 (assigning to Velocity, the current owner, "***all*** of Seller's right, title and interest in and to" Plaintiff's account) (emphasis added).

### F. Any Arbitration Rights Are Waived Because the Current Owner of the Cardholder Agreement, Velocity, Chose Court and Not Arbitration

In addition to all the reasons discussed above that arbitration cannot be compelled, Velocity's decision to sue Plaintiff in Court instead of arbitration waives any right to arbitrate under the Delegation or Arbitration Clauses.[15] In *Cain*, 156 A.3d 807 (Md. 2017), the plaintiff alleged that the defendant had used unlawful debt collection practices in a collection lawsuit. *Id*. The defendant collector filed a motion to compel arbitration. *Id*. In response, Cain argued that the collector had waived its right to arbitrate by initiating the state court collection action. *Id*. Maryland's Supreme Court agreed, holding that the collector waived its right to arbitrate the class action claim when it chose to litigate the collection action. *Id*.; *see also Novic*, 271 F. Supp. 3d at 785.

Similar to *Cain*, Velocity filed a collection lawsuit against Plaintiff on the same account at issue in this lawsuit, despite the same Arbitration Provisions which Mercury now invokes – Arbitration Provisions which FB&T assigned to CreditShop, Inc. which assigned the Agreement to Velocity. *See* **Exhibit 2**, District Court Complaint. By filing a lawsuit against Plaintiff,

---

[15] Some prior decisions of this Court held that *Cain* did not apply in federal court, because a plaintiff asserting waiver in federal court is required to show "actual prejudice." *See, e.g., Castellanos v. Mariner Fin., LLC*, No. CV MJG-17-3168, 2018 WL 488725, at *2 (D. Md. Jan. 19, 2018). However, in *Morgan v. Sundance*, 142 S. Ct. 1708, 1713 (2022), the U.S. Supreme Court determined that a showing of prejudice is *not* required to show waiver in federal court. *See id*.

Velocity chose to litigate and waived any right to have any claim arbitrated – including, but not limited to, any right to have arbitrability arbitrated under the Delegation Clause. Velocity, as the owner of "all" of FB&T's prior rights under the Arbitration Provisions, has the ability to waive the Arbitration Provisions, and has done so. Neither FB&T, nor Mercury, can compel the Plaintiff to arbitrate the same issues pending in court because of Velocity's lawsuit against her.

### G.        Plaintiff Specifically Challenges the Delegation Clause

"The [U.S.] Supreme Court has concluded that when a litigant specifically challenges the enforceability of an arbitration agreement with a delegation clause, the challenge must be submitted to the arbitrator unless the plaintiff has lodged a specific objection to the delegation clause." *Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286, 291 (4th Cir. 2020). "In specifically challenging a delegation clause, ***a party may rely on the same arguments that it employs to contest the enforceability of other arbitration agreement provisions***." *Id.* (emphasis added, citation omitted). It is a "sufficient challenge" to argue that "the 'delegation clause suffers from the same defect as the arbitration provision.'" *Id.* In *Rent-A-Center*, the Supreme Court "observ[ed] that had the plaintiff "challenged the delegation provision by arguing that [the purportedly unconscionable arbitration procedures] *as applied* to that delegation provision rendered *that provision* unconscionable, the challenge should have been considered by the court." *Id.* (*quoting Rent-A-Center*, 561 U.S. at 74) (emphasis in original).

Here, Plaintiff specifically challenges the Delegation Clause in FB&T's Cardholder Agreement. For example, Plaintiff asserts that the unilateral change-in-terms clause in the Cardholder Agreement, *as applied to* both the Delegation and Arbitration Clauses, makes *the Delegation and Arbitration Clauses* illusory. Plaintiff asserts that the assignment of "all" rights in the Cardholder Agreement from FB&T to Creditshop to Velocity  assignment, *as applied to* the Delegation and Arbitration Clauses, means that any and all rights *in the Delegation and Arbitration*

**JA171**

*Clauses* have been assigned to Velocity, and no such rights exist for either FB&T or Mercury.
Plaintiff asserts that the violations of the MCLL alleged in this case, *as applied to* the Delegation
and Arbitration Clauses, makes *those Delegation and Arbitration Clauses* void.

## IV.    Mercury's Motion to Strike Class Allegations Is Without Merit

Mercury's motion to strike class allegations must meet a high bar. "[C]lass allegations
should generally be struck before the completion of discovery ***only*** when it is apparent from the
***face of the complaint*** that 'the requirements for maintaining a class action cannot be met.'"
*Williams v. Potomac Fam. Dining Grp. Operating Co., LLC*, No. GJH-19-1780, 2019 WL 5309628, at
*5 (D. Md. Oct. 21, 2019) (emphasis added, citations omitted); *see also Morgan v. Caliber Home
Loans, Inc.*, No. 8:19-CV-02797-PX, 2022 WL 16964705, at *2 (D. Md. Nov. 16, 2022) ("'If class
treatment on the ***face of the complaint*** leaves little doubt that a class action is not viable,' the
court should strike the class allegations.") (emphasis added, citation omitted).

Here, nothing in the Complaint refers to any class action waiver, and Mercury points to
nothing on the face of the Complaint which would support striking class allegations.

As a result, discovery is necessary. *See also Newman v. Direct Energy, LP*, No. GJH-21-2446,
2022 WL 4386235, at *8 (D. Md. Sept. 22, 2022) (denying motion to strike class allegations
where "[t]he parties before this Court have not engaged in discovery and the Court has not had
the opportunity to evaluate the evidence"). Discovery is also necessary into whether the class
waiver is unconscionable. *See Underwood v. Future Income Payments, LLC*, No. SAC-V-171570-
DOCDFMX, 2018 WL 4964333, at *5 (C.D. Cal. Apr. 26, 2018) ("the unconscionability of class
waiver is fact driven, [so] courts rarely strike class allegations at the pleading stage.").

In addition, the Arbitration Provisions, which *contain* the purported class waiver, are
illusory for the reasons discussed above. So, the purported class waiver, which is *part* of the
illusory and unenforceable Arbitration Provisions, is not enforceable either. And, as discussed

**JA172**

above, "any and all … rights" in the Cardholder Agreement – including any class waiver rights – have been assigned to Velocity.

Furthermore, the purported class waiver applies only to arbitration – not court proceedings. *See* ECF No. 7-5 at 7 ("Is a class ***arbitration*** permitted? No") (emphasis added). Arbitration cannot be compelled here, for the reasons discussed above. Nothing says that a class action cannot proceed in *court*. Accordingly, the purported waiver of class actions in *arbitration* is inapplicable to this case in Court. *See also Robinson v. Virginia Coll., LLC*, 788 F. App'x 697, 701 (11th Cir. 2019) ("By its terms, the class action waiver applies only to claims governed by the arbitration agreement. Because Robinson's complaint is not subject to arbitration under the agreement, its class action waiver does not govern this dispute"); *see also Haymount Urgent Care PC v. GoFund Advance, LLC*, No. 22-CV-1245 (JSR), 2022 WL 6994507, at *6 (S.D.N.Y. Oct. 12, 2022) ("if the Court were to grant defendants the relief they request and strike plaintiffs' class allegations on the pleadings, it would necessarily have to enforce against plaintiffs a provision in an allegedly void contract before any determination as to the validity of that contract has been made.")

Finally, the purported class waiver, along with the rest of the arbitration provisions, self-destruct if the arbitration agreement is unenforceable:

> If, however, the entire Agreement to arbitrate ***or your waiver of the right to bring or participate in a class or representative action is unenforceable***, then the Agreement to arbitrate shall be of no force or effect.

Def. Exh. 4 (ECF 7-5), FB&T Cardholder Agreement at 8 (emphasis added).

## V.  At a Minimum, Discovery Is Required.

Mercury asserts that it is entitled to strike class allegations and force Plaintiff to arbitrate under a Cardmember Agreement which does not once mention Mercury Financial, LLC, and when there is no evidence that Mercury has any rights under the Cardholder Agreement it is

**JA173**

trying to enforce. Mercury has not presented any proof that it ever owned the Cardholder

Agreement, or that it is a "Related Party" under the Cardholder Agreement, or that it is

otherwise entitled to enforce any arbitration or delegation provisions or class waivers. And, as

discussed above, the Cardholder Agreement is now owned by Velocity, which chose to sue

Plaintiff instead of pursue arbitration. None of the available facts in the record suggest that any

arbitration or delegation agreement or class waiver exists between Mercury and Plaintiff.

Moreover, the facts alleged in the Complaint – which must be taken as true at this stage –

are that Mercury's relationship with Plaintiff was as a lender, not as a mere servicer or collector

for FB&T as Mercury now claims. *See* Compl. ¶ 28 (Plaintiff's account was owned by Mercury);

*see also Rowland*, 993 F.3d at 257 (allegations of the complaint are accepted as true at this stage).

To the extent that Mercury claims that it has rights in arbitration or delegation provisions by

virtue of its relationship with FB&T, Plaintiff is entitled to discovery into what that relationship is.

That is particularly so because Mercury's claims about that relationship – that it is a mere

servicer and marketer – conflict with the allegations in the Complaint.

On the factual record presented here, the Court simply cannot determine that Mercury is

entitled to force Plaintiff to arbitrate, or that it has any rights under any class waiver. And

Plaintiff disputes that Mercury has any class waiver rights, or rights to arbitrate or delegate,

under the Cardholder Agreement. To the contrary, Plaintiff asserts that all arbitration or class

waiver rights (if any exist) were assigned to Velocity. And, Plaintiff asserts that Mercury is neither

FB&T (the "we" or "us" purportedly allowed to compel arbitration) nor a "Related Party" under

the Arbitration Provisions.

Where, as here, there is a dispute of material fact concerning the existence of an

arbitration agreement, discovery and potentially a jury trial are required:

33

**JA174**

With this dispute of material fact, I cannot conclude on the record before me that the employer is entitled to arbitrate as a matter of law. *See* Fed.R.Civ.P. 56(a); *Rose v. New Day Fin., LLC*, 816 F.Supp.2d 245, 252 n. 5 (D.Md.2011). Therefore, Defendant's Motion to Compel Arbitration, treated as one for summary judgment, is denied. This case will proceed with discovery on the validity of the Arbitration Agreement, and assuming that discovery does not establish that there is no genuine dispute regarding the authenticity of the evidence that Defendants rely on to establish Plaintiff's acceptance of the Arbitration Agreement, I will hold a jury trial to determine this discrete matter of fact. *See Galloway v. Santander Consumer USA, Inc.*, No. CCB–13–3240, 2014 WL 4384641, at *2 (D.Md. Sept.3, 2014); *Rose*, 816 F.Supp.2d at 252 n. 5.

*Whitten v. Apria Healthcare Grp., Inc.*, No. PWG-14-CV-3193, 2015 WL 2227928, at *4 (D. Md. May 11, 2015).

Here, Mercury has introduced no evidence that any arbitration or delegation agreements exist between it and Plaintiff – it has only submitted a Cardholder Agreement which by its terms is between Plaintiff and a different company. So, the ***best*** case for Mercury is that there is a dispute of material fact – in reality, there are ***no*** facts in the record which support Mercury's claim that any arbitration or delegation agreements apply to it. At a minimum, as in *Whitten*, Mercury's unsupported Motion should be denied to allow discovery.

## VI.   Conclusion

Plaintiff respectfully requests that the Court deny the Motion.

Respectfully submitted,

/s/ Richard S. Gordon
_____

Richard S. Gordon (Fed. Bar No. 06882)
Benjamin H. Carney (Fed. Bar No. 27984)
GORDON, WOLF & CARNEY, Chtd.
100 W. Pennsylvania Ave., Suite 100
Towson, Maryland 21204
Tel. (410) 825-2300
Fax. (410) 825-0066
rgordon@GWCfirm.com
bcarney@GWCfirm.com

Attorneys for Plaintiff and the Putative Class

34

**JA175**





**CONSUMER FINANCIAL PROTECTION BUREAU STUDY FINDS THAT ARBITRATION AGREEMENTS LIMIT RELIEF FOR CONSUMERS**

The Consumer Financial Protection Bureau released a study indicating that arbitration agreements restrict consumers' relief for disputes with financial service providers by limiting class actions. The report found that, in the consumer finance markets studied, very few consumers individually seek relief through arbitration and the courts, while millions of consumers obtain relief each year through class action settlements.

<u>Arbitration Clauses by the Numbers</u>
Tens of millions of consumers are covered by arbitration clauses. The CFPB looked at arbitration clauses in six different consumer finance markets: credit cards, checking accounts, prepaid cards, payday loans, private student loans, and mobile wireless contracts.

- **53 percent:** The market share of **credit card** issuers that include arbitration clauses.
- **44 percent:** While fewer than 8 percent of banks and credit unions include arbitration clauses in their **checking account** agreements, those who do represent 44 percent of insured deposits.
- **92 percent:** The percentage of **prepaid card** agreements the CFPB obtained that are subject to arbitration clauses.
- **86 percent:** In the **private student loan** market, 86 percent of the largest lenders include arbitration clauses in their contracts.
- **99 percent**: The Bureau was able to obtain data on **payday loan** agreements in California and Texas. In those states, over 99 percent of storefront locations include arbitration clauses in their agreements.
- **88 percent:** Among **mobile wireless** providers who authorize third parties to charge consumers for services, 88 percent of the largest carriers include arbitration clauses. Those providers cover over 99 percent of the market.

<u>Overview</u>
Arbitration is a way to resolve disputes outside the court system. In recent years, many contracts for consumer financial products and services have included a "pre-dispute arbitration clause" stating that either party can require that disputes that may arise about that product or service be resolved through arbitration, rather than through the court system. Where such a clause exists, either side can generally block lawsuits, including class actions, from proceeding in court.

The Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) mandates that the CFPB conduct a study on the use of pre-dispute arbitration clauses in consumer financial markets. The Dodd-Frank Act also prohibits the use of arbitration clauses in mortgage contracts. And it gives the Bureau the power to issue regulations on the use of arbitration clauses in other consumer finance markets if the Bureau finds that doing so is in the public interest and for the protection of consumers, and if findings in such a rule are consistent with the results of the Bureau's study.

The Bureau first launched a public inquiry on arbitration clauses in April 2012 and released preliminary research in December 2013. Today's report uses a careful analysis of empirical evidence, including consumer contracts and court data, to understand the resolution of consumer finance disputes – both in arbitration and in the courts. The CFPB studied arbitration clauses in a number of different consumer finance markets that have the largest number of consumers, including credit cards and checking accounts.

<u>Report Findings</u>

Based on CFPB research into arbitration clauses in six different consumer finance markets, the report found that:

**Consumers filed roughly 600 arbitration cases and 1,200 individual federal lawsuits on average each year in the markets studied:** The CFPB's review of case data from the leading arbitration administrator indicates that between 2010 and 2012, across six different consumer finance markets, 1,847 arbitration disputes were filed. More than 20 percent of these cases may have been filed by companies, rather than consumers. During this same period, consumers filed 3,462 individual lawsuits in federal court about consumer finance disputes in five of these markets.

- **Many arbitration filings involved only a debt dispute:** Forty percent of the arbitration filings the CFPB studied involved only a dispute about the amount of debt the consumer owed the company – and no affirmative claims by the consumer regarding particular conduct by the company. In another 29 percent of cases, the consumer disputed the debt and also challenged conduct by the company.

- **Few cases involve small claims:** There were only on average about 8 cases per year involving a debt dispute of $1,000 or less and only about 25 cases per year involving an affirmative claim of $1,000 or less.

- **Some arbitration cases resulted in relief and debt forbearance for consumers:** In the 1,060 arbitration cases filed with the American Arbitration Association (AAA) in 2010 and 2011, 341 resulted in decisions by arbitrators. Consumers obtained relief from arbitrators on affirmative claims in 32 cases and obtained debt forbearance in 46 cases. The total amount of relief and debt forbearance consumers obtained in all of these cases combined was under $400,000. Companies obtained decisions requiring consumers to pay $2.8 million in cases filed during this same time period, predominantly for disputed debts.

- **Few consumer lawsuits went to trial:** Almost all the lawsuits the CFPB studied ended in a settlement or in a resolution consistent with a settlement, such as a withdrawal of claims. Only two individual cases went to trial. No class cases went to trial. In the sample of cases the Bureau analyzed, consumers obtained just under $1 million in damages in the few individual cases that were decided by judges.

**By contrast, on average, roughly 32 million consumers were eligible for relief through class action settlements in federal court each year:** Bureau research across consumer finance markets generally found that larger numbers of consumers are eligible for financial redress through class action settlements than through arbitration or individual lawsuits. At least 160 million class members were eligible for relief in federal consumer finance class actions over the five-year period studied. The settlements totaled $2.7 billion in cash, in-kind relief, expenses, and fees – with roughly 18 percent of

**JA177**

that going to attorneys' fees and expenses. Further, these figures do not include the potential value to consumers of companies changing their behavior. In the cases for which data was available, at least $1.1 billion was paid or scheduled to be paid to at least 34 million consumers.

- **An average of at least $220 million per year was paid out to consumers from these settlements**: The Bureau was able to obtain settlement payment data for more than 55 percent of the cases it studied, including all of the large cases. In over 100 of these settlements, payments were made to affected consumers automatically, without those consumers having to submit claims forms in order to receive relief. In those cases, over $700 million was paid to class members. The Bureau was able to obtain data on payments for roughly another 125 settlements in which consumers were required to make claims. In those cases, almost $325 million was paid to consumers according to documents the CFPB reviewed. In another roughly 25 settlements, some money was paid automatically and some in response to claims. In those cases over $60 million was paid through these combined methods. In other words, the total payout in these cases was at least $1.1 billion for an average of $220 million per year. Cash payments covered a minimum of 34 million consumers, or an average of 6.8 million consumers per year.

- **For checking accounts alone, class action settlements over three years totaled over $600 million for at least 19 million consumers:** In the checking account market, from 2010 to 2012 – the same years covered by the Bureau's review of arbitration cases and individual lawsuits – six class settlements were approved in a single proceeding involving the overdraft practices of a number of banks. Those six settlements totaled close to $600 million and covered over 19 million consumers. In contrast, there were a total of 72 arbitration disputes filed with the AAA involving checking accounts during this period and 137 individual cases filed in federal courts.

**Arbitration clauses can act as a barrier to class actions:** By design, arbitration clauses can be used to block class actions in court. The CFPB found that it is uncommon for a company to try to force an individual lawsuit into arbitration but common for arbitration clauses to be invoked to block class actions. For example, in cases where credit card issuers with an arbitration clause were sued in a class action, the companies invoked the arbitration clause to block class actions 65 percent of the time. Of the 1,200 individual lawsuits the CFPB examined that were filed between 2010 and 2012, companies invoked arbitration less than one percent of the time.

- **Most arbitration agreements prohibit class arbitrations:** Over 90 percent of the arbitration agreements the CFPB studied expressly prohibited class arbitrations. Those that did not have this express prohibition were from smaller companies that together represented 3 percent or less of their markets.

- **Class arbitrations were minimal:** Only two class arbitrations were filed with the AAA between 2010 and 2012. One was not pursued at all and the other had a motion to dismiss pending as of September 2014.

**No evidence of arbitration clauses leading to lower prices for consumers:** The CFPB looked at whether companies that include arbitration clauses in their contracts offer lower prices because they are not subject to class action lawsuits. The CFPB analyzed changes in the total cost of credit paid by consumers of some credit card companies that eliminated their arbitration clauses and of other companies that made no change in their use of arbitration provisions. The CFPB found no statistically significant

evidence that the companies that eliminated their arbitration clauses increased their prices or reduced access to credit relative to those that made no change in their use of arbitration clauses.

**Three out of four consumers surveyed did not know if they were subject to an arbitration clause:** The CFPB surveyed credit card consumers to analyze the extent to which they were aware of, and understood, arbitration agreements. Over three quarters of those who said they understood what arbitration is acknowledged they did not know whether their credit card agreement contained an arbitration clause. Of those who thought they did know, more than half were incorrect about whether their agreement actually contained an arbitration clause. Among consumers whose contract included an arbitration clause, fewer than 7 percent recognized that they could not sue their credit card issuer in court.

- **Consumers do not consider arbitration clauses while credit card shopping:** In selecting a credit card, consumers do not consider whether there is an arbitration clause. When asked to list all the factors they had considered in choosing their current credit card, not a single consumer mentioned arbitration or dispute resolution as factoring in the decision.

### ###

*The Consumer Financial Protection Bureau is a 21st century agency that helps consumer finance markets work by making rules more effective, by consistently and fairly enforcing those rules, and by empowering consumers to take more control over their economic lives. For more information, visit consumerfinance.gov.*

E-FILED; Charles District Court
Docket: 10/21/2022 12:39 PM; Submission: 10/21/2022 12:39 PM

[ ] Mark this box if this form contains Restricted Information. NOTE: Any part of a Social Security Number is Restricted Information per Md. Rule 16-915(e).

P116

**Exhibit 2**

# DISTRICT COURT OF MARYLAND FOR CHARLES COUNTY

**LOCATED AT (COURT ADDRESS)**
11 Washington Avenue
La Plata, MD 20646

CASE NO.
**D-042-CV-22-010460**

## PARTIES

Plaintiff
Velocity Investments, LLC assignee of CreditShop Credit Card Company
LLC assignee of First Bank & Trust assignee of Barclay Bank Delaware
1800 PTE 34 N A103 Ʇ505 WALL N103749  Our File No. K627751

**VS.**

Defendant(s):

1. ANGELITA BAILEY
   1140 HERITAGE PL APT B
   WALDORF MD 20602-1829

   Serve by:
   ☐ Certified Mail
   ☐ Private Process
   ☐ Constable
   ☒ Sheriff

2. 
   Serve by:
   ☐ Certified Mail
   ☐ Private Process
   ☐ Constable
   ☐ Sheriff

3. 
   Serve by:
   ☐ Certified Mail
   ☐ Private Process
   ☐ Constable
   ☐ Sheriff

## ATTORNEYS

For Plaintiff - Name, Address & Telephone Number & Code
Philip J. Collins, MD#2272/ CPF #8912180122
Protas, Spivok & Collins, LLC
4330 East West Highway, Suite 900,
Bethesda, Maryland 20814-4454
Phone (301) 469-3636          Fax (301) 469-3601
E-mail: pcollins@psclaw.net

### COMPLAINT-ASSIGNED CONSUMER DEBT
### MD  Rule 3-306(d)

☐$5,000 or under  ☒over $5,000  ☐over $10,000

The particulars of this case are:

1. Plaintiff as assignee of the original creditor, sues the Defendant for the balance due and owing for an overdue credit card debt as appears in the attached exhibits incorporated herein as if fully set forth.

[ ] I am interested in trying to resolve this dispute through mediation/ADR. (You will be contacted about ADR services after the defendant is served.)

☐(See Continuation Sheet)
The plaintiff claims $5,380.10 plus interest of $0.00
Interest at the ☒ legal rate ☐ contractual rate calculated at _____%
from _____ to _____ ( _____ days x _____ per day)
   Date          Date
Interest: $.00
Total Principal + Interest: $5,380.10
Plus attorney's fees of _____ plus court costs.

_____
   MD#2272/ CPF #8912180122
Signature of Plaintiff/Attorney/Attorney Code  Attorney Number

Printed Name: Philip J. Collins, Protas, Spivok & Collins, LLC
Address: 4330 East West Highway, Suite 900
Bethesda, Maryland 20814-4454
Telephone number: (301) 469-3636
Fax: (301) 469-3601
E-mail: pcollins@psclaw.net
**MILITARY SERVICE AFFIDAVIT**
☐Defendant(s) _____ is/are in the military service
☒ No defendant is in the military service. The facts supporting this statement are: Plaintiff has conducted a check with the Servicemembers Civil Relief Act (SCRA) and no Defendant is listed as a member of the military service.
Require facts must be given for the Court to conclude that each Defendant who is a natural person is not in the military.
☐I am unable to determine whether or not any Defendant is in military service. [ ] Verified through DOD at: http://scra.dmdc.osd.mil/
I hereby declare or affirm under the penalties of perjury that the facts and matters set forth in the aforegoing Affidavit are true and correct to the best of my knowledge, information, and belief.
Date: July 21, 2022

Signature of Affiant: _____
   Philip J. Collins, MD#2272/ CPF #8912180122
   Type or Print Name

## APPLICATION AND AFFIDAVIT IN SUPPORT OF JUDGMENT AND ASSIGNED CONSUMER CHECKLIST
(See Plaintiff Notice on Back Page)
I HEREBY CERTIFY that (1) I am the ☐ plaintiff or _____ of the plaintiff herein and I am competent to testify to the matters stated in the complaint and in this affidavit and checklist, which are made on my personal knowledge, (2) that the plaintiff is the owner of the debt(s) which is/are the subject of this case, (3) that there is justly due and owing by the defendant to the plaintiff the amount(s) set forth in the complaint, and (4) the claim is filed within the statue of limitations.
The following information is provided as required by Rule 3-306(d):
☒ **1. PROOF OF THE EXISTENCE OF THE DEBT OR ACCOUNT - Rule 3-306 (d)(1) (Exhibit #___1_____)**
Certified or properly authenticated:
   ☐ Document signed by the defendant evidencing the debt or opening of account; or
   ☒ Bill or other record reflecting purchases, payments, or other use of credit card or account by the defendant; or
   ☐ Electronic printout or documentation from the original creditor establishing the account and showing activity by the defendant.

DC-CV-106 (Rev. 11/2021)          Page 1 of 2

**1**

Pg: 183 of 308     Filed: 03/08/2024     Doc: 19     USCA4 Appeal: 23-2133

P116-2

MDEC counties only : If this submission contains Restricted Information (confidential by statute, rule or court order) you must file a Notice Regarding Restricted Information Pursuat to Rule 20-2-1.1 (form MDJ-008) with submission and check the Restricted Information box on this form.

Case No. _____

Velocity Investments, LLC assignee of CreditShop Credit Card
Company LLC assignee of First Bank & Trust assignee of Barclay
Bank Delaware                                    vs.   ANGELITA BAILEY
_____
Plaintiff                                                                    Defendant(s)

[X] **2. PROOF OF TERMS AND CONDITIONS - Rule 3-306(d)(2) (Exhibit # _____ )**

    [ ] Certified or properly authenticated photocopy or original document showing the terms and conditions of the consumer debt.

    [X] Does not apply because the consumer debt is an unpaid balance due on a credit card, the original creditor is or was a financial institution subject to regulation by the Federal Financial Institutions Examination Council or a constituent federal agency of that Council, and the claim does not include a demand or request for attorneys' fees or interest on the charge-off balance in excess of the Maryland Constitutional rate of six percent per annum.

[X] **3. PROOF OF THE PLAINTIFF'S OWNERSHIP - Rule 3-306 (d)(3) (Exhibit # 2)**
Chronological list of names of all prior owners of the debt and date of each transfer (begin with original):

| Name and Date | | Name and Date |
|---|---|---|
| Barclay Bank Delaware | March 24, 2017 | Velocity Investments, LLC |
| First Bank & Trust | November 9, 2017 | |
| CreditShop, Inc. | October 13, 2020 | |

    [X] Certified or properly authenticated copy of the bill of sale or other document transferring ownership to each successive owner.

[X] **4. IDENTIFICATION AND NATURE OF DEBT OR ACCOUNT -Rule 3-306 (d)(4)**

| Name of Original Creditor | Full Name of Defendant On Original Account | Last 4 Digits of SSN | Last 4 digits of Orig. Acct.# | Type of Transaction (utility, credit card, consumer loan, etc.) |
|---|---|---|---|---|
| Barclay Bank Delaware | ANGELITA BAILEY | ▓▓▓▓ | 9947 | Credit Card |

[ ] **5. FUTURE SERVICE CONTRACT INFORMATION - Rule 3-306 (d)(5)**
Include facts showing the plaintiff is currently entitled to an award of damage under the contract:
_____
_____

[X] **6. CHARGED OFF ACCOUNTS: ACCOUNT CHARGE-OFF INFORMATION - Rule 3-306 (d)(6) (Exhibit # 3 _____)**
    [X] Date of the Charge-off:  September 28, 2020    [X] Charge-off Balance:  $5,380.10
    [ ] Additional fees or charges: _____
    [ ] Post charge-off payments and credits: _____
    [X] Date of the last payment on debt or last transaction giving rise to the debt: January 31, 2020

[ ] **7. DEBTS AND ACCOUNTS NOT CHARGED-OFF - Rule 3-306 (d)(7) (Exhibit # _____ )**
    [ ] Itemized list of all money claimed including principal, interest, finance charges, service charges, late fees, and other fees or charges added to principal by plaintiff:
_____
    [ ] Amount and date of the consumer transaction causing the debt, or for multiple transactions, the amount and date of the last transaction:
    [ ] Statement of the amount and date of the last payment on the debt: _____

[X] **8. LICENSING INFORMATION - Rule 3-306 (d)(8)**  List all Maryland collection agency licenses the plaintiff currently holds:

| Name of Collection Agency | License Number | Name on License | Date of Issue |
|---|---|---|---|
| Velocity Investments, LLC | 4254 | Velocity Investments, LLC | August 16, 2007 |
| | | | |
| | | | |
| | | | |

[ ] (See Continuation Sheet)
I solemnly affirm under the penalties of perjury and upon personal knowledge that the contents of this affidavit and checklist are true and correct.

_____          _____
Date                                               Signature of Affiant

PO Box 788 Wall NJ 07719          Alia Rivera
_____          _____
Address                                            Printed Name

732 556 9090                              Compliance Associate
_____          _____
Telephone Number                              Title / Capacity

DC-CV-106  (Rev. 11/2021)                    Page 2 of 2 (front)                    **2**

Pg: 184 of 308   Filed: 03/08/2024   Doc: 19   USCA4 Appeal: 23-2133

**NOTICE OF INTENT TO OFFER BUSINESS RECORDS INTO EVIDENCE**          P116-B

Plaintiff, by its attorneys, pursuant to Md. Rules 5-902(b) and 5-803(b)(6), hereby provides notice of its intent to offer the attached business records into evidence at the trial of this matter.

Respectfully submitted,

Philip J. Collins, MD#2272/ CPF #8912180122
Protas, Spivok & Collins, LLC
4330 East West Highway, Suite 900,
Bethesda, Maryland 20814-4454
(301) 469-3636                    Fax (301) 469-3601
E-mail: pcollins@psclaw.net
Attorney for Plaintiff

**CERTIFICATION OF CUSTODIAN OF RECORDS OR OTHER QUALIFIED INDIVIDUAL**

I, do hereby certify that:

1. I am the Custodian of Records of or am otherwise qualified to administer the records for Velocity Investments, LLC assignee of CreditShop Credit Card Company LLC assignee of First Bank & Trust assignee of Barclay Bank Delaware, Account Number ▓▓▓▓9947 .

2. That said account is in the name of ANGELITA BAILEY at

1140 HERITAGE PL APT B

WALDORF MD 20602-1829

3. The attached records a) are true and correct copies of records that were made at or near the time of the occurrence of the matters set forth, by or from information transmitted by, a person with knowledge of these matters; and b) were kept in the course of the regularly conducted activity; and c) were made and kept by the regularly conducted business activity as a regular practice.

4. Attached are documents that reflect the account between Velocity Investments, LLC assignee of CreditShop Credit Card Company LLC assignee of First Bank & Trust assignee of Barclay Bank Delaware and ANGELITA BAILEY, and the amount due of $5,380.10.

I declare under the penalty of perjury that the foregoing is true and correct.

Velocity Investments, LLC assignee of CreditShop Credit Card Company LLC assignee of First Bank & Trust assignee of Barclay Bank Delaware

Signature: _____          Dated: _____9/28/2020_____

By: _____Rita Rivera_____

Title: _____Compliance Associate_____

3

Pg: 185 of 308          Filed: 03/08/2024          Doc: 19          USCA4 Appeal: 23-2133

USCA4 Appeal: 23-2133      Doc: 19      Filed: 03/08/2024      Pg: 186 of 308

4

E-FILED; Charles District Court
Docket: 10/21/2022 12:39 PM; Submission: 10/21/2022 12:39 PM

Department of Defense Manpower Data Center

Results as of : Oct-10-2022 03:37:41 PM

SCRA 5.15



**Status Report**
**Pursuant to Servicemembers Civil Relief Act**

SSN:

Birth Date:

Last Name:    BAILEY

First Name:    ANGELITA

Middle Name:

Status As Of:    Oct-10-2022

Certificate ID:    G0KNZ2CHKRSG0BX

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

*Michael V. Sorrento*

Michael V. Sorrento, Director
Department of Defense - Manpower Data Center
400 Gigling Rd.
Seaside, CA  93955

5

**JA184**

USCA4 Appeal: 23-2133          Doc: 19          Filed: 03/08/2024          Pg: 188 of 308

6

E-FILED; Charles District Court
Docket: 10/21/2022 12:39 PM; Submission: 10/21/2022 12:39 PM

# MERCURY

Page 1 of 4

Account Number XXXX XXXX XXXX 9947

August 05, 2020 - September 04, 2020

## PAYMENT INFORMATION

| | |
|---|---|
| New Balance | **$5,380.10** |
| Minimum Payment Due | **$1,068.27** |
| Payment Due Date | **10/01/2020** |

**Late Payment Warning:**
If we do not receive your minimum payment by the date listed above, you may have to pay a late fee up to $37.00.

**Minimum Payment Warning:**
If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance.  For example:

| If you make no additional charges using this card and each month you pay ... | You will pay off the balance shown on this statement in about ... | And you will end up paying an estimated total of ... |
|---|---|---|
| Only the Minimum Payment | 21 years | $9,414.00 |

If you would like information about credit counseling services, call 866-686-2158.

## SUMMARY OF ACCOUNT ACTIVITY

| | | |
|---|---|---|
| Previous Balance | | $5,287.86 |
| Payments | - | $0.00 |
| Other Credits | - | $0.00 |
| Purchases and Adjustments | + | $0.00 |
| Balance Transfers | + | $0.00 |
| Cash Advances | + | $0.00 |
| **Fees Charged** | + | **$37.00** |
| **Interest Charged** | + | **$55.24** |
| **New Balance** | | **$5,380.10** |
| Statement End Date | | September 04, 2020 |
| Days in Billing Cycle | | 31 |
| **Past Due** | | **$923.15** |
| **Overlimit** | | **$130.10** |

## CREDIT LINE SUMMARY

| | |
|---|---|
| Total Credit Line | $0.00 |
| Credit Line for Cash | $0.00 |
| Total Available Credit | $0.00 |
| Available Credit for Cash | $0.00 |

**Pay Online, Mobile, Phone or Mail**

 **Online** mercurycards.com    **Mobile App** In your favorite app store    **Phone** 866-686-2158    **Mail** PO BOX 70168 Philadelphia PA 19176-0168



For correspondence only: Customer Service, PO BOX 84064, Columbus GA 31908-4064

Your account is now seven payments past due. Please contact us at (844)325-5884 to discuss your options.

## FEES

| | | | |
|---|---|---|---|
| 09/01 | 09/01 | Late Fee | $37.00 |
| | | **Total Fees for this Period** | **$37.00** |

Please tear at perforation and make payment payable to Card Services.  **SEE REVERSE FOR IMPORTANT INFORMATION.**

---

# MERCURY

CARD SERVICES
PO BOX 84064
COLUMBUS GA  31908-4064

☐ Check here for any address changes and indicate any changes on reverse.

ANGELITA BAILEY
1140 HERITAGE PL APT B
WALDORF MD  20602-1829

** 0004174

Payment To

| | |
|---|---|
| Account Ending | 9947 |
| New Balance | $5,380.10 |
| Minimum Payment Due | $1,068.27 |
| Payment Due Date | 10/01/20 |
| Amount Enclosed | |

CARD SERVICES
PO BOX 70168
PHILADELPHIA PA  19176-0168

7

Pg: 189 of 308

Filed: 03/08/2024

Doc: 19

USCA4 Appeal: 23-2133

Filed: 03/08/2024   Pg: 190 of 308

Doc: 19   USCA4 Appeal: 23-2133

Page 2 of 4

Angelita Bailey                                                                 Closing Date   09/04/2020

**Payments:** You may pay all or part of your Account balance, at any time. However, you must pay at least the Minimum Payment Due by the Payment Due Date each Billing Period. We cannot accept wire transfers or payments that are electronically transmitted directly to us using our bank routing number. If you are enrolled in automatic payments (AutoPay), we reserve the right to cancel enrollment without prior notice. Please do not send post-dated checks as they will be deposited upon receipt. Late payments, partial payments or payments marked "payment in full" or with any other restrictive endorsement can be accepted by us without losing any of our rights under your Cardmember Agreement. We may re-present to your financial institution any payment that is returned unpaid. We may delay increasing your available credit by the amount of any payment that we receive for up to 10 Business Days.

**When Your Mailed Payment Will be Credited.**   If we receive your mailed payment in proper form at the proper address by 5 p.m. Eastern Time, on a Business Day, it will be credited as of that day. A payment received there in proper form after that time will be credited as of the next Business Day. If the payment due date falls on a day when we do not receive or accept payments, the payment will not be treated as late if it is credited the next Business Day. Business Day means Monday through Friday, excluding federal holidays. Allow at least 7 days for payments by regular mail to reach us. There may be a delay of up to 5 days in crediting a payment we receive that is not in proper form or not sent to the correct address. The correct address for regular mail is the 'Payment to' address on the front of the payment coupon. The correct address for express mail is Lockbox Services, Box #70168, 400 White Clay Center Dr, Newark, DE 19711.

**Proper Form:** For a payment sent by regular or express mail, proper form is a single check or money order, in U.S. dollars, drawn on a U.S. institution, with a single payment coupon from your billing statement. Include your name and the last four digits of your Account number. Unless sent by express mail, please use the envelope we provided. No cash or foreign currency. No staples or paper clips. No extra pieces of paper.

**Payment online, by phone or mobile:** Payments made through our website, www.mercurycards.com, through the phone number shown on the front of your statement, or through our mobile app,and completed on a Business Day by midnight Eastern Time, will be credited as of that day. Otherwise, it will be credited on the next Business Day.

**Electronic Check Conversion:** When you provide a check as payment on this Account, you authorize us to use information from your check to make a one-time electronic fund transfer from your bank account or to process the payment as a check transaction. When we use information from your check to make an electronic fund transfer, funds may be withdrawn from your bank account on the same day we receive your payment, and you will not receive your check back from your financial institution.

**How to Avoid Paying Interest on Purchases:**   Your due date is at least 23 days after the close of each Billing Period. You will not be charged interest on Purchases in a Billing Period in which you pay the New Balance in full by the Payment Due Date.   If you don't pay your New Balance in full by the Payment Due Date in a Billing Period, you'll pay interest on existing Purchases, and new Purchases in that billing period, from the date they post to your Account, subject to applicable law. You will pay interest on Balance Transfers and Cash Advances from the date these Transactions post to your Account.

**How We Calculate Interest:** We calculate interest separately for each different balance. Your billing statement shows each balance in the "Balance Subject to Interest Rate." We use the "**Daily Balance Method** (including Current Transactions)." For each balance, to determine a daily balance, we start with the beginning balance each day. The beginning balance for the first day of the Billing Period is the balance at the end of the prior Billing Period. Each day, we add any new transactions and fees; subtract any payments or credits applied to that balance; and make other adjustments. We add Balance Transfer fees to the applicable Balance Transfer balance. We add Cash Advance Fees to the applicable Cash Advance balance. We generally add other fees to the standard Purchase balance.We add any interest calculated on the previous day's balance. (This means interest is compounded daily). A credit balance is treated as a balance of zero. This gives us the daily balance. We multiply each daily balance by the applicable daily periodic rate. We do this for each day in the billing period. The Balance Subject to Interest Rate is the average of the daily balances.

**Variable rates:** vary with the market based on the Prime Rate.

**Credit Reporting:** We may report information about your Account to credit bureaus. Late payments, missed payments, or other defaults on your Account may be reflected in your credit report. If you think we reported inaccurate information to a credit bureau, write to us Card Services - Dispute Resolution, PO Box 84064, Columbus, GA 31908-4064.

**Change of Address** : If the information on the front of this statement is incorrect, please provide updated information:

Name: _____

Address: _____

City: _____   State: _____   Zip: _____

| Home Phone Number: | Work Phone Number: | Cell Phone Number: |
|---|---|---|

**8**

By giving us your mobile telephone number, we have your permission to contact you at that number regarding all accounts you have with us. Your consent allows us to use text messaging, artificial or prerecorded voice messages and automatic dialing technology for informational and account service calls, but not for telemarketing or sales calls. It may include calls from companies working on our behalf to service your account. Message and data rates may apply.

**JA187**

Closing Date 09/04/2020



## INTEREST CHARGED

| | | | |
|---|---|---|---:|
| 09/04 | 09/04 | Interest Charge-Purchases | $55.24 |
| | | **Total Interest for this Period** | **$55.24** |

## 2020 TOTALS YEAR-TO-DATE

| | |
|---|---:|
| Total Fees charged in 2020 | $249.00 |
| Total Interest charged in 2020 | $476.30 |

## INTEREST CHARGE CALCULATION

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|
| Purchase | 12.24%(v) | $5,319.31 | $55.24 |
| Balance Transfer | 12.24%(v) | $0.00 | $0.00 |
| Cash Advance | 13.00%(v) | $0.00 | $0.00 |

(v) = variable rate

Enroll in AutoPay to ensure your payment is made by the due date each month. Simply log in to www.mercurycards.com and select Set Up AutoPay to enroll today.

Pg: 191 of 308

Filed: 03/08/2024

Doc: 19

USCA4 Appeal: 23-2133

9

Angelita Bailey                                                                                          Closing Date   09/04/2020

**How to Report a Lost or Stolen Card:**  Call the Contact Us number on the front of this statement.

**What To Do If You Think You Find A Mistake On Your Statement**
If you think there is an error on your statement, write to us at Card Services - Dispute Resolution, PO Box 84064, Columbus, GA  31908-4064.

In your letter, give us the following information:
- *Account information:* Your name and Account number.
- *Dollar amount:* The dollar amount of the suspected error.
- *Description of problem:* If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us within 60 days after the error appeared on your statement.

You must notify us of any potential errors *in writing* at Card Services - Dispute Resolution, PO Box 84064, Columbus, GA  31908-4064.

While we investigate whether or not there has been an error, the following are true:
- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount.  But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit limit.

**Your Rights If You Are Dissatisfied With Your Credit Card Purchases**
If you are dissatisfied with the goods or services that you have purchased with your credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the Purchase.

To use this right, all of the following must be true:
1. The Purchase must have been made in your home state or within 100 miles of your current mailing address, and the Purchase price must have been more than $50. (*Note:* Neither of these is necessary if your Purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services.)
2. You must have used your credit card for the Purchase. Purchases made with Cash Advances from an ATM or with a Check that accesses your credit card Account do not qualify.
3. You must not yet have fully paid for the Purchase.

If all of the criteria above are met and you are still dissatisfied with the Purchase, contact us *in writing* at Card Services - Dispute Resolution, PO Box 84064, Columbus, GA  31908-4064.

While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay we may report you as delinquent.

**Customer Service Address:**  Card Services, PO Box 84064, Columbus, GA 31908-4064.

USCA4 Appeal: 23-2133      Doc: 19      Filed: 03/08/2024      Pg: 192 of 308

10

# MERCURY

Page 1 of 4

Account Number XXXX XXXX XXXX 9947

July 05, 2020 - August 04, 2020

## PAYMENT INFORMATION

| | |
|---|---|
| New Balance | $5,287.86 |
| Minimum Payment Due | $923.15 |
| Payment Due Date | 09/01/2020 |

**Late Payment Warning:**
If we do not receive your minimum payment by the date listed above, you may have to pay a late fee up to $37.00.

**Minimum Payment Warning:**
If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance. For example:

| If you make no additional charges using this card and each month you pay ... | You will pay off the balance shown on this statement in about ... | And you will end up paying an estimated total of ... |
|---|---|---|
| Only the Minimum Payment | 21 years | $9,376.00 |

If you would like information about credit counseling services, call 866-686-2158.

## SUMMARY OF ACCOUNT ACTIVITY

| | | |
|---|---|---|
| Previous Balance | | $5,196.60 |
| Payments | - | $0.00 |
| Other Credits | - | $0.00 |
| Purchases and Adjustments | + | $0.00 |
| Balance Transfers | + | $0.00 |
| Cash Advances | + | $0.00 |
| **Fees Charged** | + | $37.00 |
| **Interest Charged** | + | $54.26 |
| **New Balance** | | **$5,287.86** |
| Statement End Date | | August 04, 2020 |
| Days in Billing Cycle | | 31 |
| **Past Due** | | **$779.92** |
| **Overlimit** | | **$37.86** |

## CREDIT LINE SUMMARY

| | |
|---|---|
| Total Credit Line | $0.00 |
| Credit Line for Cash | $0.00 |
| Total Available Credit | $0.00 |
| Available Credit for Cash | $0.00 |

**Pay Online, Mobile, Phone or Mail**

 **Online** mercurycards.com

 **Mobile App** In your favorite app store

 **Phone** 866-686-2158

✉ **Mail** PO BOX 70168 Philadelphia PA 19176-0168

For correspondence only: Customer Service, PO BOX 84064, Columbus GA 31908-4064

Your account is now six payments past due. Contact us immediately at www.mercurycards.com or (844)325-5884 before your account is charged off for non-payment.

---

Please tear at perforation and make payment payable to Card Services. **SEE REVERSE FOR IMPORTANT INFORMATION.**

# MERCURY

CARD SERVICES
PO BOX 84064
COLUMBUS GA 31908-4064

☐ Check here for any address changes and indicate any changes on reverse.

| | |
|---|---|
| Account Ending | 9947 |
| New Balance | $5,287.86 |
| Minimum Payment Due | $923.15 |
| Payment Due Date | 09/01/20 |
| Amount Enclosed | _____ |

ANGELITA BAILEY
1140 HERITAGE PL APT B
WALDORF MD  20602-1829

** 0001696

Payment To

CARD SERVICES
PO BOX 70168
PHILADELPHIA PA 19176-0168

11

Pg: 193 of 308
Filed: 03/08/2024
Doc: 19
USCA4 Appeal: 23-2133

Angelita Bailey

Closing Date  08/04/2020



**FEES**

| | | | |
|---|---|---|---|
| 08/03 | 08/03 | Late Fee | $37.00 |
| | | **Total Fees for this Period** | **$37.00** |

**INTEREST CHARGED**

| | | | |
|---|---|---|---|
| 08/04 | 08/04 | Interest Charge-Purchases | $54.26 |
| | | **Total Interest for this Period** | **$54.26** |

**2020 TOTALS YEAR-TO-DATE**

| | |
|---|---|
| Total Fees charged in 2020 | $212.00 |
| Total Interest charged in 2020 | $421.06 |

**INTEREST CHARGE CALCULATION**

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|
| Purchase | 12.24%(v) | $5,225.20 | $54.26 |
| Balance Transfer | 12.24%(v) | $0.00 | $0.00 |
| Cash Advance | 13.00%(v) | $0.00 | $0.00 |

(v) = variable rate

Enroll in AutoPay to ensure your payment is made by the due date each month. Simply log in to www.mercurycards.com and select Set Up AutoPay to enroll today.

Pg: 194 of 308

Filed: 03/08/2024

Doc: 19

USCA4 Appeal: 23-2133

12

# MERCURY

Page 1 of 4

Account Number XXXX XXXX XXXX 9947

June 05, 2020 - July 04, 2020

## PAYMENT INFORMATION

| | |
|---|---|
| New Balance | **$5,196.60** |
| Minimum Payment Due | **$779.92** |
| Payment Due Date | **08/01/2020** |

**Late Payment Warning:**
If we do not receive your minimum payment by the date listed above, you may have to pay a late fee up to $37.00.

**Minimum Payment Warning:**
If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance.  For example:

| If you make no additional charges using this card and each month you pay ... | You will pay off the balance shown on this statement in about ... | And you will end up paying an estimated total of ... |
|---|---|---|
| Only the Minimum Payment | 21 years | $9,337.00 |

If you would like information about credit counseling services, call 866-686-2158.

## SUMMARY OF ACCOUNT ACTIVITY

| | | |
|---|---|---|
| Previous Balance | | $5,107.97 |
| Payments | - | $0.00 |
| Other Credits | - | $0.00 |
| Purchases and Adjustments | + | $0.00 |
| Balance Transfers | + | $0.00 |
| Cash Advances | + | $0.00 |
| **Fees Charged** | + | **$37.00** |
| **Interest Charged** | + | **$51.63** |
| **New Balance** | | **$5,196.60** |
| Statement End Date | | July 04, 2020 |
| Days in Billing Cycle | | 30 |
| | | |
| **Past Due** | | **$640.21** |

## CREDIT LINE SUMMARY

| | |
|---|---|
| Total Credit Line | $0.00 |
| Credit Line for Cash | $0.00 |
| Total Available Credit | $0.00 |
| Available Credit for Cash | $0.00 |

## CONTACT US

**Call:** 866-686-2158      **Online:** WWW.MERCURYCARDS.COM

**Mail:** CARD SERVICES, PO BOX 84064, COLUMBUS, GA 31908-4064

Your account is now five payments past due. Log in to your account at www.mercurycards.com to choose a repayment plan that fits your needs, or call us at (844)325-5884.

## FEES

| | | | |
|---|---|---|---|
| 07/01 | 07/01 | Late Fee | $37.00 |
| | | **Total Fees for this Period** | **$37.00** |

Please tear at perforation and make payment payable to Card Services.  SEE REVERSE FOR IMPORTANT INFORMATION.

# MERCURY

CARD SERVICES
PO BOX 84064
COLUMBUS GA 31908-4064

| | |
|---|---|
| Account Ending | 9947 |
| New Balance | $5,196.60 |
| Minimum Payment Due | $779.92 |
| Payment Due Date | 08/01/20 |
| Amount Enclosed | |

☐ Check here for any address changes and indicate any changes on reverse.

ANGELITA BAILEY
1140 HERITAGE PL APT B
WALDORF MD  20602-1829

** 0004508

Payment
To

CARD SERVICES
PO BOX 70168
PHILADELPHIA PA  19176-0168

13

JA192



Page 3 of 4

Angelita Bailey

Closing Date  07/04/2020

## INTEREST CHARGED

| | | | |
|---|---|---|---|
| 07/03 | 07/03 | Interest Charge-Purchases | $51.63 |
| | | **Total Interest for this Period** | **$51.63** |

## 2020 TOTALS YEAR-TO-DATE

| | |
|---|---|
| Total Fees charged in 2020 | $175.00 |
| Total Interest charged in 2020 | $366.80 |

## INTEREST CHARGE CALCULATION

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|
| Purchase | 12.24%(v) | $5,137.81 | $51.63 |
| Balance Transfer | 12.24%(v) | $0.00 | $0.00 |
| Cash Advance | 13.00%(v) | $0.00 | $0.00 |

(v) = variable rate

Enroll in AutoPay to ensure your payment is made by the due date each month. Simply log in to www.mercurycards.com and select Set Up AutoPay to enroll today.

Pg: 196 of 308

Filed: 03/08/2024

Doc: 19

USCA4 Appeal: 23-2133

14

JA193

# MERCURY

Page 1 of 4

Account Number XXXX XXXX XXXX 9947

May 05, 2020 - June 04, 2020

## PAYMENT INFORMATION

| | |
|---|---|
| New Balance | **$5,107.97** |
| Minimum Payment Due | **$640.21** |
| Payment Due Date | **07/01/2020** |

**Late Payment Warning:**
If we do not receive your minimum payment by the date listed above, you may have to pay a late fee up to $37.00.

**Minimum Payment Warning:**
If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance.  For example:

| If you make no additional charges using this card and each month you pay ... | You will pay off the balance shown on this statement in about ... | And you will end up paying an estimated total of ... |
|---|---|---|
| Only the Minimum Payment | 21 years | $9,300.00 |

If you would like information about credit counseling services, call 866-686-2158.

## SUMMARY OF ACCOUNT ACTIVITY

| | | |
|---|---|---|
| Previous Balance | | $5,018.54 |
| Payments | - | $0.00 |
| Other Credits | - | $0.00 |
| Purchases and Adjustments | + | $0.00 |
| Balance Transfers | + | $0.00 |
| Cash Advances | + | $0.00 |
| **Fees Charged** | + | **$37.00** |
| **Interest Charged** | + | **$52.43** |
| **New Balance** | | **$5,107.97** |
| Statement End Date | | June 04, 2020 |
| Days in Billing Cycle | | 31 |
| **Past Due** | | **$500.59** |

## CREDIT LINE SUMMARY

| | |
|---|---|
| Total Credit Line | $5,250.00 |
| Credit Line for Cash | $1,050.00 |
| Total Available Credit | $142.03 |
| Available Credit for Cash | $142.03 |

## CONTACT US

**Call:** 866-686-2158      **Online:** WWW.MERCURYCARDS.COM

**Mail:** CARD SERVICES, PO BOX 84064, COLUMBUS, GA 31908-4064

If you recently missed a payment, we may send you a paper statement, until your account is current, at our sole discretion. If your account is current, you can manage your statement delivery preferences at MercuryCards.com or on the Mercury Mobile App.
Your account is now four payments past due. Find out how we can help at www.mercurycards.com or by calling (844)325-5884.

---

Please tear at perforation and make payment payable to Card Services.  SEE REVERSE FOR IMPORTANT INFORMATION.

# MERCURY

CARD SERVICES
PO BOX 84064
COLUMBUS GA 31908-4064

☐ Check here for any address changes and indicate any changes on reverse.

ANGELITA BAILEY
1140 HERITAGE PL APT B
WALDORF MD  20602-1829

\*\* 0001710

Payment
To

| | |
|---|---|
| Account Ending | 9947 |
| New Balance | $5,107.97 |
| Minimum Payment Due | $640.21 |
| Payment Due Date | 07/01/20 |
| Amount Enclosed | |

CARD SERVICES
PO BOX 70168
PHILADELPHIA PA  19176-0168

15

Page 3 of 4
Angelita Bailey

Closing Date   06/04/2020



| FEES | | | |
|---|---|---|---|
| 06/01 | 06/01 | Late Fee | $37.00 |
| | | **Total Fees for this Period** | **$37.00** |

| INTEREST CHARGED | | | |
|---|---|---|---|
| 06/04 | 06/04 | Interest Charge-Purchases | $52.43 |
| | | **Total Interest for this Period** | **$52.43** |

**2020 TOTALS YEAR-TO-DATE**

| | |
|---|---|
| Total Fees charged in 2020 | $138.00 |
| Total Interest charged in 2020 | $315.17 |

**INTEREST CHARGE CALCULATION**

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|
| Purchase | 12.24%(v) | $5,048.63 | $52.43 |
| Balance Transfer | 12.24%(v) | $0.00 | $0.00 |
| Cash Advance | 13.00%(v) | $0.00 | $0.00 |
| | 0.00% | $0.00 | $0.00 |

(v) = variable rate

Enroll in AutoPay to ensure your payment is made by the due date each month. Simply log in to www.mercurycards.com and select Set Up AutoPay to enroll today.

Pg: 198 of 308

Filed: 03/08/2024

Doc: 19

USCA4 Appeal: 23-2133

16

# MERCURY

Page 1 of 4

Account Number XXXX XXXX XXXX 9947

April 05, 2020 - May 04, 2020

## SUMMARY OF ACCOUNT ACTIVITY

| | | |
|---|---|---|
| Previous Balance | | $4,931.69 |
| Payments | - | $0.00 |
| Other Credits | - | $0.00 |
| Purchases and Adjustments | + | $0.00 |
| Balance Transfers | + | $0.00 |
| Cash Advances | + | $0.00 |
| **Fees Charged** | + | **$37.00** |
| **Interest Charged** | + | **$49.85** |
| New Balance | | $5,018.54 |
| Statement End Date | | May 04, 2020 |
| Days in Billing Cycle | | 30 |
| **Past Due** | | **$364.42** |

## PAYMENT INFORMATION

| | |
|---|---|
| New Balance | **$5,018.54** |
| Minimum Payment Due | **$500.59** |
| Payment Due Date | **06/01/2020** |

Late Payment Warning:
If we do not receive your minimum payment by the date listed above, you may have to pay a late fee up to $37.00.

Minimum Payment Warning:
If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance.  For example:

| If you make no additional charges using this card and each month you pay ... | You will pay off the balance shown on this statement in about ... | And you will end up paying an estimated total of ... |
|---|---|---|
| Only the Minimum Payment | 21 years | $9,261.00 |

If you would like information about credit counseling services, call 866-686-2158.

## CREDIT LINE SUMMARY

| | |
|---|---|
| Total Credit Line | $5,250.00 |
| Credit Line for Cash | $1,050.00 |
| Total Available Credit | $231.46 |
| Available Credit for Cash | $231.46 |

## CONTACT US

**Call:** 866-686-2158      **Online:** WWW.MERCURYCARDS.COM

**Mail:** CARD SERVICES, PO BOX 84064, COLUMBUS, GA 31908-4064

Your account is now three payments past due. We have repayment options available to get you back on track. Please reach out to us at www.mercurycards.com or by calling (844)325-5884.

## FEES

| | | | |
|---|---|---|---|
| 05/01 | 05/01 | Late Fee | $37.00 |
| | | **Total Fees for this Period** | **$37.00** |

Please tear at perforation and make payment payable to Card Services.  SEE REVERSE FOR IMPORTANT INFORMATION.

# MERCURY

CARD SERVICES
PO BOX 84064
COLUMBUS GA 31908-4064

☐ Check here for any address changes and indicate any changes on reverse.

ANGELITA BAILEY
1140 HERITAGE PL APT B
WALDORF MD  20602-1829

** 0001749

Payment To

| | |
|---|---|
| Account Ending | 9947 |
| New Balance | $5,018.54 |
| Minimum Payment Due | $500.59 |
| Payment Due Date | 06/01/20 |
| Amount Enclosed | _____ |

CARD SERVICES
PO BOX 70168
PHILADELPHIA PA  19176-0168

17

Pg: 199 of 308    Filed: 03/08/2024    Doc: 19    USCA4 Appeal: 23-2133



Page 3 of 4

Angelita Bailey

Closing Date  05/04/2020

## INTEREST CHARGED

| | | | |
|---|---|---|---|
| 05/04 | 05/04 | Interest Charge-Purchases | $49.85 |
| | | **Total Interest for this Period** | **$49.85** |

## 2020 TOTALS YEAR-TO-DATE

| | |
|---|---|
| Total Fees charged in 2020 | $101.00 |
| Total Interest charged in 2020 | $262.74 |

## INTEREST CHARGE CALCULATION

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|
| Purchase | 12.24%(v) | $4,960.67 | $49.85 |
| Balance Transfer | 12.24%(v) | $0.00 | $0.00 |
| Cash Advance | 13.00%(v) | $0.00 | $0.00 |
| | 0.00% | $0.00 | $0.00 |

(v) = variable rate

Enroll in AutoPay to ensure your payment is made by the due date each month. Simply log in to www.mercurycards.com and select Set Up AutoPay to enroll today.

# MERCURY

Account Number XXXX XXXX XXXX 9947

March 05, 2020 - April 04, 2020

## SUMMARY OF ACCOUNT ACTIVITY

| | | |
|---|---|---|
| Previous Balance | | $4,844.08 |
| Payments | - | $0.00 |
| Other Credits | - | $0.00 |
| Purchases and Adjustments | + | $0.00 |
| Balance Transfers | + | $0.00 |
| Cash Advances | + | $0.00 |
| Fees Charged | + | $37.00 |
| Interest Charged | + | $50.61 |
| New Balance | | $4,931.69 |
| Statement End Date | | April 04, 2020 |
| Days in Billing Cycle | | 31 |
| | | |
| Past Due | | $228.37 |

## PAYMENT INFORMATION

| | |
|---|---|
| New Balance | $4,931.69 |
| Minimum Payment Due | $364.42 |
| Payment Due Date | 05/01/2020 |

**Late Payment Warning:**
If we do not receive your minimum payment by the date listed above, you may have to pay a late fee up to $37.00.

**Minimum Payment Warning:**
If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance.  For example:

| If you make no additional charges using this card and each month you pay ... | You will pay off the balance shown on this statement in about ... | And you will end up paying an estimated total of ... |
|---|---|---|
| Only the Minimum Payment | 21 years | $9,225.00 |

If you would like information about credit counseling services, call 866-686-2158.

## CREDIT LINE SUMMARY

| | |
|---|---|
| Total Credit Line | $5,250.00 |
| Credit Line for Cash | $1,050.00 |
| Total Available Credit | $318.31 |
| Available Credit for Cash | $318.31 |

## CONTACT US

**Call:** 866-686-2158     **Online:** WWW.MERCURYCARDS.COM

**Mail:** CARD SERVICES, PO BOX 84064, COLUMBUS, GA 31908-4064

Your account is two payments past due. Your credit privileges may be revoked if you do not resolve this before your next billing cycle. Payments can be made online at www.mercurycards.com or by calling us at (844)325-5884.

## FEES

| | | | |
|---|---|---|---|
| 04/01 | 04/01 | Late Fee | $37.00 |
| | | **Total Fees for this Period** | **$37.00** |

Please tear at perforation and make payment payable to Card Services.  SEE REVERSE FOR IMPORTANT INFORMATION.

---

# MERCURY

CARD SERVICES
PO BOX 84064
COLUMBUS GA 31908-4064

☐ Check here for any address changes and indicate any changes on reverse.

ANGELITA BAILEY
1140 HERITAGE PL APT B
WALDORF MD  20602-1829

** 0004702

| | |
|---|---|
| Account Ending | 9947 |
| New Balance | $4,931.69 |
| Minimum Payment Due | $364.42 |
| Payment Due Date | 05/01/20 |
| Amount Enclosed | _____ |

Payment To

CARD SERVICES
PO BOX 70168
PHILADELPHIA PA  19176-0168

19

Pg: 201 of 308

Filed: 03/08/2024

Doc: 19

USCA4 Appeal: 23-2133

Pg: 202 of 308

Filed: 03/08/2024

Doc: 19

USCA4 Appeal: 23-2133

Page 3 of 4
Angelita Bailey

Closing Date 04/04/2020



### INTEREST CHARGED

| | | | |
|---|---|---|---|
| 04/03 | 04/03 | Interest Charge-Purchases | $50.61 |
| | | **Total Interest for this Period** | **$50.61** |

### 2020 TOTALS YEAR-TO-DATE

| | |
|---|---|
| Total Fees charged in 2020 | $64.00 |
| Total Interest charged in 2020 | $212.89 |

### INTEREST CHARGE CALCULATION

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|
| Purchase | 12.24%(v) | $4,873.29 | $50.61 |
| Balance Transfer | 12.24%(v) | $0.00 | $0.00 |
| Cash Advance | 13.00%(v) | $0.00 | $0.00 |
| | 0.00% | $0.00 | $0.00 |

(v) = variable rate

Enroll in AutoPay to ensure your payment is made by the due date each month. Simply log in to www.mercurycards.com and select Set Up AutoPay to enroll today.

20

**JA199**

# MERCURY

Page 1 of 4

Account Number XXXX XXXX XXXX 9947

February 05, 2020 - March 04, 2020

## PAYMENT INFORMATION

| | |
|---|---|
| New Balance | **$4,844.08** |
| Minimum Payment Due | **$228.37** |
| Payment Due Date | **04/01/2020** |

**Late Payment Warning:**
If we do not receive your minimum payment by the date listed above, you may have to pay a late fee up to $37.00.

**Minimum Payment Warning:**
If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance.  For example:

| If you make no additional charges using this card and each month you pay ... | You will pay off the balance shown on this statement in about ... | And you will end up paying an estimated total of ... |
|---|---|---|
| Only the Minimum Payment | 21 years | $9,748.00 |

If you would like information about credit counseling services, call 866-686-2158.

## SUMMARY OF ACCOUNT ACTIVITY

| | | |
|---|---|---|
| Previous Balance | | $4,680.11 |
| Payments | - | $0.00 |
| Other Credits | - | $0.00 |
| Purchases and Adjustments | + | $84.71 |
| Balance Transfers | + | $0.00 |
| Cash Advances | + | $0.00 |
| **Fees Charged** | + | **$27.00** |
| **Interest Charged** | + | **$52.26** |
| **New Balance** | | **$4,844.08** |
| Statement End Date | | March 04, 2020 |
| Days in Billing Cycle | | 29 |
| **Past Due** | | **$101.46** |

## CREDIT LINE SUMMARY

| | |
|---|---|
| Total Credit Line | $5,250.00 |
| Credit Line for Cash | $1,050.00 |
| Total Available Credit | $405.92 |
| Available Credit for Cash | $405.92 |

## CONTACT US

**Call:** 866-686-2158    **Online:** WWW.MERCURYCARDS.COM

**Mail:** CARD SERVICES, PO BOX 84064, COLUMBUS, GA 31908-4064

Did you forget? We have not received your minimum payment due in the amount of $101.46. Your account is now past due. Payments can be made online at www.mercurycards.com.

Please tear at perforation and make payment payable to Card Services.  SEE REVERSE FOR IMPORTANT INFORMATION.

---

# MERCURY

CARD SERVICES
PO BOX 84064
COLUMBUS GA 31908-4064

☐ Check here for any address changes and indicate any changes on reverse.

ANGELITA BAILEY
1140 HERITAGE PL APT B
WALDORF MD 20602-1829

** 0001821

Payment To

| | |
|---|---|
| Account Ending | 9947 |
| New Balance | $4,844.08 |
| Minimum Payment Due | $228.37 |
| Payment Due Date | 04/01/20 |
| Amount Enclosed | |

CARD SERVICES
PO BOX 70168
PHILADELPHIA PA 19176-0168

00000000 - 001821 - 0001 - 0002 - 2

21

**JA200**

Closing Date   03/04/2020

## NEW TRANSACTIONS

| Post Date | Trans Date | Description of Transactions | | Reference Number | Amount $ |
|---|---|---|---|---|---|
| | | Angelita Bailey | XXXX XXXX XXXX 9947 | Total Activity | $84.71 |
| 02/06 | 02/05 | Vzwrlss*Bill Pay  V | Folsom CA | 42059593 | $84.71 |

## FEES

| | | | Amount |
|---|---|---|---|
| 03/02 | 03/02 | Late Fee | $27.00 |
| | | **Total Fees for this Period** | **$27.00** |

## INTEREST CHARGED

| | | | Amount |
|---|---|---|---|
| 03/04 | 03/04 | Interest Charge-Purchases | $52.26 |
| | | **Total Interest for this Period** | **$52.26** |

## 2020 TOTALS YEAR TO DATE

| | |
|---|---|
| Total Fees charged in 2020 | $27.00 |
| Total Interest charged in 2020 | $162.28 |

## INTEREST CHARGE CALCULATION

Your Annual Percentage Rate (APR) is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|
| Purchase | 13.74%(v) | $4,792.78 | $52.26 |
| Balance Transfer | 13.74%(v) | $0.00 | $0.00 |
| Cash Advance | 14.50%(v) | $0.00 | $0.00 |

(v) = variable rate

Enroll in AutoPay to ensure your payment is made by the due date each month. Simply log in to www.mercurycards.com and select Set Up AutoPay to enroll today.

22

**JA201**

Pg: 204 of 308

Filed: 03/08/2024

Doc: 19

USCA4 Appeal: 23-2133

# MERCURY

Page 1 of 4

Account Number XXXX XXXX XXXX 9947

January 05, 2020 - February 04, 2020

## PAYMENT INFORMATION

| | |
|---|---|
| New Balance | **$4,680.11** |
| Minimum Payment Due | **$101.46** |
| Payment Due Date | **03/01/2020** |

**Late Payment Warning:**
If we do not receive your minimum payment by the date listed above, you may have to pay a late fee up to $37.00.

**Minimum Payment Warning:**
If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance.  For example:

| If you make no additional charges using this card and each month you pay ... | You will pay off the balance shown on this statement in about ... | And you will end up paying an estimated total of ... |
|---|---|---|
| Only the Minimum Payment | 21 years | $9,539.00 |
| $159.00 | 3 years | $5,724.00 (Savings = $3,815.00) |

If you would like information about credit counseling services, call 866-686-2158.

## SUMMARY OF ACCOUNT ACTIVITY

| | | |
|---|---|---|
| Previous Balance | | $4,726.43 |
| Payments | - | $101.53 |
| Other Credits | - | $0.00 |
| Purchases and Adjustments | + | $0.00 |
| Balance Transfers | + | $0.00 |
| Cash Advances | + | $0.00 |
| **Fees Charged** | + | **$0.00** |
| **Interest Charged** | + | **$55.21** |
| **New Balance** | | **$4,680.11** |
| Statement End Date | | February 04, 2020 |
| Days in Billing Cycle | | 31 |

## CREDIT LINE SUMMARY

| | |
|---|---|
| Total Credit Line | $5,250.00 |
| Credit Line for Cash | $1,050.00 |
| Total Available Credit | $569.89 |
| Available Credit for Cash | $569.89 |

## CONTACT US

**Call:** 866-686-2158          **Online:** WWW.MERCURYCARDS.COM

**Mail:** CARD SERVICES, PO BOX 84064, COLUMBUS, GA 31908-4064

## PAYMENTS AND OTHER CREDITS

| Post Date | Trans Date | Description of Transactions | Reference Number | Amount $ |
|---|---|---|---|---|
| **Payments** | | | | -$101.53 |
| 01/31 | 01/31 | Payment Received -- Thank You | 01210007 | -$101.53 |

Please tear at perforation and make payment payable to Card Services.  SEE REVERSE FOR IMPORTANT INFORMATION.

---

# MERCURY

CARD SERVICES
PO BOX 84064
COLUMBUS GA 31908-4064

☐ Check here for any address changes and indicate any changes on reverse.

ANGELITA BAILEY
1140 HERITAGE PL APT B
WALDORF MD  20602-1829

| | Account Ending | 9947 |
|---|---|---|
| | New Balance | $4,680.11 |
| | Minimum Payment Due | $101.46 |
| | Payment Due Date | 03/01/20 |
| | Amount Enclosed | |

** 0001854

Payment To

CARD SERVICES
PO BOX 70168
PHILADELPHIA PA 19176-0168

23

Pg: 205 of 308

Filed: 03/08/2024

Doc: 19

USCA4 Appeal: 23-2133

Angelita Bailey

Closing Date 02/04/2020



### INTEREST CHARGED

| | | | |
|---|---|---|---|
| 02/04 | 02/04 | Interest Charge-Purchases | $55.21 |
| | | **Total Interest for this Period** | **$55.21** |

### 2020 TOTALS YEAR-TO-DATE

| | |
|---|---|
| Total Fees charged in 2020 | $0.00 |
| Total Interest charged in 2020 | $110.02 |

### INTEREST CHARGE CALCULATION

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|
| Purchase | 13.74%(v) | $4,736.80 | $55.21 |
| Balance Transfer | 13.74%(v) | $0.00 | $0.00 |
| Cash Advance | 14.50%(v) | $0.00 | $0.00 |

(v) = variable rate

Enroll in AutoPay to ensure your payment is made by the due date each month. Simply log in to www.mercurycards.com and select Set Up AutoPay to enroll today.

Pg: 206 of 308

Filed: 03/08/2024

Doc: 19

USCA4 Appeal: 23-2133

24

**JA203**

# MERCURY

Account Number XXXX XXXX XXXX 9947

December 05, 2019 - January 04, 2020

## PAYMENT INFORMATION

| | |
|---|---|
| New Balance | **$4,726.43** |
| Minimum Payment Due | **$101.53** |
| Payment Due Date | **02/01/2020** |

**Late Payment Warning:**
If we do not receive your minimum payment by the date listed above, you may have to pay a late fee up to $37.00.

**Minimum Payment Warning:**
If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance.  For example:

| If you make no additional charges using this card and each month you pay ... | You will pay off the balance shown on this statement in about ... | And you will end up paying an estimated total of ... |
|---|---|---|
| Only the Minimum Payment | 22 years | $9,639.00 |
| $161.00 | 3 years | $5,796.00 (Savings = $3,843.00) |

If you would like information about credit counseling services, call 866-686-2158.

## CONTACT US

**Call:** 866-686-2158      **Online:** WWW.MERCURYCARDS.COM
**Mail:** CARD SERVICES, PO BOX 84064, COLUMBUS, GA 31908-4064

## SUMMARY OF ACCOUNT ACTIVITY

| | | |
|---|---|---|
| Previous Balance | | $4,611.47 |
| Payments | - | $111.47 |
| Other Credits | - | $0.00 |
| Purchases and Adjustments | + | $171.62 |
| Balance Transfers | + | $0.00 |
| Cash Advances | + | $0.00 |
| **Fees Charged** | + | **$0.00** |
| **Interest Charged** | + | **$54.81** |
| **New Balance** | | **$4,726.43** |
| Statement End Date | | January 04, 2020 |
| Days in Billing Cycle | | 31 |

## CREDIT LINE SUMMARY

| | |
|---|---|
| Total Credit Line | $5,250.00 |
| Credit Line for Cash | $1,050.00 |
| Total Available Credit | $523.57 |
| Available Credit for Cash | $523.57 |

## PAYMENTS AND OTHER CREDITS

| Post Date | Trans Date | Description of Transactions | Reference Number | Amount $ |
|---|---|---|---|---|
| **Payments** | | | | **-$111.47** |
| 12/30 | 12/28 | Payment Received -- Thank You | 01210002 | -$111.47 |

Please tear at perforation and make payment payable to Card Services.  SEE REVERSE FOR IMPORTANT INFORMATION.

# MERCURY

CARD SERVICES
PO BOX 84064
COLUMBUS GA 31908-4064

☐  Check here for any address changes and indicate any changes on reverse.

ANGELITA BAILEY
1140 HERITAGE PL APT B
WALDORF MD  20602-1829

** 0005001

| | |
|---|---|
| Account Ending | 9947 |
| New Balance | $4,726.43 |
| Minimum Payment Due | $101.53 |
| Payment Due Date | 02/01/20 |
| Amount Enclosed | _____ |

Payment To

CARD SERVICES
PO BOX 70168
PHILADELPHIA PA  19176-0168

25

Pg: 207 of 308

Filed: 03/08/2024

Doc: 19

USCA4 Appeal: 23-2133

Page 3 of 4
Angelita Bailey

Closing Date  01/04/2020



0000000 - 005001 - 0002 - 0002 - 2

## NEW TRANSACTIONS

| Post Date | Trans Date | Description of Transactions | | Reference Number | Amount $ |
|---|---|---|---|---|---|
| | | Angelita Bailey | XXXX XXXX XXXX 9947 | Total Activity | **$171.62** |
| 12/06 | 12/05 | Vzwrlss*Bill Pay  V | Folsom CA | 28649891 | $84.74 |
| 01/03 | 01/02 | Vzwrlss*Bill Pay  V | Folsom CA | 85337492 | $86.88 |

## INTEREST CHARGED

| | | | |
|---|---|---|---|
| 01/03 | 01/03 | Interest Charge-Purchases | $54.81 |
| | | **Total Interest for this Period** | **$54.81** |

## 2020 TOTALS YEAR-TO-DATE

| | |
|---|---|
| Total Fees charged in 2020 | $0.00 |
| Total Interest charged in 2020 | $54.81 |

## INTEREST CHARGE CALCULATION

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|
| Purchase | 13.74%(v) | $4,702.40 | $54.81 |
| Balance Transfer | 13.74%(v) | $0.00 | $0.00 |
| Cash Advance | 14.50%(v) | $0.00 | $0.00 |

(v) = variable rate

Enroll in AutoPay to ensure your payment is made by the due date each month. Simply log in to www.mercurycards.com and select Set Up AutoPay to enroll today.

Pg: 208 of 308

Filed: 03/08/2024

Doc: 19

USCA4 Appeal: 23-2133

26

# MERCURY

Account Number XXXX XXXX XXXX 9947

November 05, 2019 - December 04, 2019

## PAYMENT INFORMATION

| | |
|---|---|
| New Balance | **$4,611.47** |
| Minimum Payment Due | **$98.10** |
| Payment Due Date | **01/01/2020** |

**Late Payment Warning:**
If we do not receive your minimum payment by the date listed above, you may have to pay a late fee up to $37.00.

**Minimum Payment Warning:**
If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance.  For example:

| If you make no additional charges using this card and each month you pay ... | You will pay off the balance shown on this statement in about ... | And you will end up paying an estimated total of ... |
|---|---|---|
| Only the Minimum Payment | 21 years | $9,394.00 |
| $157.00 | 3 years | $5,652.00 (Savings = $3,742.00) |

If you would like information about credit counseling services, call 866-686-2158.

## CONTACT US

**Call:** 866-686-2158      **Online:** WWW.MERCURYCARDS.COM

**Mail:** CARD SERVICES, PO BOX 84064, COLUMBUS, GA 31908-4064

## SUMMARY OF ACCOUNT ACTIVITY

| | | |
|---|---|---|
| Previous Balance | | $4,568.96 |
| Payments | - | $99.07 |
| Other Credits | - | $0.00 |
| Purchases and Adjustments | + | $89.07 |
| Balance Transfers | + | $0.00 |
| Cash Advances | + | $0.00 |
| **Fees Charged** | + | **$0.00** |
| **Interest Charged** | + | **$52.51** |
| **New Balance** | | **$4,611.47** |
| Statement End Date | | December 04, 2019 |
| Days in Billing Cycle | | 30 |

## CREDIT LINE SUMMARY

| | |
|---|---|
| Total Credit Line | $5,250.00 |
| Credit Line for Cash | $1,050.00 |
| Total Available Credit | $638.53 |
| Available Credit for Cash | $638.53 |

## PAYMENTS AND OTHER CREDITS

| Post Date | Trans Date | Description of Transactions | Reference Number | Amount $ |
|---|---|---|---|---|
| **Payments** | | | | **-$99.07** |
| 12/02 | 12/01 | Payment Received -- Thank You | 01210007 | -$44.07 |
| 12/02 | 12/01 | Payment Received -- Thank You | 01210005 | -$55.00 |

Please tear at perforation and make payment payable to Card Services.  SEE REVERSE FOR IMPORTANT INFORMATION.

# MERCURY

CARD SERVICES
PO BOX 84064
COLUMBUS GA 31908-4064

☐ Check here for any address changes and indicate any changes on reverse.

| | |
|---|---|
| Account Ending | 9947 |
| New Balance | $4,611.47 |
| Minimum Payment Due | $98.10 |
| Payment Due Date | 01/01/20 |
| Amount Enclosed | |

ANGELITA BAILEY
1140 HERITAGE PL APT B
WALDORF MD  20602-1829

** 0001911

Payment To

CARD SERVICES
PO BOX 70168
PHILADELPHIA PA  19176-0168

27

Pg: 209 of 308

Filed: 03/08/2024

Doc: 19

USCA4 Appeal: 23-2133

Page 3 of 4
Angelita Bailey

Closing Date   12/04/2019

## NEW TRANSACTIONS

| Post Date | Trans Date | Description of Transactions | | Reference Number | Amount $ |
|---|---|---|---|---|---|
| Angelita Bailey | | | XXXX XXXX XXXX 9947 | Total Activity | $89.07 |
| 11/11 | 11/09 | Vzwrlss*Bill Pay  V | Folsom CA | 89843904 | $84.79 |
| 12/02 | 11/30 | Food Lion #2547 | Waldorf MD | 08128210 | $4.28 |

## INTEREST CHARGED

| | | | | |
|---|---|---|---|---|
| 12/04 | 12/04 | Interest Charge-Purchases | | $52.51 |
| | | **Total Interest for this Period** | | **$52.51** |

## 2019 TOTALS YEAR-TO-DATE

| | |
|---|---|
| Total Fees charged in 2019 | $0.00 |
| Total Interest charged in 2019 | $544.21 |

## INTEREST CHARGE CALCULATION

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|
| Purchase | 13.74%(v) | $4,655.28 | $52.51 |
| Balance Transfer | 13.74%(v) | $0.00 | $0.00 |
| Cash Advance | 14.50%(v) | $0.00 | $0.00 |

(v) = variable rate

Enroll in AutoPay to ensure your payment is made by the due date each month. Simply log in to www.mercurycards.com and select Set Up AutoPay to enroll today.

Pg: 210 of 308

Filed: 03/08/2024

Doc: 19

USCA4 Appeal: 23-2133

28

JA207

# M E R C U R Y

Page 1 of 4

Account Number XXXX XXXX XXXX 9947

October 05, 2019 - November 04, 2019

## PAYMENT INFORMATION

| | |
|---|---|
| New Balance | **$4,568.96** |
| Minimum Payment Due | **$99.07** |
| Payment Due Date | **12/01/2019** |

**Late Payment Warning:**
If we do not receive your minimum payment by the date listed above, you may have to pay a late fee up to $37.00.

**Minimum Payment Warning:**
If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance.  For example:

| If you make no additional charges using this card and each month you pay ... | You will pay off the balance shown on this statement in about ... | And you will end up paying an estimated total of ... |
|---|---|---|
| Only the Minimum Payment | 21 years | $9,301.00 |
| $156.00 | 3 years | $5,616.00 (Savings = $3,685.00) |

If you would like information about credit counseling services, call 866-686-2158.

## CONTACT US

**Call:** 866-686-2158        **Online:** WWW.MERCURYCARDS.COM
**Mail:** CARD SERVICES, PO BOX 84064, COLUMBUS, GA 31908-4064

## SUMMARY OF ACCOUNT ACTIVITY

| | | |
|---|---|---|
| Previous Balance | | $4,527.54 |
| Payments | - | $97.29 |
| Other Credits | - | $0.00 |
| Purchases and Adjustments | + | $84.79 |
| Balance Transfers | + | $0.00 |
| Cash Advances | + | $0.00 |
| **Fees Charged** | + | **$0.00** |
| **Interest Charged** | + | **$53.92** |
| New Balance | | $4,568.96 |
| Statement End Date | | November 04, 2019 |
| Days in Billing Cycle | | 31 |

## CREDIT LINE SUMMARY

| | |
|---|---|
| Total Credit Line | $5,250.00 |
| Credit Line for Cash | $1,050.00 |
| Total Available Credit | $681.04 |
| Available Credit for Cash | $681.04 |

## PAYMENTS AND OTHER CREDITS

| Post Date | Trans Date | Description of Transactions | Reference Number | Amount $ |
|---|---|---|---|---|
| **Payments** | | | | **-$97.29** |
| 11/01 | 11/01 | Payment Received -- Thank You | 01210002 | -$97.29 |

Please tear at perforation and make payment payable to Card Services.  SEE REVERSE FOR IMPORTANT INFORMATION.

---

# M E R C U R Y

CARD SERVICES
PO BOX 84064
COLUMBUS GA  31908-4064

☐ Check here for any address changes and indicate any changes on reverse.

ANGELITA BAILEY
1140 HERITAGE PL APT B
WALDORF MD  20602-1829

** 0001942

Payment To

| | |
|---|---|
| Account Ending | 9947 |
| New Balance | $4,568.96 |
| Minimum Payment Due | $99.07 |
| Payment Due Date | 12/01/19 |
| Amount Enclosed | _____ |

CARD SERVICES
PO BOX 70168
PHILADELPHIA PA  19176-0168

**29**

Pg: 211 of 308     Filed: 03/08/2024     Doc: 19     USCA4 Appeal: 23-2133

Page 3 of 4
Angelita Bailey

Closing Date  11/04/2019



## NEW TRANSACTIONS

| Post Date | Trans Date | Description of Transactions | Reference Number | Amount $ |
|---|---|---|---|---|
| | | Angelita Bailey | XXXX XXXX XXXX 9947 | Total Activity | $84.79 |
| 10/07 | 10/05 | Vzwrlss*Bill Pay  V   Folsom CA | 90267278 | $84.79 |

## INTEREST CHARGED

| | | | | |
|---|---|---|---|---|
| 11/04 | 11/04 | Interest Charge-Purchases | | $53.92 |
| | | **Total Interest for this Period** | | **$53.92** |

## 2019 TOTALS YEAR-TO-DATE

| | |
|---|---|
| Total Fees charged in 2019 | $0.00 |
| Total Interest charged in 2019 | $491.70 |

## INTEREST CHARGE CALCULATION

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|
| Purchase | 13.74%(v) | $4,625.88 | $53.92 |
| Balance Transfer | 13.74%(v) | $0.00 | $0.00 |
| Cash Advance | 14.50%(v) | $0.00 | $0.00 |

(v) = variable rate

Enroll in AutoPay to ensure your payment is made by the due date each month. Simply log in to www.mercurycards.com and select Set Up AutoPay to enroll today.

Pg: 212 of 308

Filed: 03/08/2024

Doc: 19

USCA4 Appeal: 23-2133

30

JA209

# MERCURY

Page 1 of 4

Account Number XXXX XXXX XXXX 9947

September 05, 2019 - October 04, 2019

## PAYMENT INFORMATION

| | |
|---|---|
| New Balance | **$4,527.54** |
| Minimum Payment Due | **$97.29** |
| Payment Due Date | **11/01/2019** |

**Late Payment Warning:**
If we do not receive your minimum payment by the date listed above, you may have to pay a late fee up to $37.00.

**Minimum Payment Warning:**
If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance.  For example:

| If you make no additional charges using this card and each month you pay ... | You will pay off the balance shown on this statement in about ... | And you will end up paying an estimated total of ... |
|---|---|---|
| Only the Minimum Payment | 21 years | $9,303.00 |
| $155.00 | 3 years | $5,580.00 (Savings = $3,723.00) |

If you would like information about credit counseling services, call 866-686-2158.

## SUMMARY OF ACCOUNT ACTIVITY

| | | |
|---|---|---|
| Previous Balance | | $4,583.09 |
| Payments | - | $108.09 |
| Other Credits | - | $0.00 |
| Purchases and Adjustments | + | $0.00 |
| Balance Transfers | + | $0.00 |
| Cash Advances | + | $0.00 |
| **Fees Charged** | + | **$0.00** |
| **Interest Charged** | + | **$52.54** |
| New Balance | | **$4,527.54** |
| Statement End Date | | October 04, 2019 |
| Days in Billing Cycle | | 30 |

## CREDIT LINE SUMMARY

| | |
|---|---|
| Total Credit Line | $5,250.00 |
| Credit Line for Cash | $1,050.00 |
| Total Available Credit | $722.46 |
| Available Credit for Cash | $722.46 |

## CONTACT US

**Call:** 866-686-2158         **Online:** WWW.MERCURYCARDS.COM
**Mail:** CARD SERVICES, PO BOX 84064, COLUMBUS, GA 31908-4064

## PAYMENTS AND OTHER CREDITS

| Post Date | Trans Date | Description of Transactions | Reference Number | Amount $ |
|---|---|---|---|---|
| **Payments** | | | | **-$108.09** |
| 09/25 | 09/25 | Payment Received -- Thank You | 01210002 | -$108.09 |

Please tear at perforation and make payment payable to Card Services. SEE REVERSE FOR IMPORTANT INFORMATION.

# MERCURY

CARD SERVICES
PO BOX 84064
COLUMBUS GA 31908-4064

☐ Check here for any address changes and indicate any changes on reverse.

| | |
|---|---|
| Account Ending | 9947 |
| New Balance | $4,527.54 |
| Minimum Payment Due | $97.29 |
| Payment Due Date | 11/01/19 |
| Amount Enclosed | |

ANGELITA BAILEY
1140 HERITAGE PL APT B
WALDORF MD  20602-1829

** 0004978

Payment To

CARD SERVICES
PO BOX 70168
PHILADELPHIA PA  19176-0168

31

**JA210**

Pg: 213 of 308     Filed: 03/08/2024     Doc: 19     USCA4 Appeal: 23-2133

Page 3 of 4
Angelita Bailey

Closing Date  10/04/2019



## INTEREST CHARGED

| 10/04 | 10/04 | Interest Charge-Purchases | $52.54 |
| | | **Total Interest for this Period** | **$52.54** |

## 2019 TOTALS YEAR-TO-DATE

| | |
|---|---|
| Total Fees charged in 2019 | $0.00 |
| Total Interest charged in 2019 | $437.78 |

## INTEREST CHARGE CALCULATION

Your **Annual Percentage Rate (APR)** is the annual interest rate on your account.

| Type of Balance | Annual Percentage Rate (APR) | Balance Subject to Interest Rate | Interest Charge |
|---|---|---|---|
| Purchase | 13.99%(v) | $4,572.52 | $52.54 |
| Balance Transfer | 13.99%(v) | $0.00 | $0.00 |
| Cash Advance | 14.75%(v) | $0.00 | $0.00 |

(v) = variable rate

Enroll in AutoPay to ensure your payment is made by the due date each month. Simply log in to www.mercurycards.com and select Set Up AutoPay to enroll today.

Pg: 214 of 308

Filed: 03/08/2024

Doc: 19

USCA4 Appeal: 23-2133

32

**JA211**

# MERCURY

Page 1 of 4

Account Number XXXX XXXX XXXX 9947

August 05, 2019 - September 04, 2019

## PAYMENT INFORMATION

| | |
|---|---|
| New Balance | **$4,583.09** |
| Minimum Payment Due | **$99.30** |
| Payment Due Date | **10/01/2019** |

**Late Payment Warning:**
If we do not receive your minimum payment by the date listed above, you may have to pay a late fee up to $37.00.

**Minimum Payment Warning:**
If you make only the minimum payment each period, you will pay more in interest and it will take you longer to pay off your balance.  For example:

| If you make no additional charges using this card and each month you pay ... | You will pay off the balance shown on this statement in about ... | And you will end up paying an estimated total of ... |
|---|---|---|
| Only the Minimum Payment | 21 years | $9,513.00 |
| $157.00 | 3 years | $5,652.00 (Savings = $3,861.00) |

If you would like information about credit counseling services, call 866-686-2158.

## SUMMARY OF ACCOUNT ACTIVITY

| | | |
|---|---|---|
| Previous Balance | | $4,374.24 |
| Payments | - | $94.73 |
| Other Credits | - | $3.92 |
| Purchases and Adjustments | + | $253.49 |
| Balance Transfers | + | $0.00 |
| Cash Advances | + | $0.00 |
| **Fees Charged** | + | **$0.00** |
| **Interest Charged** | + | **$54.01** |
| **New Balance** | | **$4,583.09** |
| Statement End Date | | September 04, 2019 |
| Days in Billing Cycle | | 31 |

## CREDIT LINE SUMMARY

| | |
|---|---|
| Total Credit Line | $5,250.00 |
| Credit Line for Cash | $1,050.00 |
| Total Available Credit | $666.91 |
| Available Credit for Cash | $666.91 |

## CONTACT US

**Call:** 866-686-2158          **Online:** WWW.MERCURYCARDS.COM

**Mail:** CARD SERVICES, PO BOX 84064, COLUMBUS, GA 31908-4064

## PAYMENTS AND OTHER CREDITS

| Post Date | Trans Date | Description of Transactions | Reference Number | Amount $ |
|---|---|---|---|---|
| **Payments** | | | | **-$94.73** |
| 08/30 | 08/30 | Payment Received -- Thank You | 01210006 | -$94.73 |

Please tear at perforation and make payment payable to Card Services.  SEE REVERSE FOR IMPORTANT INFORMATION.

---

# MERCURY

CARD SERVICES
PO BOX 84064
COLUMBUS GA  31908-4064

☐ Check here for any address changes and indicate any changes on reverse.

| | |
|---|---|
| Account Ending | 9947 |
| New Balance | $4,583.09 |
| Minimum Payment Due | $99.30 |
| Payment Due Date | 10/01/19 |
| Amount Enclosed | _____ |

ANGELITA BAILEY
1140 HERITAGE PL APT B
WALDORF MD  20602-1829

** 0002009

Payment To

CARD SERVICES
PO BOX 70168
PHILADELPHIA PA  19176-0168

33

Pg: 215 of 308    Filed: 03/08/2024    Doc: 19    USCA4 Appeal: 23-2133

**JA212**

USCA4 Appeal: 23-2133      Doc: 19      Filed: 03/08/2024      Pg: 216 of 308

34

**JA213**

E-FILED; Charles District Court
Docket: 10/21/2022 12:39 PM; Submission: 10/21/2022 12:39 PM

USCA4 Appeal: 23-2133    Doc: 19    Filed: 03/08/2024    Pg: 217 of 308

## BILL OF SALE

THIS BILL OF SALE (this "Bill of Sale") is made as of the 24th day of March, 2017, by and between Barclays Bank Delaware, a Delaware state bank ("Seller"), and First Bank & Trust, a South Dakota corporation ("Purchaser").

## RECITALS

WHEREAS, Seller, Purchaser and Credit Shop, Incorporated, a Delaware corporation, entered into that certain Asset Purchase Agreement, dated as of the 24th day of March, 2017 (the "Purchase Agreement"); and

WHEREAS, this Bill of Sale is being executed and delivered incident to the closing of the transactions contemplated pursuant to the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

1.    Sale.  Effective as of the Cut-off Time, (a) Seller hereby sells, conveys and assigns to Purchaser, free and clear of any Lien (other than any Permitted Lien), the Acquired Assets and (b) Purchaser hereby purchases the Acquired Assets.

2.    Precautionary Grant of Security Interest.  The Parties intend that the conveyance of Seller's right, title, and interest in and to the Acquired Assets shall constitute an absolute and irrevocable sale, and a valid sale and assignment, but not a secured borrowing, including for accounting purposes.  If despite such intention, a court characterizes the sale of the Acquired Assets hereunder as a loan rather than an absolute transfer, then this Bill of Sale shall be deemed to be, and hereby is a security agreement, within the meaning of the Uniform Commercial Code in effect in any relevant jurisdiction, and, for this purpose, Seller hereby grants to Purchaser a first priority (subject to any Permitted Liens) perfected security interest in, to and under all of Seller's right, title and interest whether now owned or hereafter acquired, in, to and under each and every Acquired Asset transferred to Purchaser pursuant to this Bill of Sale for the purpose of securing Seller's obligations under the Purchase Agreement. In addition, at any time and from time-to-time, at Purchaser's expense, Seller will promptly and duly execute and deliver or will promptly cause to be executed and delivered, such further instruments and documents and take such further actions as are reasonably requested by Purchaser and necessary to authorize Purchaser to file any financing or continuation statements under the UCC or other Requirements of Law in effect in any jurisdiction with respect to the transfer of ownership of the Acquired Assets.

3.    Power of Attorney. Seller hereby constitutes and appoints Purchaser the true and lawful agent and attorney in fact of Seller, with full power of substitution and resubstitution, in whole or in part, in the name and stead of Seller but on behalf and for the benefit of Purchaser and its successors and assigns, from time to time:

      (a)    to demand, receive and collect any and all of the Acquired Assets and to give receipts and releases for and with respect to the same, or any part thereof;



35

(b)     to institute and prosecute, in the name of Seller or otherwise, any and all proceedings at law, in equity or otherwise, that Purchaser or its successors and assigns may deem proper in order to collect or reduce to possession any of the Acquired Assets and in order to collect or enforce any claim or right of any kind hereby assigned or transferred, or intended so to be; and

(c)     to do all things legally permissible, required or reasonably deemed by Purchaser to be required to recover and collect the Acquired Assets and to use Seller's name in such manner as Buyer may reasonably deem necessary for recovery and collection of same,

Seller hereby declaring that the foregoing powers are coupled with an interest and are and shall be irrevocable by Seller.

4.     <u>Terms of Purchase Agreement</u>.  The representations, warranties, covenants, agreements and indemnities contained in the Purchase Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein.  In the event of any conflict or inconsistency between the terms of the Purchase Agreement and the terms hereof, the terms of the Purchase Agreement shall govern and control.  Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Purchase Agreement.

5.     <u>Counterparts</u>.  This Bill of Sale may be executed in two (2) counterparts each of which may be delivered by facsimile or electronic transmission and both of which will together constitute one and the same instrument.  Delivery of executed copies of this Bill of Sale may be effected by facsimile, electronic or other comparable means.

6.     <u>Governing Law</u>.  This Bill of Sale shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

*[SIGNATURE PAGE TO FOLLOW]*

USCA4 Appeal: 23-2133      Doc: 19      Filed: 03/08/2024      Pg: 218 of 308

36

**JA215**

**EXECUTION COPY**

**ASSIGNMENT, ASSUMPTION AND AMENDMENT AGREEMENT
WITH RESPECT TO RECEIVABLES PURCHASE AGREEMENT**

This ASSIGNMENT, ASSUMPTION AND AMENDMENT AGREEMENT WITH RESPECT TO RECEIVABLES PURCHASE AGREEMENT (this "Assignment"), dated as of November 9, 2017, is entered into by and among:

(i)     First Bank & Trust, a South Dakota chartered bank ("FB&T");

(ii)    Credit Shop, Incorporated, a Delaware corporation ("CSI");

(iii)   CC Receivables Acquisition LLC, a Delaware limited liability company ("CCRA");

(iv)    CreditShop Receivables LLC, a Delaware limited liability company ("CSR");

(v)     CreditShop Credit Card Company LLC, a Delaware limited liability company (the "Issuer"); and

(vi)    CreditShop LLC, a Delaware limited liability company ("CreditShop").

A.      Reference is made to that certain Receivables Purchase Agreement, dated as of March 24, 2017, by and among FB&T, CCRA and CSI (as may be amended, restated, modified or supplemented from time to time, the "Receivables Purchase Agreement").

B.      CCRA desires to assign to the Issuer all of its rights, remedies, powers, privileges, claims, obligations and liabilities under the Receivables Purchase Agreement other than such rights, remedies, powers, privileges, claims, obligations and liabilities with respect to the CSR Purchased CCRA Receivables (as defined in that certain Receivables Sale Agreement (CCRA), dated as the date hereof, by and among CCRA, Credit Shop, CSR and CSI (the "Receivables Sale Agreement (CCRA)")), which CCRA desires to assign to CSR.

C.      CSI desires to assign to the CreditShop all of its rights, remedies, powers, privileges, claims, obligations and liabilities under the Receivables Purchase Agreement.

D.      The parties hereto desire to acknowledge certain agreements with respect to the Receivables Purchase Agreement as more specifically set forth herein.

E.      The parties hereto agree upon the following terms and conditions more specifically set forth herein.

**NOW, THEREFORE,** in consideration of these premises and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

37

USCA4 Appeal: 23-2133    Doc: 19    Filed: 03/08/2024    Pg: 220 of 308

## AGREEMENT

1.     **General**.  Unless otherwise indicated herein, all Article and Section references herein are to Articles and Sections of the Receivables Purchase Agreement, and all paragraph references herein are to paragraphs in this Assignment.  Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Receivables Purchase Agreement.  This Assignment shall be administered and construed pursuant to the terms of the Receivables Purchase Agreement (as affected by this Assignment).

2.     **Assignments and Acknowledgements with Respect to the Receivables Purchase Agreement**.  Each of FB&T, CSI, CCRA, CSR, the Issuer and CreditShop agrees, consents and acknowledges that:

2.1     *Assignment to and Assumption by the Issuer*.  CCRA hereby assigns to the Issuer, and the Issuer hereby assumes, all of CCRA's rights, remedies, powers, privileges, claims, obligations and liabilities under the Receivables Purchase Agreement other than such rights, remedies, powers, privileges, claims, obligations and liabilities with respect to the CSR Purchased CCRA Receivables.

2.2     *Assignment to and Assumption by CSR*.  CCRA hereby assigns to CSR, and CSR hereby assumes, all of CCRA's rights, remedies, powers, privileges, claims, obligations and liabilities under the Receivables Purchase Agreement with respect to the CSR Purchased CCRA Receivables.

2.3     *Assignment to and Assumption by CreditShop*.  CSI hereby assigns to CreditShop, and CreditShop hereby assumes, all of CSI's rights, remedies, powers, privileges, claims, obligations and liabilities under the Receivables Purchase Agreement.

3.     **Amendments to the Receivables Purchase Agreement**.  Each of FB&T, CSI, CCRA, CSR, the Issuer and CreditShop agrees, on and after the date hereof:

3.1     *Purchaser*.  All references in the Receivables Purchase Agreement to Purchaser shall mean the Issuer other than with respect to the CSR Purchased CCRA Receivables, in which case Purchaser shall mean CSR.

3.2     *Credit Shop*.  All references in the Receivables Purchase Agreement to Credit Shop shall mean CreditShop LLC.

3.3     *Defined Terms*.  The terms Eligible Account, Eligible Receivable, Indenture, Indenture Trustee, Servicer, Servicing Agreement and Subservicer as used in the Receivables Purchase Agreement and any other term used in the Receivables Purchase Agreement that has a meaning by reference to the Indenture shall have the meaning set forth in the Indenture, dated as of the date hereof, between the Issuer and Wilmington Trust, National Association.

3.4     *Allocation between the Issuer and CSR*.  All references in the Receivables Purchase Agreement to Collections, Collections Offset, Issuer Obligations, Receivables and any other term referencing or relating to Receivables shall mean Collections, Collections Offset, Issuer Obligations, Receivables or other items with respect to the Issuer other than Collections,

2

Collections Offset, Issuer Obligations, Receivables or other items with respect to the CSR Purchased CCRA Receivables, which shall be with respect to CSR.

3.5    *Allocation between the Issuer and CSR.*  All other terms and provisions of the Receivables Purchase Agreement shall be interpreted to give effect to the desired allocation between the Issuer and CSR as provided herein.

3.6    *Section 5.01(g).*  Section 5.01(g) of the Receivables Purchase Agreement is hereby deleted in its entirety.

3.7    *Notices.*  For purposes of Section 9.03 of the Receivables Purchase Agreement, notices shall be sent:

    (a) in the case of CreditShop:

> CreditShop LLC
> ATTN: Chief Executive Officer
> 221 West 6th Street, Suite 825
> Austin, TX 78701
> Email/Fax: dduncan@creditshop.com

    with a copy to:

> CreditShop LLC
> ATTN: General Counsel
> 221 West 6th Street, Suite 825
> Austin, TX 78701
> Email/Fax: dduncan@creditshop.com

    (b) in the case of the Issuer as Purchaser:

> CreditShop Credit Card Company LLC
> ATTN: Chief Executive Officer
> 221 West 6th Street, Suite 825
> Austin, TX 78701
> Email/Fax: dduncan@creditshop.com

    with a copy to:

> CreditShop Credit Card Company LLC
> c/o CreditShop LLC
> ATTN: General Counsel
> 221 West 6th Street, Suite 825
> Austin, TX 78701
> Email/Fax: dduncan@creditshop.com

    (c) in the case of the CSR as Purchaser:

> CreditShop Receivables LLC
> ATTN: Chief Executive Officer
> 221 West 6th Street, Suite 825
> Austin, TX 78701
> Email/Fax: dduncan@creditshop.com

    with a copy to:

> CreditShop Receivables LLC
> c/o CreditShop LLC
> ATTN: General Counsel

KE 49783267.7

USCA4 Appeal: 23-2133      Doc: 19      Filed: 03/08/2024      Pg: 221 of 308

39

**JA218**

221 West 6th Street, Suite 825
Austin, TX 78701
Email/Fax: dduncan@creditshop.com

(d) in the case of the Bank, as provided in the Receivables Purchase Agreement.

3.8     *Section 9.05*.  Notwithstanding the prohibition on assignments by CSI of the Receivables Purchase Agreement set forth in Section 9.05 of the Receivables Purchase Agreement, each of the parties hereto agrees that the Receivables Purchase Agreement may be assigned as provided in this Assignment, and Section 9.05 shall be deemed amended as necessary to permit such assignment.

4.     **Representations and Warranties**.  Each of FB&T, CSI, CCRA, CSR, the Issuer and CreditShop hereby represent and warrant as follows:

4.1     *General Representations*.  Each of FB&T, CSI, CCRA, CSR, the Issuer and CreditShop hereby represents and warrants (i)  the execution and delivery by such Person of this Assignment and the performance of each of its obligations under this Assignment and the Receivables Purchase Agreement (as applicable), are within such Person's organizational powers and have been duly authorized by all necessary organizational action on its part and (ii) this Assignment and the Receivables Purchase Agreement constitute the legal, valid and binding obligations of such Person enforceable against such Person in accordance with their respective terms, subject to the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar law affecting creditors' rights generally and to the effect of general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

4.2     *FB&T Representations*.  FB&T hereby reaffirms, as of the date hereof as if made on the date hereof, each of its representation and warranties made in Section 3.01 of the Receivables Purchase Agreement.

4.3     *CreditShop Representations*.  CreditShop hereby makes as to itself, as of the date hereof as if made on the date hereof, each of the representation and warranties set forth in Section 4.01 of the Receivables Purchase Agreement.

4.4     *Issuer Representations*.  The Issuer hereby makes as to itself, as of the date hereof as if made on the date hereof, each of the representation and warranties set forth in Section 4.03 of the Receivables Purchase Agreement.

5.     **Condition to Effectiveness**.  This Assignment shall become effective as of the date hereof upon receipt by the parties hereto of executed counterparts to this Assignment duly executed by each of the parties hereto.

6.     **Effect of Assignment; Ratification; Consent**.   Except as specifically waived, acknowledged or amended hereby, the Receivables Purchase Agreement is hereby ratified and confirmed in all respects, and all of their provisions shall remain in full force and effect. Unless the context otherwise requires, the Term "Agreement" as used in the Receivables Purchase Agreement shall be deemed to refer to the Receivables Purchase Agreement, as assigned,

4

KE 49783267.7

40

USCA4 Appeal: 23-2133     Doc: 19     Filed: 03/08/2024     Pg: 222 of 308

acknowledged and amended hereby. This Assignment shall not be deemed to expressly or impliedly assign, amend, or supplement any provision of the Receivables Purchase Agreement except as specifically set forth herein.

7.      **Entire Agreement**.  The Receivables Purchase Agreement, as assigned, amended and acknowledged this Assignment, contains the entire agreement among the parties with respect to the subject matter thereof and supersedes all prior or contemporaneous agreements, negotiations, correspondence, undertakings, understandings, representations and warranties, both written and oral, with respect thereto. Other than this Assignment there are no assignments, amendments, waivers or side letters with respect to the Receivables Purchase Agreement.

8.      **Counterparts**.  This Assignment may be executed in any number of counterparts and by different parties on separate counterparts, and each counterpart shall be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.  Delivery of an executed counterpart of a signature page to this Assignment by facsimile or other electronic means shall be effective as delivery of a manually executed counterpart of this Assignment.

9.      **Governing Law**.  This Assignment shall be construed in accordance with and governed by the internal laws of the State of New York applicable to agreements made and to be performed therein, without regard to the conflict of laws provisions of any other state.

10.     **Severability**.  If any one or more of the agreements, provisions or terms of this Assignment shall for any reason whatsoever be held invalid or unenforceable, then such agreements, provisions or terms shall be deemed severable from the remaining agreements, provisions and terms of this Assignment and shall in no way affect the validity or enforceability of the provisions of this Assignment or the Receivables Purchase Agreement.

11.     **Direction to Administrative Agent**.  Credit Suisse AG, Cayman Islands Branch, as Controlling Holder (as defined in the Indenture), hereby directs the Administrative Agent to execute this Assignment.

**[Signature pages follow.]**

Pg: 223 of 308      Filed: 03/08/2024      Doc: 19      USCA4 Appeal: 23-2133

KE 49783267.7

41

**JA220**

USCA4 Appeal: 23-2133      Doc: 19      Filed: 03/08/2024      Pg: 224 of 308

# ASSIGNMENT AND ASSUMPTION AGREEMENT

This ASSIGNMENT AND ASSUMPTION AGREEMENT (this "<u>Assignment</u>"), dated as of November 9, 2017, is entered into by and among:

(i)     First Bank & Trust, a South Dakota corporation ("<u>FB&T</u>");

(ii)    Credit Shop, Incorporated, a Delaware corporation ("<u>CreditShop</u>"); and

(iii)   CreditShop LLC, a Delaware limited liability company ("<u>New CreditShop</u>").

A.     Reference is made to that each of the agreements listed on <u>Schedule I</u> hereto (the "<u>Assigned Agreements</u>").

B.     On the date hereof, (i) CreditShop distributed substantially all of its assets, including its rights under the Asset Purchase Agreement (collectively, the "<u>Transferred Assets</u>") to PIHC, LLC, a Delaware limited liability company and sole shareholder of CreditShop ("<u>PIHC</u>"), and immediately thereafter PIHC contributed the Transferred Assets to CreditShop Holdings LLC, a Delaware limited liability company and indirect parent of New CreditShop ("<u>CreditShop Holdings</u>") and (ii) CreditShop Holdings and its direct subsidiary contributed the Transferred Assets to New CreditShop.

C.     CreditShop desires to assign to New CreditShop, and New CreditShop desires to assume from CreditShop, the Assigned Agreements, as more specifically set forth herein and therein.

**NOW, THEREFORE,** in consideration of these premises and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

## AGREEMENT

1.     <u>**Assignment and Assumption.**</u> CreditShop hereby irrevocably assigns, grants, conveys and transfers to New CreditShop, and New CreditShop hereby assumes, all of CreditShop's rights, remedies, powers, privileges, claims, obligations, and liabilities under each Assigned Agreement (the "<u>Assignment</u>").

2.     <u>**Representations and Warranties**</u>.  Each of FB&T, CreditShop and New CreditShop hereby represents and warrants as follows:

2.1    *Authorization.* The execution and delivery by such Person of this Assignment and the performance of each of its obligations under this Assignment are within such Person's organizational powers and have been duly authorized by all necessary organizational action on its part.

165513252v.4

42

**JA221**

2.2   *Enforceability*.  This Assignment constitutes a legal, valid and binding obligation of such Person enforceable against such Person in accordance with its terms, subject to the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar law affecting creditors' rights generally and to the effect of general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

3.   **Effect of Assignment; Ratification; Consent**. Each of the Assigned Agreements is hereby ratified and confirmed in all respects, and all of its provisions shall remain in full force and effect. This Assignment shall not be deemed to expressly or impliedly waive, amend, or supplement any provision of any such Assigned Agreement.

4.   **Counterparts**.  This Assignment may be executed in any number of counterparts and by different parties on separate counterparts, and each counterpart shall be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.  Delivery of an executed counterpart of a signature page to this Assignment by facsimile or other electronic means shall be effective as delivery of a manually executed counterpart of this Assignment.

5.   **Governing Law**.  This shall be construed in accordance with and governed by the internal laws of the State of Delaware applicable to agreements made and to be performed therein, without regard to the conflict of laws provisions of any other state.

6.   **Severability**.  If any one or more of the agreements, provisions or terms of this Assignment shall for any reason whatsoever be held invalid or unenforceable, then such agreements, provisions or terms shall be deemed severable from the remaining agreements, provisions and terms of this Assignment and shall in no way affect the validity or enforceability of the provisions of this Assignment.

**[Signature pages follow.]**

2

43

**JA222**

IN WITNESS WHEREOF, the parties have caused this Assignment to be executed as of the date first written above.

FIRST BANK & TRUST

By: _____
Name:  David Waligoske
Title:  EVP

CREDIT SHOP INCORPORATED

By: _____
Name:  Daniel N. Duncan
Title:   CEO

CREDITSHOP LLC

By: _____
Name:  Daniel N. Duncan
Title:   Authorized Signatory

[Signature Page to Omnibus Assignment]

44

Pg: 226 of 308      Filed: 03/08/2024      Doc: 19      USCA4 Appeal: 23-2133

USCA4 Appeal: 23-2133     Doc: 19     Filed: 03/08/2024     Pg: 227 of 308

**Schedule I**
**Assigned Agreements**

<u>**Credit Card Program**</u>

1.   Credit Card Program Management Agreement by and between First Bank & Trust and Credit Shop, Incorporated, dated March 24, 2017.

2.   Asset Purchase Agreement among Barclays Bank Delaware, First Bank & Trust, and Credit Shop, Incorporated dated March 24, 2017

3.   Interim Servicing Agreement among Barclays Bank Delaware, First Bank & Trust, Credit Shop, Incorporated, and CC Receivables Acquisition, LLC (Indenture ISA) dated March 24, 2017, as amended thereafter

4.   Interim Servicing Agreement among Barclays Bank Delaware, First Bank & Trust, and Credit Shop, Incorporated (Delinquent ISA) dated March 24, 2017, as amended thereafter

<u>**Installment Loan Program**</u>

5.   Installment Loan Participation Agreement by and between Credit Shop, Incorporated and First Bank & Trust, dated August 1, 2017.

6.   Loan Program Agreement by and between First Bank & Trust and Credit Shop, Incorporated, dated August 1, 2017.

7.   Loan Servicing Agreement by and between Credit Shop, Incorporated and First Bank & Trust, dated August 1, 2017.

8.   Intercreditor Agreement by and between First Bank & Trust and Fortress Credit Co LLC and acknowledged and accepted by CreditShop dated August 1, 2017.

45

**EXHIBIT H**
**BILL OF SALE AND ASSIGNMENT OF RECEIVABLES**

FOR VALUE RECEIVED, CreditShop LLC, a Delaware limited liability company located at 504 Lavaca Street, Suite 930, Austin, Texas 78701 ("Seller") hereby absolutely sells, transfers, assigns, sets-over and conveys to Velocity Investments, LLC, a New Jersey limited liability company located at 1800 Route 34N, Suite 305, Wall, NJ 07719 ("Buyer") without representations or warranties, express or implied, of any type, kind or nature except as expressly set forth in the Agreement (hereinafter defined):

(a) all of Seller's right, title, and interest in and to each of the Receivables identified in the Receivable schedule attached hereto as <u>Schedule 1</u> (the "Receivables"), and

(b) all principal, interest, or other proceeds of any kind with respect to the Receivables but excluding any payments or other consideration received by or on behalf Seller on or prior to October 5, 2020, with respect to the Receivables.

This Bill of Sale is being executed and delivered pursuant to and in accordance with the terms and provisions of that certain Purchase and Sale Agreement made and entered into by and between the Seller, and the Buyer dated January 30, 2020, (the "Agreement").

DATED: October 13, 2020

By: <u>Kathleen Leonik</u>
Title: <u>Head of Operations</u>

Pg: 228 of 308

Filed: 03/08/2024    Doc: 19    USCA4 Appeal: 23-2133

46

1

E-FILED; Charles District Court
Docket: 10/21/2022 12:39 PM; Submission: 10/21/2022 12:39 PM

| EXTNL_ACCT_ID | GROSS LOSS AMT | FIN_CHRG_CHRGOFF_RVRSL_TOT_AMT |
|---|---|---|
| ███████████ | 5380.1 | 421.49 |



Pg: 229 of 308          Filed: 03/08/2024          Doc: 19          USCA4 Appeal: 23-2133

47

JA226

| FEE_CHRGOFF_RVRSL_TOT_AMT | Credit Card Account ID | Sec Pool | Account Open Date |
|---|---|---|---|
| 249 | | CST100 | 10/9/2006 |

Pg: 230 of 308

Filed: 03/08/2024

Doc: 19

USCA4 Appeal: 23-2133

48

| Last Statement Date | Last Payment Date | Amount of Last Payment | Statement Payment Due Date |
|---|---|---|---|
| 9/4/2020 | | 101.53 | 10/1/2020 |

Pg: 231 of 308

Filed: 03/08/2024

Doc: 19

USCA4 Appeal: 23-2133

49

**JA228**

| Purchase APR | Cash APR | Credit Limit | Prin Bal | Charge off date | Name |
|---|---|---|---|---|---|
| 0.0000001 | 13 | 5250 | 4709.6 | 9/28/2020 | ANGELITA BAILEY |

Pg: 232 of 308

Filed: 03/08/2024

Doc: 19

USCA4 Appeal: 23-2133

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ANGELITA BAILEY,                              *

    *On Her Own Behalf and on Behalf of*    *    Civil Action No. 8:23-cv-827-DKC
    *All Others Similarly Situated*,

                     *    [Removed from the Circuit Court for
          Plaintiff,        *    Montgomery County, Maryland
v.                                           *    Case No. C-15-CV-23-000224]

MERCURY FINANCIAL, LLC,                       *

          Defendant.         *

  *     *     *     *     *     *     *     *     *     *     *     *

## REPLY IN SUPPORT OF
## MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
## AND STRIKE CLASS ALLEGATIONS

Dated: June 30, 2023                    Respectfully submitted,

                                  */s/ Melissa O. Martinez*
                                  Melissa O. Martinez (Fed. Bar No. 28975)
                                  **MCGUIREWOODS LLP**
                                  500 East Pratt Street
                                  Suite 1000
                                  Baltimore, MD 21202
                                  410-659-4400
                                  410-659-4482 (Fax)
                                  mmartinez@mcguirewoods.com

                                  ***Counsel for Mercury Financial, LLC***

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................. 1

ARGUMENT ........................................................................................................ 2

    I.    The Court Should Compel Arbitration Because Arbitration Is Proper Under Both South Dakota Law and Maryland Law. ............................... 2

    II.    The Court Should Compel Arbitration Because the Arbitration Provision Is Not Illusory. ...................................................................... 3

        A.    The Arbitration Provision Is Not Illusory Under South Dakota Law. ................................................................................. 4

        B.    The Arbitration Provision is Not Illusory Under Maryland Law. ............. 9

    III.    The Arbitration Provision Does Not Violate Maryland Public Policy. ............... 13

    IV.    Mercury Is Entitled to Invoke the Arbitration Provision. .................................. 133

        A.    Mercury May Invoke the Arbitration Provision as FB&T's Agent And Because Plaintiff's Claims Arise Out of the Cardmember Agreement. .................................................................... 14

        B.    FB&T's Sale of Plaintiff's Charged-Off Account to Third-Party Velocity Is Irrelevant to Mercury's Right to Invoke Arbitration............ 16

    V.    The Court Should Strike the Class Allegations. ................................................. 188

CONCLUSION.................................................................................................... 200

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adkins v. Lab. Ready, Inc.*,
    303 F.3d 496 (4th Cir. 2002) .................................................13

*Affable Servs., LLC v. C-Care LLC*,
    No. CV SAG-19-02877, 2020 WL 1675920 (D. Md. Apr. 6, 2020) ......................................11

*Baker v. Sci. Applications Int'l Corp.*,
    No. CIV. 06-4096, 2006 WL 2708546 (D.S.D. Sept. 21, 2006), *aff'd,* 273 F.
    App'x 577 (8th Cir. 2008) ..............................................................4

*Bassett v. Elec. Arts, Inc.*,
    93 F. Supp. 3d 95 (E.D.N.Y. 2015) .........................................5

*Bindagraphics, Inc. v. Fox Grp., Inc.*,
    377 F. Supp. 3d 565 (D. Md. 2019) ......................................11

*Brennan v. Deluxe Corp.*,
    361 F. Supp. 3d 494 (D. Md. 2019) ......................................19

*Brent v. Priority 1 Auto. Grp., BMW of Rockville*,
    No. PWG-14-1705, 2016 WL 9724975 (D. Md. Aug. 4, 2016) ............................12

*Buckeye Check Cashing, Inc. v. Cardegna*,
    546 U.S. 440 (2006) ............................................................2

*Cain v. Midland Funding, LLC*,
    452 Md. 141 (Md. 2017) .......................................................18

*Caire v. Conifer Value Based Care, LLC*,
    982 F. Supp. 2d 582 (D. Md. 2013) ......................................12

*CD Partners, LLC v. Grizzle*,
    424 F.3d 795 (8th Cir. 2005) ..............................................16

*In re Cendant Corp. Litig.*,
    264 F. 3d 286 (3d Cir. 2001) ...............................................8

*Cheek v. United Healthcare of the Mid-Atl., Inc.*,
    378 Md. 139 (2003) .............................................9, 10, 11

*Coady v. Nationwide Motor Sales Corp.*,
    32 F.4th 288 (4th Cir. 2022) ..............................................3, 10

i

# JA232

*Coleman v. Qwest Comms. Corp.*,
   No. Civ. A. 3:02CV2428-P, 2003 WL 22388482 (N.D. Tex. Sept. 30, 2003)........................6

*CR-RSC Tower I, LLC v. RSC Tower I, LLC*,
   429 Md. 387 (2012) ..................................................................................................10

*Crawl v. Experian Info. Sols., Inc.*,
   No. PJM 15-97, 2016 WL 8716597 (D. Md. Jan. 29, 2016) ......................................14

*Donelson v. Ameriprise Fin. Servs., Inc.*,
   999 F.3d 1080 (8th Cir. 2021), *cert. denied*, 142 S. Ct. 2675 (2022)......................19

*Double H Masonry, Inc. v. Liberty Mut. Ins. Co.*,
   No. CIV 15-5004, 2015 WL 13885390 (D.S.D. Nov. 4, 2015)..................................4

*Eiess v. USAA Fed. Sav. Bank*,
   404 F. Supp. 3d 1240 (N.D. Cal. 2019) ......................................................................7

*El-Hage v. Comerica Bank*,
   No. 20-10294, 2020 WL 7389041 (E.D. Mich. Dec. 16, 2020) ................................6

*Fagerstrom v. Amazon.com, Inc.*,
   141 F. Supp. 3d 1051 (S.D. Cal. 2015), *aff'd sub nom. Wiseley v.*
   *Amazon.com, Inc.*, 709 F. App'x 862 (9th Cir. 2017)................................................8

*Ford v. UHG I, LLC*,
   No. 22-CV-00840-LKG, 2023 WL 2185751 (D. Md. Feb. 23, 2023)......................17

*Godfrey v. Sec. Serv. Fed. Credit Union*,
   356 S.W.3d 720 (Tex. App. 2011)..............................................................................9

*Hill v. Peoplesoft USA, Inc.*,
   412 F.3d 540 (4th Cir. 2005) ......................................................................................3

*Holloman v. Circuit City Stores, Inc.*,
   391 Md. 580 (2006) ....................................................................................................9

*Holloman v. Consumer Portfolio Servs., Inc.*,
   No. CV RDB-23-134, 2023 WL 4027036 (D. Md. June 15, 2023) .................17, 18

*Hosp. Builders, Inc. v. Spokane S. Medical, LLC*,
   No. 1:20-CV-01017-CBK, 2020 WL 5969251 (D. S.D. Oct. 8, 2020) ...................17

*Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*,
   206 F.3d 411 (4th Cir. 2000) ...............................................................................15, 16

*James v. Synovus Bank*,
   No. CV TDC-19-1137, 2020 WL 1479115 (D. Md. Mar. 26, 2020) .......................12

**JA233**

*Kelley Constr. Co. v. Wash. Suburban Sanitary Comm'n,*
   247 Md. 241(1967) ..............................................................................11

*Larsen v. Citibank FSB,*
   871 F.3d 1295 (11th Cir. 2017) ..........................................................8

*Lebowitz v. Dow Jones & Co.,*
   No. 12-1253-cv, 2013 WL 309996 (2d Cir. Jan. 28, 2013).................7

*Lyons v. PNC Bank, N.A.,*
   26 F.4th 180 (4th Cir. 2022) ...............................................................5

*Miguel v. JPMorgan Chase Bank, N.A.,*
   No. CV 12-3308 PSG, 2013 WL 452418 (C.D. Cal. Feb. 5, 2013) ....6, 7

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
   460 U.S. 1 (1983)................................................................................12

*Neukranz v. Conestoga Settlement Servs., LLC,*
   No. 3:19-CV-1681-L-BH, 2020 WL 5415526 (N.D. Tex. Jan. 22, 2020) ...............7

*Peleg v. Neiman Marcus Grp., Inc.,*
   204 Cal. App. 4th 1425 (2012) ........................................................7, 9

*Phears v. LVNV Funding, LLC,*
   No. CV RDB-20-2843, 2020 WL 7054806 (D. Md. Dec. 2, 2020) .......12

*Questar Builders, Inc. v. CB Flooring, LLC,*
   410 Md. 241 (2009) ...........................................................................11

*Rossi Fine Jewelers, Inc. v. Gunderson,*
   648 N.W.2d 812 (S.D. 2002) ..............................................................4

*Russ Berrie & Co. v. Gantt,*
   998 S.W.2d 713 (Tex. App. 1999)........................................................7

*Schwalm v. TCF Nat'l Bank,*
   226 F. Supp. 3d 937 (D.S.D. 2016) .....................................................3

*Shepherd v. Burson,*
   427 Md. 541 (2012) ...........................................................................10

*Skymark Properties Corp., Inc. v. Katebian,*
   No. 20-12372, 2022 WL 1054059 (E.D. Mich. Mar. 14, 2022)........16, 17

*Stations West, LLC v. Pinnacle Bank of Oregon,*
   No. CIV 06-1419-KI, 2007 WL 1219952 (D. Or. Apr. 23, 2007)..........16

**JA234**

*Tucker v. Ford Motor Co.*,
  No. 4:22-CV-00430-AGF, 2023 WL 2662887 (E.D. Mo. Mar. 28, 2023) .............................19

*Vainqueur Corp. v. Lamborn & Co.*,
  305 F. Supp. 1007 (S.D.N.Y. 1969) .......................................................................................16

*Varon v. Uber Techs., Inc.*,
  No. MJG-15-3650, 2016 WL 1752835 (D. Md. May 3, 2016) ...............................................2

*Vinjarapu v. Gadiyaram*,
  No. CV ADC-19-3306, 2020 WL 1170613 (D. Md. Mar. 11, 2020) .....................................16

*Washington Square Sec., Inc. v. Aune*,
  385 F.3d 432 (4th Cir. 2004) ........................................................................................... 13, 15

*Waterford Inv. Servs., Inc. v. Bosco*,
  682 F.3d 348 (4th Cir. 2012) ........................................................................................... 12, 13

*Whitman v. Cap. One Bank (USA), N.A.*,
  No. CIV.A. WMN-09-1737, 2009 WL 4018523 (D. Md. Nov. 19, 2009) .............................12

## Other Authorities

12 CFR 1026.6 ............................................................................................................................6

12 CFR 1026.9 ............................................................................................................................6

7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice
  and Procedure § 1785 (3d ed. 2005) ................................................................................ 18-19

Fed. R. Civ. P. 23 .....................................................................................................................18

**JA235**

## INTRODUCTION

In opposing Mercury's Motion, Plaintiff Angelita Bailey's ("Plaintiff") primary argument is that an Arbitration Provision that may be modified by providing advance written notice "when required by law" is illusory and therefore unenforceable.  Unsurprisingly, Plaintiff fails to cite a single case in which a court—anywhere in the country—has held as much.  Federal and state cases nationwide hold that notice of changes as required by law, or when required by law, are enforceable.  Plaintiff thus resorts to citing (i) inapposite cases holding that modification clauses allowing for changes with *or without notice* rendered arbitration provisions illusory, (ii) cases in which only one party is required to arbitrate claims, and (iii) cases on retroactive modification clauses.  Those cases are inapplicable.

Plaintiff also wrongly argues that the Arbitration Provision violates Maryland public policy because it is unlicensed under the MCLL.  Even if Mercury (which is not a lender) required a license under the MCLL (it does not), Plaintiff's challenge to the validity of the contract as being void *ab initio* runs afoul of the Supreme Court's mandate that arbitrators decide such challenges.

Additionally, contrary to Plaintiff's assertions, even though Mercury is not named as a party to the Cardmember Agreement containing the Arbitration Provision, the plain language of the Arbitration Provision permits Mercury to compel arbitration.  The assignment to third party Velocity does not change this analysis, nor does Velocity's subsequent debt collection action cannot result in a waiver of Mercury's right to compel arbitration, because Plaintiff's present action is in no way dependent on Velocity's debt collection action.  And Plaintiff's argument that the Court cannot strike class allegations based on the Cardmember Agreement because she intentionally omitted it from her Complaint must also fail, as she repeatedly references Mercury's "agreements" with Plaintiff and purported class members in the Complaint, thus putting the terms

of the Cardmember Agreement—including the class action waiver provision—squarely at issue at this juncture. The Court can, and should, apply the plain terms of the Cardmember Agreement and strike the class allegations.

The Court should stay this case, compel arbitration, and strike the class allegations.

## **ARGUMENT**

### I.  **The Court Should Compel Arbitration Because Arbitration Is Proper Under Both South Dakota Law and Maryland Law.**

As explained in Mercury's Motion, South Dakota law applies to the interpretation of the Cardmember Agreement. ECF 9 at 6-7. To the extent the Court determines that the Arbitration Provision[1] is severable from the rest of the Cardmember Agreement and that it is a separate contract formed in Maryland, then the Court may apply Maryland law as Plaintiff advocates. *See Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006); *see also Varon v. Uber Techs., Inc.*, No. MJG-15-3650, 2016 WL 1752835, at *3 (D. Md. May 3, 2016) (applying Maryland law to an arbitration provision that was severable from an agreement with a California choice of law provision). Either way, the Arbitration Provision is not illusory.

Plaintiff takes contradictory positions on whether the Arbitration Provision is severable from the Cardmember Agreement. Notwithstanding the choice of law provision in the Cardmember Agreement, Plaintiff argues that Maryland law should apply because the Arbitration Provision is severable from the Cardmember Agreement and the Court should therefore decide

---

[1] Plaintiff's Opposition seems to make a distinction between the "Arbitration Agreement" and the "Delegation Agreement." There is one agreement—the Cardmember Agreement. The Arbitration Provision is a provision in the Cardmember Agreement. In addition, there is a Delegation Clause contained within the Arbitration Provision. In answering the question "What Disputes does the [Arbitration] Clause cover," it states, "Dispute also includes any claim, defense or dispute concerning the formation, existence, validity, enforceability, revocation or scope of this [Arbitration] Clause." ECF 7-5 at 6. The Arbitration Provision also carves out claims that ***either*** party may bring in small claims court. *Id*. Accordingly, the same arguments that apply to the Arbitration Provision apply also to the Delegation Clause.

2

## JA237

whether a separate, valid agreement to arbitrate was formed under Maryland law.  ECF 11 at 14-16.  But in another section of her Opposition, Plaintiff argues that the "Changes to Your Account" clause in a different section of the Cardmember Agreement applies to the Arbitration Provision, presumably because the Arbitration Provision is ***not*** severable from the rest of the Cardmember Agreement.  ECF 11 at 17-24 ("Where, as here, an arbitration provision ***is part of a larger contract*** with a unilateral modification clause…") (emphasis added).

It is unsurprising that Plaintiff engages in logistical gymnastics.  If the "Changes to Your Account" in a different section of the Cardmember Agreement does ***not*** apply to the Arbitration Provision, then Plaintiff loses the argument that the Arbitration Provision is illusory.  There is no modification provision contained in the Arbitration Provision itself; the modification provision is in the broader Cardmember Agreement.  *Compare Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540, 544 (4th Cir. 2005) (remanding with instructions to grant motion to compel arbitration because the freestanding 6-page arbitration agreement without a modification provision was severable from the "Internal Dispute Solution" allowing modifications without notice) *with Coady v. Nationwide Motor Sales Corp.*, 32 F.4th 288, 292 (4th Cir. 2022) (affirming denial of motion to compel arbitration because arbitration agreement was incorporated in the "Receipt" document that included a modification provision allowing modification with or *without notice*).  Thus, to the extent the Court determines that the Arbitration Provision is severable from the rest of the Cardmember Agreement, then this case is squarely in line with *Hill* and the bulk of Plaintiff's arguments are moot.

## II.   The Court Should Compel Arbitration Because the Arbitration Provision Is Not Illusory.

Assuming the "Changes in Agreement Terms" in the Cardmember Agreement applies to the Arbitration Provision (which is the more logical reading of the Cardmember Agreement), the

Court should grant the Motion because the Arbitration Provision is not illusory under either South Dakota or Maryland law.

### A.   The Arbitration Provision Is Not Illusory Under South Dakota Law.

South Dakota has gone further than the majority of states in enforcing arbitration clauses. For example, the District of South Dakota rejected an argument that an arbitration clause was unenforceable because it provided that only one party could demand arbitration, finding that "[the] unilateral option is harsh but it does not make the provisions for arbitration in the contract unenforceable." *Double H Masonry, Inc. v. Liberty Mut. Ins. Co.*, No. CIV 15-5004, 2015 WL 13885390, at *2 (D.S.D. Nov. 4, 2015).[2]  This is consistent with South Dakota's "overriding policy favoring arbitration when a contract provides for it," including its policy that, [i]f there is doubt whether a case should be resolved by traditional judicial means or by arbitration, arbitration will prevail." *Rossi Fine Jewelers, Inc. v. Gunderson*, 648 N.W.2d 812, 814 (S.D. 2002).

Although permitted under South Dakota law, Plaintiff does not, and cannot, point to any provision in the Cardmember Agreement, or in the Arbitration Provision specifically, that requires Plaintiff to arbitrate her claims while simultaneously exempting Mercury from the same requirement.  The Arbitration Provision, presented in Question-and-Answer format, statest:

| What is this Clause about? | The parties' agreement to arbitrate Disputes. | You and we agree that ***any party may elect to arbitrate or require arbitration*** of any "Dispute" as defined below. |
|---|---|---|
| Who does the Clause cover? | You, us, and certain "Related Parties" | ***This Clause governs you and us***.  It also covers certain "Related Parties." These include: (1) our parent companies, subsidiaries, and affiliates; (2) our employees, directors, officers, shareholders, members, representatives, and agents; and (3) any person or entity that ***your or we*** assert is potentially liable for the conduct at issue in a Dispute. |

---

[2] *See also Baker v. Sci. Applications Int'l Corp.*, No. CIV. 06-4096, 2006 WL 2708546, at *2 (D.S.D. Sept. 21, 2006), *aff'd,* 273 F. App'x 577 (8th Cir. 2008) (finding that plaintiff's employment with defendant being conditioned on signing arbitration agreement was sufficient consideration for the arbitration agreement); *Schwalm v. TCF Nat'l Bank*, 226 F. Supp. 3d 937, 943–44 (D.S.D. 2016) (rejecting plaintiff's argument that arbitration provision was substantively unconscionable for lack of mutuality because it "does not limit [the plaintiff's] remedies against [the defendant bank], it simply governs the forum in which she must first pursue her remedies")

## JA239

ECF 7-5 at 6 (emphasis added).  This establishes that the arbitration requirement applies to both parties.  In addition, the Arbitration Provision governs "any claim, counterclaim, cross-claim, complaint, cross-complaint, controversy, or dispute between you or us arising under, out of, or directly or indirectly related to your application, this Agreement or your relationship with us," without reference to one party only.  ECF 7-5 at 6; *see also id.* ("**We also give up the right to a jury trial and to have courts decide Disputes you wish to arbitrate.**" (emphasis in original)).  The Arbitration Provision further states that it covers "any person that ***you[] or we assert is potentially liable for the conduct at issue in a Dispute.***"  *Id.* (emphasis added).

Moreover, Plaintiff cannot identify any contractual provision allowing Mercury to make changes without notice.  Changes are allowed under the Cardmember Agreement as follows:

### CHANGES TO YOUR ACCOUNT

The rates, fees and terms of this Agreement (including its Jury Trial Waiver and Arbitration Clause), may change and we may add or delete any term.  ***When required by law, we will provide advance written notice of any changes*** and any right to reject the changes.

ECF 7-5 at 2 (emphasis added).[3]  Under the plain terms of this provision, advance written notice is provided ***when*** required by law.  Importantly, federal law requires that credit card companies provide their cardholders with advance written notice of, and a right to reject, any "significant

---

[3] Additionally, the Arbitration Provision permits Plaintiff to "opt out" of the agreement to arbitrate.  ECF 7-5 at 5-6.  Thus, Mercury could not make changes without Plaintiff's acceptance of those changes via Plaintiff's decision not to opt out.  *See Lyons v. PNC Bank, N.A.*, 26 F.4th 180, 189 (4th Cir. 2022) ("Under Maryland law, a consumer's silence, ***including a failure to opt out***, may be considered an acceptance of modified terms so long as the parties' original agreement provides that such silence, following a specified form of notice, will be considered assent to the new terms."); *Bassett v. Elec. Arts, Inc.*, 93 F. Supp. 3d 95, 108 (E.D.N.Y. 2015) ("Given that [Defendant] provided Plaintiff with reasonable notice of the terms and the ability to opt out of or accept the new terms, . . . the Court determines that the agreement to arbitrate was not illusory.").

change in account terms," including changes to disputes and dispute resolution.   12 CFR 1026.9(c)(2)(i) and (ii); 1026.6(b)(2)(xv); 1026.9(c)(2)(iv)(B).[4]

Indeed, courts nationwide have held that a contract is not illusory so long as it requires notice of changes, even if that notice must be provided only as required by law.   For example, in *El-Hage v. Comerica Bank*, No. 20-10294, 2020 WL 7389041, at *5 (E.D. Mich. Dec. 16, 2020), the court rejected a plaintiff's argument that "the arbitration provision does not provide adequate notice" and is therefore unenforceable.   In actuality, the cardmember agreement at issue in that case states, "We will give you notice of any such change in the manner required by law" or "in the manner required by Ohio and federal law." *Id.* at *6.   The court explained that, because the "right of modification is 'limited by a notice or timing provision,' the right is not 'unlimited' and therefore the provision is enforceable." *Id.*; *see also Coleman v. Qwest Comms. Corp.*, No. Civ. A. 3:02CV2428-P, 2003 WL 22388482, at *3 (N.D. Tex. Sept. 30, 2003) (finding that modification provision providing notice of changes to arbitration provision as required by law "is not an illusory agreement").   Indeed, Mercury has not found a single case in which notice of changes or modifications to arbitration provisions provided "when required by law" has been found illusory.

Plaintiff's argument that the Arbitration Provision is illusory because it purportedly permits retroactive modification also fails.   The modification provision requires ***advance*** written notice.   Advance written notice of changes necessarily means that the changes are prospective rather than retroactive. *See, e.g.*, *Miguel v. JPMorgan Chase Bank, N.A.*, No. CV 12-3308 PSG (PLAx), 2013 WL 452418, at *6 (C.D. Cal. Feb. 5, 2013) (finding that an arbitration provision is not illusory

---

[4] Under Regulation Z, 12 CFR 1026.9(c)(2)(ii), a significant change in account terms includes a change to a cardholder's stated "right to dispute transactions," which must be disclosed at account opening in accordance with 12 CFR 1026.6(b)(2)(xv). As an initial matter, a cardholder's right to dispute a transaction is covered by the billing rights section of the Cardmember Agreement, but once those rights have been exhausted, a cardholder's disputes with the credit card company are governed by the general dispute provisions of the credit card agreement – making changes to any of the dispute provisions significant.

because it contains an advance notice provision and, thus, allows only prospective modifications); *Neukranz v. Conestoga Settlement Servs., LLC*, No. 3:19-CV-1681-L-BH, 2020 WL 5415526, at *9 (N.D. Tex. Jan. 22, 2020) ("Even if a party retains the ability to modify the arbitration agreement, it is not illusory if there is a 'savings clause' that requires advance notice and prevents its retroactive application."). It would be illogical to find that someone can provide ***advance*** written notice of changes that apply in the past. That is not notice at all, and it certainly is not advance.

Further, even in cases where an arbitration clause could potentially be construed to permit retroactive modification, courts nationwide have found that the implied covenant of good faith and fair dealing "prevents the party with the unilateral authority from retroactively modifying the contract to deprive the other party of the benefits of the contract." *Eiess v. USAA Fed. Sav. Bank*, 404 F. Supp. 3d 1240, 1250–51 (N.D. Cal. 2019); *see also Peleg v. Neiman Marcus Grp., Inc.*, 204 Cal. App. 4th 1425, 1465–66 (2012) (analyzing an arbitration provision under California law and finding it *not* illusory because "[a] unilateral modification provision that is silent as to whether contract changes apply to claims, accrued or known, is impliedly restricted by the covenant so that changes do not apply to such claims"); *Russ Berrie & Co. v. Gantt*, 998 S.W.2d 713, 718 (Tex. App. 1999) ("New Jersey law . . . implies a duty of good faith and fair dealing in all contracts . . . . Where a modification, interpretation, or discontinuation of the contract must comply with the duty of good faith, we conclude that the company could not refuse to comply with the arbitration clause once a dispute . . . arose. We conclude therefore, under the law chosen by the parties, that the contract is not illusory and the arbitration clause is enforceable."); *Lebowitz v. Dow Jones & Co.*, No. 12-1253-cv, 2013 WL 309996, at *1 (2d Cir. Jan. 28, 2013) ("Under New York law, a contract is not illusory merely because its terms give discretion to one party to the contract, as every contract

encompasses the implied duty of good faith and fair dealing."); *In re Cendant Corp. Litig.,* 264 F. 3d 286, 300 (3d Cir. 2001) ("An implied obligation to use good faith is enough to avoid the finding of an illusory promise.")

In another example, the Eleventh Circuit held under Ohio and Washington law that a change-in-terms provision permitting a bank to unilaterally change or add to its terms and conditions "at any time" did not render the arbitration provision illusory because the unilateral right was limited by the requirement of notice "as required under applicable law" and the duty of good faith and fair dealing.  *See Larsen v. Citibank FSB*, 871 F.3d 1295, 1317-18, 1320-21 (11th Cir. 2017).  In particular, even though the change-in-terms provision contained the "at any time" language and, thus, on its face, did not prohibit retroactive changes to the arbitration provision, the court found that the power to amend the arbitration provision was "not unfettered, unlimited, or absolute" because "[t]he agreement to arbitrate is fixed and is a core component of the [whole agreement]; only the terms defining the nature of arbitral proceedings are subject to alteration." *Id.* at 1321.  In other words, because of the implied covenant of good faith and fair dealing, the party with the power to amend terms and conditions "at any time" "is not empowered to simply evade the commitment to arbitrate at its whim."  *Id.*

Likewise, the Ninth Circuit has held that, where "the bilateral promise to arbitrate disputes is a fundamental part of the [arbitration provision]—a core obligation on which the rest of the [arbitration provision] hinges," it is "inappropriate to adopt an interpretation that would allow a boilerplate change-in-terms provision applicable to the [entire agreement that includes the arbitration provision] as a whole to nullify a core obligation of the [arbitration provision]." *Fagerstrom v. Amazon.com, Inc.*, 141 F. Supp. 3d 1051, 1065 (S.D. Cal. 2015), *aff'd sub nom. Wiseley v. Amazon.com, Inc.*, 709 F. App'x 862 (9th Cir. 2017).  The court further noted, as is the

case here, "[t]he irony" in a defendant "attempting to *carry out* its core obligation to arbitrate even as Plaintiffs argue that [the defendant] has no such obligation." *Id.* at 1065 n.5.

Although courts have not yet had an opportunity to apply this reasoning under South Dakota law, South Dakota likewise recognizes an implied covenant of good faith and fair dealing in every contract, and, thus, the same logic should apply. In contrast, "Texas does *not* recognize an implied covenant of good faith and fair dealing." *Godfrey v. Sec. Serv. Fed. Credit Union*, 356 S.W.3d 720, 726 (Tex. App. 2011) (emphasis added). For this reason, one court applying Texas law found that, "[u]nder Texas law, an arbitration agreement containing a modification provision must *expressly* state that a change in the agreement will not apply to a claim that has arisen or is known to the employer." *Peleg*, 204 Cal. App. 4th at 1466. Because Texas does not recognize the implied covenant of good faith and fair dealing, this finding is entirely distinguishable from the present case.

**B.    The Arbitration Provision is Not Illusory Under Maryland Law.**

The Arbitration Provision is not illusory under Maryland law either.[5] This case is unlike *Cheek v. United Healthcare of the Mid-Atl., Inc.*, 378 Md. 139, 149 (2003), which held that an arbitration agreement could not be enforced because it allowed the defendant to unilaterally modify the arbitration agreement at any time "with or *without* notice." (Emphasis added). There is no such language here. The Cardmember Agreement here is more like the language in *Holloman v. Circuit City Stores, Inc.*, 391 Md. 580, 592 (2006), where the Court found that the arbitration agreement was enforceable because the defendant could modify the terms of the arbitration agreement only *with* notice.

---

[5] Maryland and South Dakota follow the same contract principles.

9

**JA244**

This notice distinction applies to the Maryland cases cited by Plaintiff. In *Coady*, for example, the Fourth Circuit affirmed the denial of a motion to compel arbitration because the "Receipt" document that was incorporated into the arbitration agreement, and which included a modification provision, stated that modifications could be made with or ***without*** notice. 32 F.4th at 292. Similarly, Plaintiff relies heavily upon *Jones v. Prosper Marketplace, Inc.*, in which Judge Hazel held that a modification provision that allowed the defendant to "change any term or provision" while giving the defendant unfettered discretion to only providing "notice of ***material*** changes" rendered the arbitration provision illusory. No. GJH-21-893, 2022 WL 834210, at *14-15 (D. Md. Mar. 21, 2022). The same applies to *Raley v. Whitestake Improvements LLC*, in which Judge Boardman held that the provision "reserve[ing] the right to make changes ***at any time without notice***" rendered the arbitration provision illusory. No. CV DLB-22-194, 2022 WL 3975189, at *465 (D. Md. Sept. 1, 2022)). That is not the case here. Mercury provides notice of changes ***when required by law***.

Moreover, as explained above, the plain language of the modification provision requires Mercury to give ***advance*** written notice, which necessarily requires notice of prospective changes, rather than retrospective changes. *See Shepherd v. Burson*, 427 Md. 541, 545 (2012) (explaining that Maryland law requiring "advance written notice" of intent to foreclose means notice must be provided to homeowner before foreclosure action is initiated). And, like South Dakota, Maryland recognizes an implied covenant of good faith and faith dealing, which prevents one party from retroactively modifying the Arbitration Provision. *See CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 429 Md. 387, 450 (2012). Applying this logic, the District of Maryland has distinguished from the arbitration provision at issue in *Cheek* those which "merely . . . delegate[] discretion to define one of its terms on an ongoing basis to a single party, where both parties otherwise incur

10

**JA245**

binding obligations," and, thus, are not illusory. *Bindagraphics, Inc. v. Fox Grp., Inc.*, 377 F. Supp. 3d 565, 576 n.5 (D. Md. 2019) ("If there is a restriction, express or implied, on the promisor's ability to terminate or to refuse to perform, the promise is not illusory." (quoting 2 Corbin on Contracts § 5.28 (2018))); *see also Affable Servs., LLC v. C-Care LLC*, No. CV SAG-19-02877, 2020 WL 1675920, at *4 (D. Md. Apr. 6, 2020) ("An implied restriction on the promisor's ability to perform renders a promise 'not illusory,' because the implied restriction 'prevent[s] a party's promise from being performable merely at the whim of the promisor.' Under Maryland law, then, a party allotted discretion under the terms of a contract is limited to exercising that discretion in accordance with its general obligations of good faith and fair dealing." (internal citations omitted)).

Likewise, the Court of Appeals of Maryland[6] cited *Cheek* for the proposition that illusory contracts are unenforceable, but then went on to opine that "[t]his notwithstanding, courts generally 'prefer a construction [of a contract] which will make the contract effective rather than one which will make it illusory or unenforceable.'" *Questar Builders, Inc. v. CB Flooring, LLC*, 410 Md. 241, 272–79 (2009) (quoting *Kelley Constr. Co. v. Wash. Suburban Sanitary Comm'n*, 247 Md. 241, 247 (1967)). Thus, the court applied the implied covenant of good faith and fair dealing to contract provisions permitting a party to terminate for convenience and "decline[d] to accept [the party's] invitation to declare that the right to terminate for convenience here was a right to terminate the Subcontract for any reason whatsoever, including a bad reason or no reason." *Questar Builders, Inc.*, 410 Md. at 274. In other words, "where the right to terminate established by [the contract terms] left off, the implied obligation of good faith and fair dealing picks-up, thereby limiting the manner in which [the party] was permitted to exercise its discretion." *Id.*

---

[6] The name of the Court of Appeals of Maryland was changed to the Supreme Court of Maryland in December 2022. Because the case cited herein pre-dates December 2022, this brief refers to the former name of the court.

In addition, as explained above and unlike the other cases cited by Plaintiff, the Arbitration Provision is mutual; it binds both Parties. *Cf. Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582 (D. Md. 2013) (holding arbitration provision illusory because the language, "the company requests that **you** agree," "makes clear that arbitration is the exclusive avenue for an employee to resolve disputes, but does not bind the employer"); *Brent v. Priority 1 Auto. Grp., BMW of Rockville*, No. PWG-14-1705, 2016 WL 9724975, at *6 (D. Md. Aug. 4, 2016) (holding arbitration provision illusory because only "[t]he Employee agrees" to arbitration and only the Employee was required to sign the agreement).

Because the "Changes to Your Account" provision in the Cardmember Agreement does not allow Mercury to change the Arbitration Provision at its sole discretion without providing notice to cardholder (or without complying with applicable law), and because the promise to arbitrate is mutual, the Arbitration Provision binds both Parties and is not illusory. Indeed, when faced with materially similar arbitration provisions, this Court has compelled arbitration. *See James v. Synovus Bank*, No. CV TDC-19-1137, 2020 WL 1479115, at *4 (D. Md. Mar. 26, 2020) (compelling arbitration based on an arbitration provision contained in a clickwrap agreement); *Phears v. LVNV Funding, LLC*, No. CV RDB-20-2843, 2020 WL 7054806, at *2 (D. Md. Dec. 2, 2020) (compelling arbitration despite an underlying cardholder agreement which permitted modification); *Whitman v. Cap. One Bank (USA), N.A.*, No. CIV.A. WMN-09-1737, 2009 WL 4018523, at *2 (D. Md. Nov. 19, 2009) (compelling arbitration based on a broad arbitration provision that allowed for modifications).

This makes sense given the Supreme Court and Fourth Circuit's presumption in favor of arbitration. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) (discussing a liberal federal policy favoring arbitration agreements); *Waterford Inv. Servs., Inc. v.*

*Bosco*, 682 F.3d 348, 356 (4th Cir. 2012) (applying the federal presumption favoring arbitration to affirm a district court's decision to compel arbitration); *Washington Square Sec., Inc. v. Aune*, 385 F.3d 432, 437 (4th Cir. 2004) (construing an ambiguous arbitration clause in favor of arbitration); *Adkins v. Lab. Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2002) (holding that ambiguities regarding the scope of an arbitration clause should be resolved in favor of arbitration). Accordingly, the Court should grant Mercury's Motion.

## III.   The Arbitration Provision Does Not Violate Maryland Public Policy.

Plaintiff's argument that the Arbitration Provision violates Maryland public policy is meritless and cannot preclude arbitration.  Plaintiff argues that Mercury "extended credit to the Plaintiff and each Class member of less than $25,000" without obtaining a license to do so, in violation of the MCLL.  ECF 11 at 26.  Setting aside the fact that Mercury simply services credit cards issued by First Bank & Trust, Brookings, SC ("FB&T"), the crux of Plaintiff's case is that the Cardmember Agreement itself is void *ab initio* for failing to follow Maryland licensing laws. As explained in Mercury's Motion, ECF 7-1 at 13-15, the Supreme Court and circuits nationwide have uniformly held that these types of challenges must go to the arbitrator.  Mercury incorporates those authorities herein.

## IV.   Mercury Is Entitled to Invoke the Arbitration Provision.

Plaintiff incorrectly argues that the Cardmember Agreement does not apply to Mercury because it is not a party to, and not specifically named in, the Cardmember Agreement. Additionally, Plaintiff incorrectly argues that, because Velocity purchased Plaintiff's charged-off loan from FB&T and initiated its own debt collection action, any rights Mercury had under the Cardmember Agreement have been waived.  Contrary to Plaintiff's arguments, the Cardmember Agreement expressly permits Mercury to invoke the Arbitration Provision as FB&T's agent and because Plaintiff's claims arise out of the Cardmember Agreement.  Neither the sale of the

13

**JA248**

charged-off loan to Velocity nor Velocity's subsequent debt collection action have any effect on

Mercury's express rights under the Cardmember Agreement.

### A. Mercury May Invoke the Arbitration Provision as FB&T's Agent And Because Plaintiff's Claims Arise Out of the Cardmember Agreement.

As an initial matter, Plaintiff makes contradictory arguments as to Mercury's role, and its

resultant rights under the Cardmember Agreement.  Plaintiff states that, "on November 9, 2017,

FB&T assigned *all of its interests* in the [sic] Ms. Bailey's loan to 'CreditShop, Inc.,'" Mercury's

predecessor.  ECF 11 at 7 (emphasis added).  This claim is false and unsupported; however, if

FB&T assigned its all of interests to Mercury's predecessor, then it follows that Mercury stepped

into FB&T's shoes and therefore has the same right to invoke the arbitration provision as FB&T.

In actuality, Mercury services the credit cards issued by FB&T as FB&T's agent, thus

allowing Mercury to invoke the Cardmember Agreement's arbitration provision.  The Arbitration

Provision permits Mercury to compel arbitration because (1) Mercury is an agent of FB&T and

(2) Plaintiff's Complaint against Mercury relates to the Cardmember Agreement.  In *Crawl v.

Experian Info. Sols., Inc.*, for example, this Court considered a credit card issuer's assignment of

its rights under a cardmember agreement to another bank, which was expressly permitted under

the cardmember agreement at issue.  No. PJM 15-97, 2016 WL 8716597, at *1-3 (D. Md. Jan. 29,

2016).  The latter bank assigned to Continental Finance the servicing rights to the credit cards.  *Id.*

at *5.  This Court held that "terms expressly authorizing the sale or assignment of a contract are

generally enforceable, notwithstanding a party's later objection to the sale or assignment," and,

accordingly, "Continental Finance, as assignee and servicer under the transferred Agreement, may

enforce the Agreement's arbitration provision against [the plaintiff]."  *Id.* at *5-6.

Like in *Crawl*, the Cardmember Agreement gave FB&T the right to "assign any or all of

our rights under this Agreement," including servicing rights.  ECF 7-5 at 5.  The Arbitration

Provision expressly covers certain "Related Parties," including "agents" of FB&T and "any person or entity that you[] or we assert is potentially liable for the conduct at issue in a Dispute," and "governs all 'Disputes' between you and us (*or any Related Party*)." ECF 7-5 at 6 (emphasis added). The Arbitration Provision defines "Dispute" to mean "any claim, counterclaim, cross-claim, complaint, cross-complaint, controversy, or dispute between you or us arising under, out of, directly or indirectly related to your application, this Agreement or your relationship with us." *Id.* Mercury is a service provider to FB&T, and, accordingly, FB&T assigned servicing rights under the Cardmember Agreement to Mercury as its agent. Supplemental Declaration in Support of Defendant's Motion to Compel, at ¶¶ 4, 7 (hereinafter, "Supplemental Declaration"). Thus, even though Mercury is not a party to the Cardmember Agreement, Mercury is nonetheless covered by the Arbitration Provision as a Related Party because it is FB&T's agent and because Plaintiff asserts claims against Mercury arising out of the Cardmember Agreement.

Consistent with the "Related Parties" definition including "any person or entity that you[] or we assert is potentially liable for the conduct at issue in a Dispute," courts have held that non-signatories to an arbitration provision may still compel arbitration pursuant to that provision under the doctrine of equitable estoppel. *See Aune*, 385 F.3d at 435 (internal quotations omitted) ("The obligation and entitlement to arbitrate does not attach only to one who has personally signed the written arbitration provision" and "a nonsignatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties."); *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 418 (4th Cir. 2000) ("In the arbitration context, the [equitable estoppel] doctrine recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced

**JA250**

to benefit him."); *Vinjarapu v. Gadiyaram*, No. CV ADC-19-3306, 2020 WL 1170613, at *4 (D. Md. Mar. 11, 2020) ("[B]ecause Plaintiff Vinjarapu's claims against the nonsignatory Defendants 'arise out of and relate directly to the written agreement,' the nonsignatory Defendants independently have a right to compel Plaintiff Vinjarapu's claims against them to arbitration as well." (internal citation omitted)); *CD Partners, LLC v. Grizzle*, 424 F.3d 795, 798 (8th Cir. 2005) ("When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate.").

### B. FB&T's Sale of Plaintiff's Charged-Off Account to Third-Party Velocity Is Irrelevant to Mercury's Right to Invoke Arbitration.

That FB&T sold Plaintiff's charged-off loan to Velocity, which then pursued and settled a debt collection action against Plaintiff, has no effect on Mercury's right to compel arbitration as FB&T's agent or simply because the Complaint arises out of the Cardmember Agreement.  But assuming *arguendo* that Mercury could not compel arbitration for either of those reasons, Mercury may still compel arbitration as a "party aggrieved" under the FAA because Plaintiff's allegations against Mercury relate to Mercury's actions before FB&T sold Plaintiff's loan to Velocity.  *See Vainqueur Corp. v. Lamborn & Co.*, 305 F. Supp. 1007, 1008 (S.D.N.Y. 1969) (holding under the FAA that, "[w]hen there is a specific written agreement to arbitrate any dispute that may arise out of an agreement, and one of the parties to that agreement fails to comply with its terms, the other party is entitled to an order compelling arbitration even if that party has irrevocably assigned its rights under the agreement"); *Stations West, LLC v. Pinnacle Bank of Oregon*, No. CIV 06-1419-KI, 2007 WL 1219952, at *3 (D. Or. Apr. 23, 2007) ("Since plaintiff alleges a claim against Pinnacle for breach of contract while at the same time disclaiming the arbitration provision in that very contract, Pinnacle qualifies as '[a] party aggrieved' and may compel arbitration."); *Skymark*

*Properties Corp., Inc. v. Katebian*, No. 20-12372, 2022 WL 1054059, at *18 (E.D. Mich. Mar. 14, 2022), *report and recommendation adopted,* No. CV 20-12372, 2022 WL 964191 (E.D. Mich. Mar. 30, 2022) ("[T]he Court finds that although GreenLake assigned its interest in the Southfield Loan to SMCH, it retained the ability to rely on the Promissory Note's Arbitration Provision as to claims that "are based in part on facts that arose before [the] assignment.'" (internal citation omitted)).  Here, FB&T did not sell Plaintiff's loan to Velocity until October 2020 (Supplemental Declaration ¶ 8), and Plaintiff's allegations against Mercury concern Mercury's servicing of Plaintiff's account under the Cardmember Agreement, which commenced in 2018 (ECF 7-2 ¶ 11).

Nor does Velocity's separate debt collection action result in waiver of Mercury's right to compel arbitration in this action.  Earlier this month, in *Holloman v. Consumer Portfolio Servs., Inc.*, this Court examined whether, by filing an earlier collection action in state court, defendants waived their right to compel arbitration by "act[ing] inconsistency with their right to arbitrate the instant action."  No. CV RDB-23-134, 2023 WL 4027036, at *9 (D. Md. June 15, 2023).  One of the factors considered was "whether the claims sought to be compelled to arbitration in this case are 'related' to the claims litigated in state court."  *Id.*; *see also Hosp. Builders, Inc. v. Spokane S. Medical, LLC*, No. 1:20-CV-01017-CBK, 2020 WL 5969251, at *1 (D. S.D. Oct. 8, 2020) (stating that "activity inconsistent with the right to arbitration" is also an element of the test for waiver of arbitration under South Dakota law).  The court ultimately determined that, "[b]ecause Plaintiff could have brought this lawsuit regardless of whether the Collection Case was filed, this Court finds that the factual record indicates that [Plaintiff's] claims are insufficiently related to the prior collection case to show that Defendants waived their right to compel arbitration."  *Holloman*, 2023 WL 4027036, at *10; *see also Ford v. UHG I, LLC*, No. 22-CV-00840-LKG, 2023 WL 2185751, at *6–7 (D. Md. Feb. 23, 2023) (holding that, because "the claims in this case do not arise from

17

**JA252**

the previous debt-collection litigation," "the Court concludes that claims in the two cases are not sufficiently related to show Defendants waived their right to compel arbitration"); *cf. Cain v. Midland Funding, LLC*, 452 Md. 141, 159-60 (Md. 2017) (finding waiver of right to compel arbitration because the plaintiff's "claims [in the instant action] *would not exist* if [the defendant] had not obtained a final judgment against him while it was unlicensed" (emphasis added)). Likewise, in the present action, Plaintiff could have brought this action regardless of whether Velocity filed the collection action, and, thus, the actions are insufficiently related to constitute waiver.

Even if the sale of Plaintiff's account to Velocity was relevant (and as shown above, it is not), it certainly doesn't apply across her putative class of all Maryland residents with Mercury cards. Plaintiff does not allege and cannot allege that all of these accounts have been sold to Velocity. If she truly considered the sale of her account to Velocity to be relevant to the determination whether the Arbitration Provision controls, then she would not propose to stand as a representative for a putative class of plaintiffs including consumers whose accounts were not sold to Velocity.

## V.    The Court Should Strike the Class Allegations.

Plaintiff does not engage on the legal arguments Mercury made on the enforceability of class waivers. Instead, Plaintiff argues that the Court should not consider the Cardmember Agreement's class action waiver because she (intentionally) did not attach that document to her Complaint. Rule 23 provides that "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A); *see* 7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1785 (3d ed. 2005) ("[T]he court has an independent obligation to decide whether an action brought on a class basis is to be so maintained even if neither

of the parties moves for a ruling under subdivision (c)(1)."). It is "sensible . . . to permit class allegations to be stricken at the pleading stage" if it is "apparent from the pleadings that the class cannot be certified" because "unsupportable class allegations bring 'impertinent' material into the pleading" and "permitting such allegations to remain would prejudice the defendant by requiring the mounting of a defense against claims that ultimately cannot be sustained." *Donelson v. Ameriprise Fin. Servs., Inc.*, 999 F.3d 1080, 1092 (8th Cir. 2021), *cert. denied*, 142 S. Ct. 2675 (2022) (reversing the district court's denial of defendants' motion to strike a class-action). Courts should grant motions to strike "when, after accepting all of the plaintiff's claims as true, no additional evidence the plaintiff could provide via discovery or a class certification hearing would permit the Court to certify the proposed class." *See Tucker v. Ford Motor Co.*, No. 4:22-CV-00430-AGF, 2023 WL 2662887, at *3 (E.D. Mo. Mar. 28, 2023).

The pleadings are clear that a class cannot be certified. Though Plaintiff intentionally excluded the Cardmember Agreement from her complaint, she referred to it repeatedly in her Complaint. In other words, the Cardmember Agreement is an integral part of Plaintiff's Complaint. *See Brennan v. Deluxe Corp.*, 361 F. Supp. 3d 494, 501 (D. Md. 2019) ("[A] court may consider documents that are explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits.") (quotations omitted). Plaintiff accepted and agreed to the terms of the Cardmember Agreement, part and parcel of which is the binding Arbitration Provision prohibiting class actions. ECF 7-5 at 5-8.

No discovery will change the prohibition against class actions. Indeed, Mercury's 2018 letters to Plaintiff notifying her of the upcoming conversion to a Mercury Mastercard® credit card

account issued by FB&T specifically informed Plaintiff of the Arbitration Provision, which contains the class action waiver. ECF 7-2 ¶¶ 11-15.[7]

Allowing Plaintiff's class allegations to remain would require Mercury to continue to defend against a claim that will inevitably fail as a matter of law. Accordingly, the Court should grant Mercury's motion to strike class allegations.

## **<u>CONCLUSION</u>**

WHEREFORE, Defendant respectfully requests that the Court grant the Motion to Compel Arbitration and Stay Proceedings and to Strike the Class Allegations.

---

[7] Additionally, Plaintiff's Opposition raises a new reason why her proposed class cannot be certified. The Complaint alleges that the Plaintiff Class consists of "[a]ll Maryland residents to whom Mercury made loans which are subject to the MCLL, where the loan application originated in Maryland and the borrower made one or more payments to Mercury on the loan." Compl. ¶ 44. Yet, the Opposition and Exhibit 2 to the Opposition bring to light that FB&T sold Plaintiff's loan account to Velocity in October 2020. ECF 11 at 26-27. Accordingly, if the class allegations survive (and as argued above, they should not), the Plaintiff Class would actually have to consist of "[a]ll Maryland residents to whom Mercury made loans which are subject to the MCLL, where the loan application originated in Maryland and the borrower made one or more payments to Mercury on the loan," and ***where the loan was charged off and sold to Velocity***.

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on June 30, 2023, a copy of the foregoing ***Reply in Support of Motion to Compel Arbitration and Stay Proceedings and Strike Class Allegations*** was electronically filed via the Court's CM/ECF system and served on all counsel of record.

*/s/ Melissa O. Martinez*
Melissa O. Martinez

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ANGELITA BAILEY, | * |
| *On Her Own Behalf and on Behalf of All Others Similarly Situated*, | *    Civil Action No. 8:23-cv-827 |
| | *    [Removed from the Circuit Court for |
| Plaintiff, |      Montgomery County, Maryland |
| v. | *    Case No. C-15-CV-23-000224] |
| | * |
| MERCURY FINANCIAL, LLC, | * |
| Defendant. | * |

    *      *      *      *      *      *      *      *      *      *      *      *

## SUPPLEMENTAL DECLARATION OF MERCURY FINANCIAL, LLC

1.     I, Janet Gigeous, am over the age of eighteen, have personal knowledge of the facts set forth herein, and am otherwise competent to testify.

2.     I am employed by Mercury Financial, LLC ("Mercury") as Head of Customer Operations, and I am an authorized representative of Mercury for the purposes of providing this Declaration.

3.     I am familiar with the business and record-keeping practices of Mercury.  I make this Declaration on my own personal knowledge or upon my investigation of the books and records of Mercury.

4.     Mercury is a service provider to First Bank & Trust, Brookings, SD ("FB&T"). The "Terms of Use" page of Mercury's website expressly states that "Mercury Financial is a service provider to FB&T," and that "Mercury Financial also operates this Website on behalf of [FB&T]."  A true and correct copy of the Terms of Use webpage is attached hereto as **Exhibit 1**.

1

# JA257

5.    The Cardmember Agreement governs the relationship between Mercury and Plaintiff.

6.    FB&T is the issuer of Plaintiff's credit card account governed by the Cardmember Agreement.

7.    In or about 2018, FB&T assigned its servicing responsibilities and rights under the Cardmember Agreement to Mercury.

8.    On or about October 13, 2020, FB&T sold Plaintiff's charged-off credit card account to Velocity Investments, LLC.

9.    I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 29, 2023

_____
Janet Gigeous
Head of Customer Operations

2

**JA258**

# EXHIBIT 1



# Terms of Use

PLEASE READ THESE TERMS OF USE CAREFULLY. BY ACCESSING OR USING THIS WEBSITE YOU AGREE TO BE BOUND BY THESE TERMS OF USE, AS THEY MAY BE MODIFIED FROM TIME TO TIME. THESE TERMS OF USE GOVERN ONLY THE USE OF THIS WEBSITE. THE TERMS APPLICABLE TO YOUR ACCOUNT ARE SET FORTH IN YOUR ACCOUNT AGREEMENT.

THESE TERMS OF USE ARE SUBJECT TO CHANGE. ANY CHANGES WILL BE INCORPORATED INTO THE TERMS OF USE POSTED TO THIS WEBSITE FROM TIME TO TIME. IF YOU DO NOT AGREE WITH THESE TERMS OF USE, PLEASE DO NOT ACCESS THIS WEBSITE.

These Website Terms of Use (the "Terms of Use") apply to this website ("Website") operated by Mercury Financial LLC (collectively, "Mercury Financial", "we", "us", or "our"). Mercury Financial also operates this Website on behalf of First Bank & Trust, Brookings, SD ("FB&T"). This Website is the property of Mercury Financial. Mercury Financial is a service provider to FB&T. By using this Website, you agree to these Terms of Use. You should print a copy of these Terms of Use for your records.

Unauthorized use of or entry into the Website and our systems, including but not limited to misuse of passwords, or misuse of any information posted to a site, is strictly prohibited.

You acknowledge that we may disclose and transfer any information that you provide through this Website or through other communication with us: (i) to FB&T and its affiliates, agents, service providers, or information providers for accounts provided by FB&T; (ii) to our affiliates, agents, service providers, or information providers; (iii) to any other person or entity with your consent or as provided in the Privacy Notice; or (iv) if we have a right or duty to disclose or are permitted or compelled to so disclose such information by law. You consent to the transmission, transfer or processing of such information to, or through, any country in the world, as we deem necessary or appropriate (including to countries outside the United States), and by using and providing information through this Website you agree to such transfers.

**Consent to Tracking Technologies Notices**
You consent to the use of tracking technologies on the Website to collect and record your real-time activities and movements across Website throughout your browsing session, including to track button clicks, mouse movements, scrolling, resizing, touches, keystrokes, data entered,



which may change from time-to-time, for these purposes. Please review our Privacy and Security Policy for more information about our collection, use, and sharing of Session Data.

Your use of this Website signifies your agreement to the Privacy Notice, which is incorporated herein by reference and which may change from time to time.

**Changes to these Terms of Use and the Website**
We may change, add to, or delete aspects of these Terms of Use from time to time. Such changes will not impose additional obligations on you with respect to actions you took before the change became effective unless you specifically agree to such changes. If these Terms of Use are materially changed, we will give notice to you by posting an updated version of these Terms of Use on this Website. Please check our Website periodically for updates. Every time you use the Website, you are agreeing to the then-current Terms of Use and Privacy and Security Policy. In addition, we may modify or discontinue any part of the Website or offer opportunities to some or all Website users. Any purported amendment to these Terms of Use by you must be agreed to by us in writing.

To be eligible to use this Website, you must be at least 18 years old and a resident of the United States (excluding overseas territories). You represent and warrant that you meet these requirements.

**Copyright Notices**
The works of authorship contained in the Website, including but not limited to all design, text, sound or video recordings and images, are owned, except as otherwise expressly stated, by us. Except as otherwise expressly stated herein, they may not be copied, transmitted, displayed, performed, distributed (for compensation or otherwise), licensed, altered, framed, stored for subsequent use or otherwise used in whole or in part in any manner without our prior written consent, except to the extent permitted by applicable law, and then, only with notices of our proprietary rights. Notwithstanding the foregoing, you may download information and print out hard copies for your personal use, so long as you do not remove any copyright or other notices.

**Trademark Notices**
"Mercury" and the Mercury logo are registered trademarks of Mercury Financial LLC.

**Web Content and Materials**
The information on this Website is for information purposes only. We believe it is reliable and truthful, but we do not warrant its completeness, timeliness or accuracy. The information and materials contained in this Website, and the terms of their access and, are subject to change without notice or as provided in these Terms of Use. Products and services described, as well

**JA261**



through this Website, please refer to the terms and conditions associated with each such account or service, which will be provided to you at the time you are approved for an account or other service.

You agree that: (i) you will not engage in any activities related to the Website contrary to applicable law, regulation or the terms of any agreements you may have with us; or any related service provider, which includes, without limitation, FB&T for accounts provided by FB&T (ii) in circumstances where locations of the Website require identification, you will establish and use commercially reasonable security procedures and controls to limit access to your password or other identifying information to authorized individuals; (iii) you will not use any device, software, routine, file or other tool or technology, including but not limited to any viruses, trojan horses, worms, time bombs or cancelbots, intended to damage, interfere with, or slow the proper working of this Website or to surreptitiously intercept or expropriate any system, data or personal information from this Website; and (iv) you will not take any action that imposes an unreasonable or disproportionately large load on the Website infrastructure, including but not limited to denial of service attacks, "spam" or any other such unsolicited overload technique. You are responsible for the technology required to access the Website, including all communication lines, hardware, software (including without limitation maintenance and use of the most current and secure version of the applicable browser), and Internet access.

WE OR OUR SUPPLIERS MAY DISCONTINUE OR MAKE CHANGES IN THE INFORMATION, PRODUCTS OR SERVICES DESCRIBED HEREIN AT ANY TIME WITHOUT PRIOR NOTICE TO YOU AND WITHOUT ANY LIABILITY TO YOU. ANY DATED INFORMATION IS PUBLISHED AS OF ITS DATE ONLY, AND WE DO NOT UNDERTAKE ANY OBLIGATION OR RESPONSIBILITY TO UPDATE OR AMEND ANY SUCH INFORMATION. WE RESERVE THE RIGHT TO TERMINATE ANY OR ALL WEBSITE OFFERINGS OR TRANSMISSIONS WITHOUT PRIOR NOTICE TO YOU. BY OFFERING THIS WEBSITE AND INFORMATION, PRODUCTS OR SERVICES VIA THIS WEBSITE, NO DISTRIBUTION OR SOLICITATION IS MADE BY US TO YOU OR ANY OTHER PERSON TO USE THE WEBSITE OR SUCH INFORMATION, PRODUCTS OR SERVICES IN JURISDICTIONS WHERE THE PROVISION OF THE WEBSITE AND SUCH INFORMATION, PRODUCTS OR SERVICES IS PROHIBITED BY LAW.

**Potential Disruption of Service**

Access to the Website and the financial services we provide through it may from time to time be unavailable, delayed, limited or slowed due to, among other things:

- hardware failure, including among other things failures of computers (including your own computer), servers, networks, telecommunication lines and connections, and other electronic and mechanical equipment;

**JA262**

6/30/23, 9:47 AM    Terms of Use - Mercury® Financial



other content;

- overload of system capacities;

- damage caused by weather, earthquakes, wars, insurrection, riots, civil commotion, act of God, accident, fire, water damage, explosion, mechanical breakdown or natural disasters;

- interruption (whether partial or total) of power supplies or other utility of service;

- strike or other stoppage (whether partial or total) of labor;

- governmental or regulatory restrictions, exchange rulings, court or tribunal orders or other human intervention; or

- any other cause (whether similar or dissimilar to any of the foregoing) whatsoever beyond our control.

## Links to Other Sites

Links on this Website to other third-party websites are provided solely as pointers to information on topics that may be useful, and we have no control over the content on such third party websites. If you choose to access or use a link to a third party website not controlled by us, we make no warranties, either express or implied, concerning such website and associated content, including the accuracy, completeness, reliability or suitability thereof for any particular purpose, non-infringement of copyright, trademark or other rights of third parties, or freedom from viruses or other contamination. We do not guarantee the authenticity of documents on the Internet. Links we may maintain to third party websites do not imply any endorsement of or responsibility for the opinions, ideas, products, information or services offered at such sites, or any representation regarding the content at such websites. Each such third party website may have a different privacy policy, terms of use, and level of security than our website.

## LIMITATION OF LIABILITY

BECAUSE OF THE POSSIBILITY OF HUMAN AND MECHANICAL ERROR AND OTHER FACTORS, THIS WEBSITE (INCLUDING ALL INFORMATION AND MATERIALS CONTAINED ON THE WEBSITE) IS PROVIDED "AS IS" AND "AS AVAILABLE". WE AND OUR THIRD-PARTY DATA PROVIDERS PROVIDE NO WARRANTIES AND REPRESENTATIONS REGARDING THE WEBSITE, AND DISCLAIM ALL WARRANTIES AND REPRESENTATIONS OF ANY KIND WITH REGARD TO THE WEBSITE, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT OF THIRD PARTY RIGHTS, FREEDOM FROM VIRUSES OR OTHER HARMFUL CODE, OR FITNESS FOR ANY

**JA263**



USER'S BROWSER OR OTHER SITE ACCESSING PROGRAM, OR ANY OTHER PROBLEMS EXPERIENCED BY THE USER DUE TO CAUSES BEYOND OUR CONTROL. NO LICENSE TO THE USER IS IMPLIED IN THESE DISCLAIMERS. WE AND OUR THIRD PARTY DATA PROVIDERS DO NOT WARRANT THE ACCURACY, ADEQUACY, OR COMPLETENESS OF THE INFORMATION AND MATERIALS CONTAINED ON THE WEBSITE AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE MATERIALS AND INFORMATION. FURTHERMORE, WE AND OUR AFFILIATES WILL NOT BE LIABLE FOR ANY DELAY, DIFFICULTY IN USE, COMPUTER VIRUSES, MALICIOUS CODE, OR OTHER DEFECT IN THE WEBSITE, ANY INCOMPATIBILITY BETWEEN THE WEBSITE AND THE USER'S FILES AND THE USER'S BROWSER OR OTHER SITE ACCESSING PROGRAM, OR ANY OTHER PROBLEMS EXPERIENCED BY THE USER DUE TO CAUSES BEYOND OUR AND OUR AFFILIATES' CONTROL. NO LICENSE TO THE USER IS IMPLIED IN THESE DISCLAIMERS. NOTHING HEREIN SHALL BE CONSTRUED AS LIMITING OR REDUCING OUR RESPONSIBILITIES AND OBLIGATIONS TO CLIENTS IN ACCORDANCE WITH APPLICABLE LAW GOVERNING THE FINANCIAL SERVICES WE PROVIDE. UNDER NO CIRCUMSTANCES WILL WE BE LIABLE FOR ANY LOST PROFITS, LOST OPPORTUNITY OR ANY INDIRECT, CONSEQUENTIAL, INCIDENTAL, SPECIAL, PUNITIVE, OR EXEMPLARY DAMAGES ARISING OUT OF ANY USE OF OR INABILITY TO USE THE WEBSITE OR ANY PORTION THEREOF, REGARDLESS OF WHETHER WE HAVE BEEN APPRISED OF THE LIKELIHOOD OF SUCH DAMAGES OCCURRING AND REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, WARRANTY, TORT, (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR OTHERWISE.

**Enforceability and Governing Law**

Headings are for reference purposes only. Our failure to exercise or enforce any right or provision of these Terms of Use shall not constitute a waiver of such right or provision. In the event any of the terms or provisions of these Terms of Use shall be held to be unenforceable, the remaining terms and provisions shall be unimpaired, and the unenforceable term or provision shall be replaced by such enforceable term or provision as comes closest to the intention underlying the unenforceable term or provision. These Terms of Use shall be subject to any other agreements you have entered into with us. Your access to and use of the Website, and these Terms of Use, are governed by the laws of the State of South Dakota without giving effect to its conflict of laws provisions, and by the applicable laws of the United States. YOU AGREE THAT ANY ACTION BROUGHT BY YOU, AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THESE TERMS AND USE OR THIS WEBSITE SHALL BE FILED ONLY IN THE STATE OR FEDERAL COURTS LOCATED IN BROOKINGS, SOUTH DAKOTA AND YOU HEREBY CONSENT AND SUBMIT TO THE PERSONAL JURISDICTION OF SUCH COURTS FOR THE PURPOSES OF LITIGATING ANY ACTION BROUGHT BY EITHER OF US IN SUCH COURTS. If for any reason a claim proceeds in court, we each waive any right to a jury trial and agree to proceed only on an individual basis and not in a class, consolidated, or representative action.

**JA264**



where their contents are illegal is prohibited.

**Contacting Us**

If you choose to send us an email message, we may retain the content of the email, your email address, and our response in order to service your needs.

We or a third party acting on our behalf may use the data that you provide to send you email offers that may be of special interest to you. If you unsubscribe from these email messages, you will not receive these messages from us via email.

Please note that some of our services, including the Website, require a valid email address in order to register and/or continue use of the service. You will receive email alerts or notification messages from these programs unless you un-enroll from these services.

**Last Updated:** June 24, 2021.

 

Privacy Notice

Terms of Use

Privacy & Security Policy

About Our Ads

Contact Us



4.4





This card is issued by First Bank & Trust, Brookings, SD pursuant to a license by Mastercard® International Incorporated or Visa® USA Incorporated, and managed by Mercury® Financial. All trademarks are the property of their respective owners.

© 2023 Mercury® Financial LLC all rights reserved.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division**

ANGELITA BAILEY,           :
                                :
individually, and on behalf of   :
all others similarly situated,    :
                                :     Civil Action No. 8:23-cv-827-DKC
               Plaintiff,    :
                                :
v.                             :
                                :
MERCURY FINANCIAL, LLC,   :
                                :
              Defendant.   :

_____

**PLAINTIFF'S SURREPLY IN OPPOSITION TO DEFENDANT'S MOTION TO
COMPEL ARBITRATION AND STAY PROCEEDINGS AND TO STRIKE CLASS
ALLEGATIONS**

Plaintiff, Angelita Bailey, files this Surreply to respond to five new arguments, a new

declaration and a new document from Defendant Mercury Financial, LLC ("Mercury"), in its

Reply in Support of Motion to Compel Arbitration and Stay Proceedings and Strike Class

Allegations. *See* ECF No. 15 (the "Reply").

**I.**    **Introduction**

Most of the arguments in Mercury's Reply were already refuted in Plaintiff's Opposition

to Mercury's motion. *See* ECF No. 11 (the "Opposition"). Plaintiff will not address those

arguments again here. However, Mercury's Reply included five *new* arguments, which it

contends are supported in part by a *new* declaration (*see* ECF No. 15-1) (the "New Declaration")

and a *new* document (see ECF No. 15-2) (the "New Terms of Use"). Plaintiff never had the

opportunity to see or respond to the new arguments or affidavit in her Opposition.

Mercury's five new arguments are:

1. That Mercury is the agent of First Bank & Trust;

2. That FB&T sold Plaintiff's account directly to Velocity;

3. That federal law requires Mercury to provide Plaintiff advance notice of changes to the arbitration and delegation clauses which Mercury relies upon here;

4. That the language of the Cardholder Agreement prohibits retroactive changes to the arbitration and delegation clauses; and,

5. That the Court should save the arbitration and delegation clauses in the Plaintiff's illegal loan agreement from being illusory by applying the equitable "implied covenant of good faith and fair dealing."

Although Plaintiff did not have the opportunity to respond to Mercury' new documents or arguments in the normal course of briefing, none of these documents or arguments support compelling Plaintiff to arbitrate, as discussed below.

## II.    Mercury Has Provided No Evidence that It Is the Agent of the Owner of Plaintiff's Account

First, Mercury has provided no evidence to support its new argument that it is FB&T's agent, only an unsupported allegation in a brief. In any event, FB&T sold Plaintiff's account long ago, so if Mercury really was FB&T's agent it would not make a difference.

As discussed in Plaintiff's Opposition to Mercury's motion to compel arbitration, one of the reasons that Mercury cannot compel arbitration is that it the arbitration and delegation clauses that Mercury relies upon do not even purport to be agreements between Plaintiff and Mercury, and do not purport to benefit Mercury or to allow Mercury to invoke them. Instead, the arbitration and delegation clauses, by their terms, purport only to be agreements between FB&T and Plaintiff.

**JA268**

In its Reply, Mercury addresses that argument by repeatedly making the unsupported new argument that "Mercury is nonetheless covered by the Arbitration Provision as a Related Party **because it is FB&T's agent**." Reply at 15 (emphasis added). But despite filing two affidavits – including the new affidavit with its Reply brief – Mercury has provided absolutely *no evidence* that it "is FB&T's agent." Instead, Mercury's original declaration claims that FB&T assigned it servicing rights in 2017 (*see* ECF No. 7-2 ¶ 5) and its New Declaration claims that FB&T assigned it servicing rights in 2018 (*see* ECF No. 15-1 ¶ 7). But neither declaration presents any evidence that any assignment of servicing rights carried with it the status of being FB&T's agent.

And though Mercury submits its New Terms of Use to support its argument that it is FB&T's agent, that new document actually supports reaching the opposite conclusion. The New Terms of Use do not ever refer to Mercury as FB&T's agent. Instead, they permit Mercury to "disclose and transfer any information that you provide through this Website or through other communication with us: (i) to FB&T['s] … agents." ECF No. 15-2. If anything, that provision suggests that Mercury is *not* FB&T's agent, as it identifies FB&T's agents as separate parties with whom it can share information. Furthermore, the New Terms of Use are dated June 24, 2021 – ECF No. 15-2 at 7 – which, according to Mercury's own New Declaration was long after Plaintiff's account was assigned away from FB&T. *See, e.g.*, ECF No. 15-1 ¶ 8 (claiming Plaintiff's account was assigned by FB&T to Velocity in October, 2020).

Which leads to the perhaps more important point that Mercury has presented no evidence that it is or ever was the agent (or even servicer) of the *current* owner of the account. That is crucially important. Again, Mercury's new affidavit states that FB&T *sold its rights* to Velocity some three years ago. *See* ECF No. 15-1 at ¶ 8. The assignment means that Velocity

**JA269**

now stands in FB&T's shoes – and now, only Velocity and its agents would be able to invoke any arbitration or delegation clauses, not Mercury:

> This Court has observed that an assignment allows a third party to "stand in the shoes" of an original party to the contract, *Miller v. Pac. Shore Funding*, 224 F. Supp. 2d 977, 996 (D. Md. 2002), "transfer[ring] all interests in the property from the assignor to the assignee." *Roberts v. Total Health Care, Inc.*, 349 Md. 499, 709 A.2d 142, 148 (Md. 1998). As Judge Blake of this Court has previously noted, an assignment effectively replaces the name of the assignor in the contract with that of the assignee, removing any need for a contract to anticipate an assignee by, for example, specifically naming him as a future party. *Graham v. Santander Consumer USA, Inc.*, No. CCB-17-3148, 2018 WL 2462881 at *2, 2018 U.S. Dist. LEXIS 91802 at *6 (D. Md. June 1, 2018).

*Holloman v. Consumer Portfolio Servs., Inc.*, No. CV RDB-23-134, 2023 WL 4027036, at *8 (D. Md. June 15, 2023). Critically, Mercury provides no evidence, or even any claim, that it is the agent or even servicer of the account's current owner, Velocity.

In fact, this case is the "flip side" of *Holloman v. Consumer Portfolio Servs., Inc*. In *Holloman*, the plaintiff argued that an undisputed agent of the *assignee* was not able to compel arbitration because it was not the agent of the *assignor* – but the Court rejected that argument because the assignee had replaced the assignor, and stood in its shoes. *See id.* So, in *Holloman*, the assignee's agent was covered by the arbitration clause – but the assignor's agent would not have been because it sold its rights away.

The situation here is the opposite of *Holloman*. Here, Mercury claims only to be the agent of the assignor, FB&T, who was long ago replaced by the assignee, Velocity. Mercury does not even claim to be an agent of the assignee Velocity – so when Velocity took assignment of Plaintiff's account, any rights that Mercury had as the purported agent of the assignor were extinguished and those rights only apply to Velocity's agents. *See Holloman*, 2023 WL 4027036, at *8.

Mercury has not shown that it is an agent of the owner of Plaintiff's account, which is one reason, among the many reasons discussed in the Opposition, that no arbitration agreement exists between Mercury and Plaintiff.

## III.   Mercury's New Affidavit Creates A Dispute of Material Fact and Demonstrates the Need for Discovery

Mercury's New Declaration introduces purported facts about the assignment of Plaintiff's account which conflict with its prior declarations, creating disputes of material fact highlighting the need for discovery.

Where the facts about concerning assignment of arbitration rights are ambiguous, discovery is appropriate. *See*, *e.g.*, *Kennedy v. LVNV Funding LLC*, No. CV1810695JMVCLW, 2019 WL 1789477, at *3 (D.N.J. Apr. 24, 2019)("the Court finds that arbitrability is ambiguous on the face of the Complaint and documents relied upon therein; it is unclear whether an arbitration agreement exists between the parties to this action."); *Page v. N.A.R. Inc*., No. 18CV2200KSHCLW, 2019 WL 1370146, at *4 (D.N.J. Mar. 26, 2019) (plaintiff "must be given the opportunity to conduct limited discovery into whether [original creditor] Crest validly assigned its rights to [debt buyer] NAR and thereby enabled NAR to invoke the arbitration provision"); *Lance v. Midland Credit Mgmt. Inc*., 375 F. Supp. 3d 604, 616 (E.D. Pa. 2019) ("we have no basis today to find Synchrony Bank sold its 'rights', including the right to arbitrate, when it sold its 'Accounts' to Midland Funding in a Bill of Sale. We are not reviewing a question of whether Mr. Lance agreed to arbitrate. We are instead reviewing whether Synchrony Bank's assignment of its 'Accounts' includes the separate "rights" to arbitrate. Midland needs to show us what it purchased. As of today, it has not done so.")

Here, as in *Lance*, Mercury has not shown the Court that it is the holder of a right to arbitrate – and its claims about when and to whom rights in Plaintiff's account was sold are conflicting and confusing. In particular, Velocity's state District Court affidavit and supporting documents claim that Velocity acquired Plaintiff's account from *CreditShop*, Mercury's predecessor – but Mercury's New Declaration now claims that Velocity acquired Plaintiff's account directly from FB&T. *See* ECF No. 11-2 at 2 ¶ 3, 46; *see also* ECF No. 15-1 ¶ 8.  And, as mentioned above, Mercury's original declaration claims that FB&T assigned it servicing rights in 2017 (*see* ECF No. 7-2 ¶ 5) but its New Declaration claims that FB&T assigned it servicing rights in 20*18* (*see* ECF No. 15-1 ¶ 7). Aside from these materially conflicting claims, Mercury's New Declaration does not provide any facts about those assignments, or what rights were assigned from FB&T to CreditShop, or what rights were assigned from CreditShop to Velocity, or why its information about assignment is different from what was presented to the state District Court. As a result, Plaintiff and the Court are left with only Mercury's conflicting declarations and the spare and incomplete documents which the current owner Velocity filed in the state District Court. *See* Plaintiff's Opposition, Exh. 2. Those documents state that Velocity is the current owner of the account, and leave no reason to believe that Mercury has any arbitration or delegation rights. Instead, the currently available documents paint a very incomplete picture. Many salient facts concerning the multiple assignments of Plaintiff's account have been obscured by Mercury's conflicting claims and failure to submit any documents concerning those assignments. Discovery is necessary to clarify who was sold what rights, and when.

Accordingly, to the extent that the Court entertains Mercury's argument that it can invoke arbitration or delegation clauses which never mention it, discovery is necessary to flesh out the facts concerning assignment and what rights were assigned to whom – for example, according to the documents Velocity submitted under affidavit in the state District Court, a

"Management Agreement," "Asset Purchase Agreement," and "Interim Servicing Agreements" related to Plaintiff's loan were apparently assigned on November 9, 2017, and would bear on Mercury's current status – particularly because Mercury claims to be a "servicer" and at least two of the agreements mentioned concern servicing in their title. *See* Exh. 2 to Opp. at 42-45. In addition, the rights assigned to Velocity are apparently specified in a "Purchase and Sale Agreement dated January 30, 2020" related to Plaintiff's loan *See id*. at 46. To the extent Mercury is arguing that it has an existing arbitration or delegation agreement with Plaintiff that was not assigned away under those agreements, it is essential that Plaintiff and the Court at least have the opportunity to see those agreements and what they actually say about what rights are or are not assigned.

The details of the multiple assignments and the rights assigned are material to the question at hand – indeed, Mercury's own declarations in support of its motion to compel arbitration reference the assignments repeatedly. But the details of the assignments are not currently available to Plaintiff or the Court; they are contained in the agreements described above which have not been produced. On this sparse record, the Court cannot conclude that Mercury is entitled to arbitrate as a matter of law. Discovery is necessary. *See, e.g.,* Fed.R.Civ.P. 56(d); *Rose v. New Day Fin., LLC*, 816 F.Supp.2d 245, 252 n. 5 (D.Md.2011); *Whitten v. Apria Healthcare Grp., Inc.*, No. PWG-14-CV-3193, 2015 WL 2227928, at *4 (D. Md. May 11, 2015).

## IV.   Federal Law Does Not Require Advance Notice of Changes to the Purported Arbitration or Delegation Agreements.

Mercury also newly argues that the arbitration and delegation clauses at issue are not illusory despite the unilateral change-in-terms clause which applies to them on the supposed grounds that "federal law requires that credit card companies provide their cardholders with advance written notice of, and a right to reject, any "significant change in account terms,"

7

**JA273**

including changes to disputes and dispute resolution. 12 CFR1026.9(c)(2)(i) and (ii); 1026.6(b)(2)(xv); 1026.9(c)(2)(iv)(B).

Mercury's argument is misleading at best. Nothing in the cited regulations even arguably requires disclosure of changes to arbitration or delegation agreements. Instead, the regulations Mercury points to require that credit card holders be given notice of their rights to *dispute charges* to the credit card or any changes to those rights to *dispute charges* to the credit card.

Looking to the first regulation Mercury cites, 12 CFR 1026.9(c)(2)(i) requires that:

> when ***a significant change in account terms as described in paragraph (c)(2)(ii)*** of this section is made, a creditor must provide a written notice of the change at least 45 days prior to the effective date of the change to each consumer who may be affected.

*Id*. (emphasis added).

Under this regulation, the only "significant change in account terms" for which notice is required is defined by paragraph (c)(2)(ii). *See id*. That subsection provides that a "significant change in account terms" – the only thing which triggers notice – is limited to:

> a change to a term required to be disclosed under § 1026.6(b)(1) and (b)(2), an increase in the required minimum periodic payment, a change to a term required to be disclosed under § 1026.6(b)(4), or the acquisition of a security interest.

12 CFR 1026.9(c)(2)(ii).

None of the items listed in subsection (c)(2)(ii) include arbitration or delegation clauses, directly or indirectly. Mercury, however, makes the new and strained argument that arbitration clauses are akin to the "right to dispute transactions" which must be disclosed under section 1026.6(b)(2)(xv). *See* Reply at 6 & n.4. But the plain language and context of the regulation refutes that argument. The sole subsection Mercury relies upon (but never quotes) says that the following "reference" is a required disclosure:

8

**JA274**

> **(xv) Billing error rights reference.** A statement that information about consumers' right to dispute transactions is included in the account-opening disclosures.

*Id.* This required "statement" which informs consumers about where to find information concerning their rights for "[b]illing error[s]" is not a requirement to disclose changes to an arbitration or delegation clause. Instead, this required "[b]illing error rights reference" is on page 2 of Mercury's "Cardholder Agreement." *See* ECF No. 7-5 at 2 ("Billing Rights: Information on your rights to dispute transactions and how to exercise those rights is provided in your Cardmember Agreement.") That required statement has nothing to do with arbitration or delegation clauses.

Indeed, the "Billing Rights" section which the required statement references has nothing to do with arbitration or delegation clauses, either. *See* ECF No. 7-5 at 9 (titled "YOUR BILLING RIGHTS"). Instead, the section outlines a procedure for consumers to dispute charges; a procedure which is conspicuously different from the arbitration and delegation clauses on the preceding page.

In sum, the billing rights disclosures required by 12 CFR 1026.6 and 1026.9 have nothing to do with arbitration. The regulations do not require any notice or right to reject changes to arbitration rights. Accordingly, nothing in those regulations saves the arbitration and delegation clauses here from being illusory.

## V.    The Language of the Unilateral Change-in-Terms Clause Does Not Prevent Retroactive Changes.

Mercury also newly argues that "the plain language of the modification provision requires Mercury to give **advance** written notice, which necessarily requires notice of prospective changes, rather than retrospective changes." Reply at 6 (emphasis in original). This is incorrect.[1]

Nothing in the Cardholder Agreement prevents any unilateral changes from having retroactive effect – even if "advance" notice were given. For example, Plaintiff could get notice a day in advance that the arbitration or delegation agreement was changing, but nothing in the Cardholder Agreement would require any such changes to not apply to past claims; nothing in the Cardholder Agreement even prevents such changes from applying to or forbidding arbitrations which have already been filed. The pertinent question is whether both parties are *bound* to the arbitration and delegation "agreements" – so that a mutual promise to arbitrate exists. *See Holloman v. Cir. City Stores, Inc.*, 894 A.2d 547, 555 (Md. 2006) ("we conclude that the provisions of the arbitration agreement which bind Circuit City to arbitrate for at least thirty days and for the entire year prior to the day upon which the agreement may be modified constitute consideration").

Unlike the agreement in in *Holloman v. Circuit City Stores, Inc.*, the present "Agreement" does not preserve Plaintiff's right to arbitrate for any period of time. Instead, it broadly says that "this Agreement (**including its Jury Trial Waiver and Arbitration Clause**), may change and we may **add or delete any term**." ECF No. 7-5 at 3 (emphasis added). Unlike the plaintiff in *Holloman v. Circuit City Stores, Inc.*, the Plaintiff here would not have the opportunity to arbitrate

---

[1]    In addition to the reasons discussed here, the Opposition discusses other reasons the language of the Cardholder Agreement does not require advance notice of changes. *See* Opp. at, *e.g.*, part III.C.4.

during any period of time without fear of facing a unilateral alteration to the arbitration and delegation agreements. *See Harris v. Blockbuster Inc.*, 622 F. Supp. 2d 396, 399 (N.D. Tex. 2009) ("nothing … prevents Blockbuster from unilaterally changing any part of the contract other than providing that such changes will not take effect until posted on the website."); *Grosvenor v. Qwest Corp.*, 854 F. Supp. 2d 1021, 1034 (D. Colo. 2012) (posting of changes on website did not save illusory nature of unilateral modification clause, because "[a] notice requirement becomes significant when it is coupled with the right to accept or reject the change.") Moreover, because nothing restricts the retroactive application of unilateral changes, "notice" could never save the provision's illusory nature:

> [where] the only express limitation on that unilateral right [to modify 'all rules'] is published notice…there is nothing to suggest that once published the amendment would be inapplicable to disputes arising, or arising out of events occurring, before such publication.

*Morrison v. Amway Corp.*, 517 F.3d 248, 254 (5th Cir. 2008)) (emphasis in *Morrison*). *See also Savostianov v. Fed. Advocs., Inc.*, 2021 WL 1026018, at *3 (D.D.C. Mar. 17, 2021) (same); *McNamara v. S.I. Logistics, Inc.*, 2018 WL 6573125, at *4 (D. Mass. Dec. 13, 2018) (same).

Here, as in *Morrison* and unlike *Holloman v. Circuit City Stores, Inc.*, nothing in the "Agreement" prevents eliminating arbitration or delegation entirely or restricting it to certain claims and disputes, retroactively. 517 F.3d at 254. As a result, it is illusory. Even where an arbitration or delegation clause affirmatively requires notice, the absence of a promise to allow a borrower a chance to invoke arbitration before the change becomes effective makes the agreement illusory:

> the modification provision does include a clause that "Prosper will give you notice of material changes to this Agreement[.]" See, e.g., ECF No. 15-5 ¶ 14. But this is not a limitation on Prosper's ability to change terms in the same vein as *Holloman*. Prosper does not promise to give advance notice so that a borrower could invoke arbitration before a change becomes effective, nor does it contain any time limitation. The modification provision allows Prosper to change the arbitration

provision at any time. The Court is not persuaded that the notice requirement within the modification provision limits Prosper's discretion enough such that Prosper's promise to arbitrate still constitutes a binding promise.

*Jones v. Prosper Marketplace, Inc.*, No. GJH-21-1126, 2022 WL 834210, at *16 (D. Md. Mar. 21, 2022). Plaintiff here was not promised the right to invoke arbitration before any changes to the arbitration or delegation clauses, so they are illusory – no such agreements legally exist.

## VI. The Implied Covenant of Good Faith and Fair Dealing Cannot Save the Illusory Arbitration and Delegation Clauses

Mercury also newly argues that the Court should save the arbitration and delegation clauses from being illusory by applying the "implied covenant of good faith and fair dealing," Reply at 7-9. But the Maryland Supreme Court in *Cheek* did not contemplate using an implied covenant to save an otherwise illusory arbitration agreement. If such an implied covenant applied here it would also have applied to *Cheek*. *Cheek* controls, and no Maryland cases allow an implied covenant to displace *Cheek*'s holding that an arbitration clause subject to a unilateral modification clause is illusory. *See Nat'l Fed'n of the Blind*, 904 F.3d at 87 ("the Texas cases the Container Store cites … say nothing about good faith and fair dealing and so offer nothing to back up its lead argument.") [2] Furthermore, this precise "good faith and fair dealing" argument was made to this Court in *Jones* and rejected. *See Jones v. Prosper Marketplace Inc.*, et al., Case No. 8:21-cv-00893-GJH, ECF No. 15-1 at 24-25; *see also Jones v. Prosper Marketplace, Inc.*, No. GJH-21-1126, 2022 WL 834210, at *16 (D.

---

[2]     The Maryland cases Defendant cites do not undermine *Cheek*. *Kelley Constr. Co. v. Wash. Suburban Sanitary Comm'n*, 230 A.2d 672 (Md.1967) and *Savonis v. Burke*, 216 A.2d 521 (Md. 1966), were decided decades before *Cheek*, and certainly cannot be read to overrule it. And *Questar Builders, Inc. v. CB Flooring, LLC*, 978 A.2d 651, 672-73 (Md. 2009) underlines *Cheek*. *See id.* (construing a "termination" clause in a flooring subcontract which included substantial restrictions, and *contrasting* that with *Cheek*, where "we held that an arbitration clause authorizing one party to "alter, amend, modify, or revoke the [arbitration p]olicy at its sole and absolute discretion at any time with or without notice" rendered the agreement to arbitrate illusory.")

Md. Mar. 21, 2022) (holding, despite the defendant's same "good faith and fair dealing" argument, that arbitration clause was illusory).

After all, the Fourth Circuit applied *Cheek* and did *not* apply the implied covenant of good faith and fair dealing to save an illusory arbitration clause in *Noohi* − and in that case, breach of the implied covenant of good faith and fair dealing was a *claim* asserted in the *plaintiffs' complaint*. 708 F.3d at 603. Yet the Fourth Circuit − squarely presented with a case where the implied covenant was at issue − did not find that the implied covenant impaired the holding of *Cheek*; it instead ratified *Cheek* in no uncertain terms. *See* fn. 13. In this case, where *no contract claim* (including no implied covenant claim) is even at issue, the implied covenant cannot make an illusory arbitration agreement not illusory so as to cause it to exist.

In addition, an implied covenant of good faith and fair dealing is implied into an *existing* contract. Mercury's attempt to imply a covenant into arbitration and delegation clauses for the purposes of determining whether the same clauses constitute binding agreements fails for the same cart-before-the-horse reason that a choice-of-law provision cannot be read into a contract for the purposes of determining whether that contract exists. *See G & M Oil Co. v. Glenfed Fin. Corp.*, 782 F. Supp. 1078, 1083 (D. Md. 1989) (claim for breach of good faith and fair dealing "is viable only if an underlying contract exists").[3] It bears repeating that one of Plaintiff's claims is that *no enforceable agreement for her loan exists − any such agreements are void by operation of law. See, e.g.,* ECF No. 3 at ¶ 8

---

[3]    This Court has distinguished "the arbitration-clause cases" like *Cheek*, which hold that in the circumstances of a severable arbitration agreement, a change in terms provision results in "an illusory promise that 'does not actually bind or obligate the promisor to do anything,'" from circumstances involving "an 'open term' that has good reason to change over time, is ***premised upon a mutually enforceable agreement***, and is limited by the implied covenant to act in good faith and fair dealing." *Bindagraphics, Inc. v. Fox Grp., Inc.*, 377 F. Supp. 3d 565, 576 n.5 (D. Md. 2019) (*citing Cheek*, 835 A.2d 656) (emphasis added).

("Because Mercury is in the business of making loans subject to the MCLL but it does not have an MCLL license, its loans to Plaintiff and other Maryland consumers are 'void and unenforceable.' MCLL § 12-3l4(b)(1)(i)."). As a result, Plaintiff does not make any claim that is predicated upon the existence of any contract. Her claim is instead, that *no contract exists*. Moreover, the "clean hands" doctrine bars Mercury from relying on equity to create a contract where it is engaged in illegal, unlicensed lending. *See Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 360 (Md. 2007)("[C]ourts of equity will not lend their aid to anyone … guilty of … illegal, or inequitable conduct in the matter with relation to which he seeks assistance.")

Finally, the covenant of good faith and fair dealing in Maryland cannot be used to contradict the express terms of a contract. *Enfield Equip. Co. v. John Deere Co.*, 64 F. Supp. 2d 483, 486 (D. Md. 1999). Here, the unilateral change in terms provision expressly permits changes to any term of the arbitration agreement and does not require any notice unless the law requires it. ECF No. 7-5 at 3. To use the implied covenant to contradict this language, so that the unilateral change in terms provision instead *does* require notice even where the law does not require it, and *does* guarantee Plaintiff a right to opt-out of any changes, would impermissibly contradict the plain language of the agreement.

**VII.    Conclusion**

For the reasons set forth above, and in her Opposition, Plaintiff respectfully requests that the Court deny Mercury's Motion To Compel Arbitration And Stay Proceedings And To Strike Class Allegations (ECF No. 7).

Respectfully submitted,

/s/Benjamin H. Carney
Richard S. Gordon (Fed. Bar No. 06882)
Benjamin H. Carney (Fed. Bar No. 27984)
GORDON, WOLF & CARNEY, Chtd.
11350 McCormick Road,

**JA280**

Executive Plaza 1, Suite 1000,
Hunt Valley, Maryland 21031
Tel. (410) 825-2300
Fax. (410) 825-0066
rgordon@GWCfirm.com
bcarney@GWCfirm.com

Attorneys for Plaintiff and the Putative Class

**JA281**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANGELITA BAILEY,                    :
individually and on behalf          :
of all others similarly
situated,                           :

     v.                                :   Civil Action No. DKC 23-827

                                  :

MERCURY FINANCIAL, LLC             :

                                  :

**MEMORANDUM OPINION**

Presently pending and ready for resolution are: (1) a motion to compel arbitration and stay proceedings and to strike class allegations filed by Defendant Mercury Financial, LLC ("Mercury"), (ECF No. 7); and (2) a motion for leave to file a surreply filed by Plaintiff Angelita Bailey, (ECF No. 16).  The issues have been briefed, and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  For the following reasons, the motion to compel arbitration and stay proceedings and to strike class allegations will be denied, and the motion for leave to file a surreply will be granted in part and denied in part.

**I.   Background[1]**

Defendant, a subprime credit card loan originator, marketer, and servicer, extended consumer credit of less than $25,000 to

---

[1] The facts are construed in the light most favorable to Plaintiff as the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

**JA282**

Maryland residents, including Plaintiff.  (ECF No. 3 ¶¶ 2, 17).

Plaintiff accepted a cardholder agreement (the "Cardholder

Agreement") in Maryland for a "Mercury" branded credit card

account, after which Defendant repeatedly made and collected on

its credit card loans to Plaintiff.  (*Id.* ¶¶ 28, 33-41).

The Cardholder Agreement[2] governs the cardholder ("you,"

"your," or "yours"), First Bank & Trust ("we," "us," and "our"),

in addition to related parties such as agents.  (ECF No. 7-5 at 3,

7).  The Cardholder Agreement's choice-of-law provision prescribes

application of federal and South Dakota law.  (*Id.* at 6).  The

arbitration provision provides, in part:

> By accepting this Agreement, you agree to this
> Jury Trial Waiver and Arbitration Clause
> ("Clause").  This Clause is in question and
> answer form to make it easier to understand.
> Even so, this Clause is part of this Agreement
> and is legally binding.  Under this Clause,
> you waive the right to have any Dispute heard
> by a judge and jury and you waive the right to
> participate in a class, representative or
> private attorney general action regarding any
> Dispute.

---

[2] Defendant provided multiple versions of Plaintiff's
cardholder agreement: (1) a 2006 agreement for a credit card
account issued by Barclays Bank Delaware, (ECF No. 7-3); (2) a
2018 agreement after First Bank & Trust, Brookings, SD ("First
Bank & Trust"), acquired Plaintiff's account, (ECF No. 7-6); and
(3) a 2020 version of the agreement issued by First Bank & Trust
containing an identical arbitration provision as the 2018
agreement, (ECF No. 7-5).  The court cites to the 2020 agreement
because Defendant also cites to the same agreement when invoking
the arbitration provision.  (ECF No. 7-1 at 9-10).

**JA283**

(*Id.* at 6).[3]  According to the arbitration provision's delegation clause, "'Disputes' means any claim, counterclaim, cross-claim, complaint, cross-complaint, controversy, or dispute between you or us arising under, out of, or directly or indirectly related to your application, this Agreement or your relationship with us." (ECF No. 7-5 at 7).  The arbitration provision is subject to a change-in-terms provision, which states:

> The rates, fees and terms of this Agreement (including its Jury Trial Waiver and Arbitration Clause), may change and we may add or delete any term. When required by law, we will provide advance written notice of any changes and any right to reject the changes.

(*Id.* at 3).  The Cardholder Agreement permits First Bank & Trust to assign its rights and obligations.  (*Id.* at 6).

On January 25, 2023, Plaintiff filed a complaint, on behalf of herself and others similarly situated, in the Circuit Court for Montgomery County.  (ECF No. 3).  Plaintiff alleges that Defendant made loans without a license in violation of the Maryland Consumer Loan Law Md. Code Ann., Com. Law. §§ 12-301 *et seq.* ("MCLL") – which requires consumer lenders making loans of less than $25,000 to Maryland residents to be licensed – thus rendering its loans void and unenforceable.  (*Id.* ¶¶ 4-8).  Plaintiff contends that Defendant's collection on its void and unenforceable loans also

---

[3] The arbitration provision also allows for advance opt-out, but Plaintiff does not challenge Defendant's assertion that she did not opt out of the arbitration provision.  (ECF No. 7-1 at 9).

violates the Maryland Consumer Debt Collection Act, Md. Code Ann., Com. Law §§ 14-201 *et seq.*, the Maryland Consumer Protection Act, Md. Code Ann., Corn. Law §§ 12-101 *et seq.*, and gives rise to claims for negligence, unjust enrichment, and money had and received. (*Id.* ¶¶ 10-11). Defendant timely removed this matter to this court, (ECF No. 1), and on March 31, 2023, moved to compel arbitration, stay proceedings, and strike class allegations pursuant to the arbitration provision within the cardholder agreement, (ECF No. 7). On May 15, 2023, Plaintiff responded in opposition, (ECF No. 11), and on June 30, 2023, Defendant replied, (ECF No. 15). On July 24, 2023, Plaintiff moved for leave to file a surreply. (ECF No. 16). On August 17, 2023, Defendant responded in opposition, (ECF No. 17), and on August 21, 2023, Plaintiff replied, (ECF No. 18).

## II.  Motion for Leave to File Surreply

Under Local Rule 105.2(a), "[u]nless otherwise ordered by the Court, surreply memoranda are not permitted to be filed." Although a district court has discretion to allow a surreply, surreplies are generally disfavored. *Chubb & Son v. C.C. Complete Servs., LLC*, 919 F.Supp.2d 666, 679 (D.Md. 2013). A surreply may be permitted "when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply." *Khoury v. Meserve*, 268 F.Supp.2d 600, 605 (D.Md. 2003) (citation omitted). By contrast, the court may deny a motion for

leave to file a surreply when the matter addressed in the reply is not new, *see F.D.I.C. v. Cashion*, 720 F.3d 169, 176 (4th Cir. 2013), or if the court does not rely on the new material raised in the reply to reach its decision, *see, e.g.*, *E.E.O.C. v. LA Weight Loss,* 509 F.Supp.2d 527, 540 (D.Md.2007) (denying the parties' motions to file surreplies because the court did not rely upon the new case law and evidence in making its decision); *First Penn-Pacific Life Ins. Co. v. Evans,* 162 F.Supp.2d 423, 430 (D.Md.2001) (denying plaintiff leave to file a surreply "[s]ince the Court will not be considering the additional contentions advanced.").

Plaintiff argues that she is justified in filing a surreply because Defendant made five new arguments in its reply: (1) Defendant is the agent of First Bank & Trust; (2) First Bank & Trust sold Plaintiff's account directly to Velocity Investments, LLC ("Velocity"); (3) federal law requires Defendant to provide Plaintiff advance notice of changes to the arbitration and delegation clauses; (4) the language of the Cardholder Agreement prohibits retroactive changes to the arbitration and delegation clauses; (5) the court should save the arbitration and delegation clauses in the Plaintiff's illegal loan agreement from being illusory by applying the equitable "implied covenant of good faith and fair dealing." (ECF No. 16 at 2). Plaintiff's fourth argument fails because this legal issue was raised by Plaintiff herself in her opposition brief and is not new in Defendant's reply. (ECF

No. 11 at 28-29).  While the first, second, and fifth arguments are new, a surreply to those arguments is unnecessary because the court does not rely on them to make its decision.

Plaintiff's third reason is sufficient.  Defendant's argument that federal law requires Defendant to provide Plaintiff advance notice of unilateral modifications to the Cardholder Agreement's arbitration provision exceeds a direct response to Plaintiff's contention in its opposition that Maryland law does not require notice of such modifications, (ECF No. 11 at 16, 21, 27), because Defendant references federal regulations that have not been previously discussed, (ECF No. 15 at 11-12).  Because Plaintiff was unable to respond to this argument, Plaintiff's motion to file a surreply is granted with respect to this argument.

## III. Motion to Compel Arbitration and Stay Proceedings and to Strike Class Allegations

### A. Standard of Review

Where, as here, the motion to compel arbitration implicates whether such an agreement was ever formed, the court treats the motion as one for summary judgment. *See Cherdak v. ACT, Inc.*, 437 F.Supp.3d 442, 454 (D.Md. 2020) (quoting *Caire v. Conifer Value Based Care, LLC*, 982 F.Supp.2d 582, 589 (D.Md. 2013)) (treating a motion to compel arbitration as a motion for summary judgment where "the formation or validity of the arbitration agreement is in dispute").  The court may consider documents outside the pleadings

**JA287**

"to effectively assess the merits of this motion." *Shaffer v. ACS Gov't Servs., Inc.*, 321 F.Supp.2d 682, 683-84 (D.Md. 2004).

Summary judgment is appropriate when the court, construing all evidence and drawing all reasonable inferences in the light most favorable to the non-moving party, finds that no genuine dispute exists as to any material fact, thereby entitling the movant to judgment as a matter of law. Fed.R.Civ.P. 56(a); *see In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011). Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)) (alteration in original).

The Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"), governs the court's review of a motion to compel arbitration. To prevail, the movant must show the existence of (1) a dispute between the parties; (2) a written arbitration provision that purports to cover the dispute; (3) a relationship between the transaction and

interstate or foreign commerce; and (4) the failure of a party to arbitrate the dispute. *See Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991).

### B. Analysis

Defendant argues that Plaintiff's claims are governed by the Cardholder Agreement's arbitration provision. (ECF No. 7-1 at 6). Plaintiff contends that this dispute is not subject to arbitration because the parties never formed a binding arbitration agreement. (ECF No. 11 at 10).[4]

There are several threshold issues to address: (1) whether the presumption in favor of arbitrability applies to this dispute; (2) whether the court or an arbitrator should resolve this dispute; and (3) whether Maryland or South Dakota law governs this dispute.

First, Defendant argues that the presence of an arbitration provision creates a presumption that the parties agreed to arbitrate all disputes, including those regarding the validity of the contract as a whole. (ECF No. 7-1 at 17). Plaintiff contends that there is no presumption in favor of finding that an

---

[4] Plaintiff distinguishes between an "arbitration agreement" and a "delegation agreement" throughout her opposition, (ECF No. 11), but Plaintiff's challenge to whether the parties have agreed to arbitrate the dispute necessarily encompasses the issue of whether the parties have agreed to delegate arbitrability to the arbitrator. *See Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 234 n.9 (4th Cir. 2019). Defendant has acknowledged that "the same arguments that apply to the Arbitration Provision apply also to the Delegation Clause." (ECF No. 15 at 8 n.1).

arbitration agreement exists. (ECF No. 11 at 18). "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Kop-Flex Emerson Power Transmission Corp. v. Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge No. 1784, Dist. Lodge No. 4*, 840 F.Supp.2d 885, 889 (D.Md. 2012) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648-49 (1986)). Hence, "a defendant who seeks to compel arbitration . . . bears the burden of establishing the existence of a binding contract to arbitrate the dispute." *Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 867 F.3d 449, 456 (4th Cir. 2017). While federal courts have developed a robust presumption in favor of enforcing arbitration agreements, this presumption does not apply to the preliminary question concerning the formation of an arbitration agreement. *See Coady v. Nationwide Motor Sales Corp.*, 32 F.4th 288, 291 (4th Cir. 2022) (citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 302-03 (2010); *Noohi v. Toll Bros., Inc.,* 708 F.3d 599, 611 n.6 (4th Cir. 2013)) ("Before we may enforce the Arbitration Agreement, we must be satisfied that a valid agreement exists. The presumption favoring arbitration does not apply to this preliminary question of the Arbitration Agreement's validity."); *GKD-USA, Inc. v. Coast Mach. Movers*, 126 F.Supp.3d 553, 559 (D.Md. 2015) ("While there is a 'presumption in favor of arbitration,' that presumption applies to

questions concerning the scope of an arbitration clause, but 'the presumption does not apply to disputes concerning whether an agreement to arbitrate has been made.'"). Courts may not apply the presumption in favor of arbitrability to make arbitration agreements more enforceable than other contracts. *Morgan v. Sundance, Inc.*, 142 S.Ct. 1708, 1713 (2022) (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, n.12 (1967)). Here, the presumption in favor of arbitrability does not apply because Plaintiff challenges the formation of an arbitration agreement, not its scope.[5]

Second, Defendant argues that an arbitrator should decide this dispute because Plaintiff contests the validity of the Cardholder Agreement as a whole, as opposed to the validity of the

---

[5] Plaintiff also argues that "[a]ny ambiguities about whether an arbitration agreement exists must be resolved against such as finding." (ECF No. 11 at 19). In support, Plaintiff cites *Dumais v. Am. Golf Corp.*, which construed a contract containing two change-in-terms provisions with conflicting statements about whether or not the arbitration provision is subject to unilateral modification in favor of finding the arbitration agreement illusory. 299 F.3d 1216, 1217, 1220 (2002). Here, unlike in *Dumais*, the Cardholder Agreement does not contain conflicting change-in-terms provisions. Because the parties do not contend that the Cardholder Agreement's language is ambiguous, the court construes the terms of the Cardholder Agreement according to its plain meaning. *See Rourke v. Amchem Prods., Inc.*, 863 A.2d 926, 941 (2004) ("In construing contracts, Maryland follows the objective interpretation principle. If the language of the contract is unambiguous, [courts] give effect to its plain meaning[.]"); *Coady*, 32 F.4th at 292 (considering the plain meaning of a change-in-terms clause to determine whether it applies to an arbitration provision).

Cardholder Agreement's arbitration provision.  (ECF No. 7-1 at 18).  Plaintiff contends that the court should decide this dispute because no arbitration agreement exists.  (ECF No. 11 at 23-24).  Because "an arbitration provision is severable from the remainder of a contract[,]" a challenge to the validity of an arbitration agreement is distinct from a challenge to the validity of a contract as a whole.  *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70-71 (2010) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444-45 (2006)).  While a challenge to the validity of a contract presumes that a contract has already been formed but should not be enforced, a challenge to the validity of an arbitration agreement contends that a contract to arbitrate was never formed.  *See Johnson v. Cont'l Fin. Co., LLC*, No. 8:22-CV-02001-PX, 2023 WL 5804281, at *4 (D.Md. Sept. 7, 2023) (citing *Buckeye*, 546 U.S. at 443, 444 n.1; *Granite Rock*, 561 U.S. at 300; *Prima Paint*, 388 U.S. at 399).  Section 4 of the FAA requires that the district court, rather than an arbitrator, decide whether the parties have formed an arbitration agreement.  *Berkeley*, 944 F.3d 225, 234 (4th Cir. 2019).

Defendant erroneously conflates the concepts of contract *validity* and contract *formation*.  Plaintiff argues that no contract to arbitrate this dispute exists, not that an arbitration contract exists but is unenforceable due to defects in the underlying contract.  (ECF No. 11 at 24).  Regardless of whether Plaintiff

**JA292**

challenges the formation of the arbitration agreement or the broader Agreement, the court should resolve this dispute. *See* 9 U.S.C. § 4; *Johnson*, 2023 WL 5804281, at *4 (holding that because the plaintiffs alleged that no arbitration agreement exists, "[t]his challenge plainly stays with the Court, regardless of whether Plaintiffs mount a direct challenge solely to the formation of the Arbitration Provision, or a broader attack on the formation of the Cardholder Agreement within which the Arbitration Provision sits.").

Third, Defendant argues that pursuant to the Cardholder Agreement's choice-of-law provision, South Dakota law governs this dispute. (ECF No. 7-1 at 13). Plaintiff contends that choice-of-law rules prescribe application of Maryland law. (ECF No. 11 at 21). State-law principles on contract formation, rather than a choice-of-law provision, govern challenges to an arbitration agreement's existence, *Noohi*, 708 F.3d at 607 (quoting *Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540, 543 (4th Cir. 2005)), because application of a choice-of-law provision presupposes that the parties have formed a binding arbitration agreement, *Johnson*, 2023 WL 5804281, at *3 (citing *James v. Synovus Bank*, No. TDC-19-1137, 2020 WL 1479115, at *2 (D.Md. Mar. 26, 2020); *Archer W. Contractors, LLC v. Synalloy Fabrication, LLC*, No. CCB-14-3031, 2016 WL 930965, at *4 (D.Md. Mar. 11, 2016)) ("Although generally, the Court must honor the parties' agreement to apply selected

substantive state law, this presupposes that the agreement is binding in the first instance.  But until the Court determines whether the Arbitration Provision was ever formed, it cannot enforce any of its terms, including a choice-of-law provision.").

Accordingly, Maryland choice-of-law principles determine which state's contract law applies here.  *See Francis v. Allstate Ins. Co.*, 709 F.3d 362, 369 (4th Cir. 2013).  In Maryland, "the law of the jurisdiction where the contract was made controls its validity and construction."  *Kramer v. Bally's Park Place, Inc.*, 311 Md. 387, 390 (1988).  Plaintiff's application for the credit card account as well as her acceptance of the Cardholder Agreement took place in Maryland.  (ECF No. 3 ¶¶ 16, 28, 29).  Thus, Maryland law applies to this dispute.[6]

Having addressed these threshold issues, one issue remains for analysis.  Plaintiff argues that the Cardholder Agreement's arbitration provision lacks the consideration necessary to constitute a binding agreement because it is subject to a change-

---

[6] Defendant argues that South Dakota law governs this dispute but concedes that "[t]o the extent the Court determines that the Arbitration provision is severable from the rest of the Cardmember Agreement and that it is a separate contract formed in Maryland, then the Court may apply Maryland law as Plaintiff advocates." (ECF No. 15 at 8).  This suggests that South Dakota law applies to the extent that the arbitration provision is not severable from the Cardholder Agreement.  Given that the Supreme Court of the United States has authoritatively held that "an arbitration provision is severable from the remainder of the contract[,]" *Rent-A-Ctr.*, 561 U.S. at 71 (quoting *Buckeye*, 546 U.S. at 445), under Defendant's logic, Maryland law applies here.

in-terms provision allowing for unilateral modification without advance notice. (ECF No. 11 at 24-26). Defendant argues that the change-in-terms provision does not apply to the arbitration provision because it is located outside the four corners of the arbitration provision. (ECF No. 15 at 9).

Maryland law requires an arbitration agreement to be a valid contract, which must be supported by consideration in the form of a binding obligation. *Hill*, 412 F.3d at 543 (citing *Cheek v. United Healthcare of Mid-Atl., Inc.*, 835 A.2d 656, 661). An examination of whether an arbitration agreement is a valid contract is limited to the language of the arbitration agreement. *See id.* (citing *Cheek*, 835 A.2d at 664-65). Although an arbitration provision is severable from the underlying contract, a court must read the "construe the contract as a whole" to give effect to all the provisions constituting an arbitration agreement. *See Coady*, 32 F.4th at 291 (quoting *Schneider Elec. Bldgs. Critical Sys., Inc. v. W. Sur. Co.*, 165 A.3d 485, 490 (2017)).

Defendant likens the Cardholder Agreement's arbitration provision to the one in *Hill v. Peoplesoft USA, Inc.*, 412 F.3d at 542, which held that a freestanding arbitration agreement, signed by the parties, with no unilateral change-in-terms clause was not subject to a separate company policy, not signed by the parties, that contained a unilateral change-in-terms clause. (ECF No. 15 at 9). This analogy fares no better because Defendant improperly

**JA295**

conflates the arbitration *provision* and the arbitration *agreement*. Here, the arbitration agreement is analogous to the one in *Coady v. Nationwide Motor Sales Corp.*, 32 F.4th at 290, 292, which determined that a change-in-terms provision specifically declaring its applicability to an arbitration provision that is part of the same underlying contract is incorporated into the arbitration agreement. The Cardholder Agreement's arbitration provision is in the same underlying contract as the change-in-terms provision, which explicitly identifies the arbitration provision as one of the terms of the Cardholder Agreement it applies to: "The rates, fees and terms of this Agreement (including its Jury Trial Waiver and Arbitration Clause), may change and we may add or delete any term." (ECF No. 7-5 at 3). Thus, the Cardholder Agreement's arbitration provision is subject to the change-in-terms provision. *See also Jones v. Prosper Marketplace, Inc.*, No. GJH-21-1126, 2022 WL 834210, at *15 (D.Md. Mar. 21, 2022) (considering an arbitration provision in conjunction with the contract within which it was situated); *Caire*, 982 F. Supp. 2d at 594 (D.Md. 2013) (same); *Johnson*, 2023 WL 5804281, at *5 (same).

Defendant argues that alternatively, even if the Cardholder Agreement's arbitration provision is subject to the change-in-terms provision, the arbitration agreement is not illusory. (ECF No. 15 at 15-19). An arbitration agreement is illusory when it is subject to a change-in-terms provision empowering one party to

decide whether to arbitrate a dispute – essentially rendering the arbitration agreement unenforceable. *See Coady*, 32 F.4th at 293 (2022) (holding that an arbitration agreement is illusory because its applicable change-in-terms clause gives the defendant the right to change or abolish the relevant contractual terms without notice); *Cheek*, 835 A.2d at 663 (same); *see also* 3 Williston on Contracts § 7:7 (4th ed. 2023) ("Where an illusory promise is made, that is, a promise merely in form, but in actuality not promising anything, it cannot serve as consideration.").

According to the Supreme Court of Maryland's decision in *Cheek v. United Healthcare of Mid-Atlantic, Inc.*, a change-in-terms provision allowing the defendant to modify unilaterally an arbitration provision "[']with or without notice' creates no real promise, and therefore, insufficient consideration to support an enforceable agreement to arbitrate[,]" because it empowers the defendant to revoke the arbitration agreement at any time. *Id.* at 662. Notice of unilateral changes alone, however, does not constitute adequate consideration without additional limitations. In *Holloman v. Circuit City Stores, Inc.*, the Supreme Court of Maryland found that a change-in-terms provision with robust restrictions confining the defendant's ability to change unilaterally the arbitration agreement to a single day in the year, preceded by 30-days' advance notice, provided adequate

consideration by binding the defendant to the preexisting agreement to arbitrate for 364 days. 894 A.2d 547, 592-93 (2006).

While the Cardholder Agreement's change-in terms provision states, "we will provide advance written notice of any changes[,]" the clause on notice is qualified by the condition, "*[w]hen required by law[.]*" (ECF No. 7-5 at 3) (emphasis added). This condition suggests that advance notice would not be provided when it is not required by law. Whether notice is actually required by law is dispositive here. Plaintiff asserts that the Cardholder Agreement's change-in-terms provision, like the one in *Cheek*, impermissibly allows unilateral modification of the arbitration provision without notice because Maryland law does not require notice of such changes. (ECF Nos. 11 at 25-28; 16-1 at 7-9). Defendant contends that the Cardholder Agreement's change-in-terms provision is distinguishable from the one in *Cheek* and analogous to the one in *Holloman*. (ECF No. 15 at 15). Defendant newly argues that federal law, specifically 12 C.F.R. §§ 1026.6(b)(2) and 1026.9(c)(2), requires credit card companies to provide notice of changes to dispute resolution. (*Id.* at 11-12).[7]

---

[7] In its Reply in Support of Motion to Compel Arbitration and Stay Proceedings and Strike Class Allegations, (ECF No. 15), Defendant does not respond to Plaintiff's argument that Maryland law does not require notice of unilateral changes to arbitration agreements, (ECF No. 11 at 27-28). By failing to respond, Defendant has conceded this point. *See Ferdinand-Davenport v. Children's Guild*, 742 F.Supp.2d 772, 777 (D.Md. 2010) (holding that in failing to respond to the defendant's arguments for why

Judge Xinis's decision in *Johnson v. Continental Finance Company, LLC*, a substantially similar case,[8] is instructive.  In *Johnson*, Judge Xinis held that a change-in-terms clause permitting unilateral modifications "upon such notice to you *as is required by law*" does not impose any restrictions on the defendant's unfettered ability to revoke the arbitration agreement without notice, thus rendering the arbitration agreement illusory. *Johnson*, 2023 WL 5804281, at *7 (emphasis added).  Like Defendant, the *Johnson* defendants also cite to 12 C.F.R. §§ 1026.6(b)(2) and 1026.9(c)(2) as evidence of federal law requiring notice of unilateral modification, but as Judge Xinis states, those regulations are irrelevant to the outcome because they "require[] only advance notice of any change to the 'statement that information about consumers' right to dispute transactions is included in the account-opening disclosures'; [they] do[] not require advance notice of changes to the dispute resolution process itself." *Id.* at *7 n.3.  Judge Xinis concluded that the change-in-terms provision at issue was more akin to the one in *Cheek* than

_____

her claim should be dismissed, a plaintiff abandoned her claim); *Stenlund v. Marriott Int'l, Inc.*, 172 F.Supp.3d 874, 887 (D.Md. 2016) ("In failing to respond to [defendant's] argument, Plaintiff concedes the point.").

[8] The parties in *Johnson* are represented by the same lawyers as in the action before this court and raise near identical arguments regarding whether a different cardholder agreement's unilateral change clause renders the arbitration provision illusory.

in *Holloman* because it did not require any notice at all, much less robust restrictions on the kind of notice required. *Id.* at *7.

Defendant's arguments analogizing the Cardholder Agreement's change-in-terms provision to the one in *Holloman* fail for the same reasons as in *Johnson*. "When required by law" and "as is required by law" are similarly toothless restrictions because both Defendant and the *Johnson* defendant fail to provide *any* law requiring notice of unilateral modifications to arbitration agreements. Like the change-in-terms provisions in *Johnson* and *Cheek*, the Cardholder Agreement's change-in-terms provision allows for unilateral modification without notice, thus providing no consideration to support a legally enforceable arbitration agreement. *See also Coady*, 32 F.4th at 293 ("Because the Modification Clause gives [the defendant] the right to change or abolish [the Arbitration Agreement's] policies, procedures, and benefits without notice, the Arbitration Agreement is illusory under Maryland law.").

For similar reasons, Defendant's request to strike class allegations also fails. Defendant argues that pursuant to the Cardholder Agreement's arbitration provision, Plaintiff has waived her right to participate in a class action. (ECF Nos. 7-1 at 20-21; 15 at 24-27). Because the Cardholder Agreement's arbitration provision is illusory, the court cannot enforce any of its terms.

**JA300**

Hence, Defendant's motion to compel arbitration and stay proceedings and to strike class allegations is denied. It is unnecessary to address the parties' remaining arguments about whether the change-in-terms provision allows for unilateral retroactive modification; whether the arbitration agreement violates Maryland public policy; whether all rights under the arbitration and delegation provisions have been assigned away by First Bank & Trust; whether Mercury is First Bank & Trust's agent; whether arbitration rights have been waived because Velocity, the current owner of Defendant's credit card account, sued Defendant in court instead of choosing arbitration; and whether the implied covenant of good faith and fair dealing prevents a party from invoking a unilateral change-in-terms clause to revoke an arbitration agreement.

## IV.  Conclusion

For the foregoing reasons, Defendant's motion to compel arbitration and stay proceedings and to strike class allegations will be denied, and Plaintiff's motion for leave to file a surreply will be granted in part and denied in part. A separate order will follow.

_____
/s/
DEBORAH K. CHASANOW
United States District Judge

**JA301**

```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND

                                   :
ANGELITA BAILEY,
individually and on behalf         :
of all others similarly
situated,                          :

       v.                          :   Civil Action No. DKC 23-827

                                   :

MERCURY FINANCIAL, LLC
                                   :
```

**ORDER**

For the reasons stated in the foregoing Memorandum Opinion, it is this 26th day of September, 2023, by the United States District Court for the District of Maryland, ORDERED that:

1. The motion for leave to file a surreply filed by Plaintiff Angelita Bailey (ECF No. 16) BE, and the same hereby IS, GRANTED IN PART AND DENIED IN PART;

2. The motion to compel arbitration and stay proceedings and to strike class allegations filed by Defendant Mercury Financial, LLC (ECF No. 7) BE, and the same hereby IS, DENIED; and

3. The clerk will transmit copies of the Memorandum Opinion and this Order to counsel for the parties.

```
                        _____/s/_____
                        DEBORAH K. CHASANOW
                        United States District Judge
```

**JA302**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ANGELITA BAILEY,                              *

    *On Her Own Behalf and on Behalf of*    *    Civil Action No. 8:23-cv-827-DKC
    *All Others Similarly Situated*,

                                *    [Removed from the Circuit Court for
              Plaintiff,    *    Montgomery County, Maryland
v.                                 *    Case No. C-15-CV-23-000224]

MERCURY FINANCIAL, LLC,                       *

              Defendant.

                            *

*    *    *    *    *    *    *    *    *    *    *    *

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Defendant Mercury Financial, LLC ("Mercury") hereby appeals to the United States Court of Appeals for the Fourth Circuit.  Mercury appeals from this Court's September 26, 2023 Memorandum Opinion (ECF No. 20) and September 26, 2023 Order (ECF No. 21) denying Mercury's Motion to Compel Arbitration and Stay Proceedings and to Strike Class Allegations.


Dated:  October 24, 2023          Respectfully submitted,

                                  */s/ Melissa O. Martinez*
                                  Melissa O. Martinez (Fed. Bar No. 28975)
                                  **MCGUIREWOODS LLP**
                                  500 East Pratt Street
                                  Suite 1000
                                  Baltimore, MD 21202
                                  410-659-4400
                                  410-659-4482 (Fax)
                                  mmartinez@mcguirewoods.com

                                  ***Counsel for Mercury Financial, LLC***

# JA303

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 24, 2023, the foregoing copy of Mercury Financial, LLC's Notice of Appeal was electronically filed via the Court's CM/ECF system and served on all counsel of record.

*/s/ Melissa O. Martinez*
Melissa O. Martinez

**JA304**

## CERTIFICATE OF SERVICE

I hereby certify that on March 8, 2024, the foregoing was filed with the Clerk of the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system, which will also serve counsel of record.

*/s/ Matthew A. Fitzgerald*
Matthew A. Fitzgerald